# United States Court of Appeals

*for the*

# Third Circuit

Case No. 22-3061

TAWAINNA ANDERSON, INDIVIDUALLY AND AS ADMINISTRATIX OF THE ESTATE OF N.A., A DECEASED MINOR,

*Appellant,*

– v. –

TIKTOK, INC.; BYTEDANCE, INC.

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA IN CASE NO. 2-22-CV-01849, HONORABLE PAUL S. DIAMOND, U.S. DISTRICT JUDGE

## APPELLANT'S BRIEF AND APPENDIX
## VOLUME I OF II (Pages A1 to A11)

ROBERT J. MONGELUZZI
JEFFREY P. GOODMAN
SALTZ MONGELUZZI & BENDESKY P.C.
*Attorneys for Appellant*
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, Pennsylvania 19103
(215) 496-8282

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF RELATED CASES ..................................................1

STATEMENT OF THE CASE................................................................2

    I.    The Parties ................................................................................2

    II.    Theories of Liability Against Defendants ...............................2

    III.    Factual Background...................................................................4

    IV.    Procedural History....................................................................8

SUMMARY OF THE ARGUMENT .....................................................9

STANDARD OF REVIEW ..................................................................12

ARGUMENT ......................................................................................13

    I.    Plaintiff's Claims Do Not Treat Defendants as "Publishers"
        or "Speakers" and are Thus Not Barred ...............................14

        A.    The CDA bars only claims which allege violation of
            a defendant's duties as a "publisher" or "speaker"..................14

        B.    Plaintiff's claims treat defendants as product designers
            and manufacturers, not "publishers" or "speakers"..................16

        C.    The district court erred by holding that Plaintiff's
            claims treat Defendants as "publishers" ..................................22

    II.    Defendants' Affirmative Targeted Recommendations to
        Nylah Anderson Are Not "Information Provided by Another
        Information Content Provider" and Defendants Are Thus Not
        Immune From Liability Premised on Their Recommendations .........26

i

III.   The CDA Was Never Intended to Immunize Interactive
       Computer Service Providers From Harm Caused by
       Targeted Recommendations ................................................29

IV.    The Supreme Court's Forthcoming Ruling in *Gonzalez v.
       Google, LLC* ................................................................32

CONCLUSION ........................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.M. v. Omegle.com, LLC*,
  No. 3:21-cv-01674, 2022 WL 2713721 (D. Or. July 13, 2022)............. 16, 19, 20

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ................................................................. 14, 15, 17

*Carafano v. Metrosplash.com, Inc.*,
  339 F.3d 1119 (9th Cir. 2003) ...........................................................................15

*Doe v. Internet Brands, Inc.*,
  824 F.3d 846 (9th Cir. 2016) ................................................................... *passim*

*Erie Ins. Co. v. Amazon.com, Inc.*,
  925 F.3d 135 (4th Cir. 2019) ...................................................................... 16, 19

*Fair Housing Council of San Fernando Valley v. Roommates.Com*,
  521 F.3d 1157 (9th Cir. 2008) ...........................................................................15

*Foglia v. Renal Ventures Mgmt., LLC*,
  754 F.3d 153 ......................................................................................................12

*Force v. Facebook, Inc.*,
  934 F.3d 53 (2d Cir. 2016) ......................................................... 12, 26, 27, 28

*Gonzalez v. Google, LLC*,
  2 F.4th 871 (9th Cir. 2021), *cert. granted* 143 S.Ct. 80 (Oct. 3, 2022) ....... *passim*

*Green v. AOL*,
  318 F.3d 465 (3d Cir. 2003) ................................................................... *passim*

*Herrick v. Grindr, LLC*,
  305 F.Supp.3d 579 (2018), *aff'd*, 765 F.App'x 586 (2d Cir. 2019) ....................24

*HomeAway.com, Inc. v. City of Santa Monica*,
  918 F.3d 676 (9th Cir. 2019) .............................................................................24

*In Re: Social Media Adolescent Addiction/Personal Injury Products
  Liability Litigation*,
  --F.Supp.3d--, MDL No. 3047, 2022 WL 5409144 (Oct. 6, J.P.M.L.)...............32

*Klotz v. Celentano Stadtmauer and Walentowicz LLP*,
   991 F.3d 458 (3d Cir. 2021) .....................................................................12

*Lemmon v. Snap, Inc.*,
   995 F.3d 1085 (9th Cir. 2021) ........................................................ *passim*

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*,
   141 S. Ct. 13 (2020) ...............................................................................24

*Tincher v. Omega Flex, Inc.*,
   104 A.3d 328 (PA. 2014) ............................................................... 10, 16

*Zeran v. America Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) ...................................................... 14, 24, 25

**Statutes and Other Authorities:**

15 U.S.C.A. § 6501 ....................................................................................32

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 1332(a) .....................................................................................1

47 U.S.C. § 230 ................................................................................ *passim*

47 U.S.C. § 230(b)(3)..................................................................... 11, 13, 29

47 U.S.C. § 230(b)(4) ..................................................................... 13, 29, 31

47 U.S.C. § 230(c) .....................................................................................25

47 U.S.C. § 230(c)(1)...................................................................... *passim*

47 U.S.C. § 230(c)(2)(A) ............................................................................25

47 U.S.C. § 230(e)(c) ...................................................................................8

Fed. R. Civ. P. 12(b)(2)................................................................................8

Fed. R. Civ. P. 12(b)(6)...........................................................................8, 12

Olivia Carville, TikTok's Viral Challenges Keep Luring Young Kids to
   Their Deaths, Bloomberg, November 30, 2022 ......................................6

## JURISDICTIONAL STATEMENT

This appeal arises from a final judgment of the United States District Court for the Eastern District of Pennsylvania entered on October 25, 2022. The district court had jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a). Plaintiff-Appellant ("Plaintiff") timely filed a Notice of Appeal on October 31, 2022. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in ruling that Section 230 of the Communications Decency Act is so broad that it immunizes a social media company which, through its product's defective design and automated algorithms, sent a 10-year-old an instructional video encouraging to her choke herself, resulting in the child's death?

2.    Whether the use of automated algorithms to recommend certain content to users strips social media companies of potential protections under Section 230 of the Communications Decency Act.

3.    Whether the district court erred in granting Defendants-Appellees' ("Defendants" or "TikTok") motion to dismiss. *See* Appendix ("App.") A1–9.

## STATEMENT OF RELATED CASES

Neither this case nor any case related to Plaintiffs' claims has been before this Court or any other state or federal court or agency.

## STATEMENT OF THE CASE

### I.     The Parties

Plaintiff is the mother and Administratrix of the Estate of Nylah Anderson, a 10-year-old girl who was killed in December 2021 when she attempted to perform a TikTok challenge known as the "Blackout Challenge."

Defendants are TikTok, Inc. ("TikTok") and ByteDance, Inc. ("ByteDance"). Defendant TikTok is a California corporation with a principal place of business in California.  Defendant ByteDance is TikTok's ultimate parent company and is a Delaware corporation with a principal place of business in California.  Defendants are collectively the designers, programmers, and operators of the popular social media smartphone app, TikTok.

### II.    Theories of Liability Against Defendants

In the days leading up to Nylah Anderson's death, TikTok sent Nylah a series of dangerous videos, including content known as the "Blackout Challenge" which showed users how to asphyxiate themselves and encouraged users like Nylah to repeat the trend. On December 7, 2021, 10-year-old Nylah Anderson was asphyxiated when she attempted to perform the Blackout Challenge.  *See* App. A18–63 at ¶ 1.  Nylah suffered in the pediatric intensive care unit and eventually succumbed to her injuries and died on December 12, 2021.  *Id.* at ¶ 2. Defendants sent the dangerous Blackout Challenge directly to 10-year-old Nylah through her

For You Page on the TikTok app. Defendants' product—the TikTok app—utilizes sophisticated algorithms which act as a "system that delivers content to each user that is likely to be of interest to that particular user" and "each person's feed [also known as the For You Page] is unique and tailored to that specific individual." App. A18–63 at ¶ 3; *see also* App. A163–174. The algorithms then place content on a user's For You Page so that it is immediately seen by the user.

Defendants' app and algorithms utilize massive amounts of data collected from each user which informs Defendants of a particular user's demographics, interests, likes and dislikes, characteristics, biometric data (such as faceprints and voiceprints), and much more. App. A163–174. Using the data collected, TikTok targets users with content that is "tailored to that specific individual." TikTok thus knew that Nylah Anderson was an impressionable 10-year-old minority female living in a working-class neighborhood who tended to watch challenge videos that were put in front of her and that she would then attempt to mimic the challenges and record it. Rather than employ this knowledge to screen this 10-year-old from dangerous content, TikTok harnessed this knowledge against Nylah with the intention of keeping her engaged on the app. Indeed, Defendants' algorithm (1) determined that the dangerous and deadly Blackout Challenge was likely to be of interest to 10-year-old Nylah Anderson, and (2) sent her the challenge by directly putting it on her For You Page.

On May 12, 2022, Plaintiff filed suit against Defendants. *See generally* App. A18–63. Plaintiff's claims against Defendants are founded on Defendants' own independent conduct as designers, manufacturers, sellers, and/or distributors of their dangerously defective products—the TikTok app and its algorithms. Plaintiff's claims seek to hold Defendants responsible for taking the affirmative step of recommending the Blackout Challenge directly to Nylah. Plaintiff alleged that Defendants' products were defectively designed and resulted in 10-year-old Nylah Anderson being sent the dangerous and deadly Blackout Challenge, essentially a How-To-Guide on self-asphyxiation. Plaintiff's claims do not seek to treat Defendants as publishers of the Blackout Challenge video(s) sent to Nylah. Instead, Plaintiff's claims are premised on Defendants' acts, through their defectively designed product, of affirmatively recommending the Blackout Challenge to Nylah and putting it on her For You Page.

## III.   Factual Background

TikTok is a social media product that enables users to create, view, and share short videos. TikTok is one of the world's fastest-growing social media platforms and it boasts more than one billion active users worldwide. App. A18–63 at ¶¶ 43, 47. Critical to TikTok's success is the For You Page, which Defendants describe as the "defining feature" of its product and which is intended to provide an endless stream of curated videos and content to a user without requiring a prompt or a search

input from the user.  *Id.* at ¶ 51.  According to Defendants, the For You Page is "central to the TikTok experience and where most of our users spend their time." *Id.* at ¶ 52.  The videos and content the app recommends to users through the For You Page are carefully and deliberately selected by algorithms designed by Defendants based on the user's particular and unique demographics and characteristic profile.  *Id.* at ¶ 53.  TikTok's algorithms act as a "system that delivers content to each user that is likely to be of interest to that particular user" and "each person's [For You Page] is unique and tailored to that specific individual."  *Id.* at ¶ 3.

TikTok's algorithms are specifically designed to keep users engaged with the app and maximize the amount of time users spend on the app.  Keeping users on the app and engaged is the lifeblood of Defendants' immense commercial success.  As Judge Gould of the Ninth Circuit Court of Appeals observed, "algorithms [are] devised by these companies to keep eyes focused on their websites…. '[T]hey have been designed to keep you online'…."  *Gonzalez v. Google, LLC*, 2 F.4th 871, 920 n. 3 (9th Cir. 2021) (Gould, J., dissenting) *cert. granted* 143 S.Ct. 80 (Oct. 3, 2022).

Defendants' app and algorithms have created an environment in which TikTok "challenges" are widely promoted and result in maximum user engagement and participation on the app, thus financially benefiting Defendants.  *Id.* at ¶ 60. TikTok challenges involve users filming themselves engaging in behavior that

mimics and often times "one-ups" other users posting videos performing the same or similar conduct. *Id.* at ¶ 61. These TikTok challenges often involve dangerous or risky conduct. App. A18–63 at ¶¶ 61–63. TikTok affirmatively recommends these often-dangerous challenges to users through their respective For You Pages and encourages users to create, share, and participate in the challenge. *Id.* at ¶ 62. One of the deadliest challenges to make its rounds on TikTok and be promoted or recommended to users by TikTok is the Blackout Challenge, which encourages users to choke themselves with belts, purse strings, or anything similar until passing out. *Id.* at ¶ 64. By promoting this challenge and populating it on the For Your Pages of children all around America, TikTok is placing children in harm's way—and in many cases killing them[1]—in the name of corporate greed.

Defendants' Privacy Policy reveals that as soon as Nylah Anderson downloaded the TikTok app and agreed to the Terms of Service, Defendants began a systematic collection and utilization of a *massive* amount of her personal data. Defendants harvested data from Nylah's mobile device including contacts, search history, photographs, and videos; her IP address and network activity; from her body, image, and characteristics, including "biometric identifiers and biometric

---

[1] Olivia Carville, TikTok's Viral Challenges Keep Luring Young Kids to Their Deaths, Bloomberg, November 30, 2022, available at https://www.bloomberg.com/news/features/2022-11-30/is-tiktok-responsible-if-kids-die-doing-dangerous-viral-challenges.

information" such as faceprints and voiceprints; her app usage history; her use of other social media apps like Facebook or Instagram; and numerous other sources of data. *See* App. A121; A164–168. Defendants harvest this data from users, like Nylah Anderson, to develop a thorough understanding of what content is likely to keep a particular user engaged with the app.

After collecting this data from Nylah, Defendants' app and its algorithms knew that Nylah Anderson was an impressionable 10-year-old minority female living in a working-class neighborhood who tended to watch challenge videos that were put in front of her and that she would then attempt to mimic the challenges and record it. Despite this, Defendants product (1) determined that the dangerous and deadly Blackout Challenge was likely to be of interest to 10-year-old Nylah Anderson, and (2) sent her the challenge by directly putting it on her For You Page. App. A18–63 at ¶¶ 3–5, 81–83.

On December 7, 2021, Nylah Anderson attempted the Blackout Challenge recommended to her through her For You Page. *Id.* at ¶ 85. Nylah attempted to participate in the challenge by hanging a purse from a hanger in her closet and position her head between the bag and shoulders trap and then hanging herself until blacking out, just as she had seen in the challenge video Defendants thrust upon her. *Id.* at ¶¶ 84–85. Tragically, after hanging herself with the purse, Nylah was unable to free herself and she slowly asphyxiated until near the point of death. *Id.* at ¶ 86.

Plaintiff, Tawainna Anderson, found her daughter unconscious and hanging in her bedroom closet. *Id.* at ¶ 87.

## IV.    Procedural History

On May 12, 2022, Plaintiff filed an action against Defendants in the Eastern District of Pennsylvania, asserting claims for strict products liability including failure to warn, negligence, violation of relevant consumer protection laws, wrongful death and survival, and punitive damages. *See generally* App. A18–63.

On July 18, 2022, Defendants filed a motion to dismiss Plaintiff's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) and supporting memorandum of law. App. A71–73; A74–104. Relevant to this appeal, Defendants argued that Plaintiff's claims were barred by Section 230 of the federal Communications Decency Act ("CDA"), 47 U.S.C. § 230(e)(c). On August 1, 2022, Plaintiff filed a memorandum of law in opposition to Defendants' motion to dismiss. App. A111–195. On August 11, 2022, Defendants filed a reply in support of their motion, and on August 18, 2022, Plaintiff filed a sur-reply in opposition to Defendants' motion to dismiss. App. A196–210; A211–225.

On October 25, 2022, the district court granted Defendants' motion to dismiss. App. A1–8; A9. Plaintiff timely filed her Notice of Appeal on October 31, 2022. App. A10.

On December 7, 2022, Plaintiff filed a brief as *Amicus Curiae* in support of petitioners in *Gonzalez v. Google LLC*, Case No. 21-1333, which is currently pending before the United States Supreme Court and set for argument on February 21, 2023.  Respondent Google LLC's brief on the merits is due no later than January 12, 2023 and while any *amici* in support of respondent are not due to be filed until, at the latest, January 19, 2023 it is anticipated that TikTok may file an *amicus* in support of respondent.  One *amici* brief filed in support of petitioners by seventeen members of the United States Senate and House of Representatives[2] specifically discusses the instant *Anderson* case and the harm that would flow from "misguided decisions" which "have conferred near-absolute immunity on Big Tech companies" allowing them to "push harmful content" to children throughout America if Section 230 of the CDA was read as broadly as the district court has read it here.

## SUMMARY OF THE ARGUMENT

Section 230 of the CDA provides, in pertinent part, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. §

---

[2] Senators Ted Cruz, Mike Brau, Joni Ernst, Lindsey O. Graham, Charles E. Grassley, Bill Hagerty, James Lankford, Mike Lee, Cynthia M. Lummis, Marco Rubio, and Roger F. Wicker, as well as Representatives Mike Johnson, Jodey C. Arrington, Scott Fitzgerald, Doug Lamborn, Victoria Spartz, and Tom Tiffany, available at https://www.supremecourt.gov/DocketPDF/21/21-1333/249351/20221207133438524_Gonzalez%20Amicus%2020221207%20FINAL.pdf.

230(c)(1). By its terms, Section 230 of the CDA "provides immunity to [an interactive computer service provider] as a publisher or speaker of information originating from another information content provider." *Green v. AOL*, 318 F.3d 465, 471 (3d Cir. 2003). The district court held that Section 230 of the CDA immunized Defendants from Plaintiff's claims because, according to the district court, Plaintiff's claims seek to hold Defendants liable as "publishers" of third-party content. The district court erred in reaching this ruling.

Plaintiff's claims do not treat Defendants as "publishers" as that term is used in Section 230 of the CDA. Instead, Plaintiff's claims arise from Defendants' duty to design and produce a safe, non-defective product under Pennsylvania law. *See e.g.*, *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 384-94 (PA. 2014) (holding product designers, manufacturers, and sellers have a duty to design, manufacture, and produce non-defective products). Additionally, Plaintiff's claims are premised on Defendants' act of recommending the Blackout Challenge video(s) to Nylah through its defective product. Thus, it was Defendants' recommendation *itself*, and not the third-party content, which Plaintiff alleges caused her daughter's death. Plaintiff's claims have nothing to do with Defendants' "traditional editorial functions" and are thus not barred. The district court, however, applied an improper and nearly all-encompassing definition of "publisher" that would include almost anything

Defendants do (or don't do) with respect to content.  Such a broad and all-encompassing reading of Section 230 of the CDA cannot be permitted to stand.

Further, Defendants' recommendation of the Blackout Challenge to Nylah Anderson itself carried an implicit message that the content being provided should be viewed, engaged with, or mimicked because it was likely to be of interest to Nylah.  Indeed, this is the quintessential function of the For You Page.  By placing carefully selected content on a user's For You Page, TikTok is telling the user "Click here.  This is cool.  Try this.  You will like this."  Defendants' affirmative step of targeting Nylah Anderson and recommending the Blackout Challenge was therefore not "information provided by another information content provider" as used by Section 230(c)(1), but rather information provided by Defendants themselves, which is not shielded by Section 230.

The inapplicability of the CDA's immunity provisions to Defendants' targeted recommendation of the Blackout Challenge to Nylah Anderson is confirmed by the CDA's own stated findings and policies.  *See* 47 U.S.C. § 230(b)(3) (stating that it is the policy of the United States "to encourage the development of technologies which maximize *user control* over what information is received by individuals, families, and schools[.]") (emphasis added).  Defendants' product—the TikTok app and its associated algorithms—are the exact opposite of the type of technology Congress sought to protect and foster through the CDA.  Defendants' product

removes any control by the user over what information is received and thus thwarts, rather than satisfies, the underlying policy goal of the CDA.

In *Force v. Facebook, Inc.*, Chief Judge Katzmann noted that Senator James J. Exon described that "[t]he heart and the soul" of the CDA was "its protection for families and children." 934 F.3d 53, 78 (2d Cir. 2016) (Katzmann, C.J., dissenting). Contorting the CDA into a shield protecting dangerous content recommendations TikTok thrusts upon users like Nylah Anderson through the For You Page has the opposite effect. Instead of providing protection *for* families and children, the CDA has tragically been applied to protect goliaths of the technology industry *from* families and children. Affirming the district court's overly broad reading of Section 230 of the CDA and immunization of TikTok from Plaintiff's claims would thwart the "heart and soul" of the CDA, and Plaintiff respectfully requests that this Court reverse the district court and remand for further proceedings.

## STANDARD OF REVIEW

A district court's grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is reviewed *de novo*. *Klotz v. Celentano Stadtmauer and Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (citing *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n. 1 (3d Cir. 2014)).

**ARGUMENT**

"In 1996, when the internet was young and few of us understood how it would transform American society, Congress passed the CDA." *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1090 (9th Cir. 2021) (citing 47 U.S.C. § 230).  The CDA itself is clear that a paramount goal Congress intended to achieve with its passing was to protect families and children by "encourag[ing] the development of technologies which maximize user control" over content received by families and children and to "remove disincentives for the development and utilization of…technologies that empower parents to restrict their children's access to objectionable or inappropriate online material."  47 U.S.C. § 230(b)(3), (4).   This case is one in which the CDA has been contorted to shield Defendants from liability for causing the death of Plaintiff's 10-year-old daughter, despite its actions falling well outside the scope of what Congress intended to immunize; actions which, in fact, accomplish the exact opposite of what Congress sought to achieve.

Plaintiff's claims against Defendants are not barred by the CDA because: (1) they treat Defendants as product designers, manufacturers, and sellers subject to strict products liability under well-established Pennsylvania law; (2) they seek to impose liability for Defendants' recommendation *itself* and are thus not premised on the third-party content; and (3) Defendants' recommendation algorithms are not the technology Congress intended to protect and foster through the CDA.  Despite this,

the district court applied an impermissibly broad reading of the CDA and held that Plaintiff's claims are barred. *See* App. A1–9. Affirming the district court's overly broad reading of Section 230 of the CDA and immunization of TikTok from Plaintiff's claims would thwart the "heart and soul" of the CDA and its stated policy goals, and Plaintiff respectfully requests that this Court reverse the district court and remand for further proceedings.

## I. Plaintiff's Claims Do Not Treat Defendants as "Publishers" or "Speakers" and are Thus Not Barred.

### A. The CDA bars only claims which allege violation of a defendant's duties as a "publisher" or "speaker."

Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Accordingly, to enjoy the protections of Section 230, the interactive computer service provider must show "the duty that the plaintiff alleges the [service provider] violated derives from the [service provider's] status or conduct as a 'publisher or speaker.'" *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009).

This Court has previously described a "publisher's traditional editorial functions" as including "deciding whether to publish, withdraw, postpone, or alter content." *Green v. America Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003) (quoting *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).

Similarly, the Ninth Circuit Court of Appeals defines "publication" as "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes*, 570 F.3d at 1102 (citing *Fair Housing Council of San Fernando Valley v. Roommates.Com*, 521 F.3d 1157, 1170–71 (9th Cir. 2008) (en banc) ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is performance immune under section 230.")).

In the context of the CDA, "[a] clear illustration of a cause of action that treats a website proprietor as a publisher is a defamation action founded on the hosting of defamatory third-party content." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016) (citing *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003)). However, where a plaintiff's claim is not founded on the defendant's quintessential publisher actions the CDA is inapplicable. *Internet Brands*, 824 F.3d at 851. There is a distinction between the act of "simply distributing the content to anyone who chooses to engage with it[]" and sites that "user their algorithms to connect users to specific content and highlight it as recommended[.]" *Gonzalez v. Google, LLC*, 2 F.4th 871, 914 (9th Cir. 2021) (Berzon, J., concurring). The types of "targeted recommendations and affirmative promotion" of third-party content "are well outside the scope of traditional publication." *Id.* Accordingly, claims alleging harm caused by "targeted recommendations and affirmative promotion" of third-party content should fall outside the scope of immunity conferred by the CDA.

Plaintiff respectfully submits that this Court should adopt the distinction made by Judge Berzon in her concurring opinion. *Id.*

### B. Plaintiff's claims treat defendants as product designers and manufacturers, not "publishers" or "speakers."

Courts have routinely held that where a plaintiff's claims do not arise from the defendant's traditional publisher duties and instead hinge on an alleged violation of a distinct duty, the claims do not treat the defendant as a "publisher" or "speaker." *See Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016); *Lemmon*, 995 F.3d 1085; *Erie Ins. Co. v. Amazon.com, Inc.*, 925 F.3d 135 (4th Cir. 2019); *A.M. v. Omegle.com, LLC*, No. 3:21-cv-01674, 2022 WL 2713721, *4 (D. Or. July 13, 2022). Here, Plaintiff is not seeking to hold Defendants liable as publishers or speakers. Instead, Plaintiff's claims arise from Defendants' wholly unrelated duty to design and produce a safe, non-defective product and to provide adequate warnings under Pennsylvania law. *See, e.g.*, *Tincher*, 104 A.3d at 384–94 (holding product designers, manufacturers, and sellers have a duty to design, manufacture, and produce non-defective products). Indeed, Plaintiff's product liability and failure to warn claims have "'nothing to do with' [defendants'] editing, monitoring, or removing of the content that its users generate." *Lemmon*, 995 F.3d at 1092. The CDA thus does not bar Plaintiff's claims.

In *Internet Brands*, the plaintiff was a model who posted information about herself to the Model Mayhem website. 824 F.3d at 848. Two rapists used the Model

16

Mayhem website to lure plaintiff to a fake audition, where they drugged her, raped her, and recorded her for a pornographic video.  *Id.*  Plaintiff filed suit against Internet Brands as the operator of the website, alleging that it knew abut the rapists but failed to warn her, and asserting negligence under California law based on that failure to warn.  *Id.*  The district court dismissed the action believing the claim was barred by the CDA, and plaintiff appealed.  *Id.*

The Ninth Circuit framed the essential question as "whether Plaintiff's failure to warn cause of action 'inherently requires the court to treat' Internet Brands 'as a publisher or speaker' 'of information provided by another information content provider.'"  *Id.* at 850 (quoting *Barnes*, 570 F.3d at 1100–02 (9th Cir. 2009)).  The *Internet Brands* court held that the plaintiff's claims were fundamentally different, and that "[t]he duty to warn allegedly imposed by California law would not require Internet Brands to remove any user content or otherwise affect how it publishes or monitors such content."  *Id.* at 851.  Indeed, "[a]ny obligation to warn could have been satisfied without changes to the content posted by the website's users[.]"  *Internet Brands*, 824 F.3d at 851.  The plaintiff was thus not seeking to treat Internet Brands as a publisher or speaker and the CDA was inapplicable.  *Id.*

The Ninth Circuit reached a similar finding in *Lemmon*.  995 F.3 at 1088.  In *Lemmon*, teenagers were killed in a car accident while traveling at excessive speeds.  *Id.*  Plaintiffs, parents of the deceased teenagers, alleged that the popular social

media app, Snapchat, encouraged such reckless driving through the "Speed Filter" which enabled users to record and share their real-life speed. *Id.* The parents brought wrongful death actions against Snap, Inc. alleging negligent product design of the Snapchat ap. *Id.* at 1087. The district court dismissed the plaintiffs' complaint on the grounds that the claims were barred by the CDA, and plaintiffs appealed. *Id.* at 1090. On appeal, the Ninth Circuit engaged in a thorough analysis of whether the plaintiffs' product design claims sought to treat defendant Snap, Inc. as a "publisher or speaker." *Id.* at 1091–93. The *Lemmon* court made clear that the focus of its CDA inquiry was on whether "the duty the plaintiff alleges" stems "from the defendant's status or conduct as a publisher or speaker[]" or if the duty stems from elsewhere. *Lemmon*, 995 F.3d at 1091 (citation omitted). The court held that the plaintiffs' product design claims did *not* seek to treat Snap, Inc. as a publisher or speaker:

> ***The duty underlying such a claim differs markedly from the duties of publishers as defined in the CDA***. Manufacturers have a specific duty to refrain from designing a product that poses an unreasonable risk of injury to consumers. Meanwhile, entities acting solely as publishers— *i.e.*, those that review material submitted for publication, perhaps edit it for style or technical fluency, and then decide whether to publish it— generally have no similar duty.

> ***It is thus apparent that the Parents' amended complaint does not seek to hold Snap liable for its conduct as a publisher or speaker. Their negligent design lawsuit treats Snap as a products manufacturer, accusing it of negligently designing a product*** (Snapchat) with a defect (the interplay between Snapchat's reward system and the Speed Filter). Thus, the duty that Snap allegedly violated "springs from" its distinct

capacity as a product designer…. Snap's alleged duty in this case thus "has nothing to do with" its editing, monitoring, or removing of the content that its users generate through Snapchat.

*Id.* at 1092 (emphasis added) (internal quotations and citations omitted). The *Lemmon* court fundamentally held that the plaintiff's claims did not seek to treat the defendant as a publisher or speaker because the defendant "could have satisfied" its duty "to design a product more useful than it was foreseeably dangerous—without altering the content that [defendant's] users generate." *Id.* at 1092.

Other courts have similarly held that where a plaintiff's claim hinges on allegations that the defendant violated its duties as a product designer, manufacturer, and/or distributor the CDA is inapplicable. *See Erie Ins. Co.*, 925 F.3d at 139 ("While the [CDA] protects interactive computer service providers from liability as a publisher of speech, it does not protect them from liability as the seller of a defective product."); *see also Omegle*, 2022 WL 2713721, at *4.

In *Omegle*, an 11-year-old user of an online chat room, called Omegle, was paired with a man in his late thirties who forced her to send him pornographic images and videos of herself. *Id.* at *1. After the man was apprehended by his local authorities, the minor brought a product liability action against Omegle alleging that the online chat room was defectively designed because it paired vulnerable minors, such as plaintiff, with adults. *Id.* at *1. Relying on *Lemmon*, the *Omegle* court held that the plaintiff's product liability claims were not subject to the CDA's immunity

19

provisions because "Omegle could have satisfied its obligation to Plaintiff by designing its product differently" and because the plaintiff was "not claiming that Omegle needed to review, edit, or withdraw any third-party content to meet this obligation." *Id.* at *3. Omegle could have satisfied its obligations by simply not pairing an 11-year-old user with this adult for chatting purposes.

Plaintiff's claims here, like those in *Internet Brands*, *Lemmon*, and *Omegle* have "nothing to do with" Defendants' traditional publisher functions, i.e., editing, monitoring, or removing third-party user content. *See Green*, 318 F.3d at 471 (describing a "publisher's traditional editorial functions" as including "deciding whether to publish, withdraw, postpone, or alter content."). Instead, just like in *Lemmon* and *Omegle*, Plaintiff's claims "spring[] from" Defendants' duty to design a safe, non-defective product and, like in *Internet Brands*, Plaintiff alleges Defendants are liable for failure to warn. Defendants could have satisfied their duty (to design and supply safe, non-defective products) without altering the content generated by third parties. Under *Lemmon*, *Omegle*, and *Internet Brands*, this confirms that Plaintiff's claims do not treat Defendants as "publishers" but instead as product designers.

In the court below, Plaintiff emphasized that she was not treating Defendants as "publishers" or "speakers" because she did not allege that Defendants were liable for generally publishing the Blackout Challenge videos on the TikTok app. *See* App.

A133 ("Indeed, the Blackout Challenge can exist on TikTok without necessarily exposing TikTok to liability.  However, Defendants' product functioning to send that challenge to a 10-year-old is an affirmative step (not a publisher action) which is not afforded any protections by the CDA.").  Defendants' initial action in publishing the Blackout Challenge generally on the TikTok app may very well fall within the protections of the CDA.  However, this is not the basis of Plaintiff's claims.  Defendants' product functioning to perform the second action—knowingly targeting Nylah Anderson and recommending the Blackout Challenge directly to her through the For You Page—was well outside the scope of a "publisher's traditional editorial functions."  *Green*, 318 F.3d at 471; *see also Gonzalez*, 2 F.4th at 914 (stating that "targeted recommendations and affirmative promotion" of third-party content "are well outside the scope of traditional publication.") (Berzon, J., concurring).  *This* is the basis of Plaintiff's claims, and Defendants' defectively designed product functioning to knowingly target Nylah and recommend the Blackout Challenge should not be afforded protections under the CDA.  Fundamentally, Plaintiff seeks to impose liability for Defendants designing a defective product.  Without question, product design and manufacture are not publisher functions.

21

**C.    The district court erred by holding that Plaintiff's claims treat Defendants as "publishers."**

In its decision below, the district court dramatically expanded what constitutes a publisher's traditional editorial functions.   As stated, in *Green* this Court held that a "publisher's traditional editorial functions" included "deciding whether to publish, withdraw, postpone, or alter content." 318 F.3d at 471.  The district court, however, held that publishing "involves decisions related to the monitoring, screening, arrangement, promotion, and distribution of" third-party content.  App. A7.  This is an overly expansive and seemingly all-encompassing definition of publisher functions.  Indeed, it is difficult to envision a scenario in which the district court's definition of a publisher's functions would not cover every conceivable aspect of Defendants' TikTok app.  The district court's broad definition of publisher functions essentially provides blanket immunity to Defendants and similar social media conglomerates.   At bottom, the district court held that Defendants' publisher functions include product design and manufacture.  This is an expansion of the CDA that has never been endorsed by any court.

Defendants' affirmative step of making targeted recommendations through their defectively designed product are not "publisher" functions.  The New York Times is a quintessential publisher and it publishes thousands of articles each year, but The New York Times doesn't tell its readers which articles to read.  The New York Times doesn't send one reader a different newspaper than another reader

because it thinks certain articles are more likely to be of interest to one particular reader and not the other.  When Defendants strayed from merely deciding whether or not to display and make available certain third-party content and affirmatively tell its users *which* third-party content to consume or engage with, Defendants were not acting as "publishers" of that third-party content.  The district court's holding eviscerates the distinction between the act of "simply distributing the content to anyone who chooses to engage with it[]" and Defendants' conduct in targeting specific users with specific recommendations. *Gonzalez*, 2 F.4th at 914 (Berzon, J., concurring).

The district court also ignored the fundamental holdings in *Internet Brands* and *Lemmon*—claims premised on product design and failure to warn allegations do not treat the defendant as a "publisher."  The district court attempted to distinguish both cases by noting that in neither were the plaintiff's claims linked to third-party content on the defendant's respective platforms.  *See* App. A6 (distinguishing *Internet Brands* by stating that "the plaintiff's claims had nothing to do with the site's content"); A7 (distinguishing *Lemmon* by noting that "the plaintiff's claims were 'independent[] of the content'").  Based on this, the district court found that the CDA's immunity provisions applied because Plaintiff's claims "implicitly require recourse to that content [posted by a third party] to establish liability."  App. A7

(quoting *Herrick v. Grindr, LLC*, 305 F.Supp.3d 579 (2018), *aff'd*, 765 F.App'x 586 (2d Cir. 2019)).

In so holding, the district court improperly applied a "but-for" test that hinged on whether a cause of action would not otherwise have accrued but for the third-party content. This was improper and courts have explicitly cautioned against applying such a but-for test for the very reason that it would provide blanket immunity to almost everything a service provider does. In *Internet Brands*, the Ninth Circuit stated that "[p]ublishing activity is a but-for cause of just about everything [defendant] is involved in. Without publishing user content, it would not exist." 824 F.3d at 853. In *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019), the Ninth Circuit reiterated that *Internet Brands* rejected a but-for test and held that CDA immunity does not attach "any time a legal duty might lead a company to respond with monitoring or other publication activities." "It is not enough that third-party content is involved[.]" *Id.* Courts should "look instead to what the duty at issue actually requires[.]" *Id.* Here, the duty Plaintiff alleges Defendants violated was their duty to design a safe and non-defective product and to provide adequate warnings, duties which are wholly unrelated to Defendants' traditional publisher functions.

The district court relied on *Zeran*, 129 F.3d 327, however Justice Clarence Thomas heavily criticized *Zeran* in his dissent in *Malwarebytes, Inc. v. Enigma*

*Software Grp. USA, LLC*, 141 S. Ct. 13 (2020) (Thomas, J., dissenting).  Justice

Thomas explained that Section 230(c) is "most naturally read" to protect companies

when they (1) "unknowingly *decline* to exercise editorial functions [over

objectionable] third-party content," 47 U.S.C. § 230(c)(1), or (2) "when they decide

to exercise those editorial functions in good faith, § 230(c)(2)(A).  *Malwarebytes*,

141 S. Ct. at 17 (Thomas, J., dissenting).  Justice Thomas strongly disagreed with

*Zeran*, explaining that, "[a]lthough the text of § 230(c)(1) grants immunity only from

'publisher' or 'speaker' liability, the first appellate court to consider the statute held

that it eliminates distributor liability too."  *Id.* at 15. (Thomas, J., statement

respecting the denial of certiorari) (citing *Zeran*, 129 F.3d at 331-334)).  "Extending

§ 230 immunity beyond the natural reading of the text," Justice Thomas warned,

could have "serious consequences."  *Id.* at 18.  The district court's reliance on *Zeran*

has resulted in Nylah Anderson and her family suffering the "serious consequences"

predicted by Justice Thomas.

Respectfully, the district court erred by dramatically expanding the scope of

what constitutes "publisher" functions and applying this expanded reading to

Plaintiff's product liability and failure to warn claims.

**II. Defendants' Affirmative Targeted Recommendations to Nylah Anderson Are Not "Information Provided by Another Information Content Provider" and Defendants Are Thus Not Immune From Liability Premised on Their Recommendations**

It is axiomatic that Section 230(c)(1) immunity is not available for material that the service provider itself creates. *See* 47 U.S.C. 230(c)(1) (stating that an interactive computer service is immune when it is treated as a publisher or speaker of "information provided by another information content provider."). If TikTok were to supply a video created by a third-party to another user, such as a Blackout Challenge video, and overlay text on the video which read, "Click here. This is cool. Try this. You will like this." there is little doubt that this overlayed text is not "information provided by another information content provider." However, even where TikTok recommends a video, like the Blackout Challenge, to a user without *any* added text or information, the recommendation itself carries an inherent message to the user that was not created or derived from "another information content provider." The very function of the TikTok For You Page is the technological equivalent of overlaying text on a video that says, "Click here. This is cool. Try this. You will like this."

In *Force*, Chief Judge Katzmann correctly observed that Facebook uses recommendation algorithms "to create and communicate its own message: that it thinks you, the reader—you, specifically—will like this content." *Force*, 934 F.3d at 82 (Katzmann, J., dissenting). The exact same is true of TikTok when it

26

recommends any video to a user, including the Blackout Challenge it recommended to Nylah Anderson.  TikTok boasts that its recommendation algorithms act as a "system that delivers content to each user" that TikTok determines "is likely to be of interest to that particular user."  App. A18–63 at ¶ 3.  TikTok represents that "each person's [For You Page] is unique and tailored to that specific individual."  *Id.*  Thus, when TikTok unilaterally sends specific content to a user it carries with it the message that the video "is likely to be of interest" to that user and that the video is "unique and tailored" to that user.  This is a message created and pushed *by TikTok,* not by the third-party creator of the video recommended by TikTok.

Accordingly, the recommendation itself does not fall within the scope of Section 230(c)(1) because the fundamental message communicated—that the particular user should watch the video because it will be interesting for that user— is not "information provided by another information content provider."  47 U.S.C. § 230(c)(1).

In his dissent in *Force*, Chief Judge Katzmann also opined that Facebook should not be shielded from the consequences of its recommendations because the recommendations "contribute to the creation of real-world social networks."  934 F.3d at 82 (Katzmann, J., dissenting).  According to Chief Judge Katzmann,

> the result of at least some suggestions is not just that the user consumes a third party's content.  Sometimes, Facebook's suggestions allegedly lead the user to become part of a unique global community, the creation and

maintenance of which goes far beyond and differs in kind from traditional editorial functions.

*Id.* The same is true of TikTok's "challenge" culture. There are dozens, if not hundreds, of "challenges" that have been circulated on TikTok and gone "viral" and many of them are dangerous. App. A18–63 at ¶ 63. TikTok "challenges" involve users filming themselves engaging in behavior that mimics and often times "one-ups" other users posting videos performing the same or similar conduct.

By recommending a "challenge" video TikTok, like Facebook in *Force*, "lead[s] the user to become part of a unique global community" of users performing the activity involved in the challenge. *Force*, 934 F.3d at 82 (Katzmann, J., dissenting). Recommending challenge videos to users which encourage and entice users to engage in the conduct that is the subject of the challenge "goes far beyond and differs in kind from traditional editorial functions." *Id.* After TikTok made the initial decision to publish the Blackout Challenge generally on the app, it took a second, affirmative step to target Nylah Anderson and recommend the Blackout Challenge, thereby encouraging her participation in the behavior that ultimately caused her death.

The inherent message carried with even an otherwise bare recommendation is unquestionably a message created by the service provider making the recommendation, and not from the third-party which created the underlying content. Accordingly, claims premised on the Defendants' recommendation itself are not

barred as *no* recommendations made by interactive computer service providers are "information provided by another information content provider."

### III. The CDA Was Never Intended to Immunize Interactive Computer Service Providers From Harm Caused by Targeted Recommendations

Defendants' defectively designed product functioned to knowingly target 10-year-old Nylah Anderson and recommend the Blackout Challenge video to her. Immunizing Defendants against Plaintiff's claims premised on this design defect was never Congress' intention. The CDA itself explicitly lays out the policies which Congress sought to further in enacting the CDA. Section 230(b)(3) states that it is the policy of the United States "to encourage the development of technologies which maximize *user control* over what information is received by individuals, families, and schools who use the Internet and other interactive computer services[.]" 47 U.S.C. § 230(b)(3) (emphasis added). Section 230(b)(4) makes clear that Congress sought to "remove disincentives for the development and utilization of…technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." 47 U.S.C. § 230(b)(4).

Defendants' product, which utilizes sophisticated recommendation algorithms to target specific users, like Nylah, with specific content, is the antithesis of the type of technology Congress intended to promote. The purpose behind Defendants' product and its associated recommendation algorithms is to strip users of the need (and ability) to decide for themselves what content to consume.

Defendants' product collected and analyzed copious amounts of data and information from Nylah Anderson in an attempt to predict or guess what content "is likely to be of interest" to her and then unilaterally sent specific content to her. Defendants' technology deprived Nylah of control over what content she consumed, not maximized it.

Further, a third-party content creator has no control over where their video is sent or which user's For You Page it lands upon.  That control is maintained exclusively by Defendants.  This exclusive control over to whom videos are shown and what content each user is provided highlights that Defendants' product eviscerates user control.  Had TikTok warned individuals that posted Blackout Challenge inspired content that "this video will likely be shown to young children who will mimic the challenge and may die," most users likely would have declined to post such content.  However, just as the users are ignorant as to how specific content appeared on their For Your Page, content creators lack any control of where the content is sent once posted.  There is no aspect of TikTok which "maximize[s]" or even promotes "user control."

It is simply not possible to square Defendants' product and its associated recommendation algorithms with the "technologies which maximize *user control*" that the United States Congress sought to encourage the development of. Defendants' product is intended to feed users limitless videos that are predicted to

keep users engaged and glued to their screens for the purpose of maximizing corporate profits, at the direct expense of "user control."  Defendants' defectively designed product does not "maximize user control[,]" it eliminates it.  Immunizing Defendants from Plaintiff's product liability claims here thwarts, rather than promotes, the stated policy goals of the CDA.

Further, immunizing social media goliaths like Defendants from claims attacking their recommendation technologies and practices violates the United States' policy to "remove disincentives for the development and utilization of…technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." 47 U.S.C. § 230(b)(4).  Reading the CDA to grant immunity to Defendants here will actively disincentivize Defendants and other social media companies from developing technologies that grant parents greater control over the content provided to their children.  If Defendants' product can freely push "objectionable or inappropriate" content to children without legal consequences, there is no incentive for change.

Misreading the CDA as the district court did has empowered social media companies to develop increasingly predatory and manipulative technologies designed to addict users and control their actions.  Children, more than anyone, are paying the price.  Indeed, the Joint Panel on Multidistrict Litigation has recently created an MDL focused solely on children who have been harmed by social media

companies' detrimental and profit-driven actions. *See In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, --F.Supp.3d--, MDL No. 3047, 2022 WL 5409144 (Oct. 6, J.P.M.L.). Congress has also repeatedly emphasized the dire need to protect our country's children. *See, e.g.*, Children's Online Privacy Protection Act, 15 U.S.C.A. § 6501, *et seq.* (prohibiting the collection of children's personal information without satisfying certain protective measures). Reading the CDA to immunize Defendants from Plaintiff's claims here incentivizes social media companies to continue preying upon children for the sake of ever increasing corporate profits. This is not what Congress intended.

## IV.    The Supreme Court's Forthcoming Ruling in *Gonzalez v. Google, LLC*

On October 3, 2022, the Supreme Court of the United States granted certiorari in *Gonzalez*, 2 F.4th 871, *cert. granted* 143 S.Ct. 80. The question presented to the Supreme Court is as follows:

> Does section 230(c)(1) immunize interactive computer services when they make targeted recommendations of information provided by another information content provider, or only limit the liability of interactive computer services when they engage in traditional editorial functions (such as deciding whether to display or withdraw) with regard to such information?

*See* Question Presented in *Gonzalez v. Google LLC*, Case No. 21-1333.[3] Argument in *Gonzalez* is scheduled for February 21, 2023.

---

[3] Available at https://www.supremecourt.gov/qp/21-01333qp.pdf.

On December 7, 2022, Plaintiff filed a brief as *Amicus Curiae* in support of petitioners in *Gonzalez*. Respondent Google LLC's brief on the merits is due no later than January 12, 2023 and while any *amici* in support of respondent are not due to be filed until January 19, 2023, at the latest, it is anticipated that TikTok may file an *amicus* in support of respondent.

In addition to Plaintiff's *amicus* brief, there were thirty other briefs filed in support of petitioners in *Gonazlez*. *Amici* ranged from the National Police Association, Inc. and the Anti-Defamation League to CHILD USA. CHILD USA's *amicus* brief underscores that "the immunity afforded to online platforms is now so broad that it undermines fundamental public interests including child protection." Another *amici* brief filed in support of petitioners by seventeen members of the United States Senate and House of Representatives[4] specifically discusses the instant *Anderson* case and the harm that would flow from "misguided decisions" which "have conferred near-absolute immunity on Big Tech companies" allowing them to "push harmful content" to children throughout America if Section 230 of the CDA was read as broadly as the district court has read it here.

---

[4] Senators Ted Cruz, Mike Brau, Joni Ernst, Lindsey O. Graham, Charles E. Grassley, Bill Hagerty, James Lankford, Mike Lee, Cynthia M. Lummis, Marco Rubio, and Roger F. Wicker, as well as Representatives Mike Johnson, Jodey C. Arrington, Scott Fitzgerald, Doug Lamborn, Victoria Spartz, and Tom Tiffany.

Should the Supreme Court answer the question presented in the negative and hold that targeted recommendations are not immunized by Section 230(c)(1), the district court's grant of Defendants' motion to dismiss must be reversed.

## CONCLUSION

For all of the foregoing reasons, the district court's dismissal of Plaintiff's claims should be reversed.

*/s/ Jeffrey P. Goodman*
Robert J. Mongeluzzi
Jeffrey P. Goodman
**SALTZ MONGELUZZI &**
**BENDESKY P.C.**
One Liberty Place
1650 Market Street,
52nd Floor
Philadelphia, Pennsylvania 19103
(215) 496-8282

January 9, 2023
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF BAR MEMBERSHIP

I certify that I am a member of the bar for the United States Court of Appeals for the Third Circuit.

/s/ Jeffrey P. Goodman
Jeffrey P. Goodman
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) AND LOCAL RULE 31.1

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 7,751 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2008 version of Microsoft Word in 14 point times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

*/s/ Jeffrey P. Goodman*
Jeffrey P. Goodman
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that, on January 9, 2023, I electronically filed Plaintiff-Appellant's Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I also caused a copy of this brief to be served electronically on the following counsel for Defendants-Appellees:

Joseph E. O'Neil
Katherine A. Wang
**CAMPBELL CONROY & O'NEIL, PC**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
Telephone: (610) 964-1900
Facsimile: (610) 964-1981
joneil@campbeltriallawyers.com
kwang@campbelltriallawyers.com

Albert Giang
**KING & SPALDING LLP**
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310
agiang@kslaw.com

Geoffrey M. Drake
TaCara D. Harris
**KING & SPALDING LLP**
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
gdrake@kslaw.com
tharris@kslaw.com
*Counsel for Defendants-Appellants*

# APPENDIX

**i**

## TABLE OF CONTENTS

**Page**

### Volume I of II

Memorandum of the Honorable Paul S. Diamond,
dated October 25, 2022 ............................................ A1

Order of the Honorable Paul S. Diamond, dated
October 25, 2022 .................................................... A9

Notice of Appeal, dated October 31, 2022 ................. A10

### Volume II of II

Civil Court Docket Sheet ............................................ A12

Complaint, filed May 12, 2022 .................................. A18

Exhibit A to Complaint -
Certificate of Grant of Letters of Administration .. A64

Civil Cover Sheet ...................................................... A68

Designation Form ...................................................... A70

Defendants' Motion to Dismiss the Complaint,
dated July 18, 2022 ................................................ A71

Defendants' Memorandum of Law in Support of
Motion to Dismiss, dated July 18, 2022 ................ A74

Exhibit A to Defendants' Memorandum -
Declaration of Brian O'Connor, in Support of
Motion to Dismiss, dated July 15, 2022 ................ A105

Certificate of Service ................................................ A110

Plaintiff's Memorandum of Law in Opposition to
Motion to Dismiss, dated August 1, 2022 .............. A111

ii

**Page**

Exhibit A to Plaintiff's Memorandum -
Legal Terms of Service ........................................... A144

Exhibit B to Plaintiff's Memorandum -
Legal Privacy Policy ............................................... A163

Exhibit C to Plaintiff's Memorandum -
Notice of Removal .................................................. A175

Exhibit D to Plaintiff's Memorandum -
Complaint for Declaratory Judgment of Non-
Infringement of U.S. Patent No. 9,691,429, dated
October 28, 2020 ................................................... A186

Defendants' Reply in Further Support of Motion to
Dismiss, dated August 11, 2022............................. A196

Plaintiff's Sur-Reply in Opposition to Motion to
Dismiss, dated August 18, 2022 ........................... A211

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TAWAINNA ANDERSON, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 22-1849 |
| | : | |
| TIKTOK, INC., *et al.*, | : | |
| Defendants. | : | |

---

Diamond, J.                                                    October 25, 2022

### <u>MEMORANDUM</u>

Plaintiff Tawainna Anderson accuses Defendants TikTok, Inc. and ByteDance, Inc. (operators of the social media application "TikTok") of causing the death of her daughter. (Compl. (Doc. No. 1).)  Although the circumstances here are tragic, I am compelled to rule that because Plaintiff seeks to hold Defendants liable as "publishers" of third-party content, they are immune under the Communications Decency Act.  Accordingly, I will grant Defendants' Motion to Dismiss. (Doc. No. 12); <u>see</u> 47 U.S.C. § 230(c)(1) and (e)(3).

### I.    BACKGROUND

#### a.  <u>Factual Allegations</u>

TikTok is a social media platform enabling users to create short videos and view any shared videos created by third parties.  (Compl. ¶ 50.)  As "one of the world's fastest-growing social media platforms," TikTok boasts more than one billion active users worldwide.  (<u>Id.</u> ¶¶ 43, 47.)  Some twenty-eight percent of these users are younger than eighteen.  (<u>Id.</u> ¶ 48.)  Essential to TikTok's widespread appeal is its "For You Page."  (<u>Id.</u> ¶ 52.)  When a user opens TikTok, her FYP offers a stream of third-party videos curated through an algorithm developed to find that user's particular interests.  (<u>Id.</u> ¶ 51.)  The algorithm learns her age, location, and her previous application use.  (<u>Id.</u> ¶ 53.)  Defendants thus seek to provide FYP content that is "unique and

1

A1

tailored to that specific individual." (Id. ¶ 54.)

In December 2021, ten-year-old Nylah Anderson's FYP included the "Blackout Challenge": videos in which users strangle themselves with household items and then encourage others to record themselves doing the same. (Id. ¶¶ 82-83.) As alleged, the Blackout Challenge is of a piece with many other "challenges" published on TikTok "which promote dangerous behavior." (Id. ¶ 46.) Hiding in a bedroom closet, Nylah attempted the "Challenge." Her mother, Plaintiff Taiwanna Anderson, found Nylah unconscious, hanging from a purse strap. (Id. ¶ 87.) Ms. Anderson unsuccessfully attempted CPR. (Id. ¶ 88.) Three deep ligature marks on Nylah's neck confirmed that she had suffered while struggling to free herself. (Id. ¶¶ 86, 89.) After several days in intensive care, Nylah died. (Id. ¶ 91.)

As alleged, during 2021, other children died attempting the Blackout Challenge. (Id. ¶¶ 67-70.) As further alleged, Defendants knew that TikTok's algorithm was promoting the Blackout Challenge to children. (Id. ¶ 71.)

b. Procedural History

Anderson charges that TikTok caused Nylah's death. (Compl.) She brings design defect and failure to warn claims under strict products liability and negligence theories, as well as wrongful death and survival actions. (Id. ¶¶ 101-34, 156-86.) She also brings claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law and the California Consumer Legal Remedies Act. (Id. ¶¶ 135-55); 73 P.S. §§ 201-1, et seq.; Cal. Civ. § 1750, et seq.

Defendants move to dismiss all Counts, urging: a lack of personal jurisdiction, that Section 230 of the Communications Decency Act bars Anderson's products liability and negligence claims, and that Anderson has failed to state a claim for relief. (Doc. No. 12.)

In response, Anderson defends only her products liability, negligence, wrongful death, and

A2

survival claims, abandoning her claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law and the California Consumer Legal Remedies Act. I will thus dismiss those latter claims. See Levy-Tatum v. Navient Sols., Inc., 183 F. Supp. 3d 701, 712 (E.D. Pa. 2016) (dismissing claims the plaintiff failed to defend in opposing the defendant's motion to dismiss). The matter has otherwise been fully briefed. (Doc. Nos. 12, 17, 21, 22.)

Because I conclude that Section 230 precludes Anderson's products liability and negligence claims—on which her wrongful death and survival claims depend—I will grant Defendants' Motion.

## II.    LEGAL STANDARDS

I must accept as true Anderson's well-pled factual allegations and make all reasonable inferences in her favor. See Fed. R. Civ. P. 12(b)(6); In re Rockefeller Ctr. Props., Inc., 311 F.3d 198, 215 (3d Cir. 2002). I may consider Defendants' affirmative defense—that Section 230 bars Anderson's suit—at the motion-to-dismiss stage. Putt v. TripAdvisor, Inc., No. 20-3836, 2021 WL 242470, at *3 (E.D. Pa. Jan. 25, 2021). Anderson is "not required to anticipate and plead around an affirmative defense," however. Id.; see also Schmidt v. Skolas, 770 F.3d 241, 248 (3d Cir. 2014). Dismissal is thus permissible only if Section 230 immunity is "evident from the face of the complaint." Brody v. Hankin, 145 F. App'x 768, 771 (3d Cir. 2005) (quoting Bethel v. Jendoco Constr. Corp., 570 F.2d 1168, 1174 n. 10 (3d Cir.1978)) (emphasis omitted).

## III.    DISCUSSION

In pertinent part, CDA Section 230 provides as follows:

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.
                                            ****
No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

A3

47 U.S.C. § 230(c)(1) and (e)(3).

In thus precluding interactive service providers from being "treated as the publisher[s]" of third-party content, Congress immunized the providers' "decisions relating to the monitoring, screening, and deletion of content from [their] network[s]—actions quintessentially related to a publisher's role." Green v. Am. Online (AOL), 318 F.3d 465, 471 (3d Cir. 2003).

Congress conferred this immunity "to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum." Zeran v. Am. Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997); 47 U.S.C. § 230(b)(1)-(2). It recognized that because of the "staggering" amount of information communicated through interactive computer services, providers cannot prescreen each message they republish. Zeran, 129 F.3d at 331. Accordingly, Congress conferred immunity on providers to encourage them not to restrict unduly the number and nature of their postings. Id.

Section 230 provides immunity when: (1) the defendant is an interactive computer service provider; (2) the plaintiff seeks to treat the defendant as a publisher or speaker of information; and (3) that information is provided by another content provider. 47 U.S.C. § 230(c)(1). Here, the Parties agree that Defendants are interactive computer service providers, and that the Blackout Challenge videos came from "another information content provider" (third-party users). (See Doc. Nos. 12, 17.) They dispute only whether Anderson, by her design defect and failure to warn claims, impermissibly seeks to treat Defendants as the "publishers" of those videos. It is evident from the face of Anderson's Complaint that she does.

Anderson urges that she seeks to hold Defendants directly liable for their own acts and omissions as designers, manufacturers, and sellers of a defective product, not for their conduct as publishers. See Erie Ins. Co. v. Amazon.com, Inc., 925 F.3d 135, 139-40 (4th Cir. 2019); (Doc.

4

A4

No. 17 at 10.)  She cannot defeat Section 230 immunity, however, by creatively labeling her claims:

> [W]hat matters is not the name of the cause of action—defamation versus negligence versus intentional infliction of emotional distress—what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another.

Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1101 (9th Cir. 2009).  I must look past how Anderson characterizes a claim and "ask whether the duty that [Anderson] alleges that [Defendants] violated derives from [Defendants'] status or conduct as a 'publisher or speaker.'"  Id.

Anderson bases her allegations entirely on Defendants' presentation of "dangerous and deadly videos" created by third parties and uploaded by TikTok users.  She thus alleges that TikTok and its algorithm "recommend inappropriate, *dangerous, and deadly videos* to users"; are designed "to addict users and manipulate them into participating in *dangerous and deadly challenges*"; are "not equipped, programmed with, or developed with the necessary safeguards required to prevent circulation of *dangerous and deadly videos*"; and "[f]ail[] to warn users of the risks associated *with dangerous and deadly videos and challenges*."  (Compl. ¶¶ 107, 127 (emphasis added).)  Anderson thus premises her claims on the "defective" manner in which Defendants *published* a third party's dangerous content.

Although Anderson recasts her content claims by attacking Defendants' "deliberate action" taken through their algorithm, those "actions," however "deliberate," are the actions of a publisher. Courts have repeatedly held that such algorithms are "not content in and of themselves."  Dyroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1098 (9th Cir. 2019).  The Second Circuit has explained that the use of "tools such as algorithms that are designed to match [] information with a consumer's interests" is well within the range of publisher functions covered by Section 230. Force v. Facebook, Inc., 934 F.3d 53, 66 (2d Cir. 2019), cert. denied, 140 S. Ct. 2761 (2020) (No.

A5

19-859); cf. Obado v. Magedson, 612 F. App'x 90, 94 (3d Cir. 2015) ("[A]llegation that the defendants manipulated search engines to maximize search results relating to the alleged defamatory content does not affect their immunity from suit.").

Anderson relies heavily on two inapposite Ninth Circuit decisions. Doe v. Internet Brands, Inc., 824 F.3d 846 (9th Cir. 2016); Lemmon v. Snap, Inc., 995 F.3d 1085 (9th Cir. 2021).

In Internet Brands, the plaintiff was a member of "Model Mayhem," a networking website for "aspiring models." 824 F.3d at 848. The plaintiff "posted information about herself on the website." Id. at 848. Posing as talent scouts, two men contacted the plaintiff and lured her to a fake audition, where they assaulted her. Id. The plaintiff alleged that the failure of the website's operator to post a warning of the risks associated with using the website caused her to fall victim to the scheme. Id. at 849. Significantly, the plaintiff's claims had nothing to do with the site's content: she did not allege that the two men had posted anything to the site or that she was lured by any website posting. Id. at 851. The Court thus deemed Section 230 immunity inapplicable because the defendant's purported duty to warn "[did] not arise from an alleged failure to adequately regulate access to user content," and would not "affect how [the defendant] publishes or monitors such content." Id. at 851, 853.

As I have discussed, however, the duty Anderson invokes directly implicates the manner in which Defendants have chosen to publish third-party content. (Compl. ¶ 107.) Anderson's claims thus are plainly barred by Section 230 immunity. Cf. Doe v. MySpace, Inc., 528 F.3d 413, 420 (5th Cir. 2008) (considering claims "predicated solely on [service provider's] failure to implement basic safety measures to protect minors" as "merely another way of claiming that [service provider] was liable for publishing the communications").

The plaintiffs in Lemmon alleged that a speed filter on Snap's smartphone application,

A6

"Snapchat," helped cause the high-speed car accident in which the plaintiffs' two sons were killed. 995 F.3d at 1087-90. As alleged, the speed filter enabled users to record their real-life speed, and users believed that Snapchat would reward them for recording a speed over 100 miles per hour. Id. at 1093. The Court ruled that Section 230 did not apply because the plaintiff's claims were "independent[] of the content" created by Snapchat's users. Id. at 1093. Rather, the defect alleged was the way in which the site was designed, highlighting "the interplay between Snapchat's reward system and the Speed Filter." Id. at 1092.

Selectively quoting from Internet Brands and Lemmon, Anderson insists that she is not attacking Defendants' actions as publishers because her claims do not require Defendants to *remove* or *alter* the content generated by third parties. (Doc. No. 17 at 12, 14.) Publishing involves more than just these two actions, however. As I have discussed, it also involves decisions related to the monitoring, screening, arrangement, promotion, and distribution of that content—actions that Anderson's claims all implicate. See Force, 934 F.3d at 66. Indeed, "[c]ourts have interpreted 'publication' capaciously to reach claims that, although pleaded to avoid the CDA, 'implicitly require recourse to that content [posted by a third party] to establish liability." Herrick v. Grindr, LLC, 305 F. Supp. 3d 579 (2018), aff'd, 765 F. App'x 586 (2d Cir. 2019); see also Force, 934 F.3d at 64 ("The Circuits are in general agreement that the text of Section 230(c)(1) should be construed broadly in favor of immunity.").

In sum, because Anderson's design defect and failure to warn claims are "inextricably linked" to the manner in which Defendants choose to publish third-party user content, Section 230 immunity applies. Herrick, 765 F. App'x at 591. Anderson's wrongful death and survival claims cannot proceed in light of that tort immunity. See Valentino v. Phila. Triathlon, LLC, 150 A.3d 483, 493 (Pa. Super. Ct. 2016) ("Pennsylvania case law has long held that a wrongful death

A7

claimant's substantive right to recover is derivative of and dependent upon a tortious act that resulted in the decedent's death."); <u>Tulewicz v. Se. Pa. Transp. Auth.</u>, 606 A.2d 427, 431 (Pa. 1992) ("A survival action … 'merely continues in [the decedent's] personal representatives the right of action which accrued to the deceased at common law because of the tort.'") (cleaned up).

## IV.    CONCLUSION

Nylah Anderson's death was caused by her attempt to take up the "Blackout Challenge." Defendants did not create the Challenge; rather, they made it readily available on their site. Defendants' algorithm was a way to bring the Challenge to the attention of those likely to be most interested in it.  In thus promoting the work of others, Defendants published that work—exactly the activity Section 230 shields from liability.  The wisdom of conferring such immunity is something properly taken up with Congress, not the courts.

I will thus grant Defendants' Motion on immunity grounds.  In light of my decision, I need not address Defendants' contentions respecting jurisdiction and failure to state a claim.

An appropriate Order follows.

October 25, 2022                                        */s/ Paul S. Diamond*
                                              _____

                                              Paul S. Diamond, J

A8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TAWAINNA ANDERSON,** | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Civ. No. 22-1849** |
| | : | |
| **TIKTOK, INC.,** *et al.*, | : | |
| **Defendants.** | : | |

## <u>ORDER</u>

**AND NOW**, this 25th day of October, 2022, upon consideration of Defendants' Motion to Dismiss (Doc. No. 12), Plaintiff's Response (Doc. No. 17), Defendants' Reply (Doc. No. 21), Plaintiff's Sur-Reply (Doc No. 22), and all related submissions, it is hereby **ORDERED** that Defendants' Motion is **GRANTED**.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*

Paul S. Diamond, J.

A9

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TAWAINNA ANDERSON, Individually and as Administratrix of the ESTATE OF NYLAH ANDERSON, a deceased minor** | |
| *Plaintiff,* | **No. 2:22-cv-01849-PD** |
| v. | |
| **TIKTOK, INC. AND BYTEDANCE, INC.** | |
| *Defendants.* | |

## PLAINTIFF'S NOTICE OF APPEAL

Notice is hereby given that Plaintiff, Tawainna Anderson, Individually and as Administratrix of the Estate of Nylah Anderson, a deceased minor ("Plaintiff"), hereby appeals to the United States Court of Appeals for the Third Circuit from the final judgment entered by this Court in favor of Defendants, TikTok, Inc. and ByteDance, Inc. ("Defendants") on October 25, 2022 (ECF 40) and all decisions subsumed in that judgment, including, but not limited to the Court's Memorandum and Order (ECF 39, 40).

Dated: October 31, 2022

/s/ Robert J. Mongeluzzi
Robert J. Mongeluzzi
Jeffrey P. Goodman
Samuel B. Dordick
Rayna McCarthy
**SALTZ MONGELUZZI & BENDESKY P.C.**
One Liberty Place
1650 Market Street, 52nd Floor
Philadelphia, Pennsylvania 19103
Tel: (215) 496-8282
rmongeluzzi@smbb.com
jgoodman@smbb.com
sdordick@smbb.com

A10

Mark A. DiCello
**DiCELLO LEVITT GUTZLER LLC**
Western Reserve Law Building
7556 Mentor Avenue
Mentor, Ohio  44060
Tel: (440) 953-8888
madicello@dicellolevitt.com

*Counsel for Plaintiffs*

### CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2022, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Robert J. Mongeluzzi*
Robert J. Mongeluzzi
*Counsel for Plaintiffs*