# United States Court of Appeals

*for the*

# Third Circuit

---

Case No. 22-3061

TAWAINNA ANDERSON, INDIVIDUALLY AND AS ADMINISTRATIX OF
THE ESTATE OF N.A., A DECEASED MINOR,

*Appellant,*

– v. –

TIKTOK, INC.; BYTEDANCE, INC.

---

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA IN CASE NO. 2-22-CV-01849,
HONORABLE PAUL S. DIAMOND, U.S. DISTRICT JUDGE

## APPELLANT'S APPENDIX
## VOLUME II OF II (Pages A12 to A225)

ROBERT J. MONGELUZZI
JEFFREY P. GOODMAN
SALTZ MONGELUZZI & BENDESKY P.C.
*Attorneys for Appellant*
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, Pennsylvania 19103
(215) 496-8282

i

# TABLE OF CONTENTS

**Page**

**Volume I of II**

Memorandum of the Honorable Paul S. Diamond,
dated October 25, 2022 ............................................ A1

Order of the Honorable Paul S. Diamond, dated
October 25, 2022 ................................................. A9

Notice of Appeal, dated October 31, 2022 ................. A10

**Volume II of II**

Civil Court Docket Sheet ........................................... A12

Complaint, filed May 12, 2022 .................................. A18

    Exhibit A to Complaint -
    Certificate of Grant of Letters of Administration .. A64

Civil Cover Sheet ..................................................... A68

Designation Form ...................................................... A70

Defendants' Motion to Dismiss the Complaint,
dated July 18, 2022 ................................................ A71

Defendants' Memorandum of Law in Support of
Motion to Dismiss, dated July 18, 2022 ................. A74

    Exhibit A to Defendants' Memorandum -
    Declaration of Brian O'Connor, in Support of
    Motion to Dismiss, dated July 15, 2022 ................ A105

Certificate of Service ................................................ A110

Plaintiff's Memorandum of Law in Opposition to
Motion to Dismiss, dated August 1, 2022 .............. A111

ii

|  | Page |
|---|---|
| Exhibit A to Plaintiff's Memorandum - Legal Terms of Service | A144 |
| Exhibit B to Plaintiff's Memorandum - Legal Privacy Policy | A163 |
| Exhibit C to Plaintiff's Memorandum - Notice of Removal | A175 |
| Exhibit D to Plaintiff's Memorandum - Complaint for Declaratory Judgment of Non-Infringement of U.S. Patent No. 9,691,429, dated October 28, 2020 | A186 |
| Defendants' Reply in Further Support of Motion to Dismiss, dated August 11, 2022 | A196 |
| Plaintiff's Sur-Reply in Opposition to Motion to Dismiss, dated August 18, 2022 | A211 |

APPEAL

# United States District Court
# Eastern District of Pennsylvania (Philadelphia)
# CIVIL DOCKET FOR CASE #: 2:22−cv−01849−PD

| | |
|---|---|
| ANDERSON v. TIKTOK, INC. | Date Filed: 05/12/2022 |
| Assigned to: HONORABLE PAUL S. DIAMOND | Jury Demand: None |
| Demand: $100,000,000 | Nature of Suit: 365 P.I.: Personal Inj. Prod. |
| Case in other court: USCA, 22−03061 | Liability |
| Cause: 28:1332 Diversity−Product Liability | Jurisdiction: Diversity |

**Plaintiff**

**TAWAINNA ANDERSON**
*INDIVIDUALLY AND AS*
*ADMINISTRATIX OF THE ESTATE OF*
*NYLAH ANDERSON, A DECEASED*
*MINOR*

represented by **JEFFREY P. GOODMAN**
SALTZ MONGELUZZI & BENDESKY
PC
ONE LIBERTY PLACE
1650 MARKET ST 52ND FL
PHILADELPHIA, PA 19103
215−496−8282
Email: jgoodman@smbb.com
*ATTORNEY TO BE NOTICED*

**Parthena McCarthy**
910 Lantern Hill Road
Shavertown, PA 18708
610−368−3184
Email: rmccarthy@smbb.com
*ATTORNEY TO BE NOTICED*

**SAMUEL B. DORDICK**
SALTZ MONGELUZZI & BENDESKY
PC
1650 MARKET ST
PHILADELPHIA, PA 19103
215−496−8282
Email: SDordick@smbb.com
*ATTORNEY TO BE NOTICED*

**ROBERT J. MONGELUZZI**
SALTZ MONGELUZZI & BENDESKY
P.C.
ONE LIBERTY PLACE
1650 MARKET STREET
52ND FLOOR
PHILADELPHIA, PA 19103
215−496−8282
Fax: 215−496−0999
Email: rmongeluzzi@smbb.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**TIKTOK, INC.**

represented by **JOSEPH E. O'NEIL**
Campbell Conroy & O'Neil
1205 Westlakes Drive
Suite 330
Berwyn, PA 19312
610−964−1900
Email: joneil@campbelltriallawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

A12

**ALBERT GIANG**
KING & SPALDING
633 WEST FIFTH STREET
STE 1600
LOS ANGELES, CA 90071
Email: AGIANG@KSLAW.COM
*ATTORNEY TO BE NOTICED*

**GEOFFREY M DRAKE**
KING & SPALDING
1180 PEACHTREE STREET N.E.
ATLANTA, GA 30309
404−572−4726
Fax: 404−572−5100
Email: gdrake@kslaw.com
*ATTORNEY TO BE NOTICED*

**KATHERINE A. WANG**
CAMPBELL CAMPBELL EDWARDS &
CONROY
1205 WESTLAKES DR STE 330
BERWYN, PA 19312
610−964−1900
Fax: 610−964−1981
Email: kwang@campbell−trial−lawyers.com
*ATTORNEY TO BE NOTICED*

**TACARA D. HARRIS**
KING & SPALDING LLP
1180 PECHTREE STREET
STE 1600
ATLANTA, GA 30309−3521
404−572−2819
Fax: 404−572−2819
Email: tharris@kslaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**
**BYTEDANCE, INC.**               represented by **JOSEPH E. O'NEIL**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALBERT GIANG**
(See above for address)
*ATTORNEY TO BE NOTICED*

**GEOFFREY M DRAKE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KATHERINE A. WANG**
(See above for address)
*ATTORNEY TO BE NOTICED*

**TACARA D. HARRIS**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|

A13

| 05/12/2022 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number BPAEDC−15917186.), filed by Tawainna Anderson. (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet, # 3 Designation Form)(MONGELUZZI, ROBERT) (Entered: 05/12/2022) |
| --- | --- | --- |
| 05/12/2022 | 2 | NOTICE of Appearance by SAMUEL B. DORDICK on behalf of TAWAINNA ANDERSON (DORDICK, SAMUEL) (Entered: 05/12/2022) |
| 05/12/2022 | 3 | NOTICE of Appearance by JEFFREY P. GOODMAN on behalf of TAWAINNA ANDERSON (GOODMAN, JEFFREY) (Entered: 05/12/2022) |
| 05/12/2022 | 4 | NOTICE of Appearance by Parthena McCarthy on behalf of TAWAINNA ANDERSON (McCarthy, Parthena) (Entered: 05/12/2022) |
| 05/13/2022 | 5 | Summons Issued as to BYTEDANCE, INC., TIKTOK, INC.. Forwarded To: EMAILED TO PLAINTIFFS COUNSEL on 5/13/2022 (sg) (Entered: 05/13/2022) |
| 05/20/2022 | 6 | STANDING ORDER OUTLINED HEREIN. SIGNED BY HONORABLE PAUL S. DIAMOND ON 5/20/2022. 5/23/2022 ENTERED AND COPIES E−MAILED.(rt) (Entered: 05/23/2022) |
| 05/24/2022 | 7 | WAIVER OF SERVICE Returned Executed by TAWAINNA ANDERSON. All Defendants. (MONGELUZZI, ROBERT) (Entered: 05/24/2022) |
| 07/15/2022 | 8 | NOTICE of Appearance by JOSEPH E. O'NEIL on behalf of BYTEDANCE, INC., TIKTOK, INC. with Certificate of Service(O'NEIL, JOSEPH) (Entered: 07/15/2022) |
| 07/15/2022 | 9 | NOTICE of Appearance by KATHERINE A. WANG on behalf of BYTEDANCE, INC., TIKTOK, INC. with Certificate of Service(WANG, KATHERINE) (Entered: 07/15/2022) |
| 07/18/2022 | 10 | Disclosure Statement Form pursuant to FRCP 7.1 including Bytedance Ltd. by BYTEDANCE, INC..(O'NEIL, JOSEPH) (Entered: 07/18/2022) |
| 07/18/2022 | 11 | Disclosure Statement Form pursuant to FRCP 7.1 including TikTok LLC, TikTok Ltd. by TIKTOK, INC..(O'NEIL, JOSEPH) (Entered: 07/18/2022) |
| 07/18/2022 | 12 | MOTION to Dismiss filed by BYTEDANCE, INC., TIKTOK, INC..Memorandum, Declaration, Certificate of Service. (Attachments: # 1 Memorandum in Support of Motion to Dismiss, # 2 Declaration in Support of Motion to Dismiss, # 3 Certificate of Service)(O'NEIL, JOSEPH) (Entered: 07/18/2022) |
| 07/18/2022 | 13 | MOTION for Pro Hac Vice of Geoffrey M. Drake ( Filing fee $ 40 receipt number APAEDC−16050929.) filed by BYTEDANCE, INC., TIKTOK, INC... (Attachments: # 1 Exhibit A)(O'NEIL, JOSEPH) (Entered: 07/18/2022) |
| 07/18/2022 | 14 | MOTION for Pro Hac Vice of Albert Giang ( Filing fee $ 40 receipt number APAEDC−16050944.) filed by BYTEDANCE, INC., TIKTOK, INC...(O'NEIL, JOSEPH) (Entered: 07/18/2022) |
| 07/18/2022 | 15 | MOTION for Pro Hac Vice of TaCara D. Harris ( Filing fee $ 40 receipt number APAEDC−16050948.) filed by BYTEDANCE, INC., TIKTOK, INC...(O'NEIL, JOSEPH) (Entered: 07/18/2022) |
| 07/19/2022 | 16 | ORDER granting 13 MOTION FOR PRO HAC VICE; granting 14 MOTION FOR PRO HAC VICE; granting 15 MOTION FOR PRO HAC VICE SIGNED BY HONORABLE PAUL S. DIAMOND ON 7/19/22.7/20/22 ENTERED AND COPIES E−MAILED.(bw) (Entered: 07/20/2022) |
| 08/01/2022 | 17 | RESPONSE in Opposition re 12 MOTION to Dismiss filed by TAWAINNA ANDERSON. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(MONGELUZZI, ROBERT) (Entered: 08/01/2022) |
| 08/04/2022 | 18 | CORRESPONDENCE FROM JEFFREY P. GOODMAN, ESQ., DATED 8/4/2022.(rt) (Entered: 08/04/2022) |
| 08/04/2022 | 19 | ORDER, UPON CONSIDERATION OF PLAINTIFFS LETTER REQUEST FOR A MOTION TO COMPEL (DOC. NO. 18 ), IT IS HEREBY ORDERED THAT DEFENDANTS SHALL PROVIDE FULL AND COMPLETE RESPONSES TO DEFENDANTS REQUESTS FOR PRODUCTION NO LATER THAN |

A14

| | | |
|---|---|---|
| | | SEPTEMBER 2, 2022 AT 5 P.M. FAILURE TO COMPLY WITH THIS ORDER MAY RESULT IN THE IMPOSITION OF SANCTIONS, INCLUDING THE STRIKING OF DEFENSES.. SIGNED BY HONORABLE PAUL S. DIAMOND ON 8/4/2022. 8/4/2022 ENTERED AND COPIES E−MAILED.(rt) (Entered: 08/04/2022) |
| 08/09/2022 | 20 | Letter dated 8/9/2022 by BYTEDANCE, INC., TIKTOK, INC.. (O'NEIL, JOSEPH) (Entered: 08/09/2022) |
| 08/11/2022 | 21 | RESPONSE in Support re 12 MOTION to Dismiss filed by BYTEDANCE, INC., TIKTOK, INC.. (O'NEIL, JOSEPH) (Entered: 08/11/2022) |
| 08/18/2022 | 22 | RESPONSE to Motion re 12 MOTION to Dismiss *Sur−Reply* filed by TAWAINNA ANDERSON. (MONGELUZZI, ROBERT) (Entered: 08/18/2022) |
| 09/07/2022 | 23 | Letter dated 9/7/2022 by TAWAINNA ANDERSON. (GOODMAN, JEFFREY) (Entered: 09/07/2022) |
| 09/08/2022 | 24 | ORDER, UPON CONSIDERATION OF PLAINTIFFS LETTER REQUEST FOR A MOTION TO COMPEL (DOC. NO. 23 ), IT IS HEREBY ORDERED THAT DEFENDANTS SHALL PROVIDE FULL AND COMPLETE RESPONSES TO PLAINTIFFS REQUESTS FOR PRODUCTION NO LATER THAN SEPTEMBER 12, 2022 AT 5 P.M. FAILURE TO COMPLY WILL RESULT IN THE IMPOSITION OF SANCTIONS.. SIGNED BY HONORABLE PAUL S. DIAMOND ON 9/8/2022. 9/8/2022 ENTERED AND COPIES E−MAILED.(rt) (Entered: 09/08/2022) |
| 09/08/2022 | 25 | Letter dated 09/08/2022 by BYTEDANCE, INC., TIKTOK, INC.. (O'NEIL, JOSEPH) (Entered: 09/08/2022) |
| 09/09/2022 | 26 | Letter dated 09/09/2022 by BYTEDANCE, INC., TIKTOK, INC.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(O'NEIL, JOSEPH) (Entered: 09/09/2022) |
| 09/09/2022 | 27 | Letter dated 9/9/2022 by TAWAINNA ANDERSON. (GOODMAN, JEFFREY) (Entered: 09/09/2022) |
| 09/12/2022 | 28 | ORDER, UPON CONSIDERATION OF DEFENDANTS LETTER REQUEST TO STAY PROCEEDINGS (DOC. NO. 26 ), IT IS HEREBY ORDERED THAT DEFENDANTS REQUEST IS DENIED.. SIGNED BY HONORABLE PAUL S. DIAMOND ON 9/12/2022. 9/12/2022 ENTERED AND COPIES E−MAILED.(rt) (Entered: 09/12/2022) |
| 09/22/2022 | 29 | Letter dated 9/22/2022 by TAWAINNA ANDERSON. (GOODMAN, JEFFREY) (Entered: 09/22/2022) |
| 09/22/2022 | 30 | Letter dated 9/22/2022 by BYTEDANCE, INC., TIKTOK, INC.. (O'NEIL, JOSEPH) (Entered: 09/22/2022) |
| 09/30/2022 | 31 | Copy Re: Documents (Notice of Appearance) filed before the JPML regarding MDL 3047. (Attachments: # 1 Attachment)(mbh) (Entered: 10/03/2022) |
| 10/07/2022 | 32 | MOTION to Stay *Proceedings Pending Transfer to MDL No. 3047* filed by BYTEDANCE, INC., TIKTOK, INC..Memorandum, Certificate of Service. (Attachments: # 1 Memorandum, # 2 Text of Proposed Order, # 3 Exhibit A)(O'NEIL, JOSEPH) (Entered: 10/07/2022) |
| 10/17/2022 | 33 | MOTION for Leave to File *Amended Complaint* filed by TAWAINNA ANDERSON.Certificate of Service. (Attachments: # 1 Memorandum of Law, # 2 Exhibit A, # 3 Exhibit B, # 4 Text of Proposed Order)(GOODMAN, JEFFREY) (Entered: 10/17/2022) |
| 10/17/2022 | 34 | Letter dated 10/17/2022 by BYTEDANCE, INC., TIKTOK, INC.. (Attachments: # 1 Exhibit A)(O'NEIL, JOSEPH) (Entered: 10/17/2022) |
| 10/18/2022 | 35 | RESPONSE in Opposition re 32 MOTION to Stay *Proceedings Pending Transfer to MDL No. 3047* filed by TAWAINNA ANDERSON. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(GOODMAN, JEFFREY) (Entered: 10/18/2022) |
| 10/19/2022 | 36 | RESPONSE in Opposition re 33 MOTION for Leave to File *Amended Complaint* filed by BYTEDANCE, INC., TIKTOK, INC.. (Attachments: # 1 Text of Proposed Order 1, |

| | | |
|---|---|---|
| | | # 2 Text of Proposed Order 2, # 3 Memorandum, # 4 Exhibit A–B)(O'NEIL, JOSEPH) (Entered: 10/19/2022) |
| 10/19/2022 | 37 | REPLY to Response to Motion re 32 MOTION to Stay *Proceedings Pending Transfer to MDL No. 3047* filed by BYTEDANCE, INC., TIKTOK, INC.. (Attachments: # 1 Exhibit A)(O'NEIL, JOSEPH) (Entered: 10/19/2022) |
| 10/25/2022 | 38 | ORDER, PLAINTIFFS MOTION TO AMEND (DOC. NO. 33 ) IS DENIED. THE PROPOSED FIRST AMENDED COMPLAINT ADDS NO NEW ALLEGATION. RATHER, [T]HE PURPOSE OF THE AMENDMENT IS TO REMOVE DICTA THAT IS INCONSEQUENTIAL TO PLAINTIFFS CLAIMS AGAINST DEFENDANTS... AND TO MAKE CLEAR THAT PLAINTIFFS CLAIMS AGAINST TIKTOK ARE NOT PREMISED UPON ADDICTION. (DOC. NO. 33 , MOTION, AT 1.) THIS AMENDMENT IS INTENDED TO FRUSTRATE DEFENDANTS PURPORTED EFFORT TO DRAG THIS CASE INTO A RECENTLY FORMED MDL. (DOC. NO. 33−1, MEMORANDUM, AT 1.) THE PROPOSED FIRST AMENDED COMPLAINT SUFFERS FROM THE SAME DEFECTS AS THE ORIGINAL COMPLAINT. AS I HAVE EXPLAINED IN TODAYS MEMORANDUM OPINION, PLAINTIFFS CLAIMS (EVEN AS AMENDED) ARE BARRED BY IMMUNITY CONFERRED BY SECTION 230 OF THE COMMUNICATIONS DECENCY ACT. 47 U.S.C. § 230. ACCORDINGLY, PLAINTIFFS MOTION TO AMEND IS DENIED ON FUTILITY GROUNDS. SEE IN RE BURLINGTON COAT FACTORY SEC. LITIG., 114 F.3D 1410, 1434 (3D CIR. 1997).. SIGNED BY HONORABLE PAUL S. DIAMOND ON 10/25/2022. 10/25/2022 ENTERED AND COPIES E−MAILED.(rt) (Entered: 10/25/2022) |
| 10/25/2022 | 39 | MEMORANDUM, PLAINTIFF TAWAINNA ANDERSON ACCUSES DEFENDANTS TIKTOK, INC. AND BYTEDANCE, INC. (OPERATORS OF THE SOCIAL MEDIA APPLICATION TIKTOK) OF CAUSING THE DEATH OF HER DAUGHTER. (COMPL. (DOC. NO. 1 ).) ALTHOUGH THE CIRCUMSTANCES HERE ARE TRAGIC, I AM COMPELLED TO RULE THAT BECAUSE PLAINTIFF SEEKS TO HOLD DEFENDANTS LIABLE AS PUBLISHERS OF THIRD−PARTY CONTENT, THEY ARE IMMUNE UNDER THE COMMUNICATIONS DECENCY ACT. ACCORDINGLY, I WILL GRANT DEFENDANTS MOTION TO DISMISS. (DOC. NO. 12 ); SEE 47 U.S.C. § 230(C)(1) AND (E)(3).. NYLAH ANDERSONS DEATH WAS CAUSED BY HER ATTEMPT TO TAKE UP THE BLACKOUT CHALLENGE. DEFENDANTS DID NOT CREATE THE CHALLENGE; RATHER, THEY MADE IT READILY AVAILABLE ON THEIR SITE. DEFENDANTS ALGORITHM WAS A WAY TO BRING THE CHALLENGE TO THE ATTENTION OF THOSE LIKELY TO BE MOST INTERESTED IN IT. IN THUS PROMOTING THE WORK OF OTHERS, DEFENDANTS PUBLISHED THAT WORKEXACTLY THE ACTIVITY SECTION 230 SHIELDS FROM LIABILITY. THE WISDOM OF CONFERRING SUCH IMMUNITY IS SOMETHING PROPERLY TAKEN UP WITH CONGRESS, NOT THE COURTS. I WILL THUS GRANT DEFENDANTS MOTION ON IMMUNITY GROUNDS. IN LIGHT OF MY DECISION, I NEED NOT ADDRESS DEFENDANTS CONTENTIONS RESPECTING JURISDICTION AND FAILURE TO STATE A CLAIM. AN APPROPRIATE ORDER FOLLOWS.. SIGNED BY HONORABLE PAUL S. DIAMOND ON 10/25/2022. 10/25/2022 ENTERED AND COPIES E−MAILED.(rt) (Entered: 10/25/2022) |
| 10/25/2022 | 40 | ORDER, UPON CONSIDERATION OF DEFENDANTS MOTION TO DISMISS (DOC. NO. 12 ), PLAINTIFFS RESPONSE (DOC. NO. 17 ), DEFENDANTS REPLY (DOC. NO. 21 ), PLAINTIFFS SUR−REPLY (DOC NO. 22 ), AND ALL RELATED SUBMISSIONS, IT IS HEREBY ORDERED THAT DEFENDANTS MOTION IS GRANTED.. SIGNED BY HONORABLE PAUL S. DIAMOND ON 10/25/2022. 10/25/2022 ENTERED AND COPIES E−MAILED.(rt) (Entered: 10/25/2022) |
| 10/25/2022 | 41 | ORDER, DEFENDANTS MOTION TO STAY (DOC. NO. 32 ) IS DENIED AS MOOT.. SIGNED BY HONORABLE PAUL S. DIAMOND ON 10/25/2022. 10/25/2022 ENTERED AND COPIES E−MAILED.(rt) (Entered: 10/25/2022) |
| 10/31/2022 | 42 | NOTICE OF APPEAL as to 40 Order, 39 Memorandum and/or Opinion,,,,, by TAWAINNA ANDERSON. Filing fee $ 505, receipt number APAEDC−16282170. Copies to Judge, Clerk USCA, Appeals Clerk and (MONGELUZZI, ROBERT) |

| | | (Entered: 10/31/2022) |
|---|---|---|
| 11/10/2022 | <u>43</u> | NOTICE of Docketing Record on Appeal from USCA re <u>42</u> Notice of Appeal (Credit Card Payment) filed by TAWAINNA ANDERSON. USCA Case Number 22−3061 (sg) (Entered: 11/10/2022) |

## UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TAWAINNA ANDERSON, Individually and as Administratrix of the ESTATE OF NYLAH ANDERSON, a deceased minor** | CASE NO. |
| Plaintiff, | COMPLAINT WITH JURY TRIAL DEMANDED |
| **v.** | |
| **TIKTOK, INC. AND BYTEDANCE, INC.** | |
| Defendants | |

## COMPLAINT

> *In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of children and young people….Technology companies must step up and take responsibility for creating a safe digital environment for children and youth. Today, most companies are not transparent about the impact of their products, which prevents parents and young people from making informed decisions and researchers from identifying problems and solutions.  At a minimum, the public and researchers deserve much more transparency.*

*Protecting Youth Mental Health*, United States Surgeon General's Advisory, Dec. 7, 2021.

COMES NOW, Plaintiff, Tawainna Anderson, Individually and as Administratrix of the Estate of Nylah Anderson, a deceased minor, by her undersigned counsel, and makes the following Complaint against Defendants, TikTok Inc. and ByteDance Inc. (collectively referred to as the "TikTok Defendants"), and alleges as follows:

### INTRODUCTION

1.     On December 7, 2021 10-year-old Nylah Anderson was excruciatingly asphyxiated when she attempted to perform a viral TikTok challenge known as the "Blackout Challenge" which encourages children to choke themselves until passing out.

2.     After Nylah attempted the TikTok challenge and passed out, Plaintiff, Tawainna

1

Anderson, found her young daughter and rushed her to the hospital. Nylah suffered in the pediatric intensive care unit for several days until she tragically succumbed to her injuries and died on December 12, 2021.

3.    The viral and deadly TikTok Blackout Challenge was thrust in front of Nylah on her TikTok For You Page ("FYP") as a result of TikTok's algorithm which, according to the TikTok Defendants, is "a recommendation system that delivers content to each user that is likely to be of interest to that particular user…each person's feed is unique and tailored to that specific individual."[1]

4.    ***The TikTok Defendants' algorithm determined that the deadly Blackout Challenge was well-tailored and likely to be of interest to 10-year-old Nylah Anderson, and she died as a result***.

5.    The TikTok Defendants' app and algorithm are intentionally designed to maximize user engagement and dependence and powerfully encourage children to engage in a repetitive and dopamine-driven feedback loop by watching, sharing, and attempting viral challenges and other videos. ***TikTok is programming children for the sake of corporate profits and promoting addiction.***

6.    Plaintiff brings this strict product liability and negligence action against the TikTok Defendants to hold them accountable for their dangerously defective product—the TikTok app and its algorithm—and the TikTok Defendants' own direct negligent conduct.

7.    Plaintiff does not seek to hold the TikTok Defendants liable as the speaker or publisher of third-party content and instead intends to hold the TikTok Defendants responsible for their own independent conduct as the designers, programmers, manufacturers, sellers, and/or

---

[1] https://newsroom.tiktok.com/en-us/how-tiktok-recommends-videos-for-you/

distributors of their dangerously defective social media products and for their own independent acts of negligence as further described herein. Thus, Plaintiffs claims fall outside of any potential protections afforded by Section 230(c) of the Communications Decency Act.

### PARTIES

8.      Plaintiff, Tawainna Anderson ("Plaintiff"), is an adult individual and resident of the Commonwealth of Pennsylvania, residing at 2319 Bethel Road, Chester, Pennsylvania 19013.

9.      At all times relevant hereto, Plaintiff was the mother of 10-year-old Nylah Anderson.

10.     On April 7, 2022, Plaintiff was appointed as Administratrix of the estate of Nylah Anderson by the Register of Probate and Wills in and for County of Delaware in the Commonwealth of Pennsylvania. *See* **Exhibit A**, Letters of Administration.

11.     Nylah Anderson is survived by her mother, Plaintiff Tawainna Anderson, her brothers, Nakye Anderson and Kevin Freeman Lamarr Neal III, as well as potentially her biological father.

12.     Nylah was an active, happy, healthy, and incredibly intelligent child. Though only 10 years old, Nylah spoke three languages.

 

A20

13.     Defendant, TikTok Inc., is a corporation organized and existing under the laws of the State of California with its principal place of business located at 5800 Bristol Parkway, Culver City, California 90230.

14.     At all times relevant hereto, Defendant TikTok Inc. has carried out, and continues to carry out, substantial, continuous, and systematic business activities within the Commonwealth of Pennsylvania, and has purposely established significant contacts within Pennsylvania.

15.     Plaintiff's claims and the injuries and damages alleged herein arise directly out of, and are related to, Defendant TikTok Inc.'s contacts and activities in the Commonwealth of Pennsylvania.

16.     At all times relevant hereto, Defendant TikTok Inc. was acting by and through its employees, servants, agents, workmen, and/or staff, all of whom were acting within the course and scope of their employment, for and on behalf of TikTok Inc.

17.     Defendant, ByteDance Inc., is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 250 Bryant Street, Mountain View, California 94041.

18.     At all times relevant hereto, Defendant ByteDance Inc. has carried out, and continues to carry out, substantial, continuous, and systematic business activities within the Commonwealth of Pennsylvania, and has purposely established significant contacts within Pennsylvania.

19.     Plaintiff's claims and the injuries and damages alleged herein arise directly out of, and are related to, Defendant ByteDance Inc.'s contacts and activities in the Commonwealth of Pennsylvania.

20.     At all times relevant hereto, Defendant ByteDance Inc. was acting by and through

4

A21

its employees, servants, agents, workmen, and/or staff, all of whom were acting within the course and scope of their employment, for and on behalf of ByteDance Inc.

21.     Upon information and belief, at all times relevant hereto, the TikTok Defendants were the designers, programmers, manufacturers, distributors, sellers, suppliers, operators, managers, and/or were otherwise responsible for the operation of the TikTok app and its associated algorithms.

### JURISDICTION AND VENUE

22.     This Court has specific jurisdiction over Plaintiff's action pursuant to 28 U.S.C. § 1332(a) as the amount in controversy exceeds the jurisdictional threshold, exclusive of costs, is between citizens of different states, and because the TikTok Defendants each have certain minimum contacts with the Commonwealth of Pennsylvania such that the maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice, and because the injuries and damages alleged herein arise directly out of, and are related to, Defendants' contacts and activities in the Commonwealth of Pennsylvania.

23.     Plaintiff's decedent, Nylah Anderson, downloaded the TikTok app on her smartphone in Pennsylvania, relying on the TikTok Defendants' assurances that the app was safe to use.

24.     Plaintiff's decedent, Nylah Anderson, created her TikTok app user profile in Pennsylvania.

25.     Plaintiff's decedent, Nylah Anderson, first viewed the dangerous content associated with the TikTok Blackout Challenge while in Pennsylvania.

26.     Plaintiff's decedent, Nylah Anderson, used the TikTok app on her smartphone in Pennsylvania, including on the date she attempted the viral TikTok Blackout Challenge.

27.    The TikTok Defendants' algorithm delivered the dangerous and deadly viral TikTok Blackout Challenge directly to Nylah's FYP on her phone in Pennsylvania.

28.    The TikTok Defendants' contacts and activities in Pennsylvania directly gave rise to the injuries and damages suffered by Nylah Anderson, her estate, and her beneficiaries, as alleged herein, as the TikTok Defendants' algorithm presented Nylah Anderson with the deadly challenge which ultimately led to her death in Pennsylvania, and this Court thus has specific personal jurisdiction over the TikTok Defendants in this action.

29.    There is specific personal jurisdiction over the TikTok Defendants pursuant to Pennsylvania's long arm statute, 42 Pa.C.S. § 5322.

30.    Venue is proper in the United States District Court of the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) as a substantial portion of the acts, omissions, and events giving rise to Plaintiff's claim occurred in and around this district.

### **FACTUAL ALLEGATIONS**

**A.    The Detrimental Impact of Social Media Platforms, Including TikTok, on Children**

31.    On December 7, 2021, the United States Surgeon General issued an advisory titled *Protecting Youth Mental Health* which presented data showing an alarming rise in mental health challenges among children.[2]  This crisis includes a dramatic explosion in the number of suicides, attempted suicides, and inpatient mental health admissions for U.S. children.  For example, between 2007 and 2018, suicide rates among children ages twelve to sixteen in the U.S. increased by 146 percent, and incidences of serious depression and dissatisfaction with life in this same age group have dramatically risen.  According to the Surgeon General's December 7, 2021 advisory, between 2011 and 2015, youth psychiatric visits to emergency departments for depression, anxiety,

---

[2] https://www.hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf

and behavioral challenges increased by 28 percent.

32.     Concurrent with the emergence of this mental health crisis among children and teenagers has been the explosion of social media platform use by children. A Pew Research Center 2018 study revealed that 45 percent of high school students reported using a social media platform daily, while 24 percent reported being online "almost constantly."

33.     The COVID-19 pandemic and the rapid emergence of TikTok have accelerated this trend. In 2020, a staggering 81 percent of 14- to 22-year-olds reported using social media either "daily" or "almost constantly."

34.     The U.S. Surgeon General December 7, 2021 advisory warned of the "growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of children and young people[]" and that research has shown that social media "can expose children to bullying, contribute to obesity and eating disorders, trade off with sleep, encourage children to negatively compare themselves to others, and lead to depression, anxiety, and self-harm." Indeed, "[s]everal studies have linked time spent on social media to mental health challenges such as anxiety and depression."

35.     A July 2021 report titled *Pathways: How digital design puts children at risk*,[3] published by 5Rights Foundation detailed "alarming and upsetting" results from interviews with digital designers and children which lays bare how the commercial objectives of digital social media companies, like the TikTok Defendants, translate into design features that negatively impact children.

36.     The *Pathways* report shockingly describes the social media world in which today's children are living as one in which the social media conglomerates, including the TikTok

---

[3] https://5rightsfoundation.com/uploads/Pathways-how-digital-design-puts-children-at-risk.pdf

7

Defendants, push products which intend to maximize the time spent using the product and shaping children's behavior. A digital design professional interviewed by 5Rights Foundation put it succinctly—"companies make their money from attention. Reducing attention will reduce revenue."

37. As another digital design professional included in the *Pathways* report stated, "[t]here are no safety standards – there is no ethics board in the digital space."

38. The TikTok Defendants were aware of each of these reports, yet failed to act to correct the safety hazards identified.

39. Social media giants like the TikTok Defendants have seized the opportunity presented by the digital wild west to manipulate and control the behavior of vulnerable children to maximize attention dedicated to their social media platforms and thus maximize revenues and profits, all while shirking any safety responsibilities whatsoever.

40. In all settings other than social media platforms children are offered protections deemed critical for children's safety and proper development. A bar or restaurant cannot serve a child an alcoholic drink. A retail store may not sell children products like spray paint. A convenience store may not sell children cigarettes. A movie theatre may not allow children to see an R-rated film. A drug company cannot give children a dose of medicine meant for an adult. Children's toys have warnings for parents to read and abide by. These protections do not apply only when harm is proven, but in anticipation of the risks associated with children's age and evolving capacity. These protections are hardwired into our legal system and our culture.[4] Everywhere but the social media universe created by those like the TikTok Defendants.

41. The U.S. Surgeon General December 7, 2021 advisory called upon digital media

---

[4] https://5rightsfoundation.com/uploads/Pathways-how-digital-design-puts-children-at-risk.pdf

companies like the TikTok Defendants to "step up and take responsibility for creating a safe digital environment for children and youth."

42.     The TikTok Defendants have failed to heed this warning.

**B.      The TikTok App Becomes a Global Phenomenon With a Strong Presence in the United States**

43.     The TikTok app has become "one of the world's fastest-growing social media platforms" and a "global phenomenon" with a massive American audience.[5]  In November 2019, the *Washington Post* reported that the TikTok app had been downloaded more than 1.3 billion times worldwide and more than 120 million times in the United States.[6]  However, by April 2020, *TechCrunch* reported that the TikTok app's worldwide downloads already had surpassed 2 billion, and that in "the quarter that ended on March 31, TikTok was downloaded 315 million times — the highest number of downloads for any app in a quarter."[7]

44.     TikTok is the most downloaded non-game app in the world.[8]  The TikTok app routinely outranks its top competitors – such as Facebook, Snapchat, and Instagram – on the Apple and Google app stores.[9]  In fact, it has been the most downloaded app on the Apple and Google app stores for months.[10]  The average user opened the TikTok app more than 8 times per day and spent approximately 45 minutes on the app daily as of March 2019.[11]  Its popularity and use has skyrocketed since March 2019 and its daily usage numbers today dwarf those from March 2019.

---

5 https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-whereus-views-about-censorship-often-were-overridden-by-chinese-bosses/.

6 https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-whereus-views-about-censorship-often-were-overridden-by-chinese-bosses/.

7 https://techcrunch.com/2020/04/29/tiktok-tops-2-billion-downloads/.

8 https://www.cnbc.com/2019/07/25/china-camera-apps-may-open-up-user-data-to-beijinggovernment-requests.html.
9 https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-whereus-views-about-censorship-often-were-overridden-by-chinese-bosses/.

10 https://thehill.com/policy/technology/469114-tiktok-faces-lawmaker-anger-over-china-ties.

11 https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-mediais-serious-11561780861.

45.     In January 2020, *Barron's* reported on the TikTok app's revenue: "The wildly popular short-video service generated $176.9 million in revenue in 2019—71% of the total $247.6 million in revenue the app has ever generated, according to new data from the app-tracking firm SensorTower. In the fourth quarter alone, TikTok had revenue of $88.5 million, up two times from the third quarter and up six times year over year, most of that from advertising and in-app purchases, SensorTower reports. China accounted for about 69% of the company's 2019 revenue, according to the firm, with U.S. revenues accounting for 20%."[12]

46.     Evidencing the TikTok app's rapid growth, three months later, *TechCrunch* reported that: "Users have spent about $456.7 million on TikTok to date, up from $175 million five months ago.  Users in the U.S. have spent about $86.5 million on the app, making the nation the second most important market for TikTok from the revenue standpoint."[13]

47.     In 2021, TikTok reported that it had 1 billion active global users,[14] and revenues of $4.6 billion.[15]

48.     Alarmingly, estimated age demographics show that a staggering 28 percent of TikTok's users are under the age of 18.[16]

49.     More precise data on the average age of users is known to the TikTok defendants but not disclosed to the public or government agencies.

**C.     The TikTok Defendants' App and Algorithm**

50.     TikTok is a video sharing social media app and product which allows and encourages users to create, share, and view short video clips.

---

[12] https://www.barrons.com/articles/beware-facebook-tiktok-revenues-are-exploding51579201752.
[13] https://techcrunch.com/2020/04/29/tiktok-tops-2-billion-downloads/.
[14] https://www.cnbc.com/2021/09/27/tiktok-reaches-1-billion-monthly-users.html
[15] https://www.businessofapps.com/data/tik-tok-statistics/
[16] *Id.*

51.     TikTok users who open the TikTok app are immediately confronted with an endless stream of curated videos selected by the TikTok Defendants' proprietary algorithm and shown to users on their FYP which is a "defining feature of the TikTok platform[.]"[17]

52.     According to the TikTok Defendants, the FYP is "central to the TikTok experience and where most of our users spend their time."[18]

53.     The TikTok Defendants' algorithm selects which videos are shown to each user based on the user's demographics, ***including age***, user interactions such as the videos viewed and shared, and the seemingly limitless amount of metadata tied to each user's digital presence and device settings which is collected and analyzed by the TikTok Defendants.

54.     The TikTok Defendants' algorithm "delivers content to each user that is likely to be of interest to that particular user."[19]  The TikTok Defendants boast that "while different people may come upon some of the same standout videos, each person's feed is unique and tailored to that specific individual."[20]

55.     The TikTok Defendants claim that their algorithm is "designed with safety as a consideration."  "Reviewed content found to depict things like graphic medical procedures or legal consumption of regulated goods…may not be eligible for recommendation."[21]

56.     The algorithm is designed and employed to achieve a singular ultimate goal: increase corporate profits.  The TikTok Defendants' app and algorithm seeks to show users videos and content designed to keep users engaged and glued to the app where they are encouraged only to participate more.

---

[17] https://newsroom.tiktok.com/en-us/how-tiktok-recommends-videos-for-you/
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*

57.     The TikTok Defendants prey upon vulnerable users, such as children, who are thrust into a never-ending dopamine feedback loop which creates addiction and a compelling urge to engage further in the TikTok Defendants' app.

58.     Cultivating and feeding addictive use of the app through the algorithm translates into greater revenues for the TikTok Defendants.

59.     ***The TikTok Defendants' app and algorithm are carrying out social and psychological programming and manipulation on an unprecedented scale, particularly among children.***

60.     The TikTok Defendants' app and algorithm have created an environment in which TikTok "challenges" are widely promoted and result in maximum user engagement and participation, thus financially benefitting the TikTok Defendants.

61.     TikTok "challenges" involve users filming themselves engaging in behavior that mimics and often times "one-ups" other users posting videos performing the same or similar conduct.  These TikTok "challenges" routinely involve dangerous or risky conduct.

62.     The TikTok Defendants' algorithm presents these often-dangerous "challenges" to users on their FYP and encourages users to create, share, and participate in the "challenge."

63.     There have been numerous dangerous TikTok challenges that the TikTok Defendants' app and algorithm have caused to spread rapidly, which promote dangerous behavior, including:

- ***Fire Mirror Challenge*** – involves participants spraying shapes on their mirror with a flammable liquid and then setting fire to it.
- ***Orbeez Shooting Challenge*** – involves participants shooting random strangers with tiny water-absorbent polymer beads using gel blaster guns
- ***Milk Crate Challenge*** – involves participants stacking a mountain of milk crates and attempting to ascend and descend the unstable structure without falling

A29

- ***Penny Challenge*** – involves sliding a penny behind a partially plugged-in phone charger
- ***Benadryl Challenge*** – involves consuming a dangerous amount of Benadryl in order to achieve hallucinogenic effects
- ***Skull Breaker Challenge*** – involves users jumping in the air while friends kick their feet out from underneath them, causing the users to flip in the air and fall back on their head
- ***Cha-Cha Slide Challenge*** – involves users swerving their vehicles all over the road to the famous song by the same name
- ***Dry Scoop Challenge*** – involves users ingesting a heaping scoop of undiluted supplemental energy powder
- ***Nyquil Chicken Challenge*** – involves soaking chicken breast in cough medicine like Nyquil and cooking it, boiling off the water and alcohol in it and leaving the chicken saturated with a highly concentrated amount of drugs in the meat
- ***Tooth Filing Challenge*** – involves users filing down their teeth with a nail file
- ***Fax Wax Challenge*** – involves users covering their entire face, including their eyes, with hot wax before ripping it off
- ***Coronavirus Challenge*** – involves users licking random items and surfaces in public during the midst of the global COVID-19 pandemic
- ***Scalp Popping Challenge*** – involves users twisting a piece of hair on the crown of someone's head around their fingers and pulling upward, creating a "popping" effect on their scalp
- ***Nutmeg Challenge*** – involves users consuming dangerously large amounts of nutmeg with the aim of achieving an intoxicating high
- ***Throw it in the Air Challenge*** – involves users standing in a circle looking down at a cellphone on the ground as someone throws an object into the air, and the goal is to not flinch as you watch the object fall on one of the participant's heads
- ***Corn Cob Challenge*** – involves users attaching a corn cob to a power drill and attempting to each the corn as it spins
- ***Gorilla Glue Challenge*** – involves users using a strong adhesive to stick objects to themselves
- ***Kiki Challenge*** – involves users getting out of moving vehicles to dance alongside in the roadway
- ***Salt and Ice Challenge*** – involves users putting salt on their skin and then holding an ice cube on the spot for as long as possible, creating a chemical reaction that causes pain and can lead to burns
- ***Snorting Challenge*** – involves users snorting an entire latex condom into their nose before pulling it out of their mouth
- ***Hot Water Challenge*** – involves users pouring boiling hot water on someone else
- ***Fire Challenge*** – involves users dousing themselves in a flammable liquid and then lighting themselves on fire

A30

64.     One of the deadliest TikTok Challenges to make its rounds on the TikTok Defendants' app and be promoted to users by their FYP algorithm is the TikTok Blackout Challenge, which encourages users to choke themselves with belts, purse strings, or anything similar until passing out.

65.     10-year-old Nylah Anderson died from attempting the Blackout Challenge because the TikTok Defendants' dangerously defective app and algorithm determined that the Blackout Challenge was "tailored" and "likely to be of interest" to Nylah.

**D.      The TikTok Defendants Knew the Deadly Blackout Challenge Had Killed Multiple Children**

66.     Tragically, Nylah Anderson is just the latest in a growing list of children killed as a result of the TikTok Defendants' app and algorithm determining it is appropriate to promote the dissemination of the deadly Blackout Challenge to kids.

67.     On January 21, 2021, a 10-year-old girl in Italy died after the TikTok Defendants' app and algorithm recommended the Blackout Challenge to her vis-à-vis her FYP.  According to Italian news reports, after the young girl saw the Blackout Challenge on her TikTok app, she tied a belt around her neck and choked herself, causing her to go into cardiac arrest.  She was rushed to the hospital but was declared braindead upon arrival and ultimately died.

68.     On March 22, 2021, a 12-year-old boy, Joshua Haileyesus, died after attempting the Blackout Challenge that the TikTok Defendants' app and algorithm recommended to him through his FYP.  Joshua was discovered breathless and unconscious by his twin brother and ultimately died after 19 days on life support.  Joshua attempted the Blackout Challenge by choking himself with a shoelace.

A31

69.     On June 14, 2021, a 14-year-old boy died in Australia while attempting to take part in TikTok's Blackout Challenge after the TikTok Defendants' app and algorithm presented the deadly challenge to him through his FYP.

70.     In July 2021, a 12-year-old boy died in Oklahoma while attempting the Blackout Challenge after the TikTok Defendants' app and algorithm recommended the dangerous and deadly video to him through his FYP.

71.     The TikTok Defendants unquestionably knew that the deadly Blackout Challenge was spreading through its app and that its algorithm was specifically feeding the Blackout Challenge to children, including those who had died.

72.     The TikTok Defendants knew or should have known that failing to take immediate and significant action to extinguish the spread of the deadly Blackout Challenge would result in more injuries and deaths, especially among children, as a result of their users attempting the viral challenge.

73.     The TikTok Defendants knew or should have known that their products—the app and algorithm—were dangerously defective and in need of immediate and significant change to prevent users, especially children, from being shown dangerous challenges that were known to have killed children.

74.     The TikTok Defendants knew or should have known that a failure to take immediate and significant corrective action would result in an unreasonable and unacceptable risk that additional users, and additional children, would fall victim to the deadly Blackout Challenge.

75.     Despite this aforementioned knowledge, the TikTok Defendants outrageously took no and/or completely inadequate action to extinguish and prevent the spread of the Blackout Challenge and specifically to prevent the Blackout Challenge from being shown to children on

their FYP despite knowing that such a failure would inevitably lead to more injuries and deaths, including those of children.

76.     Despite this aforementioned knowledge, the TikTok Defendants outrageously failed to change, update, and/or correct their algorithm to prevent it from presenting users, specifically children, with the dangerous and deadly Blackout Challenge despite knowing that such a failure would inevitably lead to more injuries and deaths, including those of children.

77.     The TikTok Defendants failed to take the necessary corrective action because it would result in less user engagement on the app and thus less corporate profits.

78.     The TikTok Defendants prioritized greater corporate profits over the health and safety of its users, and specifically over the health and safety of vulnerable children.

**E.     Nylah Anderson's Fatal TikTok Experience**

79.     Nylah Anderson was a bright, active, and innocent 10-year-old girl who fell victim to the TikTok Defendants' predatory and manipulative app and algorithm.

80.     Prompted by the never-ending stream of notifications from the TikTok app that were pushed to the forefront of Nylah's attention every day, Nylah began attempting to TikTok challenges that were presented to her on her FYP.

81.     The TikTok Defendants' app and algorithm pushed exceedingly and unacceptably dangerous challenges and videos to Nylah's FYP, thus encouraging her to engage and participate in the challenges.

82.     Only days before Nylah attempted the Blackout Challenge that killed her, the TikTok Defendants' algorithm presented Nylah with a similar choking challenge through her FYP, which entailed placing plastic wrap around her neck and holding her breath until a euphoric effect was achieved.

83.    The following day, the TikTok Defendants' algorithm thrust the Blackout Challenge onto Nylah's FYP, encouraging Nylah to participate.

84.    The particular Blackout Challenge video that the TikTok Defendants' algorithm showed Nylah prompted Nylah to hang a purse from a hanger in her closet and position her head between the bag and shoulder strap and then hang herself until blacking out.

85.    On December 7, 2021 Nylah attempted the Blackout Challenge she had seen on her FYP in her mother's bedroom closet while her mother was downstairs.

86.    Tragically, after hanging herself with the purse as the video the TikTok Defendants put on her FYP showed, Nylah was unable to free herself. Nylah endured hellacious suffering as she struggled and fought for breath and slowly asphyxiated until near the point of death.

87.    Plaintiff, Tawainna Anderson, found her daughter unconscious and hanging in her bedroom closet by her neck from the purse strap.

88.    Plaintiff performed several rounds of emergency CPR on Nylah in an ultimately futile effort to resuscitate her as Plaintiff waited for emergency responders to arrive.

89.    Three deep ligature marks were found on Nylah's neck, suggesting that she struggled greatly to free herself from the perilous and terrifying position but was unable to do so.

90.    Nylah was emergently transported to Nemours DuPont Hospital in Delaware with the hope that she could survive the extreme injuries she sustained in this horrific event.

91.    After spending several days in the pediatric intensive care unit, all hope for Nylah was extinguished and on December 12, 2021, 10-year-old Nylah Anderson succumbed to her injuries and died.

92.    This tragedy and the unimaginable suffering endured by Plaintiff and Nylah's family was entirely preventable had the TikTok Defendants not ignored the health and safety of its users, particularly the children using their product, in an effort to rake in greater profits.

93.    The TikTok Defendants' intentionally manipulative app and algorithm thrust an unacceptably dangerous video that Defendants knew to be circulating its platform in front of an impressionable 10-year-old girl.

94.    As a direct result of the TikTok Defendants' corrosive marketing practices, Nylah attempted the dangerous challenge and died as a result.

95.    As a direct and proximate result of the Defendants' carelessness, negligence, gross negligence, recklessness, willful and wanton conduct, strict liability, failure to warn, and defective design, Nylah suffered serious, severe, disabling injuries including, but not limited to her death resulting from asphyxiation by strangulation.

96.    As a direct and proximate result of the Defendants' carelessness, negligence, gross negligence, recklessness, willful and wanton conduct, strict liability, failure to warn, and defective design, which resulted in the death of Nylah Anderson, her beneficiaries have in the past and will in the future continue to suffer great pecuniary loss, including, but not limited to, loss of support, loss of aid, loss of services, loss of companionship, loss of consortium and comfort, loss of counseling, and loss of guidance.

97.    As a direct and proximate result of the Defendants' carelessness, negligence, gross negligence, recklessness, willful and wanton conduct, strict liability, failure to warn, and defective design, Nylah Anderson's beneficiaries incurred or have been cause to incur and pay large and various expenses for various funeral, burial, and estate administration expenses for which Plaintiff is entitled to compensation.

98.     As a direct and proximate result of the Defendants' carelessness, negligence, gross negligence, recklessness, willful and wanton conduct, strict liability, failure to warn, and defective design, Plaintiff claims all damages suffered by the Estate of Nylah Anderson and her wrongful death beneficiaries by reason of the death of Nylah Anderson, including, without limiting the generality thereof, the following: the severe injuries to Nylah which resulted in her death; the anxiety, horror, fear of impending death, mental disturbance, pain, suffering and other intangible losses which Nylah suffered prior to her death; the loss of future earning capacity suffered by Nylah from the date of her death until the time in the future that she would have lived had she not died as a result of the injuries she sustained; and the loss and total limitation and deprivation of her normal activities, pursuits and pleasures from the date of her death until such time in the future as she would have lived had she not died as a result of the injuries sustained by reason of the Defendants' carelessness, negligence, gross negligence, recklessness, strict liability, failure to warn, and defective design.

99.     As a direct and proximate result of the Defendants' carelessness, negligence, gross negligence, recklessness, willful and wanton conduct, strict liability, failure to warn, and defective design, Plaintiff, Tawainna Anderson, has been forced to suffer the death and loss of her 10-year-old daughter, Nylah Anderson.

100.     Defendants are jointly and severally liable for the injuries and damages alleged herein.

## COUNT I – STRICT PRODUCTS LIABILITY

### TAWAINNA ANDERSON, Individually and as Administratrix of the ESTATE OF NYLAH ANDERSON v. TIKTOK INC. AND BYTEDANCE INC.

101.     Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs the same as though fully set forth herein.

A36

102.    The TikTok Defendants' app and the algorithm that determines the videos and content that each user, including Nylah Anderson, sees is a product that is downloaded and used by hundreds of millions, if not billions, of people across the world, including young children like Nylah Anderson.

103.    The TikTok app and its algorithm are designed, developed, programmed, manufactured, marketed, sold, supplied, distributed, operated, and/or managed by the TikTok Defendants.

104.    Plaintiff is not seeking to hold the TikTok Defendants liable for the as the speaker or publisher of third-party content and instead intends to hold the TikTok Defendants responsible for their own independent conduct as the designers, programmers, manufacturers, sellers, and/or distributors of their dangerously defective TikTok app and algorithm.  Thus, Plaintiffs claims fall outside of any potential protections afforded by Section 230(c) of the Communications Decency Act.

105.    The TikTok Defendants, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, are strictly liable under § 402A of the Restatement (Second) of Torts because:

    a.    Defendants are engaged in the business of designing, developing, programming, manufacturing, selling, marketing, supplying, and/or distributing app products and algorithms, like the TikTok app and its associated algorithm;

    b.    The TikTok app and algorithm which caused Plaintiff's decedent's death and injuries was designed, created, programmed, developed, marketed, and placed in the general stream of commerce by Defendants;

    c.    The TikTok app and algorithm was expected to and did reach users such as Nylah Anderson without substantial change in the condition in which it was

A37

designed, developed, programmed, manufactured, marketed, distributed and/or sold;

    d.   The TikTok app and algorithm was designed, developed, programmed, manufactured, marketed, distributed and/or sold in the defective condition(s) for the reasons set forth herein.

106.    The TikTok app and its algorithm were in a defective condition as: (1) the danger contained therein is unknowable and unacceptable to the average or ordinary consumer; and/or (2) a reasonable person would conclude that the probability and seriousness of the harm caused by the subject product outweigh the burden or costs of taking precautions.

107.    The TikTok Defendants, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, are strictly liable under § 402A of the Restatement (Second) of Torts, by:

    a.   Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) in a defective condition;

    b.   Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) without adequate warnings;

    c.   Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) without adequate parental control features;

    d.   Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was not equipped, programmed with, or developed with the necessary safeguards required to prevent circulation of dangerous and deadly videos, including but not limited to the Blackout Challenge;

    e.   Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was not equipped, programmed with, or developed with the necessary safeguards required to prevent circulation of dangerous and deadly videos, including but not limited to the Blackout Challenge despite knowing that a failure to equip, program, or develop the app and algorithm with such

21

safeguards would result in severe injury and/or death to users, including children;

f.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was intended to addict users and manipulate them into participating in dangerous and deadly challenges, including but not limited to the Blackout Challenge;

g.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was intended to addict users and manipulate them into participating in dangerous and deadly challenges, including but not limited to the Blackout Challenge despite knowing that this would lead to severe injuries and/or death to users, including children;

h.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was intended to addict users;

i.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that preyed upon the vulnerability of children;

j.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was intended to manipulate and/or encourage maximum engagement and/or participation by users;

k.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that recommended inappropriate, dangerous, and deadly videos to users, including but not limited to the Blackout Challenge, through users' FYP;

l.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) which lacked all the necessary safety features to protect users, including Nylah Anderson;

m.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) for which the risks of use far outweighed the utility thereof;

n.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was unreasonably dangerous for its intended and foreseeable uses and/or misuses and to its intended and foreseeable users, including Nylah Anderson;

o.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that promoted the circulation of dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge;

22

p.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was incapable of preventing the circulation of dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge;

q.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that recommended dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, to young children, including Nylah Anderson;

r.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that recommended dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, to young children, including Nylah Anderson despite knowing that this would lead to severe injury and/or death;

s.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was not safe for its intended and represented purposes;

t.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that intentionally creates user addiction;

u.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that presents inappropriate, dangerous and/or deadly videos and challenges on users' FYP, including Nylah Anderson's FYP;

v.    Despite having actual knowledge of dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, circulating its app and platform and said videos and challenges causing serious injuries and/or deaths, failing to assess the risks of the product and adopt available, reasonable, and feasible alternatives;

w.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that lacked all the necessary safety features to protect users, including Nylah Anderson;

x.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that malfunctioned by recommending dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, to users, including children like Nylah Anderson;

y.    Failing to warn users of the risks associated with the product (the TikTok app and its algorithm);

23

A40

z.   Failing to warn users of the risks associated with dangerous and deadly videos and challenges circulating the TikTok app and recommended to users, including Nylah Anderson, through their FYP;

aa.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) the risks and hazards of which far outweighed any utility or benefit of the product (i.e. in violation of the risk-utility test);

bb.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that lacked reasonable, available, and feasible alternative designs that would have made the product safer for users, including Nylah Anderson; and

cc.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) the risks of which were unknown or unknowable to the consumer (i.e., in violation of the consumer expectations test).

108.   By conducting themselves as set forth above, the TikTok Defendants' acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm that caused Plaintiff's decedent's injuries and death.

109.   By reason of the breach of duties, pursuant to § 402A of the Restatement (Second) of Torts, by the TikTok Defendants, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, Nylah Anderson was caused to sustain severe and permanent disabling injuries resulting in her death as set forth above.

110.   The TikTok Defendants designed, developed, programmed, manufactured, sold, marketed, supplied, and/or distributed a product (the TikTok app and its algorithm) the risks and hazards of which far outweighed its utility or benefit, thus violating the risk-utility test set forth in *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014) and its progeny, as well as Restatement (Second) of Torts § 402A.

24

A41

111.    The TikTok Defendants designed, developed, programmed, manufactured, sold, marketed, supplied, and/or distributed a product (the TikTok app and its algorithm) the risks of which were unknown or unknowable to the consumer and for which the consumer would not reasonably anticipate or appreciate the dangerous condition in violation of the consumer expectations test set forth in *Tincher*, 104 A.3d 328 and its progeny, as well as Restatement (Second) of Torts § 402A.

112.    The safety of the public and the users of the TikTok app, particularly children, must come first and be the paramount concern and consideration in the design, development, programming, supply, and distribution of Defendants' app and algorithm.

113.    Outrageously, the TikTok Defendants knowingly exposed the public and innocent children, including Nylah Anderson, to addiction, manipulation, and control causing them to promote, engage, and participate in dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, all in the name of greater corporate profits.

114.    The TikTok Defendants knew that dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, were circulating its app and being recommended to users by the Defendants' algorithm on users' FYP.

115.    The TikTok Defendants knew that children were dying from attempting to participate in dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, that Defendants' algorithm was recommending to them through the children's FYPs.

116.    The TikTok Defendants outrageously prioritized revenues and profits over the health and safety of its users, particularly children like Nylah Anderson.

**WHEREFORE**, Plaintiff, Tawainna Anderson, Individually and as Administratrix of the

Estate of Nylah Anderson, a deceased minor, claims of Defendants, TikTok Inc. and ByteDance Inc., jointly and severally, sums in excess of the jurisdictional threshold in compensatory damages, punitive damages, delay damages, interest and allowable costs of suit and brings this action to recover same.

## COUNT II – NEGLIGENCE

### <u>TAWAINNA ANDERSON, Individually and as Administratrix of the ESTATE OF NYLAH ANDERSON v. TIKTOK INC. AND BYTEDANCE INC.</u>

117.    Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs the same as though fully set forth herein.

118.    The TikTok Defendants had a duty to design, develop, program, manufacture, distribute, sell, supply, and/or operate their app and algorithm such that it did not expose users to harm, injury, and/or death.

119.    The TikTok Defendants had a duty to monitor the videos and challenges shared, posted, and/or circulated on their app and platform to ensure that dangerous and deadly videos and challenges were not posted, shared, circulated, recommended, and/or encouraged.

120.    The TikTok Defendants had a duty to monitor and evaluate the performance of their algorithm and ensure that it was not recommending or posting dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, to users' FYP.

121.    The TikTok Defendants had a duty to employ and train personnel to appropriately and reasonably respond to notice that dangerous and deadly videos and challenges were being posted, shared, and/or circulated on Defendants' app.

122.    The TikTok Defendants had a duty to protect vulnerable users of their product, specifically children like Nylah Anderson.

123.   The TikTok Defendants had a duty to design, develop, program, manufacture, distribute, sell, supply, and/or operate their app and algorithm such that it did not manipulate users and/or otherwise encourage them to engage in dangerous and potentially deadly videos and challenges.

124.   The TikTok Defendants had a duty to design, develop, program, manufacture, distribute, sell, supply, and/or operate their app and algorithm that did not create addiction and dependence among its users.

125.   The TikTok Defendants miserably failed these aforementioned duties and as a result Nylah Anderson was killed.

126.   Plaintiff does not seek to hold the TikTok Defendants liable as the speaker or publisher of third-party content and instead intends to hold the TikTok Defendants responsible for their own independent conduct as the designers, programmers, manufacturers, sellers, and/or distributors of their dangerously defective social media products and for their own independent acts of negligence, gross negligence, carelessness, recklessness, and willful and wanton conduct as further described herein.   Thus, Plaintiffs claims fall outside of any potential protections afforded by Section 230(c) of the Communications Decency Act.

127.   The injuries, damages and losses suffered by Plaintiff and Plaintiff's decedent, Nylah Anderson, and her beneficiaries, as more fully set forth herein, were caused by the negligence, gross negligence, carelessness, recklessness, willful and wanton conduct of the TikTok Defendants, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, both generally and in the following particular respects:

a.  Recommending and/or posting dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, to users' FYP, including Nylah Anderson's FYP;

b.  Allowing dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, to be posted, shared, and/or circulated to users on the TikTok app;

c.  Creating an algorithm that recommended and/or posted dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, to 10-year-old Nylah Anderson's FYP;

d.  Failing to prevent dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, from being posted, shared, and/or circulated to users on the TikTok app despite being actually aware of said videos and challenges and despite knowing that such a failure would expose users, including children like Nylah Anderson, to the unreasonable and unacceptable risk of severe injury and/or death;

e.  Intentionally addicting users to the TikTok app;

f.  Intentionally addicting users to the TikTok app for the goal of increasing corporate revenues and profits;

g.  Manipulating and socially programming users, including Nylah Anderson, into posting, engaging in, and participating in dangerous videos and challenges, including but not limited to the Blackout Challenge;

h.  Creating a digital environment in which the risks of dangerous videos and challenges, including but not limited to the Blackout Challenge, are hidden and/or downplayed and in which users are encouraged to participate in dangerous videos and challenges;

i.  Failing to timely remove all dangerous and deadly videos and challenges from its app, including but not limited to the Blackout Challenge;

j.  Hiring and/or employing personnel who were unfit, untrained, and/or incapable of operating and/or managing the TikTok app and its algorithm to ensure that dangerous and potentially deadly videos and challenges were not posted, shared, or circulated to users on the app;

k.  Failing to adequately train, educate, and/or supervise its employees, contractors, agents, and/or servants such that they were capable of operating and/or managing the TikTok app and its algorithm to ensure that dangerous and potentially deadly videos and challenges were not posted, shared, or circulated to users on the app;

l.  Failing to remove dangerous and deadly videos and challenges from the TikTok app despite knowing that users were being encouraged to engage in dangerous and deadly actions and despite knowing that users were being exposed to and actually suffering severe injury and death, including children such as Nylah Anderson;

28

A45

m.  Manipulating and socially programming users, including children like Nylah Anderson, to engage in certain desired activities and engagement on the TikTok app in order to maximize corporate revenues and profits;

n.  Developing, enacting, promulgating, and enforcing policies and procedures which allowed dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, to be posted, shared, and circulated on the app;

o.  Developing, enacting, promulgating, and enforcing policies and procedures which prevented the discovery of dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, that were being posted, shared, and circulated to users on the app;

p.  Developing, enacting, promulgating, and enforcing policies and procedures which prevented the timely takedown of dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge;

q.  Developing, enacting, promulgating, and enforcing policies and procedures which resulted in dangerous and deadly videos, including but not limited to the Blackout Challenge, being recommended to users through their FYP;

r.  Failing to prevent videos of the Blackout Challenge from being posted, shared, circulated, and/or recommended to users, including Nylah Anderson, through their FYP despite knowing that multiple people, including children, had been killed after attempting to participate in the challenge they had seen and/or were recommended on the TikTok app;

s.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) in a defective condition;

t.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) without adequate warnings;

u.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was not equipped, programmed with, or developed with the necessary safeguards required to prevent circulation of dangerous and deadly videos, including but not limited to the Blackout Challenge;

v.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was not equipped, programmed with, or developed with the necessary safeguards required to prevent circulation of dangerous and deadly videos, including but not limited to the Blackout Challenge despite knowing that a failure to equip, program, or develop the app and algorithm with such safeguards would result in severe injury and/or death to users, including children;

w.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was intended to addict users and manipulate them into participating in dangerous and deadly challenges, including but not limited to the Blackout Challenge;

x.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was intended to addict users and manipulate them into participating in dangerous and deadly challenges, including but not limited to the Blackout Challenge despite knowing that this would lead to severe injuries and/or death to users, including children;

y.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was intended to addict users;

z.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that preyed upon the vulnerability of children;

aa.   Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was intended to manipulate and/or encourage maximum engagement and/or participation by users;

bb.   Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that recommended inappropriate, dangerous, and deadly videos to users, including but not limited to the Blackout Challenge, through users' FYP;

cc.   Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) which lacked all the necessary safety features to protect users, including Nylah Anderson;

dd.   Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) for which the risks of use far outweighed the utility thereof;

ee.   Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was unreasonably dangerous for its intended and foreseeable uses and/or misuses and to its intended and foreseeable users, including Nylah Anderson;

ff.   Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that promoted the circulation of dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge;

gg.   Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was

incapable of preventing the circulation of dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge;

hh.     Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that recommended dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, to young children, including Nylah Anderson;

ii.     Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that recommended dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, to young children, including Nylah Anderson despite knowing that this would lead to severe injury and/or death;

jj.     Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that was not safe for its intended and represented purposes;

kk.     Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that intentionally creates user addiction;

ll.     Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that presents inappropriate, dangerous and/or deadly videos and challenges on users' FYP, including Nylah Anderson's FYP;

mm.     Despite having actual knowledge of dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, circulating its app and platform and said videos and challenges causing serious injuries and/or deaths, failing to assess the risks of the product and adopt available, reasonable, and feasible alternatives;

nn.     Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that lacked all the necessary safety features to protect users, including Nylah Anderson;

oo.     Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the TikTok app and its algorithm) that malfunctioned by recommending dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, to users, including children like Nylah Anderson;

pp.     Failing to warn users of the risks associated with the product (the TikTok app and its algorithm);

qq.     Failing to warn users of the risks associated with dangerous and deadly videos and challenges circulating the TikTok app and recommended to users, including Nylah Anderson, through their FYP;

A48

128.    By conducting themselves as set forth above, the TikTok Defendants' acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm that caused Plaintiff's decedent's injuries and death.

129.    By reason of the TikTok Defendants' carelessness, negligence, gross negligence, recklessness, and willful and wanton conduct, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, Nylah Anderson was caused to sustain severe and permanent disabling injuries resulting in her death as set forth above.

130.    The safety of the public and the users of the TikTok app, particularly children, must come first and be the paramount concern and consideration in the design, development, programming, supply, and distribution of Defendants' app and algorithm as well as in the operation, oversight, supervision, and management of the app and algorithm and the content available, posted, shared, and/or recommended to users on the app.

131.    Outrageously, the TikTok Defendants knowingly exposed the public and innocent children, including Nylah Anderson, to addiction, manipulation, and control causing them to promote, engage, and participate in dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, all in the name of greater corporate profits.

132.    The TikTok Defendants knew that dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, were circulating its app and being recommended to users by the Defendants' algorithm on users' FYP but failed to take appropriate, reasonable, timely, and necessary remedial actions.

A49

133.    The TikTok Defendants knew that children were dying from attempting to participate in dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, that Defendants' algorithm was recommending to them through the children's FYPs but failed to take appropriate, reasonable, timely, and necessary remedial actions.

134.    The TikTok Defendants outrageously prioritized revenues and profits over the health and safety of its users, particularly children like Nylah Anderson.

**WHEREFORE**, Plaintiff, Tawainna Anderson, Individually and as Administratrix of the Estate of Nylah Anderson, a deceased minor, claims of Defendants, TikTok Inc. and ByteDance Inc., jointly and severally, sums in excess of the jurisdictional threshold in compensatory damages, punitive damages, delay damages, interest and allowable costs of suit and brings this action to recover same.

### COUNT III – VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. §§ 201-1, *et seq.*

### TAWAINNA ANDERSON, Individually and as Administratrix of the ESTATE OF NYLAH ANDERSON v. TIKTOK INC. AND BYTEDANCE INC.

135.    Plaintiff hereby incorporates by reference each and every allegations contained in the preceding paragraphs the same as though fully set forth herein.

136.    At all times relevant hereto, the TikTok Defendants intended and expected their product (the TikTok app and its algorithm) to be deployed, marketed, sold, and used in the Commonwealth of Pennsylvania.

137.    At all times relevant hereto, the TikTok Defendants were persons within the meaning of 73 P.S. § 201-2(2).

138.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") at § 201-9.2(a) provides that "[a]ny person who purchases or leases goods or services

A50

primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real and personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 [(73 P.S. § 201-3)] of this act, may bring a private action to recover actual damages[.]"  73 P.S. § 201-9.2(a).

139.   The UTPCPL makes unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  73 P.S. § 201-3.

140.   At all times relevant hereto, the TikTok Defendants had both constructive and actual knowledge that when Defendants' products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants they were used by consumers, including children, to engage in risky and dangerous activities that were promoted and disseminated by Defendants' products which sought to encourage such engagement and it was likely that significant injuries, including death, would occur.

141.   At all times relevant hereto, the TikTok Defendants had both constructive and actual knowledge that Defendants app and algorithm were resulting in dangerous videos being shown to users, including children, and that the app and algorithm were encouraging users to engage in risky and dangerous activities that were likely to cause significant injuries, including death, despite these dangers being concealed from said consumers and despite the Defendants' products being marketed and sold as safe.

142.   From the first date on which the TikTok Defendants placed their products (the TikTok app and its algorithm) into the stream of commerce for use in the Commonwealth of Pennsylvania through the date of Nylah Anderson's death, Defendants engaged in unfair or deceptive acts or practices, in violation of the UTPCPL, including but not limited to deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or

34

A51

omission of material facts, in designing, developing, programming, manufacturing, selling, marketing, supplying, and/or distributing Defendants' products for use in the Commonwealth of Pennsylvania in that Defendants:

    a.    concealed, suppressed, or omitted to disclose that Defendants' products were designed and intended to addict users;

    b.    concealed, suppressed, or omitted to disclose that Defendants' products carried a risk of addiction and dependence;

    c.    concealed, suppressed, or omitted to disclose that Defendants' products were designed and intended to urge and/or compel users to spend as much time as possible on the TikTok app;

    d.    concealed, suppressed, or omitted to disclose that Defendants' products would expose users to videos and challenges which encouraged, promoted, and/or prompted users, including children, to engage in risky and dangerous activities;

    e.    concealed, suppressed, or omitted to disclose that Defendants' products were not safe or suitable for use by children;

    f.    concealed, suppressed, or omitted to disclose that the risk and dangerous videos and challenges shown to users by Defendants' products would result in severe injury and/or death;

    g.    concealed, suppressed, or omitted to disclose that Defendants' products would reward users for engaging in risky and dangerous activities;

    h.    concealed, suppressed, or omitted to disclose that Defendants' products, namely the app's algorithm, had not been adequately developed, refined, and/or tested to ensure that dangerous and risky videos and challenges would not be disseminated or promoted on the app or otherwise shown to users;

    i.    concealed, suppressed, or omitted to disclose that Defendants' products, namely the app's algorithm, had not been adequately developed, refined, and/or tested to ensure that children and other vulnerable users were not shown videos or challenges which encouraged and/or prompted said users to engage in dangerous activities or which otherwise created a system which rewarded users for engaging in said dangerous activities; and

    j.    concealed, suppressed, or omitted to disclose that Defendants' corporate profits depended on user addiction and maximizing a user's time spent on and engaging in the Defendants' products.

143.    These acts and practices of the TikTok Defendants and those with whom they were acting in concert in designing, developing, programming, manufacturing, distributing, selling,

35

supplying, and/or operating their products (the TikTok app and its algorithm) for sale and use in the Commonwealth of Pennsylvania were unfair because they offended public policy, were immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers, including Plaintiff's decedent Nylah Anderson, her estate, and her beneficiaries.

144.    These acts and practices of the TikTok Defendants in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating their products (the TikTok app and its algorithm) for sale and use in the Commonwealth of Pennsylvania offended the clearly stated public policy of the Commonwealth of Pennsylvania.

145.    These acts and practices of the TikTok Defendants in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating their products (the TikTok app and its algorithm) for sale and use in the Commonwealth of Pennsylvania were immoral and unethical, as they served only to financially benefit Defendants at the expense of the health and safety of users of the Defendants' products, including Nylah Anderson.

146.    These acts and practices of the TikTok Defendants in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating their products (the TikTok app and its algorithm) for sale and use in the Commonwealth of Pennsylvania were likely to cause substantial injury and/or death to users, including Nylah Anderson, by exposing them to and encouraging them to engage in activities which posed unnecessary and unreasonable risks to their health and safety.

147.    These acts and practices of the TikTok Defendants in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating their products (the TikTok app and its algorithm) for sale and use in the Commonwealth of Pennsylvania were likely to cause, and did cause, substantial injury and/or death to users of Defendants' products, including

A53

Nylah Anderson, in that but for these acts and practices, Defendants' products would not have been downloaded, purchased, and/or used in Pennsylvania and persons who used them, including Nylah Anderson, would not have been injured or killed by said use.

148.    These acts and practices of the TikTok Defendants in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating their products (the TikTok app and its algorithm) for sale and use in the Commonwealth of Pennsylvania committed these acts and engaged in these practices in conscious disregard of the safety of others and their users, including Nylah Anderson.

149.    The injuries caused by the TikTok Defendants' acts and practices in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating their products (the TikTok app and its algorithm) for sale and use in the Commonwealth of Pennsylvania—namely, users' injuries and damages (including monetary losses)—are not outweighed by any countervailing benefit to consumers or competition.

150.    The TikTok Defendants intended that purchasers and/or users of their products use them in reliance on these unfair and deceptive acts and practices.

151.    The facts that the TikTok Defendants concealed, suppressed, and/or omitted to disclose were material to the decisions to use Defendants' products, and Plaintiff's decedent would not have used said products had these facts been disclosed.

152.    The TikTok Defendants' unfair and deceptive acts and practices occurred in connection with their conduct of trade and commerce in the Commonwealth of Pennsylvania.

153.    The TikTok Defendants' unfair and deceptive acts and practices of the TikTok Defendants violated the UTPCPL.

154. The TikTok Defendants committed these unfair and deceptive practices knowing they created a substantial risk of harm to those who used Defendants' products in the Commonwealth of Pennsylvania.

155. As a direct and proximate result of the TikTok Defendants' violations of the UTPCPL, Plaintiff's decedent, Nylah Anderson, suffered grievous injury and died and Nylah Anderson and her estate and beneficiaries suffered all of the damages discussed and claimed herein.

**WHEREFORE**, Plaintiff, Tawainna Anderson, Individually and as Administratrix of the Estate of Nylah Anderson, a deceased minor, claims of Defendants, TikTok Inc. and ByteDance Inc., jointly and severally, sums in excess of the jurisdictional threshold in damages recoverable under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, as well as, compensatory damages, punitive damages, delay damages, interest and allowable costs of suit and brings this action to recover same.

## COUNT IV – VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT, CAL. CIV. § 1750, *et seq.*

### TAWAINNA ANDERSON, Individually and as Administratrix of the ESTATE OF NYLAH ANDERSON v. TIKTOK INC. AND BYTEDANCE INC.

156. Plaintiff hereby incorporates by reference each and every allegations contained in the preceding paragraphs the same as though fully set forth herein.

157. As corporations or other business entities headquartered in and operating out of the State of California, the TikTok Defendants were required to comply with the California Consumer Legal Remedies Act, Cal. Civ. § 1750, *et seq.*

A55

158.    At all times relevant hereto, the TikTok Defendants intended and expected that their products (the TikTok app and its algorithm) would be marketed, sold, downloaded, and/or used in the State of California.

159.    The TikTok Defendants designed, developed, programmed, manufactured, distributed, sold, supplied, and/or operated their products for sale and use in the U.S., including California.

160.    At all times relevant hereto, the TikTok Defendants were persons within the meaning of Cal. Civ. Code § 1761(c).

161.    At all times relevant hereto, Nylah Anderson was a consumer within the meaning of Cal. Civ. Code § 1761(d).

162.    The California Consumer Legal Remedies Act, Cal. Civ. § 1770(a)(5); (7), provides in pertinent part:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful: Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have […] Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are another.

163.    At all times relevant hereto, the TikTok Defendants had both constructive and actual knowledge that when Defendants' products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants they were used by consumers, including children, to engage in risky and dangerous activities that were promoted and disseminated by Defendants' products which sought to encourage such engagement and it was likely that significant injuries, including death, would occur.

A56

164.    At all times relevant hereto, the TikTok Defendants had both constructive and actual knowledge that Defendants app and algorithm were resulting in dangerous videos being shown to users, including children, and that the app and algorithm were encouraging users to engage in risky and dangerous activities that were likely to cause significant injuries, including death, despite these dangers being concealed from said consumers and despite the Defendants' products being marketed and sold as safe.

165.    From the first date on which the TikTok Defendants placed their products (the TikTok app and its algorithm) into the stream of commerce for use in California through the date of Nylah Anderson's death, Defendants engaged in unfair or deceptive acts or practices, in violation of the California Consumer Legal Remedies Act, including but not limited to deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of material facts, in designing, developing, programming, manufacturing, selling, marketing, supplying, and/or distributing Defendants' products for use in California and elsewhere in the U.S., in that Defendants:

      a.    concealed, suppressed, or omitted to disclose that Defendants' products were designed and intended to addict users;

      b.    concealed, suppressed, or omitted to disclose that Defendants' products carried a risk of addiction and dependence;

      c.    concealed, suppressed, or omitted to disclose that Defendants' products were designed and intended to urge and/or compel users to spend as much time as possible on the TikTok app;

      d.    concealed, suppressed, or omitted to disclose that Defendants' products would expose users to videos and challenges which encouraged, promoted, and/or prompted users, including children, to engage in risky and dangerous activities;

      e.    concealed, suppressed, or omitted to disclose that Defendants' products were not safe or suitable for use by children;

      f.    concealed, suppressed, or omitted to disclose that the risk and dangerous videos and challenges shown to users by Defendants' products would result in severe injury and/or death;

g.    concealed, suppressed, or omitted to disclose that Defendants' products would reward users for engaging in risky and dangerous activities;

h.    concealed, suppressed, or omitted to disclose that Defendants' products, namely the app's algorithm, had not been adequately developed, refined, and/or tested to ensure that dangerous and risky videos and challenges would not be disseminated or promoted on the app or otherwise shown to users;

i.    concealed, suppressed, or omitted to disclose that Defendants' products, namely the app's algorithm, had not been adequately developed, refined, and/or tested to ensure that children and other vulnerable users were not shown videos or challenges which encouraged and/or prompted said users to engage in dangerous activities or which otherwise created a system which rewarded users for engaging in said dangerous activities; and

j.    concealed, suppressed, or omitted to disclose that Defendants' corporate profits depended on user addiction and maximizing a user's time spent on and engaging in the Defendants' products.

166.    These acts and practices of the TikTok Defendants and those with whom they were acting in concert in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating their products (the TikTok app and its algorithm) for sale and use in California, and elsewhere in the U.S., were unfair because they offended public policy, were immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers, including Plaintiff's decedent Nylah Anderson, her estate, and her beneficiaries.

167.    These acts and practices of the TikTok Defendants in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating their products (the TikTok app and its algorithm) for sale and use in California, and elsewhere in the U.S., offended the clearly stated public policy of California.

168.    These acts and practices of the TikTok Defendants in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating their products (the TikTok app and its algorithm) for sale and use in California, and elsewhere in the U.S., were

A58

immoral and unethical, as they served only to financially benefit Defendants at the expense of the health and safety of users of the Defendants' products, including Nylah Anderson.

169.    These acts and practices of the TikTok Defendants in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating their products (the TikTok app and its algorithm) for sale and use in California, and elsewhere in the U.S., were likely to cause substantial injury and/or death to users, including Nylah Anderson, by exposing them to and encouraging them to engage in activities which posed unnecessary and unreasonable risks to their health and safety.

170.    These acts and practices of the TikTok Defendants in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating their products (the TikTok app and its algorithm) for sale and use in California, and elsewhere in the U.S., were likely to cause, and did cause, substantial injury and/or death to users of Defendants' products, including Nylah Anderson, in that but for these acts and practices, Defendants' products would not have been downloaded, purchased, and/or used in Pennsylvania and persons who used them, including Nylah Anderson, would not have been injured or killed by said use.

171.    These acts and practices of the TikTok Defendants in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating their products (the TikTok app and its algorithm) for sale and use in California, and elsewhere in the U.S., committed these acts and engaged in these practices in conscious disregard of the safety of others and their users, including Nylah Anderson.

172.    The injuries caused by the TikTok Defendants' acts and practices in designing, developing, programming, manufacturing, distributing, selling, supplying, and/or operating their products (the TikTok app and its algorithm) for sale and use in California, and elsewhere in the

A59

U.S.—namely, users' injuries and damages (including monetary losses)—are not outweighed by any countervailing benefit to consumers or competition.

173.    The TikTok Defendants intended that purchasers and/or users of their products use them in reliance on these unfair and deceptive acts and practices.

174.    The facts that the TikTok Defendants concealed, suppressed, and/or omitted to disclose were material to the decisions to use Defendants' products, and Plaintiff's decedent would not have used said products had these facts been disclosed.

175.    The TikTok Defendants' unfair and deceptive acts and practices occurred in connection with their conduct of trade and commerce in California, and elsewhere in the U.S.

176.    The TikTok Defendants' unfair and deceptive acts and practices of the TikTok Defendants violated the California Consumer Legal Remedies Act.

177.    The TikTok Defendants committed these unfair and deceptive practices knowing they created a substantial risk of harm to those who used Defendants' products in California, and elsewhere in the U.S.

178.    As a direct and proximate result of the TikTok Defendants' violations of the California Consumer Legal Remedies Act, Plaintiff's decedent, Nylah Anderson, suffered grievous injury and died and Nylah Anderson and her estate and beneficiaries suffered all of the damages discussed and claimed herein.

**WHEREFORE**, Plaintiff, Tawainna Anderson, Individually and as Administratrix of the Estate of Nylah Anderson, a deceased minor, claims of Defendants, TikTok Inc. and ByteDance Inc., jointly and severally, sums in excess of the jurisdictional threshold in damages recoverable under the California Consumer Legal Remedies Act, as well as, compensatory damages, punitive damages, delay damages, interest and allowable costs of suit and brings this action to recover same.

## COUNT V – WRONGFUL DEATH

### TAWAINNA ANDERSON, Individually and as Administratrix of the ESTATE OF NYLAH ANDERSON v. TIKTOK INC. AND BYTEDANCE INC.

179.    Plaintiff hereby incorporates by reference each and every allegations contained in the preceding paragraphs the same as though fully set forth herein.

180.    Decedent, Nylah Anderson's known potential wrongful death beneficiaries are her mother, Plaintiff Tawainna Anderson, her brothers, Nakye Anderson and Kevin Freeman Lamarr Neal III, as well as potentially her biological father.

181.    By reason of the death of Nylah Anderson, her wrongful death beneficiaries have in the past and will in the future continue to suffer great pecuniary loss, including but not limited to, loss of companionship, loss of comfort, loss of society, loss of guidance, loss of solace, loss of protection, profound emotional loss, and profound psychological loss.

182.    As a direct and proximate result of the foregoing, decedent, Nylah Anderson's wrongful death beneficiaries incurred or have been caused to incur and pay large and various expenses for medical treatment, hospital care and to incur various funeral, burial and estate and administration expenses for which Plaintiff is entitled to compensation in this proceeding.

183.    Plaintiff, Tawainna Anderson, Individually and as Administratrix of the Estate of Nylah Anderson, a deceased minor, brings this action by virtue of the Wrongful Death Act, 42 Pa.C.S.A. § 8301, and Pa.R.Civ.P. 2202, and claims all benefits and recoverable damages under the Wrongful Death Act on behalf of all other persons entitled to recover under law.

**WHEREFORE**, Plaintiff, Tawainna Anderson, Individually and as Administratrix of the Estate of Nylah Anderson, a deceased minor, claims of Defendants, TikTok Inc. and ByteDance Inc., jointly and severally, sums in excess of the jurisdictional threshold in compensatory damages, punitive damages, delay damages, interest and allowable costs of suit and brings this action to

A61

recover same.

## COUNT VI – SURVIVAL ACT

### TAWAINNA ANDERSON, Individually and as Administratrix of the ESTATE OF NYLAH ANDERSON v. TIKTOK INC. AND BYTEDANCE INC.

184.    Plaintiff hereby incorporates by reference each and every allegations contained in the preceding paragraphs the same as though fully set forth herein.

185.    Plaintiff claims on behalf of the Estate of Nylah Anderson all damages suffered by the Estate by reason of the death of Nylah Anderson, including without limiting the generality of the following: the severe injuries to Nylah Anderson, which resulted in death; the anxiety, horror, and fear of impending and certain death, mental disturbance, pain, suffering, and other intangible losses which Nylah Anderson suffered prior to death; the loss of future earning capacity suffered by Nylah Anderson from the date of her death until the time in the future decedent would have lived had she not died as a result of the injuries sustained by reason of the strict liability, failure to warn, carelessness, negligence, gross negligence, recklessness, and willful and wanton conduct of the TikTok Defendants as laid out herein.

186.    Plaintiff brings this action on behalf of the Estate of Nylah Anderson, by virtue of the Survival Act, 52 Pa.C.S.A. § 8302, and claims all benefits of the Survival Act on behalf of Nylah Anderson's Estate, and other persons entitled to recover under law.

**WHEREFORE**, Plaintiff, Tawainna Anderson, Individually and as Administratrix of the Estate of Nylah Anderson, a deceased minor, claims of Defendants, TikTok Inc. and ByteDance Inc., jointly and severally, sums in excess of the jurisdictional threshold in compensatory damages, punitive damages, delay damages, interest and allowable costs of suit and brings this action to recover same.

A62

## PLAINTIFF'S PRAYERS FOR RELIEF

Plaintiff, Tawainna Anderson, Individually and as Administratrix of the Estate of Nylah Anderson, a deceased minor, prays that this Court enter judgment in her favor and against Defendants, TikTok Inc. and ByteDance Inc., jointly and severally compensatory damages in an amount greater than the jurisdictional threshold plus costs of suit, severally as to each Defendant for punitive damages in an amount sufficient to punish it and encourage it and others from similar conduct, for delay damages, reasonable attorney's fees, and for such further relief as is just and appropriate under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

<div style="margin-left:40%;">

*/s/ Robert J. Mongeluzzi*
Robert J. Mongeluzzi
Jeffrey P. Goodman
Samuel B. Dordick
Rayna McCarthy
**SALTZ MONGELUZZI & BENDESKY P.C.**
One Liberty Place
1650 Market Street, 52nd Floor
Philadelphia, Pennsylvania 19103
Tel: (215) 496-8282
rmongeluzzi@smbb.com
jgoodman@smbb.com
sdordick@smbb.com
rmccarthy@smbb.com

Mark A. DiCello
**DiCELLO LEVITT GUTZLER LLC**
7556 Mentor Avenue
Western Reserve
Law Building
Mentor, OH 44060
Tel: (440) 953-8888
madicello@dicellolevitt.com

*Counsel for Plaintiff*

</div>

46

A63

# EXHIBIT "A"



## *Certificate of Grant of Letters of Administration*

**ESTATE NO:**     **2322-0371**

**ESTATE OF:**     **NYLAH D. ANDERSON, Deceased**

**SOC SEC NO:**     **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**

    **WHEREAS, NYLAH D. ANDERSON, AKA NYLAH ANDERSON,** late of **Chester City,** Delaware County, PA, who died on **December 12, 2021,** and;

    **WHEREAS,** the Grant of Letters of Administration is required for the administration of the estate.

    **THEREFORE,** I, Rachel Ezzell Berry, Register of Wills in and for said county, hereby certify that I have this day granted LETTERS OF ADMINISTRATION to **TAWAINNA LASHA ANDERSON (AS PER ORDER DATED: 04/07/22 SIGNED BY RACHEL EZZELL BERRY, ESQUIRE, REGISTER OF WILLS )** who has duly qualified as **Administratrix** and has agreed to administer the estate according to law, all of which fully appears of record in my office in the Delaware County Government Center, Media, Pennsylvania.

    **IN TESTIMONY WHEREOF,** I have here unto set my hand and affixed the seal of my office on **April 7th, 2022**.

                                        Rachel Ezzell Berry
                        Register of Wills & Clerk of Orphans' Court

A65

Commonwealth of Pennsylvania
Delaware County
} ss:

I, RACHEL EZZELL BERRY, ESQUIRE,
Register for the Probate of Wills and
Granting Letters Testamentary and of
Administration in and for County of
Delaware, in the Commonwealth of
Pennsylvania, do hereby Certify that on
**April 07, 2022**

**TAWAINNA LASHA ANDERSON (AS PER ORDER DATED: 04/07/22**
**SIGNED BY RACHEL EZZELL BERRY, ESQUIRE, REGISTER OF**
**WILLS )**

was duly and legally appointed as **Administratrix** of the estate of

**NYLAH D. ANDERSON**
**also known as:**
**NYLAH ANDERSON**

who died **December 12, 2021** late of **Chester City**, Delaware County,
Pennsylvania, and has been duly qualified as such according to law as can
be verified by reference to the records in my office, and that the letters
have not been revoked.

WITNESS my hand and seal of office, at Media in the County aforesaid, on
April 07, 2022.
**File No. 2322-0371**

A66

Commonwealth of Pennsylvania     **}** ss:
Delaware County

I, RACHEL EZZELL BERRY, ESQUIRE,
Register for the Probate of Wills and
Granting Letters Testamentary and of
Administration in and for County of
Delaware, in the Commonwealth of
Pennsylvania,  do hereby Certify that on
**April 07,  2022**

**TAWAINNA LASHA ANDERSON (AS PER ORDER DATED: 04/07/22
SIGNED BY RACHEL EZZELL BERRY, ESQUIRE, REGISTER OF
WILLS )**

was duly and legally appointed as **Administratrix** of the estate of

**NYLAH D. ANDERSON**
**also known as:**
**NYLAH ANDERSON**

who died **December 12,  2021** late of **Chester City**, Delaware County,
Pennsylvania, and has been duly qualified as such according to law as can
be verified by reference to the records in my office, and that the letters
have not been revoked.

WITNESS my hand and seal of office, at Media in the County aforesaid, on
April 07, 2022.
**File No. 2322-0371**

Register of Wills

A67

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Tawainna Anderson, Individually and as Administratrix of the Estate of Nylah Anderson, a deceased minor

**(b)** County of Residence of First Listed Plaintiff   Delaware County, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Robert J. Mongeluzzi, Esq.; Saltz Mongeluzzi & Bendesky P.C., 1650 Market Street, 52nd Floor, Philadelphia, PA 19103; (215) 496-8282

## DEFENDANTS

TikTok, Inc. and ByteDance, Inc.

County of Residence of First Listed Defendant   Los Angeles County, CA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [x] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [x] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [x] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | | | [ ] 790 Other Labor Litigation | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 791 Employee Retirement Income Security Act | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332
Brief description of cause:
Wrongful Death and Survival Action arising from the death of 10-year-old Nylah Anderson caused by Defendants' products.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
In excess of thresholds

CHECK YES only if demanded in complaint:
JURY DEMAND:  [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*

JUDGE _____    DOCKET NUMBER _____

DATE
May 12, 2022

SIGNATURE OF ATTORNEY OF RECORD
/s/ Robert J. Mongeluzzi

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

A68

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. **(See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 2319 Bethel Road, Chester, PA 19013 _____

Address of Defendant: _____ 5800 Bristol Pkwy, Los Angeles, CA 90034 _____

Place of Accident, Incident or Transaction: _____ 2319 Bethel Road, Chester, PA 19013 _____

---

**RELATED CASE, IF ANY:**

Case Number: _____   Judge: _____   Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 05/12/2022   /s/ Robert J. Mongeluzzi   36283
_____   _____   _____
   *Attorney-at-Law / Pro Se Plaintiff*   *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
   *(Please specify)* _____

**B.** *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify)* _____
☑ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
   *(Please specify)* _____

---

## ARBITRATION CERTIFICATION
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Robert J. Mongeluzzi _____, counsel of record or pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: 05/12/2022   /s/ Robert J. Mongeluzzi   36283
_____   _____   _____
   *Attorney-at-Law / Pro Se Plaintiff*   *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| TAWAINNA ANDERSON, Individually and as Administratrix of the ESTATE OF NYLAH ANDERSON, a deceased minor,<br><br>               *Plaintiff*,<br><br>     vs.<br><br>TIKTOK INC. AND BYTEDANCE, INC.,<br><br>               *Defendants*. | Case No.: 2:22-cv-01849-PD |

## MOTION TO DISMISS

Defendants TikTok Inc. ("TTI") and ByteDance Inc. ("BDI") move to dismiss Plaintiff's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

*First*, this Court lacks personal jurisdiction over Defendants. Neither Defendant is "at home" in Pennsylvania, nor have they taken any actions directed at Pennsylvania to "purposely avail" themselves of Pennsylvania law in connection with Plaintiff's Complaint. *See Toys "R" Us, Inc. v. Step Two, S.A*., 318 F.3d 446, 454 (3d Cir. 2003); *Ziencik v. Snap, Inc*., Civil Action No. 21-49, 2021 WL 4076997, at *4 (W.D. Pa. Sept. 8, 2021).

A71

*Second*, Section 230 of the federal Communications Decency Act (CDA) bars Plaintiff's state-law claims.  47 U.S.C. § 230(e)(c); *e.g.*, *Obado v. Magedson*, 612 Fed. Appx. 90, 93 (3d Cir. 2015).

*Third*, separate from Section 230 immunity, Plaintiff cannot state a claim for any of the individual causes of action in the Complaint because:

- TikTok is not a "product" or a "seller" subject to strict product liability (Count I);

- Defendants have no legal duty of care to protect against third-party depictions of dangerous activity that would give rise to a negligence claim (Count II);

- Defendants did not engage in any "unfair or deceptive" conduct—and Plaintiff does not otherwise state a claim—under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (Count III) or the California Consumer Legal Remedies Act ("CLRA") (Count IV); and

- Plaintiff's derivative wrongful death (Count V) and survival (Count VI) claims—which both require the existence of an underlying tort—also fail.

Because these legal defects cannot be cured by amendment, Plaintiff's Complaint should be dismissed with prejudice.

Defendants further rely upon the attached Brief in Support and Declaration, which are incorporated by reference.

A72

Dated: July 18, 2022                    Respectfully submitted,


                                        */s/ Joseph E. O'Neil*
                                        Joseph E. O'Neil
                                        Katherine A. Wang
                                        **CAMPBELL CONROY & O'NEIL, P.C.**
                                        1205 Westlakes Drive, Suite 330
                                        Berwyn, PA 19083
                                        Telephone: (610) 964-1900
                                        Facsimile: (610) 964-1981
                                        JONeil@CampbellTrialLawyers.com
                                        kwang@campbell-trial-lawyers.com

                                        Albert Giang (*Pro Hac Vice pending*)
                                        **KING & SPALDING LLP**
                                        633 West Fifth Street, Suite 1600
                                        Los Angeles, CA 90071
                                        Telephone:  (213) 443-4355
                                        Facsimile:  (213) 443-4310
                                        agiang@kslaw.com

                                        Geoffrey M. Drake (*Pro Hac Vice pending*)
                                        TaCara D. Harris (*Pro Hac Vice pending*)
                                        **KING & SPALDING LLP**
                                        1180 Peachtree Street, NE, Suite 1600
                                        Atlanta, GA 30309
                                        Telephone:  (404) 572-4600
                                        Facsimile:  (404) 572-5100
                                        gdrake@kslaw.com
                                        tharris@kslaw.com

                                        *Counsel for TikTok Inc. and ByteDance Inc.*

A73

# UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| TAWAINNA ANDERSON, Individually and as Administratrix of the ESTATE OF NYLAH ANDERSON, a deceased minor, | |
| *Plaintiff,* | Case No.: 2:22-cv-01849-PD |
| vs. | |
| TIKTOK INC. AND BYTEDANCE, INC., | |
| *Defendants.* | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS</u>

Joseph E. O'Neil
Katherine A. Wang
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
Telephone: (610) 964-1900
Facsimile: (610) 964-1981

Geoffrey M. Drake (*Pro Hac Vice pending*)
TaCara D. Harris (*Pro Hac Vice pending*)
**KING & SPALDING LLP**
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

July 18, 2022

Albert Giang (*Pro Hac Vice pending*)
**KING & SPALDING LLP**
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

*Counsel for TikTok Inc. and ByteDance Inc.*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................3

ARGUMENT .....................................................................................5

I.  Defendants Are Not Subject to Personal Jurisdiction in
    Pennsylvania. ..........................................................................5

    A.  General Jurisdiction Does Not Exist Because Defendants Are Not
        "At Home" In Pennsylvania.............................................. 6

    B.  Specific Jurisdiction Does Not Exist Because Defendants Did Not
        Direct Relevant Activity To Pennsylvania In Connection With
        Plaintiff's Claims. ........................................................... 7

II. Plaintiff's Claims Are Barred by Section 230 ...............................11

III. Plaintiff Cannot State Essential Elements of Any of Her Claims. ...............18

    A.  TikTok Is Not A "Product" Or A "Seller" For Strict Product Liability
        (Count I)............................................................................ 19

    B.  Plaintiff Does Not State a Negligence Claim Because She Does Not
        Sufficiently Allege A Duty Owed by Defendants (Count II). ............................. 21

    C.  Plaintiff is Not Entitled to Relief Under the UTPCPL (Count III) or the
        CLRA (Count IV). ............................................................ 23

    D.  Plaintiff Is Not Entitled To Relief For Wrongful Death (Count V) or
        Under Pennsylvania's Survival Act (Count VI). .................................. 25

CONCLUSION.................................................................................25

A75

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)..................................................................................18, 19

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)..................................................................................18, 19

*Bilt–Rite Contractors, Inc. v. Architectural Studio,*
866 A.2d 270 (Pa. 2005) ................................................................21

*BNSF Ry. Co. v. Tyrrell,*
137 S. Ct. 1549 (2017)..................................................................6

*Boring v. Google, Inc.,*
362 Fed. Appx. 273 (3d Cir. 2010)..................................................21

*Boring v. Google, Inc.,*
598 F. Supp. 2d 695 (W.D. Pa. 2009)........................................21, 22

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462, 475 ..........................................................................8

*Churchill Vill., L.L.C v. Gen. Elec. Co.,*
169 F.Supp.2d 1119 (N.D. Cal. 2000)..............................................24

*City of Rome v. Glanton,*
958 F. Supp. 1026 (E.D. Pa. 1997)..................................................23

*D'Jamoos, ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.,*
566 F.3d 94 (3d Cir. 2009) ..............................................................8

*Daimler AG v. Bauman,*
571 U.S. 117 (2014)....................................................................6, 7

*Daugherty v. Am. Honda Motor Co.,*
144 Cal. App. 4th 835 (2006) ..........................................................24

*Day v. TikTok, Inc.,*
No. 21 C 50129, 2022 WL 595745 (N.D. Ill. Feb. 28, 2022) ............13

A76

*Doe v. Facebook, Inc.*,
  No. 2019-16262 (151st Dist. Ct., Harris Cty., Tex. Oct. 4, 2019) ....................20

*Doe v. MySpace, Inc.*,
  528 F.3d 413 (5th Cir. 2008) ....................................................................17, 18

*Doe v. Twitter, Inc.*,
  555 F. Supp. 3d 889 (N.D. Cal. 2021) ...............................................................16

*Durell v. Sharp Healthcare*,
  183 Cal. App. 4th 1350 (2010) ..........................................................................24

*Dyroff v. Ultimate Software Grp., Inc.*,
  934 F.3d 1093 (9th Cir. 2019) ....................................................................17, 22

*Dyroff v. Ultimate Software Grp., Inc.*,
  No. 17-cv-05359-LB, 2017 WL 5665670 (N.D. Cal. Nov. 26,
  2017) ..................................................................................................................22

*Est. of B.H. v. Netflix, Inc.*,
  2022 WL 551701 (N.D. Cal. Jan. 12, 2022)................................................20, 22

*Ferrington v. McAfee, Inc.*,
  2010 WL 3910169 (N.D. Cal. Oct. 5, 2010) .....................................................24

*Fields v. Twitter, Inc.*,
  217 F. Supp. 3d 1116 (N.D. Cal. 2016), *aff'd*, 881 F.3d 739 (9th
  Cir. 2018) .....................................................................................................17, 18

*Force v. Facebook, Inc.*,
  934 F.3d 53 (2d Cir. 2019) .........................................................................16, 17

*Fragale v. Wells Fargo Bank*,
  480 F. Supp. 3d 653 (E.D. Pa. 2020).................................................................21

*Grant St. Grp., Inc. v. D & T Ventures, LLC*,
  No. 10-CV-1095, 2012 WL 13689 (W.D. Pa. Jan. 4, 2012) .............................10

*Green v. AOL*,
  318 F.3d 465 (3d Cir. 2003) ...............................................................12, 14, 18

*Hepp v. Facebook*,
  14 F. 4th 204 (3d Cir. 2021) ...............................................................................9

iii

A77

*Institutional Invs. Grp. V. Avava, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ............................................................... 23

*James v. Meow Media, Inc.*,
    300 F.3d 683 (6th Cir. 2002) .............................................................. 20

*Kabbaj v. Google, Inc.*,
    592 Fed. Appx. 74 (3d Cir. 2015)......................................................... 2

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ............................................................ 23

*Klayman v. Zuckerberg*,
    753 F.3d 1354 (D.C. Cir. 2014)........................................................... 15

*Kurz v. Holiday Hosp. Franchising, LLC*,
    No. 19-2129, 2019 WL 5068646 (E.D. Pa. Oct. 9, 2019) .................... 6

*Lewis v. Google, Inc.*,
    No. 20-1784, 2021 WL 211495 (W.D. Pa. Jan. 21, 2020) ................. 14

*Lucas v. Lane*,
    No. CIV.A. 87-5346, 1987 WL 28352 (E.D. Pa. Dec. 16, 1987) ....... 7

*Marcum v. Columbia Gas Transmission, LLC*,
    No. 19-3873, 2019 WL 6217878 (E.D. Pa. Nov. 20, 2019)............... 23

*Metcalfe v. Renaissance Marine, Inc.*,
    566 F.3d 324 (3d Cir. 2009) ................................................................ 6

*O'Connor v. Sandy Lake*,
    496 Fed. 312 (3d Cir. 2007)................................................................. 7

*Obado v. Magedson*,
    612 Fed. Appx. 90 (3d Cir. 2015)........................................... 2, 11, 16

*Parker v. Paypal, Inc.*,
    No. 16-4786, 2017 WL 3508759 (E.D. Pa. Aug. 16, 2017).............. 2

*Pathfinder Software, LLC v. Core Cashless, LLC*,
    127 F. Supp. 3d 531 (M.D.N.C. 2015) .............................................. 10

A78

*Rodgers v. Christie*,
    795 F. Appx. 878 (3d Cir. 2020) ...............................................19, 20

*Rush v. Savchuk*,
    444 U.S. 320 (1980) .............................................................................8

*Snyder v. ISC Alloys, Ltd.*,
    772 F. Supp. 244 (W.D. Pa. 1991) ....................................................19

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
    903 F. Supp. 2d 942 (S.D. Cal. 2012) ................................................24

*Tincher v. Omega Flex, Inc.*,
    104 A.3d 328 (Pa. 2014) .....................................................................19

*Toys "R" Us, Inc. v. Step Two, S.A.*,
    318 F.3d 446 (3d Cir. 2003) ..............................................1, 5, 8, 10

*Tulewicz v. Se. Pa. Transp. Auth.*,
    606 A.2d 427 (Pa. 1992) .....................................................................25

*Valentino v. Phila. Triathlon, LLC*,
    150 A.3d 483 (Pa. Super. 2016) .........................................................25

*Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*,
    75 F.3d 147 (3d Cir. 1996) ..................................................................6

*Walden v. Fiore*,
    571 U.S. 277 (2014) .........................................................................7, 9

*Winter v. Facebook, Inc.*,
    No. 21-CV-1046 JAR, 2021 WL 5446733 (E.D. Mo. Nov. 22,
    2021) ...................................................................12, 13, 15, 22

*Winter v. G.P. Putnam's Sons*,
    938 F.2d 1033 (9th Cir. 1991) .....................................................20, 21

*Ziencik v. Snap, Inc.*,
    No. 21-49, 2021 WL 4076997 (W.D. Pa. Sept. 8, 2021) .........*passim*

**Statutes**

47 U.S.C. § 230 ....................................................................................*passim*

## INTRODUCTION

This lawsuit arises from the tragic death of Nylah Anderson, who died from self-strangulation after allegedly seeing a user video that encouraged participation in a "blackout challenge"—whereby participants choke themselves through various means until they pass out.  Compl. [Doc. No. 1] ¶¶ 1, 64, 86.  Defendants TikTok Inc. ("TTI") and ByteDance Inc. ("BDI") take these issues seriously and extend their deepest condolences to Nylah's family.  But a careful review of the Complaint makes clear that Plaintiff's legal theories—based on user-generated videos and content created by third parties that TikTok allegedly failed to remove—cannot be heard in this jurisdiction, are preempted by law, and fail to state a claim.[1]

*First*, this Court lacks personal jurisdiction over Defendants for these claims. Neither Defendant is "at home" in Pennsylvania, nor have they taken any actions directed at Pennsylvania to "purposely avail" themselves of Pennsylvania law in connection with Plaintiff's Complaint.  *See Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 454 (3d Cir. 2003); *Ziencik v. Snap, Inc.*, No. 21-49, 2021 WL 4076997, at *4 (W.D. Pa. Sept. 8, 2021).

*Second*, Section 230 of the federal Communications Decency Act ("CDA") bars Plaintiff's state-law claims.  For more than two decades, Congress has broadly

---

[1] Defendants generally deny all allegations in the Complaint and only accept them as true for purposes of this Motion to Dismiss.

immunized Internet-based platforms—including the TikTok platform—for liability that stems from content created and developed by third-party users.   47 U.S.C. § 230(e)(c); *e.g.*, *Obado v. Magedson*, 612 Fed. Appx. 90, 93 (3d Cir. 2015).   Here, Plaintiff's core theory is that Defendants employ an algorithm that "presents" or "recommends" user-generated content on For You Pages ("FYP")—including videos depicting dangerous activity such as choking or blacking out that "encourage" users to create, share, and/or participate in these "challenges."   Compl. ¶¶ 3, 62, 82, 83.   She faults Defendants for failing to provide safeguards "to prevent circulation of dangerous and deadly videos."   *Id.* ¶¶ 107, 127.   But those allegations are traceable to whether and how TikTok selects, presents, recommends, aggregates, or fails to monitor/remove user content—quintessential publisher functions that well-established law immunizes and protects.   Courts in this circuit routinely grant motions to dismiss suits alleging analogous claims as barred by Section 230.   *See, e.g.*, *Kabbaj v. Google, Inc.*, 592 Fed. Appx. 74 (3d Cir. 2015) (finding CDA barred plaintiff's claims against Google, Amazon, and Yahoo); *Obado*, 612 Fed. Appx. at 93 (affirming dismissal of Google, Yahoo, and other internet sites based on Section 230 immunity); *Parker v. Paypal, Inc.*, No. 16-4786, 2017 WL 3508759, at *7 (E.D. Pa. Aug. 16, 2017) (same).

*Finally*, separate from Section 230 immunity, Plaintiff cannot state a claim for any of the individual causes of action in the Complaint because:

2

A81

- TikTok is not a "product" or a "seller" subject to strict product liability (Count I);

- Defendants have no legal duty of care to protect against third-party depictions of dangerous activity that would give rise to a negligence claim (Count II);

- Defendants did not engage in any "unfair or deceptive" conduct—and Plaintiff does not otherwise state a claim—under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (Count III) or the California Consumer Legal Remedies Act ("CLRA") (Count IV); and

- Plaintiff's derivative wrongful death (Count V) and survival (Count VI) claims—which both require the existence of an underlying tort—also fail and should be dismissed.

Because these legal defects cannot be cured by amendment, Plaintiff's claims should be dismissed with prejudice.

## BACKGROUND

TikTok is a video-sharing platform that millions of Americans use to create, share, and/or view short-form videos on their mobile devices.  Compl. ¶ 50.  As alleged by Plaintiff, TikTok uses an algorithm that is "a recommendation system that delivers content to each user that is likely to be of interest to that particular user," and provides an FYP that shows user videos recommended by the algorithm.  *Id*. at ¶ 3.  The TikTok platform is made available in the United States by TTI.  Decl. ¶ 8 (Exhibit A).  Although BDI is also named as a Defendant, the Complaint pleads no facts specific to BDI.

A82

Plaintiff asserts that her daughter, Nylah, died after seeing a user video allegedly through her FYP that encouraged participation in a "blackout challenge"—whereby participants choke themselves through various means until they pass out.[2] *Id*. ¶¶ 1, 64, 84. Plaintiff concedes that this "involve[s] *users* filming themselves engaging in behavior that mimics and often times 'one-ups' *other users* posting videos performing the same or similar conduct." *Id*. at ¶ 61 (emphases added). Indeed, the Complaint includes a list of so-called "challenges"—all of which involve third-party participants and users who create and post content of themselves engaging in potentially dangerous activities.[3] *Id*. at ¶ 63. The Complaint does not (and cannot) allege that Defendants created or otherwise contributed content to these user-generated videos.

---

[2] Unintentional strangulation deaths of youth from participation in "choking games" date back to at least 1995, including online versions of blackout challenges on websites such as YouTube dating back to 2007 or earlier. *See, e.g.*, The Centers for Disease Control and Prevention, *CDC Study Warns of Deaths Due to the "Choking Game"*, https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5706a1.htm (last visited July 14, 2022); Linkletter, et al., *The Choking Game and YouTube: A Dangerous Combination*, 49 Clinical Pediatrics, 274 (2010), https://publish.uwo.ca/~pakvis/LinkletterChokingGame.pdf (last visited July 18, 2022) (noting that choking game videos are "often viewed on the video-sharing Web site YouTube," but that "[t]he choking game is not new activity").

[3] The Complaint adds allegations about the general impact of "social media" on children's mental health and claim that such technology is designed "to addict users" (*see id*. ¶¶ 31-42, 107, 127, 142, 165), but does not allege that Nylah herself suffered from any mental health issues or that such issues somehow caused the act of strangulation allegedly after watching a specific user video. To the contrary, the Complaint states that "Nylah was an active, happy, healthy and incredibly intelligent child" (*id*. ¶ 12).

4

A83

At bottom, Plaintiff seeks to hold Defendants liable for failing to remove third-party user content, such as videos depicting dangerous activity like choking or blacking out—*e.g.*, claiming that Defendants "took no and/or completely inadequate action to extinguish and prevent the spread of the Blackout Challenge"; "failed to change, update, and/or correct their algorithm to prevent it from presenting users, specifically children, with the dangerous and deadly Blackout Challenge"; and "fail[ed] to timely remove all dangerous and deadly videos." *Id.* ¶¶ 75-76, 127. As detailed below, these claims are all barred by Section 230 and should be dismissed.

## ARGUMENT

### I.     Defendants Are Not Subject to Personal Jurisdiction in Pennsylvania.

While Nylah's death was a tragedy, settled law requires dismissal of this Complaint first and foremost because this Court lacks personal jurisdiction over Defendants in this action. Both are out-of-state defendants, and none of the allegations plead that Defendants purposefully directed any activities to Pennsylvania or that the Complaint's allegations bear a strong relationship to Defendants' purposeful activities in the forum. *E.g., Toys "R" Us, Inc.*, 318 F.3d at 454; *Ziencik*, 2021 WL 4076997, at *4.

District courts generally have personal jurisdiction to the same extent as state courts in the same district. *See* Fed. R. Civ. P. 4(k)(1)(A). Pennsylvania's long-arm statute "coextends" with the Due Process Clause of the Fourteenth Amendment,

5

which allows for two forms of personal jurisdiction: general or specific. *See, e.g.,* *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147, 150 (3d Cir. 1996). General jurisdiction is an exceptional form of jurisdiction that only applies to defendants "at home" in a given state, subject to any claims regardless of where they arose. Specific jurisdiction, on the other hand, focuses on the particular claims brought by Plaintiff and requires that the claims arise out of Defendants' contacts with the state where the suit is pending. Plaintiff bears the affirmative "burden of demonstrating the facts that establish personal jurisdiction." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330-31 (3d Cir. 2009) (cleaned up).

### A.   General Jurisdiction Does Not Exist Because Defendants Are Not "At Home" In Pennsylvania.

Defendants are not subject to general jurisdiction in Pennsylvania, which exists only "when [the corporation's] affiliations with the State are so 'continuous and systematic' as to render [the corporation] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (cleaned up). "The 'paradigm' forums in which a corporate defendant is 'at home,' . . . are the corporation's place of incorporation and its principal place of business . . . ." *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017) (quoting *Daimler*, 571 U.S. at 137). General jurisdiction lies elsewhere only in "exceptional case[s]." *Kurz v. Holiday Hosp.*

6

A85

*Franchising, LLC*, No. 19-2129, 2019 WL 5068646, at *3 (E.D. Pa. Oct. 9, 2019)

(quoting *Daimler*, 571 U.S. at 139 n.19).

Here, TTI is a California corporation with its principal place of business in California. BDI is a Delaware corporation with its principal place of business in California. Neither is "at home" in Pennsylvania, and Plaintiff has pled no facts that would support general jurisdiction over either. Compl. ¶¶ 13, 17. A "mere conclusory allegation" about "systematic" contacts is plainly insufficient to establish an "exceptional case" of general jurisdiction. *See Lucas v. Lane*, No. CIV.A. 87-5346, 1987 WL 28352, at *3 (E.D. Pa. Dec. 16, 1987).

> **B.    Specific Jurisdiction Does Not Exist Because Defendants Did Not Direct Relevant Activity To Pennsylvania In Connection With Plaintiff's Claims.**

Nor are Defendants subject to specific jurisdiction for Plaintiff's claims. Specific jurisdiction requires "an affiliation between the forum and the underlying controversy"—a nexus that must be based only "out of contacts that the '*defendant* himself' creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 & n.6 (2014) (cleaned up). And "the defendant's suit-related conduct must create a substantial connection with the forum State." *Id.* at 284. That requires Plaintiff to show that (1) each Defendant "purposefully availed" itself of the forum, (2) the claims arise out of or relate to those activities, and (3) exercising personal jurisdiction is reasonable. *O'Connor v. Sandy Lake*, 496 F.3d 312, 317 (3d Cir.

2007); *Rush v. Savchuk*, 444 U.S. 320, 332 (1980) (factor "must be met as to each defendant").

The gravamen of Plaintiff's claims is based on *third-party users'* actions: the Complaint alleges that Nylah downloaded the TikTok app on her smartphone, created her user profile, and accessed content on the app in Pennsylvania. Compl. ¶¶ 23-27. But the Complaint does not allege any active participation by Defendants in connection with Nylah's actions, or any other conduct by Defendants directed at Pennsylvania related to the allegations in the Complaint. Indeed, Plaintiff does not even allege any contacts between BDI and Pennsylvania whatsoever.

Allegations about a plaintiff or other third party—such as Nylah's activity in Pennsylvania—cannot establish that *Defendants* "purposefully directed [their] activities" towards Pennsylvania. *D'Jamoos, ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009). The Complaint itself asserts that "millions" of users in the United States and "billions" throughout the world have downloaded and used the TikTok app, Compl. ¶¶ 43-44; Decl. ¶¶ 9-10, where *users* choose where they download, access, or use an app. Unilateral user decisions do not equate to purposeful availment in Pennsylvania (or elsewhere), or otherwise would create impermissibly limitless jurisdiction. *See, e.g., Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (defendant cannot be "haled into a jurisdiction" by the "unilateral activity" of others); *Toys "R" Us*, 318 F.3d at 454 ("mere operation

8

A87

of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world.").  There are no allegations about purposeful contacts that *Defendants* affirmatively created with Pennsylvania.  *See Walden*, 571 U.S. at 289 (specific jurisdiction "must arise out of contacts that the '*defendant* himself' creates with the forum State").

Nor does the Complaint establish the second requirement of relatedness, which requires pled facts establishing "*a strong 'relationship* among the defendant, the forum, and the litigation,'" sufficient to show that any contacts arise out of or relate to her claim.  *Hepp v. Facebook*, 14 F. 4th 204, 208 (3d Cir. 2021) (emphasis added).  In fact, Plaintiff pleads no facts about Nylah's circumstances that relate to Defendants' purposeful contacts, let alone facts sufficient to establish a "strong relationship."   Nor is the location of the injury sufficient to establish this jurisdictional nexus, where "Defendant[s] did not expressly aim its tortious conduct at the forum state."  *Zeincik*, 2021 WL 4076997, at *4.  To the contrary, Plaintiff alleges that videos showing various dangerous "challenges" are filmed and/or viewed by users worldwide, Compl. ¶¶ 43, 61, 63—even alleging that users as far as Oklahoma, Australia, and Italy viewed and/or participated in blackout challenge videos.  *Id.*  ¶¶ 67-70.  While such allegations do not qualify under the first requirement as *Defendants'* purposeful availment, they *do* preclude any suggestion under the second requirement that relevant conduct was targeted at and created a

9

A88

strong relationship to Pennsylvania.   *See Zeincik*, 2021 WL 4076997, at *4 (declining specific jurisdiction despite more allegations of contacts, where alleged tortious conduct "could have occurred in any state").

As for the third requirement of reasonableness, both the Third Circuit and other district courts have rejected similar attempts to exercise sweeping personal jurisdiction over nonresident web-based companies.   The Third Circuit has explained that the "mere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world."   *Toys "R" Us, Inc.*, 318 F.3d at 454; *see also e.g., Grant St. Grp., Inc. v. D & T Ventures, LLC*, No. 10-CV-1095, 2012 WL 13689, at *6-7 (W.D. Pa. Jan. 4, 2012) ("The mere fact that [defendant] may have provided a 'highly interactive' tax portal website or interactive websites … does not automatically confer personal jurisdiction.").   This is consistent with other courts that similarly have held that mere accessibility of a website or app is not enough to demonstrate purposeful availment of the forum State's laws by the operator.   *See, e.g.*, *Pathfinder Software, LLC v. Core Cashless, LLC*, 127 F. Supp. 3d 531, 543 (M.D.N.C. 2015) ("The fact that North Carolina residents can download the [WhatsApp] application does not" give rise to jurisdiction over the company "as the application is available to [] smartphone and tablet users all over the world").

The Western District of Pennsylvania recently addressed this very issue in *Ziencik v. Snap, Inc*.   There, the court found it lacked personal jurisdiction over Snap,

a communications platform, because, among other things: (i) Snap did not have any officers or a registered agent in Pennsylvania, and it was headquartered in California; (ii) Snap's only contact with plaintiffs was initiated by plaintiffs; and (iii) Snap did no more "than exist as an application that people can download while located in Pennsylvania." 2021 WL 4076997, at *4. Just as in *Ziencik*, Defendants do not have any offices or registered agents in Pennsylvania and are headquartered in California. Decl. ¶¶ 3-4, 6. Defendants operate and administer the TikTok platform outside of Pennsylvania and do not maintain any servers in Pennsylvania. Decl. ¶¶ 6, 8. And Plaintiff's allegations make clear that Nylah initiated contact with TikTok and, otherwise, the TikTok platform merely exists as an application that people can download throughout the world (not just Pennsylvania). Compl. ¶¶ 23-27, 43. Because the Court lacks personal jurisdiction over Defendants, it should dismiss.

## II.    Plaintiff's Claims Are Barred by Section 230

If this Court does not dismiss for lack of personal jurisdiction, it should still dismiss as a matter of law. Plaintiff's claims—all of which relate to whether and how TikTok presented, recommended, or failed to remove user content—are barred by Section 230 of the CDA. *See, e.g.*, *Obado*, 612 Fed. Appx. at 93 (dismissal under Rule 12(b)(6) for Section 230 immunity). Under Section 230, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C.

11

§ 230(c)(1). The statute adds preemptive bite to this prohibition, providing that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3).

"The majority of federal circuits, including the [Third] Circuit, have interpreted the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Winter v. Facebook, Inc.*, No. 21-CV-1046 JAR, 2021 WL 5446733, at *3 (E.D. Mo. Nov. 22, 2021) (cleaned up) (citing cases, including *Green v. AOL*, and dismissing claims that TikTok was "liable for not removing the content/accounts posted/held by" users). That broad immunity bars a wide range of theories traceable to "publisher" acts and omissions, such as "deciding whether to publish, withdraw, postpone, or alter content." *Green v. AOL*, 318 F.3d 465, 471 (3d Cir. 2003). Here, the requirements for Section 230 immunity are met because: (1) TikTok is the "provider or user of an interactive computer service"; (2) it allegedly published "information provided by another information content provider"; and (3) the Complaint seeks to "treat[]" TikTok "as the publisher or speaker" of that third-party content. 47 U.S.C. § 230(c)(1).

***TikTok Is an Interactive Computer Service Provider.*** There is no reasonable dispute that TikTok is a "provider . . . of an interactive computer service," as confirmed in other federal decisions. 47 U.S.C. § 230(c)(1); *see Winter*, 2021 WL

12

5446733, at *4 ("TikTok [is an] 'interactive computer service.'"); *Day v. TikTok, Inc.*, No. 21 C 50129, 2022 WL 595745, at *1 (N.D. Ill. Feb. 28, 2022) (TikTok immune under § 230). Here, the Complaint alleges that "TikTok is a video sharing social media app" that operates through the internet, thereby establishing this element. Compl. ¶ 50.[4]

***Plaintiff's Claims Arise from Third-Party Content.*** Plaintiff's claims fundamentally relate to content provided by another content provider—the third-party users who "create, share, and view" content on the TikTok platform, including any videos "challenging" other users or depicting dangerous user activities. *See id.* ("TikTok is a[n] . . . app . . . which allows and encourages *users* to create, share and view short video clips" (emphasis added)); *id.* ¶ 61 (alleging challenges involve "users filming themselves" and "often times 'one-up[ping]' other users posting videos performing the same or similar conduct"). Although Plaintiff attempts to label these disparate user videos as "the TikTok Blackout Challenge," Plaintiff does not allege that TikTok created or developed any of this content (because it did not) and, in fact, any such suggestion would be belied by Plaintiff's other allegations that third-party users create such video content.

---

[4] The Complaint does not include any factual allegations specific to BDI. To the extent Plaintiff seeks to hold BDI responsible for owning or operating the TikTok platform, BDI also qualifies as the "provider" of TikTok's interactive computer service, 47 U.S.C. § 230(c)(1).

13

A92

In fact, nowhere does Plaintiff allege that TikTok provided, created, or developed any relevant content that Nylah may have viewed from other users or attempted to film herself. Even generic references to "addiction" to various forms of "social media"—none of which link to Nylah's particular circumstances or death—are still inextricably intertwined with content supplied by users, who are other "information content providers" under Section 230.[5] A website does not create or develop content "when it merely provides a neutral means by which third parties can post information of their own independent choosing online." *Lewis v. Google, Inc.*, No. 20-1784, 2021 WL 211495, at *2 (W.D. Pa. Jan. 21, 2020) (cleaned up).

***Plaintiff's Claims Treat Defendants as Publishers***. In promulgating Section 230, Congress enacted a policy "not to treat providers of interactive computer services like other information providers such as newspapers, magazines or television and radio stations, all of which may be held liable for publishing obscene or defamatory material written or prepared by others." *Id*. (citation omitted). "Publisher" activity protected by Section 230 includes everything from "deciding whether to publish, withdraw, postpone or alter content." *Green*, 318 F.3d at 471;

---

[5] The policy rationale behind broad CDA immunity is that countless websites and platforms permit third-party users to post content, and Plaintiff does not—and cannot—allege that TikTok is the only website or platform where third parties have posted, or can post, user-generated content about choking or blackout challenges. *See, e.g.*, Background, p. 4 n.1 *supra*; Chan, *Kids Are Playing the 'Choking Game' to Get High. Instead, They're Dying*, Time (Mar. 12, 2018), https://time.com/5189584/choking-game-pass-out-challenge/ (discussing evolution of the choking game from "spread through word of mouth" to online spread on YouTube and Facebook).

*see also Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014) ("[T]he very essence of publishing is making the decision whether to print or retract.").

All of Plaintiff's theories against TikTok are based on functions performed as a "publisher" of third-party content.  From the start, the Complaint repeatedly asserts—often using euphemisms such as "push," "show," "promote," "algorithm," or "recommend"—that TikTok selects, presents, and recommends material to users.[6] Those are quintessential functions of a publisher.  So too is Plaintiff's corollary theory that TikTok failed to remove harmful content, including videos depicting dangerous user conduct.  Compl. ¶ 127; *Winter*, 2021 WL 5446733, at *6 (dismissing claims that "TikTok wrongfully refused to remove content/accounts").

Each of Plaintiff's state-law causes of actions thus inherently requires the court to treat TikTok as the "publisher or speaker" of content provided by another. 47 U.S.C. § 230(c)(1).  Counts I through IV are all premised on Plaintiff's theory that TikTok's app and algorithm "determine[] the videos and content that each user" sees; "recommend[] inappropriate, dangerous, and deadly videos"; fail to "prevent circulation of dangerous and deadly videos"; and "promote[] the circulation of dangerous and deadly videos and challenges."  Compl. ¶¶ 102, 107; *see also id.*

---

[6] *E.g.*, Compl. ¶ 56 ("show users videos and content"); ¶ 66 ("promote the dissemination of the deadly Blackout Challenge"); ¶ 67 ("app and algorithm recommended the Blackout Challenge"); ¶ 81 ("pushed exceedingly and unacceptably dangerous challenges and videos").

¶¶ 127, 142, 165.[7]  These are simply variations on TikTok's publisher functions.
Applying well-established CDA principles, courts have repeatedly dismissed similar
claims as barred by Section 230 based on a platform's use of algorithms to promote
content.  *See*, *e.g.*, *Obado*, 612 Fed. Appx. at 94 (3d Cir. 2015) ("allegation that the
defendants manipulated search engines to maximize search results relating to the
alleged defamatory content does not affect their immunity from suit"); *Force v.
Facebook, Inc.*, 934 F.3d 53, 66-67 (2d Cir. 2019) (holding that Facebook's use of
algorithms did not "render[] it a non-publisher," including because "arranging and
distributing third-party information inherently forms 'connections' and 'matches'
among speakers, content, and viewers of content").

     Likewise, Counts I through IV also include "design" allegations that boil
down to claims that TikTok designed the platform to encourage users to view more
third-party content, including dangerous "challenges."[8]  But when "the nature of the
alleged design flaw in this case—and the harm that is alleged to flow from that
flaw—is directly related to the posting of third-party content," Section 230 bars the
claim.  *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 930 (N.D. Cal. 2021) (CDA bars

---

[7] Counts V and VI are derivative of the other Counts in the Complaint.

[8] *See, e.g.*, Compl. ¶ 107 (platform and algorithm are "intended to addict users and manipulate
them into participating in dangerous and deadly challenges"); ¶ 127 ("[i]ntentionally addicting
users to the TikTok app"); ¶ 142 ("Defendants' products were designed and intended to addict
users"); ¶ 165 ("Defendants' products carried a risk of addiction and dependence").

16

claim premised on failure to design platform to prevent and remove harmful third-party content); *see also, e.g., Doe v. MySpace, Inc.*, 528 F.3d 413, 419 (5th Cir. 2008) (dismissing case "predicated solely on MySpace's failure to implement basic safety measures to protect minors").

***Plaintiff's Nominal Effort to Disavow Section 230 Lacks Merit***.   Plaintiff cannot avoid Section 230 by invoking algorithmic recommendations of third-party content via the FYP.   Compl. ¶¶ 3-5, 107, 127, 132.   App "recommendations" are "not content in and of themselves" but are "tools meant to facilitate the communication and content of others."   *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019).   And algorithms reflect TikTok's choice to "automate [its] editorial decision-making"—and are themselves protected publisher functions.   *Force*, 934 F.3d at 67.   "By recommending" content to users, including through "algorithms," online platforms are "acting as a publisher of others' content."   *Dyroff*, 934 F.3d at 1098.   Even the allegation that TikTok "promoted" certain content cannot escape Section 230, which specifically protects "'features that are part and parcel of the overall design and operation of the website'" with respect to publishing—whether characterized as rewards, recommendations, or any other features that Plaintiff alleges.   *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016), *aff'd*, 881 F.3d 739 (9th Cir. 2018).

17

A96

Section 230 also bars Plaintiff's theories based on TikTok's alleged "failure to provide adequate warnings"—including Plaintiff's claims about inadequate parental controls and inadequate monitoring.  Compl. ¶¶ 107, 119-120, 127.  Many courts have rejected similar allegations that would require a platform to post a warning about third-party content or implement age verification, reasoning it is a form of editing that implicates Section 230's protections.  *See Green*, 318 F.3d at 472 ("Section 230(c)(2) … allows AOL to establish standards of decency without risking liability for doing so."); *Myspace*, 528 F.3d at 419–22 (dismissing allegations of inadequate safety features, including age verification to prevent a minor from communicating with adults, which were "directed towards … publishing, editorial, and/or screening capacities"); *Fields*, 217 F. Supp. 3d at 1126 (failure to warn theory barred where it required defendant to "monitor[] and "police" individual accounts).

## III.   Plaintiff Cannot State Essential Elements of Any of Her Claims.

Even if Plaintiff could somehow evade the broad threshold immunity provided by the CDA, the Complaint fails to plead any cognizable claims.  To survive a motion to dismiss under Federal Rule of Civil Procedure 8(a), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will

not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Here, Plaintiff does not and

cannot plead facts sufficient to support any of the causes of action, which requires

dismissal with prejudice of the entire Complaint.

> **A.**    **TikTok Is Not A "Product" Or A "Seller" For Strict Product Liability (Count I).**

The TikTok platform and other digital apps are intangible programs that

display content.  TikTok is not a "product" or a "seller" that can be liable for strict

product liability.  Pennsylvania has adopted Section 402A of the Restatement

(Second) of Torts, which imposes liability on "[o]ne who *sells* any *product* in a

defective condition unreasonably dangerous to the user or consumer or to his

property."  Restatement (Second) of Torts § 402A(1) (1965); *see Tincher v. Omega

Flex, Inc.*, 104 A.3d 328 (Pa. 2014) (strict liability requires "a seller (manufacturer

or distributor) placed on the market a product in a defective condition") (internal

quotation marks omitted).  Courts have uniformly interpreted "product" under

Section 402A to mean "finished items with a *tangible* form," excluding ideas,

services, or other intangible items from the definition.  *Snyder v. ISC Alloys, Ltd.*,

772 F. Supp. 244, 251 (W.D. Pa. 1991); *see also Rodgers v. Christie*, 795 F. Appx.

878, 880 (3d Cir. 2020) (similar limitation under New Jersey law).  These limitations

exist "both as a definitional matter and because extending strict liability to the

distribution of ideas would raise serious First Amendment concerns."  *Rodgers*, 795

F. App'x at 880.

A98

Applying these principles, courts have held consistently that video games, books, other apps, and other video streaming services are not "products" subject to strict product liability.  The Third Circuit recently held that an "algorithm," as with other "information, guidance, ideas, and recommendations," is not a "product" subject to strict product liability.  *Rodgers*, 795 F. Appx. at 880.  Other courts have held that Instagram, Netflix, and video games are also not "products."  *See, e.g.*, *Doe v. Facebook, Inc.*, No. 2019-16262 (151st Dist. Ct., Harris Cty., Tex. Oct. 4, 2019) (Instagram is "not a product" under Texas law adopting Restatement (Second) of Torts); *Est. of B.H. v. Netflix, Inc.*, 2022 WL 551701, at *3 (N.D. Cal. Jan. 12, 2022) (rejecting strict-product liability claims against Netflix); *James v. Meow Media, Inc.*, 300 F.3d 683, 700–01 (6th Cir. 2002) ("video games, movies, and internet sites" are not "products").

For example, like the claims against Netflix in *Estate of B.H.*, Plaintiff's suit "is premised on the content and dissemination" of video content.  If a video service and a video game are not "products," neither is a short-form video platform like TikTok.  The policy considerations that motivated those courts to cabin the definition of "products" similarly apply here.  Unlike a faulty car or power tool, there is nothing inherently physically harmful about an intangible app.  Moreover, strict product liability law "do[es] not take into consideration the unique characteristics of ideas and expressions."  *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034 (9th

20

A99

Cir. 1991).  The "transmission of words is not the same as selling items with physical properties," yet imposing strict liability on content "could seriously inhibit those who wish to share thoughts and theories."  *Id.* at 1035, 1036 n.6.

### B.    Plaintiff Does Not State a Negligence Claim Because She Does Not Sufficiently Allege A Duty Owed by Defendants (Count II).

Plaintiff fails to state a claim for negligence because she pleads no facts to establish a cognizable duty of care—an essential element of negligence that can be decided as a matter of law.  *Fragale v. Wells Fargo Bank*, 480 F. Supp. 3d 653, 660-61 (E.D. Pa. 2020) (granting motion to dismiss negligence claim for lack of duty).  "Simply stating that there is or ought to be a duty is not enough; the duty alleged must be one recognized by law."  *Boring v. Google, Inc.*, 598 F. Supp. 2d 695 (W.D. Pa. 2009) (dismissing negligence claim for lack of duty) (reversed in part on other grounds in *Boring v. Google, Inc.*, 362 Fed. Appx. 273 (3d Cir. 2010); *see also Bilt–Rite Contractors, Inc. v. Architectural Studio*, 866 A.2d 270, 280 (Pa. 2005) (declaring it "well established that 'a cause of action in negligence requires allegations that establish the breach of a legally recognized duty or obligation that is causally connected to the damages suffered by the complainant'") (citation omitted).

Plaintiff makes bare assertions that Defendants have duties to take certain actions—for example, to operate the app and algorithm so as not to "expose users to harm, injury, and/or death"; "to monitor the videos and challenges shared"; and "to protect vulnerable users."  Compl. ¶¶ 118, 119, 122.  But websites do not owe a legal

21

A100

duty to users to modify content. *See, e.g.*, *Boring*, 598 F. Supp. at 695 (allegations insufficient to state a negligence claim where Plaintiff generally alleged that internet search engine "has a duty of care to the public to utilize proper internal controls" and "has a duty to utilize proper methods and controls"); *Dyroff*, 934 F.3d at 1101 (websites do not owe a legal duty to users when they "facilitate[] communication, in a content-neutral fashion, of [their] users' content"). Nor do websites owe a legal duty to users to prevent self-harm. *See Est. of B.H.*, 2022 WL 551701, at *3-4.

Plaintiff provides no explanation (because there is none) for how the nature of the relationship between Plaintiff and Defendants should give rise to a duty of care or how the public interest would be served by imposing such a sweeping duty, particularly when Congress has immunized platforms from taking on such obligations or failing to prevent harms relating to third-party content. *See Dyroff v. Ultimate Software Grp., Inc.*, No. 17-cv-05359-LB, 2017 WL 5665670, at *14 (N.D. Cal. Nov. 26, 2017) (collecting authority "that a website has no 'special relationship' with its users"); *Winter*, 2021 WL 5446733, at *6 (rejecting duty of care and dismissing claim that TikTok was negligent by failing to prevent cyberbullying because "[S]tate law cannot predicate liability for publishing decisions on the mere existence of the very relationship that Congress immunized from suit").

A101

### C.    Plaintiff is Not Entitled to Relief Under the UTPCPL (Count III) or the CLRA (Count IV).

Plaintiff fails to adequately state a violation under section 201 of the UTPCPL or section 1750 of the CLRA.  In fact, Plaintiff pleads *no* facts to show that Defendants engaged in "unfair or deceptive acts" under either statute, much less facts that meet the heightened specificity required by Rule 9(b) for claims sounding in fraud.  *See* Fed. R. Civ. P. 9(b) ("a party must state with particularity the circumstances constituting fraud or mistake"); *Marcum v. Columbia Gas Transmission, LLC*, No. 19-3873, 2019 WL 6217878, at *2 (E.D. Pa. Nov. 20, 2019) (applying Rule 9(b) standard to UTPCPL claim of fraudulent concealment); *Institutional Invs. Grp. V. Avava, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) (a plaintiff "must plead the who, what, when, where, and how" of a UTPCPL claim based in fraud); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (Rule 9(b) particularity requirements apply to CLRA claims). The Complaint identifies zero fraudulent statements by TikTok, let alone specifying the "who, what, when, where, and how" of an alleged fraud.  *Id.* at 1124.

Further, Plaintiff makes the conclusory claim that TikTok "concealed, suppressed, or omitted" certain information related to the TikTok app and algorithm, Compl. ¶¶ 142, 165, but pleads no facts that Plaintiff [or Nylah] justifiably relied on any alleged statement or omission by TikTok.  *See City of Rome v. Glanton*, 958 F. Supp. 1026, 1038–39 (E.D. Pa. 1997) (noting a "duty to speak" under the UTPCPL

23

A102

arises only in limited circumstances where "one party is the only source of information to the other party, or the problems are not discoverable by other reasonable means); *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 835 (2006) ("to be actionable," fraudulent omission claim under the CLRA "must be contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose"); *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350 (2010) (affirming dismissal of CLRA claim where plaintiff did not allege he relied on any representation).

The CLRA claim is also doomed because: (1) the requirements for a "sale" of "goods" do not apply to the free download/usage of an intangible app, *Ferrington v. McAfee, Inc.*, 2010 WL 3910169, at *19 (N.D. Cal. Oct. 5, 2010) ("CLRA's express limitation of goods to 'tangible chattels' must be given meaning, [and] exclude[s] software from the Act's coverage."); (2) Plaintiff lacks standing for "lost money or profits" under the CLRA, *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 966 (S.D. Cal. 2012) (dismissing CLRA claim where plaintiffs "received the PSN services free of cost"); and (3) Plaintiff does not explain why the CLRA extends to Nylah's usage in Pennsylvania (Compl. ¶¶ 23-27), *Churchill Vill., L.L.C v. Gen. Elec. Co.*, 169 F.Supp.2d 1119, 1126 (N.D. Cal. 2000) ("California law embodies a presumption against the extraterritorial application of its statutes.").  The UTPCPL and CLRA claims should be dismissed.

24

A103

**D.    Plaintiff Is Not Entitled To Relief For Wrongful Death (Count V) or Under Pennsylvania's Survival Act (Count VI).**

Given the defective claims above, Plaintiff's derivative claims for wrongful death and survival—which both require the existence of an underlying tort—also fail and should be dismissed. *See Valentino v. Phila. Triathlon, LLC*, 150 A.3d 483, 493 (Pa. Super. 2016) ("Pennsylvania case law has long held that a wrongful death claimant's substantive right to recover is derivative of and dependent upon a tortious act that resulted in the decedent's death"); *Tulewicz v. Se. Pa. Transp. Auth.*, 606 A.2d 427, 431 (Pa. 1992) ("A survival action … 'merely continues in [the decedent's] personal representatives the right of action which accrued to the deceased at common law because of the tort'") (cleaned up).

## CONCLUSION

TikTok and ByteDance respectfully request that the Complaint be dismissed.

Dated: July 18, 2022                    Respectfully submitted,

                                        */s/ Joseph E. O'Neil*
                                        Joseph E. O'Neil
                                        Katherine A. Wang
                                        Albert Giang (*Pro Hac Vice pending*)
                                        Geoffrey Drake (*Pro Hac Vice pending*)
                                        TaCara Harris (*Pro Hac Vice pending*)

                                        *Counsel for TikTok Inc. and ByteDance Inc.*

25

A104

# Exhibit A

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TAWAINNA ANDERSON, Individually and as Administratrix of the ESTATE OF NYLAH ANDERSON, a deceased minor, | |
| *Plaintiff*, | Case No.: 2:22-cv-01849-PD |
| vs. | |
| TIKTOK INC. AND BYTEDANCE, INC., | |
| *Defendants*. | |

## DECLARATION IN SUPPORT OF MOTION TO DISMISS

I, Brian O'Connor, hereby declare and state as follows:

1.      I am over the age of 18 and I submit this declaration in support of the Motion to Dismiss filed by TikTok Inc. ("TTI") and ByteDance Inc. ("BDI") (collectively, "Defendants"). I am authorized to make these statements on behalf of Defendants. I have personal knowledge of each fact stated in this declaration (unless otherwise stated), and if called as a witness, I could and would competently and truthfully testify therein.

2.      I am currently employed by TTI as the Head of HR, TikTok Operations & Corporate Functions, US. I have been employed by TTI since July 2021. The statements made in this declaration about Defendants are based on my personal

A106

knowledge, corporate records maintained by Defendants in the ordinary course of business, and/or as a result of consulting with company employees. I also am familiar with and have access to Defendants' business records.

**Overview of Defendants**

3.      TikTok Inc. is a California corporation with its principal place of business in Culver City, California.

4.      ByteDance Inc. is a Delaware corporation with its principal place of business in Mountain View, California.

5.      TTI and BDI are separate legal entities. TTI is a subsidiary of TikTok LLC. BDI is a subsidiary of ByteDance Ltd.

6.      Neither have offices or registered agents in Pennsylvania. They also do not have any employees working in Pennsylvania. They do not maintain any servers in Pennsylvania.

7.      TikTok is a video-sharing platform that millions of Americans use to create, share, and view short-form videos on their mobile devices. Users create, control, and upload the content of their videos on the TikTok platform.

8.      The TikTok platform is made available in the United States by TTI, and TTI operates and administers the platform from its current headquarters in California. The TikTok platform was not developed in Pennsylvania.

A107

9.     As of September 2021, TikTok had 1 billion monthly active users worldwide.

10.    The TikTok platform has users in all 50 states.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed July 15, 2022 in Los Angeles, CA.

4

A109

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 18th day of July, 2022, the foregoing was filed

electronically through the Court's CM/ECF system, which will send notice of filing

to all CM/ECF participants.

*/s/ Joseph E. O'Neil*
Joseph E. O'Neil, Esquire

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TAWAINNA ANDERSON, Individually and as Administratrix of the ESTATE OF NYLAH ANDERSON, a deceased minor** | |
|   ***Plaintiff,*** | **No. 2:22-cv-01849-PD** |
| **v.** | |
| **TIKTOK, INC. AND BYTEDANCE, INC.** | |
|   ***Defendants****.* | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' <u>MOTION TO DISMISS</u>

Robert J. Mongeluzzi
Jeffrey P. Goodman
Samuel B. Dordick
Rayna McCarthy
**SALTZ MONGELUZZI & BENDESKY, P.C.**
One Liberty Place
1650 Market Street, 52nd Floor
Philadelphia, Pennsylvania 19103
Tel.: (215) 496-8282
rjmongeluzzi@smbb.com
jgoodman@smbb.com
sdordick@smbb.com
rmccarthy@smbb.com

Mark A. DiCello
**DICELLO LEVITT GUTZLER LLC**
Western Reserve Law Building
7556 Mentor Avenue
Mentor, Ohio 44060
Tel.: (440) 953-8888
madicello@dicellolevitt.com

Dated: August 1, 2022

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................. 1

ARGUMENT ...................................................................................... 2

    I.     Defendants Are Subject to Specific Personal Jurisdiction in
        Pennsylvania ............................................................................ 2

    II.    Plaintiff's Claims Are Not Barred by the CDA ......................... 9

        A.   Plaintiff Does Not Treat Defendants as Publishers or Speakers ...... 10

        B.   Defendants' Case Law is Readily Distinguishable ......................... 15

    III.   Plaintiff Has Adequately Stated Claims For Relief ................. 18

        A.   Legal Standard ................................................................ 18

        B.   The TikTok App and Algorithm Are "Products" ............................ 19

        C.   Defendants Owed Nylah Anderson a Duty ...................................... 24

CONCLUSION ................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Schwartz v. Abex Corp.*,
  106 F.Supp.3d 626 (E.D. Pa. 2015) ....................................................25

*Aetna Cas. & Sur. Co. v. Duncan*,
  972 F.2d 523 (3d Cir. 1992) ...............................................4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................19

*Estate of B.H. v. Netflix, Inc.*,
  2022 WL 551701 (N.D. Cal. Jan. 12, 2022)......................................23

*Barker v. Lull Engineering Co.*,
  573 P.2d 443 (Ca. 1978) ...................................................14

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................18

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)........................................................3, 4

*ByteDance Inc. and TikTok Inc. v. Triller, Inc.*,
  United States District Court for the Northern District of California,
  Case No. 3:20-cv-7572 ....................................................21

*In re Craftmatic Sec. Litig.*,
  890 F.2d 628 (3d Cir. 1989) ..............................................4

*Dauphin Deposit Bank and Trust Co. v. Toyota Motor Corp.*,
  596 A.2d 845 (Pa. Super. 1991) ......................................25

*Doe v. Internet Brands, Inc.*,
  824 F.3d 846 (9th Cir. 2016) ...................................*passim*

*Doe v. Twitter, Inc.*,
  555 F. Supp. 3d 889 (N.D. Cal. 2021)...............................16

ii

*Dryoff v. Ultimate Software Group, Inc.*,
   934 F.3d 1093 (9th Cir. 2019) ...................................................................17, 18

*Erie Ins. Co. v. Amazon.com, Inc.*,
   925 F.3d 135 (4th Cir. 2019) ............................................................................14

*Est. of Alex through Coker v. T-Mobile US, Inc.*,
   313 F.Supp.3d 723 (N.D. Tex. 2018) ..............................................................21

*Fields v. Twitter, Inc.*,
   217 F. Supp. 3d 1116 (N.D. Cal. 2016), *aff'd*, 881 F.3d 739 (9th
   Cir. 2018) ..........................................................................................................16

*Force v. Facebook, Inc.*,
   934 F.3d 53 (2d Cir. 2019) .........................................................................15, 16

*Ford Motor Co. v. Montana Eighth Judicial District Court*,
   141 S.Ct. 1017 (2021).................................................................................*passim*

*Green v. AOL*,
   318 F.3d 465 (3d Cir. 2003) ............................................................................10

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
   466 U.S. 408 (1984)............................................................................................3

*Holbrook v. Prodomax Automation Ltd.*,
   2021 WL 4260622 (W.D. Mich. Sept. 20, 2021) .............................................22

*Inman v. Technicolor USA, Inc.*,
   2011 WL 5829024 (W.D. Pa. Nov. 18, 2011)..............................................18, 19

*International Shoe Co. v. Washington*,
   326 U.S. 310 (1945)............................................................................................3

*Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*,
   65 Fed. App'x 803 (3d Cir. 2003) .....................................................................4

*Kabbaj v. Google Inc.*,
   592 Fed. App'x. 74 (3d Cir. 2015) ...................................................................15

*Lemmon v. Snap, Inc.*,
   995 F.3d 1085 (9th Cir. 2021) ...................................................................*passim*

A114

*Maynard v. Snapchat, Inc.*,
　　870 S.E.2d 739 (Ga. 2022) ............................................................22

*O'Connor v. Sandy Lake*,
　　496 F.3d 312 (3d Cir. 2007) .......................................................3, 6

*Obado v. Magedson*,
　　612 Fed. App'x. 90 (3d Cir. 2015) ................................................15

*Parker v. Paypal, Inc.*,
　　2017 WL 3508759 (E.D. Pa. Aug. 16, 2017) ................................15

*Phillips v. Cricket-Lighters*,
　　841 A.2d 1000 (Pa. 2003) .............................................................25

*Rodgers v. Christie*,
　　795 Fed. App'x. 878 (3d Cir. 2020) ..........................................23, 24

*Snyder v. ISC Alloys, Ltd.*,
　　772 F.Supp. 244 (W.D. Pa. 1991) .................................................22

*Time Share Vacation Club v. Atlantic Resorts, Ltd.*,
　　735 F.2d 61 (3d Cir. 1984) .............................................................3

*Tincher v. Omega Flex, Inc.*,
　　104 A.3d 328 (Pa. 2014) .......................................................*passim*

*Toys "R" Us, Inc. v. Step Two, S.A.*,
　　318 F.3d 446 (3d Cir. 2003) ....................................................7, 8, 9

*Winter v. Facebook, Inc.*,
　　2021 WL 5446733 (E.D. Mo. Nov. 22, 2021) ...............................15

*Winter v. G.P. Putnam's Sons*,
　　938 F.2d 1033 (9th Cir. 1989) .......................................................23

*Ziencik v. Snap, Inc.*,
　　2021 WL 4076997 (W.D. Pa. Sept. 8, 2021) ................................8, 9

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*,
　　952 F.Supp. 1119 (W.D. Pa. 1997) ..............................................7, 8

A115

**Statutes**

18 U.S.C. § 2333 ................................................................................15

47 U.S.C. § 230(c)(1) ....................................................................9, 10

CDA ......................................................................................*passim*

47 U.S.C. § 230(e)(c) ................................................................2, 9, 10

**Other Authorities**

Federal Rule 8(a)(2) ........................................................................18

Restatement of Torts ........................................................................19

Restatement (Second) of Torts § 388 ................................................25

v

A116

## INTRODUCTION

On December 7, 2021, 10-year-old Nylah Anderson was asphyxiated when she attempted to perform a viral TikTok challenge known as the "Blackout Challenge" which encouraged Nylah to choke herself until passing out. Compl. [D.E. 1] ¶ 1. Nylah suffered in the pediatric intensive care unit and eventually succumbed to her injuries and died on December 12, 2021. *Id.* ¶ 2. Defendants, TikTok, Inc. and ByteDance, Inc. (collectively "Defendants") sent the dangerous Blackout Challenge directly to 10-year-old Nylah through her For You Page ("FYP") on the TikTok app. *Id.* ¶ 3. Defendants' app utilizes an algorithm, which acts as a "system that delivers content to each user that is likely to be of interest to that particular user" and "each person's feed [also known as the FYP] is unique and tailored to that specific individual." *Id.* ¶ 3. This algorithm then places content on the users FYP so that it is immediately seen by the user. The TikTok algorithm thus (1) determined that the dangerous and deadly Blackout Challenge was likely to be of interest to 10-year-old Nylah Anderson, and (2) sent her the challenge by directly putting it on her FYP. *Id.* ¶ 4.

On May 12, 2022, Plaintiff filed suit against Defendants. *See generally* Compl. Plaintiff's Complaint is crystal clear: Defendants' liability in this matter is based on their own independent conduct as designers, manufacturers, sellers and/or distributors of their dangerously defective products—TikTok and its algorithm—

1

and their own independent acts of negligence. *See, e.g. Id.* ¶¶ 7, 104, 126. Despite this, Defendants attempt to rewrite Plaintiff's Complaint as seeking to hold Defendants liable for the content created by third-parties. *See* Def. Mem. [D.E. 12-1] p. 8 (arguing that "[t]he gravamen of Plaintiff's claims is based on *third-party users'* actions"). Plaintiff does no such thing and Defendants' attempts are a transparent effort to shoehorn this case into the immunity provisions of Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(e)(c). The CDA is entirely inapplicable to Plaintiff's claims against Defendants.

In addition to the demonstrably incorrect argument that they are immune under Section 230 of the CDA, Defendants' motion also challenges this Court's personal jurisdiction, argues that TikTok and its algorithm are not "products" subject to strict product liability, and that Defendants owed no duty to Nylah Anderson. Defendants are wrong on all fronts, and their motion to dismiss should be denied.

## **ARGUMENT**

### I. **Defendants Are Subject to Specific Personal Jurisdiction in Pennsylvania.**

This Court has specific personal jurisdiction over Defendants TikTok, Inc. and ByteDance, Inc. because (1) they purposefully directed their activities to Pennsylvania, and specifically to Nylah Anderson, (2) Plaintiffs' claims arise out of and/or relate to these purposeful and targeted activities, and (3) assertion of personal jurisdiction comports with fair play and substantial justice. *E.g., Ford Motor Co. v.*

2

*Montana Eighth Judicial District Court*, 141 S.Ct. 1017, 1024 (2021); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).

The Due Process clause requires defendants be given "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign[.]" *Burger King*, 471 U.S. at 471-72 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)); *see also International Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945). This "fair warning" requirement is satisfied "if the defendant has 'purposefully directed' his activities at residents of the forum…and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Id.* (citation omitted); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). "The contacts needed for [specific] jurisdiction often go by the name 'purposeful availment.'" *Ford Motor Co.*, 141 S.Ct. at 1024 (citing *Burger King Corp.*, 471 U.S. at 475). The contacts must be the defendant's own choice and not "random, isolated, or fortuitous." *Id.* (citations omitted).

The Third Circuit requires Plaintiff show: (1) Defendants "purposefully availed" themselves of Pennsylvania; (2) the claims arise out of or relate to those activities; and (3) exercising personal jurisdiction is reasonable. *O'Connor v. Sandy Lake*, 496 F.3d 312, 317 (3d Cir. 2007). A court may look to facts beyond the complaint in deciding whether a plaintiff has established personal jurisdiction. *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 66 n. 9 (3d Cir. 1984).

A119

There is no question that Defendants[1] purposefully availed themselves of Pennsylvania. Nylah and her mobile device through which she used TikTok were located in Chester, Pennsylvania. Compl. ¶¶ 8, 9. The moment TikTok was downloaded, Defendants reached into Pennsylvania and entered into a contract[2] with Nylah Anderson concerning her use of Defendants' "Platform" and "related websites, services, applications, *products* and content[.]" *See* **Exhibit A**, TikTok

---

[1] Defendants incorrectly assert that "Plaintiff does not even allege any contacts between [Defendant ByteDance, Inc.] and Pennsylvania whatsoever. However, the Complaint is clear on the very first page that the use of the term "TikTok Defendants" throughout the Complaint refers collectively to both TikTok, Inc. and ByteDance, Inc. Compl. p. 1. This case is in the pleadings stage, and Plaintiff does not have personal knowledge of the division in responsibility and ownership of the product at issue—the TikTok app and its algorithm—between TikTok, Inc. and ByteDance, Inc, and the law does not require this. *See In re Craftmatic Sec. Litig.*, 890 F.2d 628, 645 (3d Cir. 1989) ("[P]laintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs [at the pleading stage].").

Plaintiff also alleged that Defendant ByteDance, Inc. "was acting by and through its…agents" and that ByteDance, Inc. "through their agents" are both strictly liable and negligent. Compl. ¶¶ 20, 105, 107, 109, 127, 129. One such agent through which ByteDance, Inc. was acting is its subsidiary, Defendant TikTok, Inc. *See Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*, 65 Fed. App'x 803, 808 (3d Cir. 2003) (holding that an "agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting."). Plaintiff "is not required to have extensive proof at the complaint stage" of such an agency relationship between ByteDance, Inc. and TikTok, Inc. *Id.*

[2] Under Pennsylvania law, "[c]ontracts of a minor, other than contracts for necessities, are voidable by the minor, not void[]" and "a minor can render a contract a nullity by disaffirming it at any point up until a reasonable time after the minor attains his or her majority." *Aetna Cas. & Sur. Co. v. Duncan*, 972 F.2d 523, 526 (3d Cir. 1992) (citations omitted). Although the enforceability of this contract is suspect and likely to be litigated in this action, for jurisdictional purposes its existence cannot be ignored. The Supreme Court has emphasized that parties who "reach out beyond one state and create continuing relationships and obligations with citizens of another state" are subject to regulation and sanctions in the other State for the consequences of their activities. *Burger King*, 471 U.S. at 473.

4

A120

Terms of Service, ¶ 1 (emphasis added). The Terms of Service expressly incorporate the Privacy Policy. *Id.* ¶ 2; *see also* **Exhibit B**, TikTok Privacy Policy.

The Privacy Policy reveals that as soon as Nylah cracked the door open by downloading TikTok and agreeing to the Terms of Service, Defendants blew the door off its hinges and began a systematic collection and utilization of a *massive* amount of Nylah's Pennsylvania-based personal data. The shocking scope of data harvested by Defendants is detailed in Defendants' Privacy Policy. *See* **Ex. B**.

This gargantuan amount of data is then utilized to target users with specific videos and advertisements designed to keep the user fully engaged. User engagement drives revenues mostly generated by advertisements. Defendants purposefully availed themselves of Pennsylvania by harvesting data from Nylah's Pennsylvania-based mobile device; from her Pennsylvania-based IP address and network activity; from her body, image, and characteristics, including "biometric identifiers and biometric information" while she was located in Pennsylvania; from her approximate and precise Pennsylvania-based location data; and the list goes on. *See* **Ex. B**. Defendants' extraction of Nylah's Pennsylvania-based data was not "random, isolated, or fortuitous." *Ford Motor Co.*, 141 S.Ct. at 1024. Instead, Defendants utilized the data it purposefully gathered to satisfy their primary business objectives including to "send promotional materials", "measure and understand the effectiveness of the advertising", "conduct product development", and relevant here,

"make suggestions and provide a customized ad experience" and "provide you with…personalized content." *See* **Ex. B**.

The geographic location of a user is critical to TikTok's decisions of what promotional materials to send to a user.  This is why a user located in the Philadelphia area will receive advertisements concerning Philadelphia sports, Philadelphia concerts and other Philadelphia events.  By contrast, a user in Los Angeles or Miami will receive material targeted to those regions.  Defendants cannot have it both ways.  They cannot rely on a user's geographic location as a central aspect of their business model but then claim that their connection to that user's location are simply fortuitous.  Compl. ¶¶ 23-29.

Defendants' purposeful availment of Pennsylvania is based on their systematic, targeted, and intentional actions by reaching into Pennsylvania to extract a huge amount of data from Nylah which Defendants' product ultimately used to deliver the Blackout Challenge directly to Nylah's FYP on her phone in Pennsylvania.  Compl. ¶ 27; *see also id.* ¶¶ 26, 80-84, 93.  The first requirement for specific personal jurisdiction is satisfied.  *O'Connor*, 496 F.3d at 317.

The second requirement for specific personal jurisdiction—that Plaintiff's claims arise out of or relate to Defendants' Pennsylvania contacts—is easily satisfied here.  *Ford Motor Co.*, 141 S.Ct. at 1024.  Tik Tok utilized the data Defendants purposefully harvested from Pennsylvania to deliver the Blackout Challenge directly

A122

to Nylah's FYP.   Nylah fell victim to Defendants' targeted Pennsylvania-based actions, participated in the challenge and died as a result. Compl. ¶¶ 26, 27, 77-99.

The final requirement for specific personal jurisdiction—that exercise thereof be reasonable—is likewise satisfied.   The Supreme Court has repeatedly defined the framework under which it is reasonable for a product designer/manufacturer to be subjected to suit in a given State:

> If the sale of a product of a manufacturer or distributor…is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in several or all other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others.

*Ford Motor Co.*, 141 S.Ct. at 1027 (citation omitted); *see also Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1126-27 (W.D. Pa. 1997) (holding that when a defendant makes a conscious choice to conduct business with the residents of a forum state "it has clear notice that it is subject to suit there" and if defendant was not amenable to jurisdiction in Pennsylvania, "it could have chosen not to sell its services to Pennsylvania residents.").   Technology readily exists whereby an app can be inaccessible in certain geographic locations.   If Defendants wanted to avoid Pennsylvania jurisdiction, they could have utilized this blocking capability.

The case law relied on by Defendants is readily distinguishable.   Defendants rely on the Third Circuit's holding in *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 454 (3d Cir. 2003) that "mere operation of a commercially interactive web site

should not subject the operator to jurisdiction anywhere in the world." The TikTok app and Defendants' intentional data harvesting from Pennsylvania residents, including Nylah Anderson, is a far cry from the twenty-year-old website at issue in *Toys "R" Us* which was merely accessible from Pennsylvania. The website at issue in *Toys "R" Us* was identical for all users regardless of from where it was accessed. This is not the case for Defendants' product, which is specifically tailored to each individual user.

Contrary to defendants' argument, *Toys "R" Us* actually supports Plaintiff's position. *Id.* at 452 (holding if a defendant web site operator "intentionally targets the site to the forum state, and/or knowingly conducts business with forum state residents via the site" the purposeful availment requirement is satisfied); *see also Zippo*, 952 F.Supp. at 1126 (defendant purposefully availed itself of doing business in Pennsylvania when it "repeatedly and consciously chose to process Pennsylvania residents' applications and to assign them passwords," knowing this would result in Pennsylvania business contacts). Defendants' conduct here goes *far* beyond that which was found sufficient in *Zippo*.

Defendants rely heavily on *Ziencik v. Snap, Inc.*, 2021 WL 4076997, *1 (W.D. Pa. Sept. 8, 2021), but this case is highly distinguishable. In *Ziencik*, plaintiffs filed suit against Snap, Inc. ("Snap", the maker of the Snapchat app) alleging that they suffered emotional and physical injuries as a result of threats sent directly to them

A124

by third parties through the Snapchat app.  *See* **Exhibit C**, *Ziencik* Notice of

Removal, ¶ 1.  These threats were direct messages sent by third parties that did not

involve data collection or a targeting algorithms.  The district court found that "[t]he

only contacts between Defendant and Plaintiffs were…initiated by Plaintiffs[]" and

"Plaintiffs provide no evidence that Defendant does more than exist as an application

that people can download while located in Pennsylvania."  *Ziencik*, 2021 WL

4076997 at *4.  Here, on the other hand, Defendants' contacts are far more extensive

than Nylah's initial download and use of TikTok.  While Defendants try to align

themselves with the defendant in *Ziencik* as merely being "an application that people

can download while located in Pennsylvania[,]" this does not reflect the reality of

Defendants' product or data collection efforts.  *See* **Ex. A**; **Ex. B**.

Respectfully, Defendants' motion should be denied.  However, should the

Court not be convinced that specific personal jurisdiction exists, Plaintiff requests

the opportunity to conduct jurisdictional discovery.  *See Toys "R" Us*, 318 F.3d at

456 (district court erred in denying the plaintiff jurisdictional discovery).

## II.    Plaintiff's Claims Are Not Barred by the CDA.

"In 1996, when the internet was young and few of us understood how it would

transform American society, Congress passed the CDA."  *Lemmon v. Snap, Inc.*, 995

F.3d 1085, 1090 (9th Cir. 2021) (citing 47 U.S.C. § 230).  Section 230 of the CDA

provides, in pertinent part, "[n]o provider or user of an interactive computer service

shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).  By its terms, Section 230 of the CDA "provides immunity to [an interactive computer service provider] as a publisher or speaker of information originating from another information content provider." *Green v. AOL*, 318 F.3d 465, 471 (3d Cir. 2003).

Plaintiff's claims will only be barred under Section 230 if they seek to treat Defendants "as the publisher or speaker" of third-party content.  47 U.S.C. § 230(c)(1); *Green*, 318 F.3d at 470-71.  Plaintiff's claims do not treat Defendants as the publisher or speaker of the Blackout Challenge video.  Instead, they seek to hold Defendants directly liable as product designers, manufacturers, and sellers.

A.     **Plaintiff Does Not Treat Defendants as Publishers or Speakers.**

In the context of the CDA, "[a] clear illustration of a cause of action that treats a website proprietor as a publisher is a defamation action founded on the hosting of defamatory third-party content." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016) (citing *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003)).  However, where a plaintiff's claim is not founded on the defendant's quintessential publisher actions, i.e., editing, monitoring, or removing third-party content, the CDA is inapplicable. *Id.*; *Lemmon*, 995 F.3d at 1092.

Plaintiff is not seeking to hold Defendants liable as speakers or publishers. Plaintiff's claims arise from Defendants' duty to design and produce a safe, non-

10

A126

defective product under Pennsylvania law. *See, e.g., Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 384-94 (Pa. 2014) (holding product designers, manufacturers, and sellers have a duty to design, manufacture, and produce non-defective products). Defendants' duty relevant to Plaintiff's product liability claims "'has nothing to do with' its editing, monitoring, or removing of the content that its users generate" and the CDA is thus inapplicable.[3] *Lemmon*, 995 F.3d at 1092. Had a TikTok employee, in an effort to carry out his official job responsibilities, spied on 10-year-old Nylah and then used the information gained to determine that Nylah was likely to view and partake in dangerous challenges that involved choking activity, and texted a Blackout Challenge video link to her and said, "try this," no one would suggest the CDA bestows immunity. This is precisely what TikTok did, and simply because TikTok utilized sophisticated automated (and defective) technologies to accomplish this action does not bring Plaintiff's claims under the CDA.

The CDA's inapplicability to Plaintiff's claims is confirmed by *Internet Brands*, 824 F.3d 846 and *Lemmon*, 995 F.3d 1085—two seminal cases outright ignored by the TikTok Defendants. In *Internet Brands*, the plaintiff was a model who posted information about herself to the Model Mayhem website. 824 F.3d at

---

[3] Defendants focus on factual allegations in Plaintiff's Complaint concerning Defendants' failure to remove the dangerous Blackout Challenge. Plaintiff's legal theories against Defendants are not based on whether Defendants should have removed the Blackout Challenge videos and are instead premised on their roles as product designers, programmers, manufacturers, and distributors.

11

A127

848. Two rapists used the Model Mayhem website to lure plaintiff to a fake audition, where they drugged her, raped her, and recorded her for a pornographic video. *Id.* Plaintiff filed suit against Internet Brands as the operator of the website, alleging that it knew about the rapists but failed to warn her, and asserting negligence under California law based on that failure to warn. *Id.* The district court dismissed the action believing the claim was barred by the CDA, and plaintiff appealed. *Id.*

The Ninth Circuit framed the essential question as "whether Plaintiff's failure to warn cause of action 'inherently requires the court to treat' Internet Brands 'as a publisher or speaker' 'of information provided by another information content provider.'" *Id.* at 850 (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-02 (9th Cir. 2009)). The *Internet Brands* court held that the plaintiff's claims were fundamentally different, and that "[t]he duty to warn allegedly imposed by California law would not require Internet Brands to remove any user content or otherwise affect how it publishes or monitors such content." *Id.* at 851. Indeed, "[a]ny obligation to warn could have been satisfied without changes to the content posted by the website's users[.]" *Internet Brands*, 824 F.3d at 851. The plaintiff was thus not seeking to treat Internet Brands as a publisher or speaker and the CDA was inapplicable. *Id.*

In *Lemmon*, teenagers were killed in a car accident while traveling at excessive speeds. 995 F.3d at 1088. Plaintiffs, parents of the deceased teenagers,

alleged that the popular social media app, Snapchat, encouraged such reckless driving through the "Speed Filter" which enabled users to record and share their real-life speed. *Id.* The parents brought wrongful death actions against Snap, Inc., alleging negligent design of the Snapchat app. *Id.* at 1087. The district court dismissed the plaintiffs' complaint on the grounds that the claims were barred by the CDA, and plaintiffs appealed. *Id.* at 1090. On appeal, the Ninth Circuit engaged in a thorough analysis of whether the plaintiffs' product design claims sought to treat defendant Snap, Inc. as a "publisher or speaker." *Id.* at 1091-93. The *Lemmon* court made clear that its focus was on whether "the duty the plaintiff alleges" stems "from the defendant's status or conduct as a publisher or speaker[]" or if the duty stems from elsewhere. *Id.* at 1091 (citation omitted). The court held that the plaintiffs' product liability claims did ***not*** seek to treat Snap, Inc. as a publisher or speaker:

> ***The duty underlying such a claim differs markedly from the duties of publishers as defined in the CDA***. Manufacturers have a specific duty to refrain from designing a product that poses an unreasonable risk of injury to consumers. Meanwhile, entities acting solely as publishers— *i.e.*, those that review material submitted for publication, perhaps edit it for style or technical fluency, and then decide whether to publish it— generally have no similar duty.
>
> ***It is thus apparent that the Parents' amended complaint does not seek to hold Snap liable for its conduct as a publisher or speaker. Their negligent design lawsuit treats Snap as a products manufacturer, accusing it of negligently designing a product*** (Snapchat) with a defect (the interplay between Snapchat's reward system and the Speed Filter). Thus, the duty that Snap allegedly violated "springs from" its distinct capacity as a product designer….Snap's alleged duty in this case thus

"has nothing to do with" its editing, monitoring, or removing of the
content that its users generate through Snapchat.

*Id.* at 1092 (emphasis added) (internal quotations and citations omitted); *see also*
*Erie Ins. Co. v. Amazon.com, Inc.*, 925 F.3d 135, 139 (4th Cir. 2019) ("While the
[CDA] protects interactive computer service providers from liability as a publisher
of speech, it does not protect them from liability as the seller of a defective
product.").

Plaintiff's claims here, like those in *Internet Brands* and *Lemmon*, have
"nothing to do with" Defendants' editing, monitoring, or removing third-party user
content. Instead, just like in *Lemmon*, Plaintiff's claims spring from Defendants'
duty to design a safe, non-defective product under Pennsylvania law and, like in
*Internet Brands*, Plaintiff alleges Defendants are liable for failure to warn stemming
from their product liability duty. *Id.* ¶ 107(y-z). The fact that the TikTok Defendants
could have satisfied their duty (to design and supply safe, non-defective products
under the consumer expectation and/or risk-utility standards) *without altering the
content generated by third-parties* cements that Plaintiff is not seeking to treat
Defendants as publishers or speakers. *Lemmon*, 995 F.3d at 1092.

Importantly, *Lemmon* and *Internet Brands* were decided under California law.
*Tincher* is the progeny of California product liability law. In *Tincher*, the
Pennsylvania Supreme Court repeatedly relied on California product liability law,
particularly *Barker v. Lull Engineering Co.*, 573 P.2d 443 (Ca. 1978), in determining

14

A130

the modern framework of Pennsylvania product liability law. *Tincher*, 104 A.3d at 368, 389, 391-92. Both *Lemmon*, 995 F.3d at 1092 and *Internet Brands*, 824 F.3d at 851, the most on-point cases, were decided under California law and hold that Plaintiff's product liability and failure to warn claims fall outside the CDA. *Lemmon* and *Internet Brands* carry tremendous weight under Pennsylvania law.

**B.    Defendants' Case Law is Readily Distinguishable**

Defendants rely on a number of cases in which the court dismissed a plaintiff's claims on grounds of CDA immunity. Each of these cases is highly distinguishable. Defendants cite *Obado v. Magedson*, 612 Fed. App'x. 90 (3d Cir. 2015); *Winter v. Facebook, Inc.*, 2021 WL 5446733, *1 (E.D. Mo. Nov. 22, 2021); *Kabbaj v. Google Inc.*, 592 Fed. App'x. 74 (3d Cir. 2015); and *Parker v. Paypal, Inc.*, 2017 WL 3508759, *1 (E.D. Pa. Aug. 16, 2017). These are all primarily ***defamation*** cases in which a plaintiff sought to hold the defendants liable for the allegedly defamatory content posted by a third party. None of these cases is on point.

Defendants cite *Force v. Facebook, Inc.*, 934 F.3d 53, 66-67 (2d Cir. 2019) for the proposition that Facebook's use of algorithms did not render it a non-publisher. In *Force*, the plaintiff brought federal ***anti-terrorism*** claims against Facebook seeking to hold it liable for Hamas's acts of international terrorism under 18 U.S.C. § 2333. *Force*, 934 F.3d at 61. The plaintiff argued that Facebook's use of algorithms transformed Facebook into a non-publisher. *Id.* at 65-66. The *Force*

15

A131

plaintiff's claims, however, clearly were treating Facebook as a publisher. Plaintiff here does not suggest that Defendants' use of algorithms alone brings this case outside the CDA. Instead, Plaintiff notes that the algorithm took the affirmative step of sending the dangerous content to the user, which fundamentally treats Defendants as product designers subject to product liability outside the scope of the CDA entirely, which was not at all the issue in *Force*.[4]

Defendants rely on *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 930 (N.D. Cal. 2021). In *Doe*, two minors were solicited for sex trafficking and were manipulated into providing pornographic videos of themselves which were posted on Twitter years later. *Id.* at 894. Plaintiffs asserted claims against Twitter, including claims for products liability, negligence per se, and negligent infliction of emotional distress. *Id.* at 929-30. The *Doe* court summarized the products liability claim as alleging that Twitter's design did not enable efficient reporting of child sexual abuse material or immediate blocking/removal thereof. *Id.* at 930. The *Doe* court distinguished plaintiffs' claims from those in *Lemmon* and found that to meet the obligation plaintiffs sought to impose, "Twitter would have to alter the content

---

[4] Defendants' reliance on *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016), *aff'd*, 881 F.3d 739 (9th Cir. 2018) is distinguishable for substantially the same reasons. Like the plaintiff in *Force*, the *Fields* plaintiff sought to hold Twitter liable for ISIS's terrorism under 18 U.S.C. § 2333, part of the Anti-Terrorism Act, on the theory that Twitter provided material support to ISIS by allowing its members to sign up for Twitter accounts and send messages. Plaintiff's claims here treat Defendants as product designers and suppliers, not as the pure publishers that the *Force* and *Fields* plaintiffs treated those defendants.

posted by its users, ***in contrast to the design defect*** alleged in Lemmon." *Id.* at 930 (emphasis added).

Here, just as in *Lemmon* and opposite of the claims at issue in *Doe*, Defendants would not be required to alter any content posted by its users in order to comply with their product liability duties. Indeed, the Blackout Challenge can exist on TikTok without necessarily exposing TikTok to liability. However, Defendants' product functioning to send that challenge to a 10-year-old is an affirmative step (not a publisher action) which is not afforded any protections by the CDA.

Defendants also rely on *Dryoff v. Ultimate Software Group, Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019) to suggest that because TikTok makes "recommendations" to "facilitate the communication and content of others" it is immune under the CDA. This is wrong, and *Dryoff* is plainly distinguishable. In *Dryoff*, the plaintiff's son overdosed on drugs after a social networking website allowed the decedent to connect and communicate directly with the drug dealer who sold the fatal narcotics. *Id.* at 1094-95. The *Dryoff* plaintiff did not argue the CDA was inapplicable but instead that defendant's actions transformed it into an "information content provider" which is not immune under the CDA. *Id.* at 1096. This is not at all what Plaintiff is alleging here. The *Dryoff* court's focus was on whether the defendant was an "information content provider" under the CDA whereas here, the fundamental issue is whether Plaintiff's product liability claims

17

are subject to the CDA at all (they aren't). *Dryoff* did not involve product liability claims and also predates the Ninth Circuit's decision in *Lemmon*, which held the CDA did not apply to product liability claims. *Dryoff* is irrelevant.

The gravamen of Plaintiff's claims arises from Defendants' liability for designing, developing, and supplying a defective and dangerous product. *Internet Brands* and *Lemmon*—the two cases most analogous to Plaintiff's claims but which are glaringly absent from Defendants' Memorandum—confirm that these claims are outside the scope of the CDA. Defendants' motion should be denied.

### III. Plaintiff Has Adequately Stated Claims For Relief.

#### A. <u>Legal Standard</u>

In considering a motion to dismiss for failure to state a claim, this Court must be "mindful that federal courts require notice pleading, as opposed to the heightened standard of fact pleading." *Inman v. Technicolor USA, Inc.*, 2011 WL 5829024, at *2 (W.D. Pa. Nov. 18, 2011). Federal Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" so that the defendant has "fair notice of what the claim is and the grounds on which it rests." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

To survive a motion to dismiss, a plaintiff must allege sufficient facts that, if accepted as true, state "a claim to relief that is plausible on its face," or put another way, "nudge [the plaintiff's] claims across the line from conceivable to plausible."

18

A134

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 570. A claim has facial plausibility when a plaintiff pleads facts that allow the court to draw a reasonable inference that the defendant may be liable for the misconduct alleged. *Id.* A complaint may not be dismissed "merely because it appears unlikely or improbable that the plaintiff can prove the facts alleged or will ultimately prevail on the merits." *Inman*, 2011 WL 5829024, at *3.

**B.     The TikTok App and Algorithm Are "Products"**

Defendants urge this Court to adopt overly restrictive definitions of the terms "product" and "seller." However, Pennsylvania courts have repeatedly emphasized that, in applying the law of strict liability, courts must be flexible to effectuate the underlying public policy considerations behind strict product liability. Those policy considerations necessitate concluding that Defendants' app and its associated algorithm are "products" under Pennsylvania law.

Pennsylvania generally follows § 402A of the Second Restatement of Torts for strict product liability actions. *Tincher*, 104 A.3d at 415. In adopting the Second Restatement approach, however, the Pennsylvania Supreme Court cautioned against rigid implementation of its principles, stating:

> The language of a restatement…is not necessarily susceptible to 'statutory'-type construction or parsing. An effective and valuable restatement of the law offers instead a pithy articulation of a principle of law which, in many cases, including novel or difficult ones, ***represents a starting template for members of the judiciary, whose***

19

A135

*duty is then to employ an educated, candid, and common-sense approach to ensure dispensation of justice to the citizenry*. *Id.* (emphasis added).  In the context of strict product liability, the Pennsylvania Supreme Court has stressed that "[b]right lines and broad rules always offer a superficially enticing option.  However, [the court] cannot elevate the lull of simplicity over the balancing of interests embodied by the principles underpinning [the jurisprudence of the relevant area of law]." *Id.* at 425.  This is because "[s]trict liability in tort for product defects is a cause of action which implicates the social and economic policy of [the Commonwealth of Pennsylvania]." *Id.* at 385.  Product liability law is thus intentionally flexible so as to accommodate adaptation to technological innovations.

Defendants argue TikTok is similar to intangible "ideas" and "expressions" but this ignores the fundamental basis of what the TikTok app and algorithm are—computer programs and software that physically exist on smartphones.  They are "products."  TikTok, Inc. itself characterizes its app as a "product."  *See* **Ex. A** at ¶ 5 ("Our automated systems analyze your content…to provide you personally relevant ***product features***, such as customized search results[]") (emphasis added), ¶ 7 ("our staff is continually working to develop and evaluate our own ***product*** ideas and features") (emphasis added); **Ex. B** (stating that Defendants utilize data mined

20

A136

from users to "conduct *product* development").  Further, ByteDance represents on its website that TikTok is one of ***"Our Products"***.[5]

Defendants have confirmed in legal pleadings that their app is a "product". *See* **Exhibit D**, Defendants' Complaint in *ByteDance Inc. and TikTok Inc. v. Triller, Inc.*, United States District Court for the Northern District of California, Case No. 3:20-cv-7572.  In *Triller*, Defendants filed a declaratory judgment action seeking judgment that Defendants' "products" do not infringe a patent held by Triller, Inc. *Id.*  Defendants characterized their app as a "product" numerous times. *Id.* ¶ 24, 25, 27 ("[n]either Plaintiffs nor their ***products***…infringe") (emphasis added); ¶ 26 ("Plaintiffs ***products*** do not infringe…[n]or are Plaintiffs' ***products*** installed or otherwise used by end-users in a way that satisfies this claim limitation.") (emphasis added).  Defendants cannot characterize their app as a "product" when it suits them and then disclaim such representations when convenient.

Courts across the country have routinely held that software, such as computer programs, apps, and algorithms, are "products" that are subject to design defect claims, despite Defendants' contentions to the contrary.  *See Est. of Alex through Coker v. T-Mobile US, Inc.*, 313 F.Supp.3d 723, 732 (N.D. Tex. 2018) (denying defendant's motion to dismiss the plaintiff's products liability claim alleging that "the software installed on mobile devices was defectively designed" and holding that

---

[5] https://www.bytedance.com/en/products/ (accessed July 25, 2022).

"[t]he fact that a product does not work as expected can support a design defect claim" and that plaintiffs had "plausibly alleged a products liability claim."); *Lemmon*, 995 F.3d at 1092 (allowing the plaintiff's negligent product design claims related to the popular social media app, Snapchat, to proceed against Snap, Inc., the designer, developer, and operator of the app); *Maynard v. Snapchat, Inc.*, 870 S.E.2d 739 (Ga. 2022) (characterizing the Snapchat app as a "product" and the defendant, Snapchat, Inc. as a "manufacturer" of that product and holding that the plaintiff adequately alleged that the manufacturer owed a design duty); *Holbrook v. Prodomax Automation Ltd.*, 2021 WL 4260622, at *3 (W.D. Mich. Sept. 20, 2021) (holding that the computer software installed on a programmable logic controller ("basically a computer") is a "product").

Defendants' TikTok app and algorithm are nothing like the intangible ideas or expressions that were found not to be "products" in the cases cited by Defendants. For example, Defendants cite *Snyder v. ISC Alloys, Ltd.*, 772 F.Supp. 244, 247 (W.D. Pa. 1991) in which the district court analyzed whether technical drawings and professional information provided by the defendant constituted "products" that would subject the defendant to strict product liability.  TikTok and its algorithm are nothing like the "idea" and information at issue in *Snyder*.  Instead, it is computer software physically downloaded onto mobile devices which carries out specific and

A138

tangible functions, such as injecting videos into the user's conscious attention and bombarding users with advertising. TikTok is not an "idea" or "expression."

Similarly, Defendants rely on *Estate of B.H. v. Netflix, Inc.*, 2022 WL 551701, at *3 (N.D. Cal. Jan. 12, 2022) in which the district court held that the plaintiff's strict product liability claims against Netflix related to a particular show failed because "[t]here is no strict liability for books, movies, or other forms of media." (citing *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034-36 (9th Cir. 1989)). The distinction here is that Plaintiff is not seeking to hold Defendants strictly liable for the existence of the Blackout Challenge video that resulted in Nylah's death like the *Estate of B.H.* plaintiff was attempting to do. Instead, Plaintiff seeks to hold Defendants liable for the defective design of its app and algorithm, which is decided to send the Blackout Challenge video to a 10-year-old child. Plaintiff's claims here are fundamentally different than those seeking liability for ideas and expressions of the type contained in books, movies, or other forms of media. *Winter*, 938 F.2d at 1034-36 is distinguishable for the same reason.

Defendants rely on *Rodgers v. Christie*, 795 Fed. App'x. 878, 880 (3d Cir. 2020) for the same proposition, that "products" must be in tangible form. *Rodgers*, however, analyzed the issue under New Jersey law which has adopted the Third Restatement that explicitly defines "product" as "tangible personal property distributed commercially for use or consumption" or any other item that "is

23

A139

sufficiently analogous to [that] of tangible personal property." *Id.* 879.  Pennsylvania

has expressly rejected adoption of the Third Restatement.  *Tincher*, 104 A.3d at 399.

*Rodgers* is inapplicable to Plaintiff's claims.

Plaintiff is not aware of any Pennsylvania law ruling on whether an app and

its associated algorithms or software are "products."  However, the social and

economic policy of Pennsylvania "demands that the burden of accidental injuries

caused by products intended for consumption be placed upon those who market

them, and be treated as a cost of production against which liability insurance can be

obtained[]" and that consumers be "entitled to the maximum protection at the hands

of someone, and proper persons to afford it are those who market the products."  *Id.*

at 383.  Defendants market their app product, and the burden of accidental injuries

caused thereby should be placed on Defendants.  Declining to extend strict product

liability to claims centered on software products, like TikTok, thwarts the social and

economic policy underpinning product liability law in Pennsylvania.

**C.    Defendants Owed Nylah Anderson a Duty**

Defendants owed a duty to Nylah Anderson as product designers,

manufacturers, sellers, and/or suppliers under deeply-rooted Pennsylvania law.  It is

axiomatic that a plaintiff may bring a claim for negligent product design.  Relying

on *Tincher*, this Court has previously held that, ***"[i]t is now clear that Pennsylvania

law imposes negligence liability (in addition to strict liability) upon product***

24

*manufacturers."* Schwartz v. Abex Corp., 106 F.Supp.3d 626, 654 (E.D. Pa. 2015) (emphasis added); *see also Phillips v. Cricket-Lighters*, 841 A.2d 1000, 1008-10 (Pa. 2003); *Dauphin Deposit Bank and Trust Co. v. Toyota Motor Corp.*, 596 A.2d 845, 849-50 (Pa. Super. 1991). Defendants ignore any discussion of *Phillips* or the plethora of Pennsylvania case law establishing that product designers, manufacturers, and suppliers have a negligence duty to provide a safe product.

Plaintiff also pled Defendants were negligent for failure to warn. Compl. ¶ 127(pp), (qq). Pennsylvania has adopted Restatement (Second) of Torts § 388 in cases involving such claims. *Dauphin*, 596 A.2d at 850 (citing *Incollingo v. Ewing*, 282 A.2d 206, 220 n. 8 (Pa. 1971)). Section 388 confirms that a product supplier has a duty to warn. Restatement (Second) of Torts § 388, cmt. k; *see also Schwartz*, 106 F.Supp.3d at 654-56 (concluding that "under Pennsylvania law, a product manufacturer has a common law duty to warn"). Plaintiff has sufficiently alleged a duty owed by Defendants and their motion to dismiss should be denied.[6]

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motion to Dismiss.

---

[6] Plaintiff's wrongful death and survival act claims must also survive. Defendants only argument concerning these claims is that they are derivative of Plaintiff's strict liability and negligence claims. For all of the reasons stated above, Defendants' arguments seeking dismissal of Plaintiff's strict liability and negligence claims fail, and Plaintiff's wrongful death and survival act claims survive.

A141

Dated: August 1, 2022

/s/ Robert J. Mongeluzzi
Robert J. Mongeluzzi
Jeffrey P. Goodman
Samuel B. Dordick
Rayna McCarthy
**SALTZ MONGELUZZI &
BENDESKY P.C.**
One Liberty Place
1650 Market Street, 52nd Floor
Philadelphia, Pennsylvania 19103
Tel: (215) 496-8282
rmongeluzzi@smbb.com
jgoodman@smbb.com
sdordick@smbb.com
rmccarthy@smbb.com

Mark A. DiCello
**DiCELLO LEVITT GUTZLER LLC**
7556 Mentor Avenue
Western Reserve
Law Building
Mentor, OH 44060
Tel: (440) 953-8888
madicello@dicellolevitt.com

***Counsel for Plaintiff***

26

A142

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2022, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Jeffrey P. Goodman*

A143

# EXHIBIT "A"

How TikTok is supporting our community through COVID-19

# Legal

## Terms of Service

⊕    U.S.

(If you are a user having your usual residence in the US)

*Last updated: February 2019*

## 1. Your Relationship With Us

Welcome to TikTok (the "Platform"), which is provided by TikTok Inc. in the United States (collectively such entities will be referred to as "TikTok", "we" or "us").

You are reading the terms of service (the "Terms"), which govern the relationship and serve as an agreement between you and us and set forth the terms and conditions by which you may access and use the Platform and our related websites, services, applications, products and content (collectively, the "Services"). Access to certain Services or features of the Services (such as, by way of example and not limitation, the ability to submit or share User Content (defined below)) may be subject to age restrictions and not available to all users of the Services. Our Services are provided for private, non-commercial use. For purposes of these Terms, "you" and "your" means you as the user of the Services.

The Terms form a legally binding agreement between you and us. Please take the time to read them carefully. If you are under age 18, you may only use the Services with the consent of your parent or legal guardian. Please be sure your parent or legal guardian has reviewed and discussed these Terms with you.

ARBITRATION NOTICE FOR USERS IN THE UNITED STATES: THESE TERMS CONTAIN AN ARBITRATION CLAUSE AND A WAIVER OF RIGHTS TO BRING A CLASS ACTION AGAINST US. EXCEPT FOR CERTAIN TYPES OF DISPUTES MENTIONED IN THAT ARBITRATION CLAUSE, YOU AND TIKTOK AGREE THAT DISPUTES BETWEEN US WILL BE RESOLVED BY MANDATORY BINDING ARBITRATION, AND YOU AND TIKTOK WAIVE ANY RIGHT TO PARTICIPATE IN A CLASS-ACTION LAWSUIT OR CLASS-WIDE ARBITRATION.

A145

8/1/22, 8:44 AM                                    Terms of Service | TikTok

## 2. Accepting the Terms

By accessing or using our Services, you confirm that you can form a binding contract with TikTok, that you accept these Terms and that you agree to comply with them. Your access to and use of our Services is also subject to our Privacy Policy and Community Guidelines, the terms of which can be found directly on the Platform, or where the Platform is made available for download, on your mobile device's applicable app store, and are incorporated herein by reference. By using the Services, you consent to the terms of the Privacy Policy.

If you are accessing or using the Services on behalf of a business or entity, then (a) "you" and "your" includes you and that business or entity, (b) you represent and warrant that you are an authorized representative of the business or entity with the authority to bind the entity to these Terms, and that you agree to these Terms on the entity's behalf, and (c) your business or entity is legally and financially responsible for your access or use of the Services as well as for the access or use of your account by others affiliated with your entity, including any employees, agents or contractors.

You can accept the Terms by accessing or using our Services. You understand and agree that we will treat your access or use of the Services as acceptance of the Terms from that point onwards.

You should print off or save a local copy of the Terms for your records.

## 3. Changes to the Terms

We amend these Terms from time to time, for instance when we update the functionality of our Services, when we combine multiple apps or services operated by us or our affiliates into a single combined service or app, or when there are regulatory changes. We will use commercially reasonable efforts to generally notify all users of any material changes to these Terms, such as through a notice on our Platform, however, you should look at the Terms regularly to check for such changes. We will also update the "Last Updated" date at the top of these Terms, which reflect the effective date of such Terms. Your continued access or use of the Services after the date of the new Terms constitutes your acceptance of the new Terms. If you do not agree to the new Terms, you must stop accessing or using the Services.

## 4. Your Account with Us

To access or use some of our Services, you must create an account with us. When you create this account, you must provide accurate and up-to-date information. It is important that you maintain and promptly update your details and any other information you provide to us, to keep such information current and complete.

It is important that you keep your account password confidential and that you do not disclose it to any third party. If you know or suspect that any third party knows your password or has accessed your account, you must notify us immediately at: https://www.tiktok.com/legal/report/feedback.

A146

8/1/22, 8:44 AM    Terms of Service | TikTok

You agree that you are solely responsible (to us and to others) for the activity that occurs under your account.

We reserve the right to disable your user account at any time, including if you have failed to comply with any of the provisions of these Terms, or if activities occur on your account which, in our sole discretion, would or might cause damage to or impair the Services or infringe or violate any third party rights, or violate any applicable laws or regulations.

If you no longer want to use our Services again, and would like your account deleted, contact us at: https://www.tiktok.com/legal/report/feedback. We will provide you with further assistance and guide you through the process. Once you choose to delete your account, you will not be able to reactivate your account or retrieve any of the content or information you have added.

## 5. Your Access to and Use of Our Services

Your access to and use of the Services is subject to these Terms and all applicable laws and regulations. You may not:

- access or use the Services if you are not fully able and legally competent to agree to these Terms or are authorized to use the Services by your parent or legal guardian;

- make unauthorised copies, modify, adapt, translate, reverse engineer, disassemble, decompile or create any derivative works of the Services or any content included therein, including any files, tables or documentation (or any portion thereof) or determine or attempt to determine any source code, algorithms, methods or techniques embodied by the Services or any derivative works thereof;

- distribute, license, transfer, or sell, in whole or in part, any of the Services or any derivative works thereof

- market, rent or lease the Services for a fee or charge, or use the Services to advertise or perform any commercial solicitation;

- use the Services, without our express written consent, for any commercial or unauthorized purpose, including communicating or facilitating any commercial advertisement or solicitation or spamming;

- interfere with or attempt to interfere with the proper working of the Services, disrupt our website or any networks connected to the Services, or bypass any measures we may use to prevent or restrict access to the Services;

- incorporate the Services or any portion thereof into any other program or product. In such case, we reserve the right to refuse service, terminate accounts or limit access to

A147

the Services in our sole discretion;

- use automated scripts to collect information from or otherwise interact with the Services;

- impersonate any person or entity, or falsely state or otherwise misrepresent you or your affiliation with any person or entity, including giving the impression that any content you upload, post, transmit, distribute or otherwise make available emanates from the Services;

- intimidate or harass another, or promote sexually explicit material, violence or discrimination based on race, sex, religion, nationality, disability, sexual orientation or age;

- use or attempt to use another's account, service or system without authorisation from TikTok, or create a false identity on the Services;

- use the Services in a manner that may create a conflict of interest or undermine the purposes of the Services, such as trading reviews with other users or writing or soliciting fake reviews;

- use the Services to upload, transmit, distribute, store or otherwise make available in any way: files that contain viruses, trojans, worms, logic bombs or other material that is malicious or technologically harmful;

- any unsolicited or unauthorised advertising, solicitations, promotional materials, "junk mail," "spam," "chain letters," "pyramid schemes," or any other prohibited form of solicitation;

- any private information of any third party, including addresses, phone numbers, email addresses, number and feature in the personal identity document (e.g., National Insurance numbers, passport numbers) or credit card numbers;

- any material which does or may infringe any copyright, trademark or other intellectual property or privacy rights of any other person;

- any material which is defamatory of any person, obscene, offensive, pornographic, hateful or inflammatory;

- any material that would constitute, encourage or provide instructions for a criminal offence, dangerous activities or self-harm;

- any material that is deliberately designed to provoke or antagonise people, especially trolling and bullying, or is intended to harass, harm, hurt, scare, distress, embarrass or upset people;

A148

8/1/22, 8:44 AM                                    Terms of Service | TikTok

- any material that contains a threat of any kind, including threats of physical violence;

- any material that is racist or discriminatory, including discrimination on the basis of someone's race, religion, age, gender, disability or sexuality;

- any answers, responses, comments, opinions, analysis or recommendations that you are not properly licensed or otherwise qualified to provide; or

- material that, in the sole judgment of TikTok, is objectionable or which restricts or inhibits any other person from using the Services, or which may expose TikTok, the Services or its users to any harm or liability of any type.

In addition to the above, your access to and use of the Services must, at all times, be compliant with our Community Guidelines.

We reserve the right, at any time and without prior notice, to remove or disable access to content at our discretion for any reason or no reason. Some of the reasons we may remove or disable access to content may include finding the content objectionable, in violation of these Terms or our Community Policy, or otherwise harmful to the Services or our users. Our automated systems analyze your content (including emails) to provide you personally relevant product features, such as customized search results, tailored advertising, and spam and malware detection. This analysis occurs as the content is sent, received, and when it is stored.

## 6. Intellectual Property Rights

We respect intellectual property rights and ask you to do the same. As a condition of your access to and use of the Services, you agree to the terms of the Copyright Policy.

## 7. Content

### TikTok Content

As between you and TikTok, all content, software, images, text, graphics, illustrations, logos, patents, trademarks, service marks, copyrights, photographs, audio, videos, music on and "look and feel" of the Services, and all intellectual property rights related thereto (the "TikTok Content"), are either owned or licensed by TikTok, it being understood that you or your licensors will own any User Content (as defined below) you upload or transmit through the Services. Use of the TikTok Content or materials on the Services for any purpose not expressly permitted by these Terms is strictly prohibited. Such content may not be downloaded, copied, reproduced, distributed, transmitted, broadcast, displayed, sold, licensed or otherwise exploited for any purpose whatsoever without our or, where applicable, our licensors' prior written consent. We and our licensors reserve all rights not expressly granted in and to their content.

You acknowledge and agree that we may generate revenues, increase goodwill or otherwise increase our value from your use of the Services, including, by way of example and not limitation, through the sale

A149

Terms of Service | TikTok

of advertising, sponsorships, promotions, usage data and Gifts (defined below), and except as specifically permitted by us in these Terms or in another agreement you enter into with us, you will have no right to share in any such revenue, goodwill or value whatsoever. You further acknowledge that, except as specifically permitted by us in these Terms or in another agreement you enter into with us, you (i) have no right to receive any income or other consideration from any User Content (defined below) or your use of any musical works, sound recordings or audiovisual clips made available to you on or through the Services, including in any User Content created by you, and (ii) are prohibited from exercising any rights to monetize or obtain consideration from any User Content within the Services or on any third party service ( e.g. , you cannot claim User Content that has been uploaded to a social media platform such as YouTube for monetization).

Subject to the terms and conditions of the Terms, you are hereby granted a non-exclusive, limited, non-transferable, non-sublicensable, revocable, worldwide license to access and use the Services, including to download the Platform on a permitted device, and to access the TikTok Content solely for your personal, non-commercial use through your use of the Services and solely in compliance with these Terms. TikTok reserves all rights not expressly granted herein in the Services and the TikTok Content. You acknowledge and agree that TikTok may terminate this license at any time for any reason or no reason.

NO RIGHTS ARE LICENSED WITH RESPECT TO SOUND RECORDINGS AND THE MUSICAL WORKS EMBODIED THEREIN THAT ARE MADE AVAILABLE FROM OR THROUGH THE SERVICE.

You acknowledge and agree that when you view content provided by others on the Services, you are doing so at your own risk. The content on our Services is provided for general information only. It is not intended to amount to advice on which you should rely. You must obtain professional or specialist advice before taking, or refraining from, any action on the basis of the content on our Services.

We make no representations, warranties or guarantees, whether express or implied, that any TikTok Content (including User Content) is accurate, complete or up to date. Where our Services contain links to other sites and resources provided by third parties, these links are provided for your information only. We have no control over the contents of those sites or resources. Such links should not be interpreted as approval by us of those linked websites or information you may obtain from them. You acknowledge that we have no obligation to pre-screen, monitor, review, or edit any content posted by you and other users on the Services (including User Content).

## User-Generated Content

Users of the Services may be permitted to upload, post or transmit (such as via a stream) or otherwise make available content through the Services including, without limitation, any text, photographs, user videos, sound recordings and the musical works embodied therein, including videos that incorporate locally stored sound recordings from your personal music library and ambient noise ("User Content"). Users of the Services may also extract all or any portion of User Content created by another user to produce additional User Content, including collaborative User Content with other users, that combine

and intersperse User Content generated by more than one user. Users of the Services may also overlay music, graphics, stickers, Virtual Items (as defined and further explained Virtual Items Policy) and other elements provided by TikTok ("TikTok Elements") onto this User Content and transmit this User Content through the Services. The information and materials in the User Content, including User Content that includes TikTok Elements, have not been verified or approved by us. The views expressed by other users on the Services (including through use of the virtual gifts) do not represent our views or values.

Whenever you access or use a feature that allows you to upload or transmit User Content through the Services (including via certain third party social media platforms such as Instagram, Facebook, YouTube, Twitter), or to make contact with other users of the Services, you must comply with the standards set out at "Your Access to and Use of Our Services" above. You may also choose to upload or transmit your User Content, including User Content that includes TikTok Elements, on sites or platforms hosted by third parties. If you decide to do this, you must comply with their content guidelines as well as with the standards set out at "Your Access to and Use of Our Services" above. As noted above, these features may not be available to all users of the Services, and we have no liability to you for limiting your right to certain features of the Services.

You warrant that any such contribution does comply with those standards, and you will be liable to us and indemnify us for any breach of that warranty. This means you will be responsible for any loss or damage we suffer as a result of your breach of warranty.

Any User Content will be considered non-confidential and non-proprietary. You must not post any User Content on or through the Services or transmit to us any User Content that you consider to be confidential or proprietary. When you submit User Content through the Services, you agree and represent that you own that User Content, or you have received all necessary permissions, clearances from, or are authorised by, the owner of any part of the content to submit it to the Services, to transmit it from the Services to other third party platforms, and/or adopt any third party content.

If you only own the rights in and to a sound recording, but not to the underlying musical works embodied in such sound recordings, then you must not post such sound recordings to the Services unless you have all permissions, clearances from, or are authorised by, the owner of any part of the content to submit it to the Services

You or the owner of your User Content still own the copyright in User Content sent to us, but by submitting User Content via the Services, you hereby grant us an unconditional irrevocable, non-exclusive, royalty-free, fully transferable, perpetual worldwide licence to use, modify, adapt, reproduce, make derivative works of, publish and/or transmit, and/or distribute and to authorise other users of the Services and other third-parties to view, access, use, download, modify, adapt, reproduce, make derivative works of, publish and/or transmit your User Content in any format and on any platform, either now known or hereafter invented.

A151

8/1/22, 8:44 AM
Terms of Service | TikTok

You further grant us a royalty-free license to use your user name, image, voice, and likeness to identify you as the source of any of your User Content; provided, however, that your ability to provide an image, voice, and likeness may be subject to limitations due to age restrictions.

For the avoidance of doubt, the rights granted in the preceding paragraphs of this Section include, but are not limited to, the right to reproduce sound recordings (and make mechanical reproductions of the musical works embodied in such sound recordings), and publicly perform and communicate to the public sound recordings (and the musical works embodied therein), all on a royalty-free basis. This means that you are granting us the right to use your User Content without the obligation to pay royalties to any third party, including, but not limited to, a sound recording copyright owner (e.g., a record label), a musical work copyright owner (e.g., a music publisher), a performing rights organization (e.g., ASCAP, BMI, SESAC, etc.) (a "PRO"), a sound recording PRO (e.g., SoundExchange), any unions or guilds, and engineers, producers or other royalty participants involved in the creation of User Content.

**Specific Rules for Musical Works and for Recording Artists.** If you are a composer or author of a musical work and are affiliated with a PRO, then you must notify your PRO of the royalty-free license you grant through these Terms in your User Content to us. You are solely responsible for ensuring your compliance with the relevant PRO's reporting obligations. If you have assigned your rights to a music publisher, then you must obtain the consent of such music publisher to grant the royalty-free license(s) set forth in these Terms in your User Content or have such music publisher enter into these Terms with us. Just because you authored a musical work (e.g., wrote a song) does not mean you have the right to grant us the licenses in these Terms. If you are a recording artist under contract with a record label, then you are solely responsible for ensuring that your use of the Services is in compliance with any contractual obligations you may have to your record label, including if you create any new recordings through the Services that may be claimed by your label.

**Through-To-The-Audience Rights.** All of the rights you grant in your User Content in these Terms are provided on a through-to-the-audience basis, meaning the owners or operators of third party services will not have any separate liability to you or any other third party for User Content posted or used on such third party service via the Services.

**Waiver of Rights to User Content.** By posting User Content to or through the Services, you waive any rights to prior inspection or approval of any marketing or promotional materials related to such User Content. You also waive any and all rights of privacy, publicity, or any other rights of a similar nature in connection with your User Content, or any portion thereof. To the extent any moral rights are not transferable or assignable, you hereby waive and agree never to assert any and all moral rights, or to support, maintain or permit any action based on any moral rights that you may have in or with respect to any User Content you Post to or through the Services.

We also have the right to disclose your identity to any third party who is claiming that any User Content posted or uploaded by you to our Services constitutes a violation of their intellectual property rights, or of their right to privacy.

We, or authorised third parties, reserve the right to cut, crop, edit or refuse to publish, your content at our or their sole discretion. We have the right to remove, disallow, block or delete any posting you make on our Services if, in our opinion, your post does not comply with the content standards set out at "Your Access to and Use of Our Services" above. In addition, we have the right – but not the obligation – in our sole discretion to remove, disallow, block or delete any User Content (i) that we consider to violate these Terms, or (ii) in response to complaints from other users or third parties, with or without notice and without any liability to you. As a result, we recommend that you save copies of any User Content that you post to the Services on your personal device(s) in the event that you want to ensure that you have permanent access to copies of such User Content. We do not guarantee the accuracy, integrity, appropriateness or quality of any User Content, and under no circumstances will we be liable in any way for any User Content.

You control whether your User Content is made publicly available on the Services to all other users of the Services or only available to people you approve. To restrict access to your User Content, you should select the privacy setting available within the Platform.

We accept no liability in respect of any content submitted by users and published by us or by authorised third parties.

If you wish to file a complaint about information or materials uploaded by other users, contact us at: https://www.tiktok.com/legal/report/feedback.

TikTok takes reasonable measures to expeditiously remove from our Services any infringing material that we become aware of.It is TikTok's policy, in appropriate circumstances and at its discretion, to disable or terminate the accounts of users of the Services who repeatedly infringe copyrights or intellectual property rights of others.

While our own staff is continually working to develop and evaluate our own product ideas and features, we pride ourselves on paying close attention to the interests, feedback, comments, and suggestions we receive from the user community. If you choose to contribute by sending us or our employees any ideas for products, services, features, modifications, enhancements, content, refinements, technologies, content offerings (such as audio, visual, games, or other types of content), promotions, strategies, or product/feature names, or any related documentation, artwork, computer code, diagrams, or other materials (collectively "Feedback"), then regardless of what your accompanying communication may say, the following terms will apply, so that future misunderstandings can be avoided. Accordingly, by sending Feedback to us, you agree that:

TikTok has no obligation to review, consider, or implement your Feedback, or to return to you all or part of any Feedback for any reason;

Feedback is provided on a non-confidential basis, and we are not under any obligation to keep any Feedback you send confidential or to refrain from using or disclosing it in any way; and

A153

You irrevocably grant us perpetual and unlimited permission to reproduce, distribute, create derivative works of, modify, publicly perform (including on a through-to-the-audience basis), communicate to the public, make available, publicly display, and otherwise use and exploit the Feedback and derivatives thereof for any purpose and without restriction, free of charge and without attribution of any kind, including by making, using, selling, offering for sale, importing, and promoting commercial products and services that incorporate or embody Feedback, whether in whole or in part, and whether as provided or as modified.

## 8. Indemnity

You agree to defend, indemnify, and hold harmless TikTok, its parents, subsidiaries, and affiliates, and each of their respective officers, directors, employees, agents and advisors from any and all claims, liabilities, costs, and expenses, including, but not limited to, attorneys' fees and expenses, arising out of a breach by you or any user of your account of these Terms or arising out of a breach of your obligations, representation and warranties under these Terms.

## 9. EXCLUSION OF WARRANTIES

NOTHING IN THESE TERMS SHALL AFFECT ANY STATUTORY RIGHTS THAT YOU CANNOT CONTRACTUALLY AGREE TO ALTER OR WAIVE AND ARE LEGALLY ALWAYS ENTITLED TO AS A CONSUMER.

THE SERVICES ARE PROVIDED "AS IS" AND WE MAKE NO WARRANTY OR REPRESENTATION TO YOU WITH RESPECT TO THEM. IN PARTICULAR WE DO NOT REPRESENT OR WARRANT TO YOU THAT:

- YOUR USE OF THE SERVICES WILL MEET YOUR REQUIREMENTS;

- YOUR USE OF THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE OR FREE FROM ERROR;

- ANY INFORMATION OBTAINED BY YOU AS A RESULT OF YOUR USE OF THE SERVICES WILL BE ACCURATE OR RELIABLE; AND

- DEFECTS IN THE OPERATION OR FUNCTIONALITY OF ANY SOFTWARE PROVIDED TO YOU AS PART OF THE SERVICES WILL BE CORRECTED.

NO CONDITIONS, WARRANTIES OR OTHER TERMS (INCLUDING ANY IMPLIED TERMS AS TO SATISFACTORY QUALITY, FITNESS FOR PURPOSE OR CONFORMANCE WITH DESCRIPTION) APPLY TO THE SERVICES EXCEPT TO THE EXTENT THAT THEY ARE EXPRESSLY SET OUT IN THE TERMS. WE MAY CHANGE, SUSPEND, WITHDRAW OR RESTRICT THE AVAILABILITY OF ALL OR ANY PART OF OUR PLATFORM FOR BUSINESS AND OPERATIONAL REASONS AT ANY TIME WITHOUT NOTICE

## 10. LIMITATION OF LIABILITY

A154

NOTHING IN THESE TERMS SHALL EXCLUDE OR LIMIT OUR LIABILITY FOR LOSSES WHICH MAY NOT BE LAWFULLY EXCLUDED OR LIMITED BY APPLICABLE LAW. THIS INCLUDES LIABILITY FOR DEATH OR PERSONAL INJURY CAUSED BY OUR NEGLIGENCE OR THE NEGLIGENCE OF OUR EMPLOYEES, AGENTS OR SUBCONTRACTORS AND FOR FRAUD OR FRAUDULENT MISREPRESENTATION.

SUBJECT TO THE PARAGRAPH ABOVE, WE SHALL NOT BE LIABLE TO YOU FOR:

- (I) ANY LOSS OF PROFIT (WHETHER INCURRED DIRECTLY OR INDIRECTLY);

- (II) ANY LOSS OF GOODWILL;

- (III) ANY LOSS OF OPPORTUNITY;

- (IV) ANY LOSS OF DATA SUFFERED BY YOU; OR

- (V) ANY INDIRECT OR CONSEQUENTIAL LOSSES WHICH MAY BE INCURRED BY YOU. ANY OTHER LOSS WILL BE LIMITED TO THE AMOUNT PAID BY YOU TO TIKTOK WITHIN THE LAST 12 MONTHS.

ANY LOSS OR DAMAGE WHICH MAY BE INCURRED BY YOU AS A RESULT OF:

- ANY RELIANCE PLACED BY YOU ON THE COMPLETENESS, ACCURACY OR EXISTENCE OF ANY ADVERTISING, OR AS A RESULT OF ANY RELATIONSHIP OR TRANSACTION BETWEEN YOU AND ANY ADVERTISER OR SPONSOR WHOSE ADVERTISING APPEARS ON THE SERVICE;

- ANY CHANGES WHICH WE MAY MAKE TO THE SERVICES, OR FOR ANY PERMANENT OR TEMPORARY CESSATION IN THE PROVISION OF THE SERVICES (OR ANY FEATURES WITHIN THE SERVICES);

- THE DELETION OF, CORRUPTION OF, OR FAILURE TO STORE, ANY CONTENT AND OTHER COMMUNICATIONS DATA MAINTAINED OR TRANSMITTED BY OR THROUGH YOUR USE OF THE SERVICES;

- YOUR FAILURE TO PROVIDE US WITH ACCURATE ACCOUNT INFORMATION; OR

- YOUR FAILURE TO KEEP YOUR PASSWORD OR ACCOUNT DETAILS SECURE AND CONFIDENTIAL.

PLEASE NOTE THAT WE ONLY PROVIDE OUR PLATFORM FOR DOMESTIC AND PRIVATE USE. YOU AGREE NOT TO USE OUR PLATFORM FOR ANY COMMERCIAL OR BUSINESS PURPOSES, AND WE HAVE NO LIABILITY TO YOU FOR ANY LOSS OF PROFIT, LOSS OF BUSINESS, LOSS OF GOODWILL OR BUSINESS REPUTATION, BUSINESS INTERRUPTION, OR LOSS OF BUSINESS OPPORTUNITY.

A155

IF DEFECTIVE DIGITAL CONTENT THAT WE HAVE SUPPLIED DAMAGES A DEVICE OR DIGITAL CONTENT BELONGING TO YOU AND THIS IS CAUSED BY OUR FAILURE TO USE REASONABLE CARE AND SKILL, WE WILL EITHER REPAIR THE DAMAGE OR PAY YOU COMPENSATION. HOWEVER, WE WILL NOT BE LIABLE FOR DAMAGE THAT YOU COULD HAVE AVOIDED BY FOLLOWING OUR ADVICE TO APPLY AN UPDATE OFFERED TO YOU FREE OF CHARGE OR FOR DAMAGE THAT WAS CAUSED BY YOU FAILING TO CORRECTLY FOLLOW INSTALLATION INSTRUCTIONS OR TO HAVE IN PLACE THE MINIMUM SYSTEM REQUIREMENTS ADVISED BY US.

THESE LIMITATIONS ON OUR LIABILITY TO YOU SHALL APPLY WHETHER OR NOT WE HAVE BEEN ADVISED OF OR SHOULD HAVE BEEN AWARE OF THE POSSIBILITY OF ANY SUCH LOSSES ARISING.

YOU ARE RESPONSIBLE FOR ANY MOBILE CHARGES THAT MAY APPLY TO YOUR USE OF OUR SERVICE, INCLUDING TEXT-MESSAGING AND DATA CHARGES. IF YOU'RE UNSURE WHAT THOSE CHARGES MAY BE, YOU SHOULD ASK YOUR SERVICE PROVIDER BEFORE USING THE SERVICE.

TO THE FULLEST EXTENT PERMITTED BY LAW, ANY DISPUTE YOU HAVE WITH ANY THIRD PARTY ARISING OUT OF YOUR USE OF THE SERVICES, INCLUDING, BY WAY OF EXAMPLE AND NOT LIMITATION, ANY CARRIER, COPYRIGHT OWNER OR OTHER USER, IS DIRECTLY BETWEEN YOU AND SUCH THIRD PARTY, AND YOU IRREVOCABLY RELEASE US AND OUR AFFILIATES FROM ANY AND ALL CLAIMS, DEMANDS AND DAMAGES (ACTUAL AND CONSEQUENTIAL) OF EVERY KIND AND NATURE, KNOWN AND UNKNOWN, ARISING OUT OF OR IN ANY WAY CONNECTED WITH SUCH DISPUTES.

## 11. Other Terms

**Open Source.** The Platform contains certain open source software. Each item of open source software is subject to its own applicable license terms, which can be found at Open Source Policy.

**Entire Agreement.** These Terms constitute the whole legal agreement between you and TikTok and govern your use of the Services and completely replace any prior agreements between you and TikTok in relation to the Services.

**Links.** You may link to our home page, provided you do so in a way that is fair and legal and does not damage our reputation or take advantage of it. You must not establish a link in such a way as to suggest any form of association, approval or endorsement on our part where none exists. You must not establish a link to our Services in any website that is not owned by you. The website in which you are linking must comply in all respects with the content standards set out at "Your Access to and Use of Our Services" above. We reserve the right to withdraw linking permission without notice.

**No Waiver.** Our failure to insist upon or enforce any provision of these Terms shall not be construed as a waiver of any provision or right.

A156

**Security.** We do not guarantee that our Services will be secure or free from bugs or viruses. You are responsible for configuring your information technology, computer programmes and platform to access our Services. You should use your own virus protection software.

**Severability.** If any court of law, having jurisdiction to decide on this matter, rules that any provision of these Terms is invalid, then that provision will be removed from the Terms without affecting the rest of the Terms, and the remaining provisions of the Terms will continue to be valid and enforceable.

**ARBITRATION AND CLASS ACTION WAIVER.** This Section includes an arbitration agreement and an agreement that all claims will be brought only in an individual capacity (and not as a class action or other representative proceeding). Please read it carefully. You may opt out of the arbitration agreement by following the opt out procedure described below.

Informal Process First. You agree that in the event of any dispute between you and TikTok, you will first contact TikTok and make a good faith sustained effort to resolve the dispute before resorting to more formal means of resolution, including without limitation any court action.

Arbitration Agreement. After the informal dispute resolution process any remaining dispute, controversy, or claim (collectively, "Claim") relating in any way to your use of TikTok's services and/or products, including the Services, or relating in any way to the communications between you and TikTok or any other user of the Services, will be finally resolved by binding arbitration. This mandatory arbitration agreement applies equally to you and TikTok. However, this arbitration agreement does not (a) govern any Claim by TikTok for infringement of its intellectual property or access to the Services that is unauthorized or exceeds authorization granted in these Terms or (b) bar you from making use of applicable small claims court procedures in appropriate cases. If you are an individual you may opt out of this arbitration agreement within thirty (30) days of the first of the date you access or use this Services by following the procedure described below.

You agree that the U.S. Federal Arbitration Act governs the interpretation and enforcement of this provision, and that you and TikTok are each waiving the right to a trial by jury or to participate in a class action. This arbitration provision will survive any termination of these Terms.

If you wish to begin an arbitration proceeding, after following the informal dispute resolution procedure, you must send a letter requesting arbitration and describing your claim to:

TikTok Inc., 5800 Bristol Parkway, Culver City, CA 90230

Email Address: legal@tiktok.com

The arbitration will be administered by the American Arbitration Association (AAA) under its rules including, if you are an individual, the AAA's Supplementary Procedures for Consumer-Related Disputes. If you are not an individual or have used the Services on behalf of an entity, the AAA's Supplementary

A157

Procedures for Consumer-Related Disputes will not be used. The AAA's rules are available at www.adr.org or by calling 1-800-778-7879.

Payment of all filing, administration and arbitrator fees will be governed by the AAA's rules. If you are an individual and have not accessed or used the Services on behalf of an entity, we will reimburse those fees for claims where the amount in dispute is less than $10,000, unless the arbitrator determines the claims are frivolous, and we will not seek attorneys' fees and costs in arbitration unless the arbitrator determines the claims are frivolous.

The arbitrator, and not any federal, state, or local court, will have exclusive authority to resolve any dispute relating to the interpretation, applicability, unconscionability, arbitrability, enforceability, or formation of this arbitration agreement, including any claim that all or any part of this arbitration agreement is void or voidable. However, the preceding sentence will not apply to the "Class Action Waiver" section below.

If you do not want to arbitrate disputes with TikTok and you are an individual, you may opt out of this arbitration agreement by sending an email to legal@tiktok.com within thirty (30) days of the first of the date you access or use the Services.

**Class Action Waiver.** Any Claim must be brought in the respective party's individual capacity, and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiff, or similar proceeding ("Class Action"). The parties expressly waive any ability to maintain any Class Action in any forum. If the Claim is subject to arbitration, the arbitrator will not have authority to combine or aggregate similar claims or conduct any Class Action nor make an award to any person or entity not a party to the arbitration. Any claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void, or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator. The parties understand that any right to litigate in court, to have a judge or jury decide their case, or to be a party to a class or representative action, is waived, and that any claims must be decided individually, through arbitration.

If this class action waiver is found to be unenforceable, then the entirety of the Arbitration Agreement, if otherwise effective, will be null and void. The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. If for any reason a claim proceeds in court rather than in arbitration, you and TikTok each waive any right to a jury trial.

If a counter-notice is received by TikTok's Copyright Agent, we may send a copy of the counter-notice to the original complaining party informing that person that we may replace the removed content or cease disabling it. Unless the original complaining party files an action seeking a court order against the Content Provider, member or user, the removed content may be replaced, or access to it restored, in ten business days or more after receipt of the counter-notice, at TikTok's sole discretion.

Please understand that filing a counter-notification may lead to legal proceedings between you and the complaining party to determine ownership. Be aware that there may be adverse legal consequences in your country if you make a false or bad faith allegation by using this process.

**California Consumer Rights Notice.** Under California Civil Code Section 1789.3, California users of the Services receive the following specific consumer rights notice: The Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs may be contacted in writing at the contact information set forth at https://www.dca.ca.gov/about_us/contactus.shtml.

Users of the Services who are California residents and are under 18 years of age may request and obtain removal of User Content they posted by contacting us at: https://www.tiktok.com/legal/report/feedback. All requests must be labeled "California Removal Request" on the email subject line. All requests must provide a description of the User Content you want removed and information reasonably sufficient to permit us to locate that User Content. We do not accept California Removal Requests via postal mail, telephone or facsimile. We are not responsible for notices that are not labeled or sent properly, and we may not be able to respond if you do not provide adequate information.

**Exports.** You agree that you will not export or re-export, directly or indirectly the Services and/or other information or materials provided by TikTok hereunder, to any country for which the United States or any other relevant jurisdiction requires any export license or other governmental approval at the time of export without first obtaining such license or approval. In particular, but without limitation, the Services may not be exported or re-exported (a) into any U.S. embargoed countries or any country that has been designated by the U.S. Government as a "terrorist supporting" country, or (b) to anyone listed on any U.S. Government list of prohibited or restricted parties, including the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Department of Commerce Denied Person's List or Entity List.

**U.S. Government Restricted Rights.** The Services and related documentation are "Commercial Items", as that term is defined at 48 C.F.R. §2.101, consisting of "Commercial Computer Software" and "Commercial Computer Software Documentation", as such terms are used in 48 C.F.R. §12.212 or 48 C.F.R. §227.7202, as applicable. Consistent with 48 C.F.R. §12.212 or 48 C.F.R. §227.7202-1 through 227.7202-4, as applicable, the Commercial Computer Software and Commercial Computer Software Documentation are being licensed to U.S. Government end users (a) only as Commercial Items and (b) with only those rights as are granted to all other end users pursuant to the terms and conditions herein.

## App Stores

To the extent permitted by applicable law, the following supplemental terms shall apply when accessing the Platform through specific devices:

## Notice regarding Apple.

By downloading the Platform from a device made by Apple, Inc. ("Apple") or from Apple's App Store, you specifically acknowledge and agree that:

- These Terms between TikTok and you; Apple is not a party to these Terms.

- The license granted to you hereunder is limited to a personal, limited, non-exclusive, non-transferable right to install the Platform on the Apple device(s) authorised by Apple that you own or control for personal, non-commercial use, subject to the Usage Rules set forth in Apple's App Store Terms of Services.

- Apple is not responsible for the Platform or the content thereof and has no obligation whatsoever to furnish any maintenance or support services with respect to the Platform.

- In the event of any failure of the Platform to conform to any applicable warranty, you may notify Apple, and Apple will refund the purchase price for the Platform, if any, to you. To the maximum extent permitted by applicable law, Apple will have no other warranty obligation whatsoever with respect to the Platform.

- Apple is not responsible for addressing any claims by you or a third party relating to the Platform or your possession or use of the Platform, including without limitation (a) product liability claims; (b) any claim that the Platform fails to conform to any applicable legal or regulatory requirement; and (c) claims arising under consumer protection or similar legislation.

- In the event of any third party claim that the Platform or your possession and use of the Platform infringes such third party's intellectual property rights, Apple is not responsible for the investigation, defence, settlement or discharge of such intellectual property infringement claim.

- You represent and warrant that (a) you are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" country; and (b) you are not listed on any U.S. Government list of prohibited or restricted parties.

- Apple and its subsidiaries are third party beneficiaries of these Terms and upon your acceptance of the terms and conditions of these Terms, Apple will have the right (and will be deemed to have accepted the right) to enforce these Terms against you as a third party beneficiary hereof.

- TikTok expressly authorises use of the Platform by multiple users through the Family Sharing or any similar functionality provided by Apple.

**Windows Phone Store.**

By downloading the Platform from the Windows Phone Store (or its successors) operated by Microsoft, Inc. or its affiliates, you specifically acknowledge and agree that:

8/1/22, 8:44 AM

Terms of Service | TikTok

- You may install and use one copy of the Platform on up to five (5) Windows Phone enabled devices that are affiliated with the Microsoft account you use to access the Windows Phone Store. Beyond that, we reserve the right to apply additional conditions or charge additional fees.

- You acknowledge that Microsoft Corporation, your phone manufacturer and network operator have no obligation whatsoever to furnish any maintenance and support services with respect to the Platform.

**Amazon Appstore.**

By downloading the Platform from the Amazon Appstore (or its successors) operated by Amazon Digital Services, Inc. or affiliates ("Amazon"), you specifically acknowledge and agree that:

- to the extent of any conflict between (a) the Amazon Appstore Terms of Use or such other terms which Amazon designates as default end user license terms for the Amazon Appstore ("Amazon Appstore EULA Terms"), and (b) the other terms and conditions in these Terms, the Amazon Appstore EULA Terms shall apply with respect to your use of the Platform that you download from the Amazon Appstore, and

- Amazon does not have any responsibility or liability related to compliance or non-compliance by TikTok or you (or any other user) under these Terms or the Amazon Appstore EULA Terms.

**Google Play.**

By downloading the Platform from Google Play (or its successors) operated by Google, Inc. or one of its affiliates ("Google"), you specifically acknowledge and agree that:

- to the extent of any conflict between (a) the Google Play Terms of Services and the Google Play Business and Program Policies or such other terms which Google designates as default end user license terms for Google Play (all of which together are referred to as the "Google Play Terms"), and (b) the other terms and conditions in these Terms, the Google Play Terms shall apply with respect to your use of the Platform that you download from Google Play, and

- you hereby acknowledge that Google does not have any responsibility or liability related to compliance or non-compliance by TikTok or you (or any other user) under these Terms or the Google Play Terms.

**Contact Us.**

You can reach us at: https://www.tiktok.com/legal/report/feedback or write us at TikTok Inc.: 10100 Venice Blvd., Culver City, CA 90232 , USA

A161

8/1/22, 8:44 AM

Terms of Service | TikTok

A162

# EXHIBIT "B"

8/1/22, 8:47 AM    Privacy Policy | TikTok

How TikTok is supporting our community through COVID-19

# Legal

## Privacy Policy

 U.S.

*Last updated: June 2, 2021*

We have updated our Privacy Policy. Among other clarifying changes, we have added more details about the information we collect and how it's used, including clarifications related to, for example, collection of user content information, use of data for verification, ad related choices, data sharing with third party services, and data storage/processing practices.

Welcome to TikTok (the "Platform"). The Platform is provided and controlled by TikTok Inc. ("TikTok", "we" or "us"). We are committed to protecting and respecting your privacy. This Privacy Policy covers the experience we provide for users age 13 and over on our Platform. For information about our under-13 experience ("Children's Platform") and our practices in the United States regarding children's privacy, please refer to our Privacy Policy for Younger Users.

Capitalized terms that are not defined in this policy have the meaning given to them in the Terms of Service.

## What information do we collect?                                                    ⌃

We collect information when you create an account or use the Platform. We also collect information you share with us from third-party social network providers, and technical and behavioral information about your use of the Platform. We also collect information contained in the messages you send through our Platform and, if you grant us access, information from your phone book on your mobile device. More information about the categories and sources of information is provided below.

### Information you choose to provide

A164

For certain activities, such as when you register, upload content to the Platform, or contact us directly, you may provide some or all of the following information:

- Registration information, such as age, username and password, language, and email or phone number

- Profile information, such as name, social media account information, and profile image

- User-generated content, including comments, photographs, livestreams, audio recordings, videos, and virtual item videos that you choose to create with or upload to the Platform ("User Content"). We collect User Content through pre-loading at the time of creation, import, or upload, regardless of whether you choose to save or upload that User Content, in order to recommend audio options and provide other personalized recommendations. If you apply an effect to your User Content, we may collect a version of your User Content that does not include the effect.

- Content, including text, images, and video, found in your device's clipboard, with your permission. For example, if you choose to initiate content sharing with a third-party platform, or choose to paste content from the clipboard into the TikTok App, we access this information stored in your clipboard in order to fulfill your request.

- Payment information, including payment card numbers or other third-party payment information (such as PayPal) where required for the purpose of payment

- Your phone and social network contacts, with your permission. If you choose to find other users through your phone contacts, we will access and collect the names and phone numbers and match that information against existing users of the Platform. If you choose to find other users through your social network contacts, we will collect your public profile information as well as names and profiles of your social network contacts

- Your opt-in choices and communication preferences

- Information to verify an account such as proof of identity or age

- Information in correspondence you send to us

- Information you share through surveys or your participation in challenges, sweepstakes, or contests such as your gender, age, likeness, and preferences.

## Information we obtain from other sources

We may receive the information described in this Privacy Policy from other sources, such as:

A165

8/1/22, 8:47 AM
Privacy Policy | TikTok

**Social Media and Login Services.** If you choose to link or sign up using a third-party social network or login service (such as Facebook, Twitter, Instagram, or Google), we may collect information from these services, including your contact lists for these services and information relating to your use of the Platform in relation to these services. If you link your TikTok account to another service, we may receive information about your use of that service.

**Third-Party Services.** We may collect information about you from third-party services, such as advertising partners, data providers, and analytics providers.

**Other Users of the Platform.** Sometimes other users of the Platform may provide us information about you, including through customer service inquiries.

**Other Sources.** We may collect information about you from other publicly available sources.

## Information we collect automatically

We automatically collect certain information from you when you use the Platform, including internet or other network activity information such as your IP address, geolocation-related data (as described below), unique device identifiers, browsing and search history (including content you have viewed in the Platform), and Cookies (as defined below).

### Usage Information

We collect information regarding your use of the Platform and any other User Content that you generate through or upload to our Platform.

### Device Information

We collect certain information about the device you use to access the Platform, such as your IP address, user agent, mobile carrier, time zone settings, identifiers for advertising purposes, model of your device, the device system, network type, device IDs, your screen resolution and operating system, app and file names and types, keystroke patterns or rhythms, battery state, audio settings and connected audio devices. Where you log-in from multiple devices, we will be able to use your profile information to identify your activity across devices. We may also associate you with information collected from devices other than those you use to log-in to the Platform.

### Location data

We collect information about your approximate location, including location information based on your SIM card and/or IP address. With your permission, we may also collect precise location data (such as GPS).

**Image and Audio Information**

We may collect information about the images and audio that are a part of your User Content, such as identifying the objects and scenery that appear, the existence and location within an image of face and body features and attributes, the nature of the audio, and the text of the words spoken in your User Content. We may collect this information to enable special video effects, for content moderation, for demographic classification, for content and ad recommendations, and for other non-personally-identifying operations. We may collect biometric identifiers and biometric information as defined under US laws, such as faceprints and voiceprints, from your User Content. Where required by law, we will seek any required permissions from you prior to any such collection.

**Messages**

We collect and process, which includes scanning and analyzing, information you provide when you compose, send, or receive messages through the Platform's messaging functionality. That information includes the content of the message and information about when the message has been sent, received and/or read, as well as the participants of the communication. Please be aware that messages sent to other users of the Platform will be accessible by those users and that we are not responsible for the manner in which those users use or disclose messages.

**Metadata**

When you upload or create User Content, you automatically upload certain metadata that is connected to the User Content. Metadata describes other data and provides information about your User Content that will not always be evident to the viewer. In connection with your User Content the metadata can describe how, when, where, and by whom the piece of User Content was created, collected, or modified and how that content is formatted. It also includes information, such as your account name, that enables other users to trace back the User Content to your user account. Additionally, metadata includes data that you choose to provide with your User Content, e.g. any hashtags used to mark keywords to the video and captions.

**Cookies**

We and our service providers and business partners use cookies and other similar technologies (e.g. web beacons, flash cookies, etc.) ("Cookies") to automatically collect information, measure and analyze which web pages and advertisements you click on and how you use the Platform, enhance your experience using the Platform, improve the Platform, provide you with advertising on the Platform and elsewhere across your devices, and measure the effectiveness of advertisements. Cookies enable the Platform to provide certain features and functionality. Web beacons are very small images or small pieces of data embedded in images, also known as "pixel tags" or "clear GIFs," that can recognize Cookies, the time and date a page is viewed, a description of the page where the pixel tag is placed,

A167

and similar information from your computer or device. To learn how to disable Cookies, see the "Your choices" section below.

We and our service providers and business partners may link your contact or account information with your activity on and off our Platform across all your devices, using your email or other log-in or device information. Our service providers and business partners may use this information to display advertisements on our Platform and elsewhere online and across your devices tailored to your interests, preferences, and characteristics. We are not responsible for the privacy practices of these service providers and business partners, and the information practices of these service providers and business partners are not covered by this Privacy Policy.

We may aggregate or de-identify the information described above. Aggregated or de-identified data is not subject to this Privacy Policy.

## How we use your information                                                       ⌃

As explained below, we use your information to improve, support and administer the Platform, to allow you to use its functionalities, and to fulfill and enforce our Terms of Service. We may also use your information to, among other things, show you suggestions, promote the Platform, and customize your ad experience.

We generally use the information we collect:

- To fulfill requests for products, services, Platform functionality, support and information for internal operations, including troubleshooting, data analysis, testing, research, statistical, and survey purposes and to solicit your feedback

- To customize the content you see when you use the Platform. For example, we may provide you with services based on the country settings you have chosen or show you content that is similar to content that you like or interacted with

- To send promotional materials from us or on behalf of our affiliates and trusted third parties

- To improve and develop our Platform and conduct product development

- To measure and understand the effectiveness of the advertising we serve to you and others and to deliver advertising

- To make suggestions and provide a customized ad experience

A168

- To support the social functions of the Platform, including to permit you and other users to connect with each other through the Platform and for you and other users to share, download, and otherwise interact with User Content posted through the Platform

- To use User Content as part of our advertising and marketing campaigns to promote the Platform

- To understand how you use the Platform, including across your devices

- To infer additional information about you, such as your age, gender, and interests

- To help us detect abuse, fraud, and illegal activity on the Platform

- To prove your identity in order to use certain features, such as livestream or verified accounts, or when you apply for a Pro Account, ensure that you are old enough to use the Platform (as required by law), or in other instances where verification may be required

- To communicate with you, including to notify you about changes in our services

- To announce you as a winner of our contest, sweepstakes, or promotions if permitted by the promotion rule, and to send you any applicable prizes

- To enforce our terms, conditions, and policies

- Consistent with your permissions, to provide you with location-based services, such as advertising and other personalized content

- To inform our algorithms

- To combine all the information we collect or receive about you for any of the foregoing purposes

- For any other purposes disclosed to you at the time we collect your information or pursuant to your consent.

- To facilitate sales, promotion, and purchases of goods and services and to provide user support

## How we share your information

We are committed to maintaining your trust, and while TikTok does not sell personal information to third parties, we want you to understand when and with whom we may share the information we collect for business purposes.

A169

## Service Providers and Business Partners

We share the categories of personal information listed above with service providers and business partners to help us perform business operations and for business purposes, including research, payment processing and transaction fulfillment, database maintenance, administering contests and special offers, technology services, deliveries, sending communications, advertising, analytics, measurement, data storage and hosting, disaster recovery, search engine optimization, marketing, and data processing. These service providers and business partners may include:

- Payment processors and transaction fulfillment providers, who may receive the information you choose to provide, the information we obtain from other sources, and the information we collect automatically but who do not receive your message data.

- Customer and technical support providers, who may receive the information you choose to provide, the information we obtain from other sources, and the information we collect automatically.

- Research providers, who may receive the information you choose to provide, the information we obtain from other sources, and the information we collect automatically but would not receive your payment information or message data.

- Cloud providers, who may receive the information you choose to provide, the information we obtain from other sources, and the information we collect automatically.

- Advertising, marketing, and analytics vendors, who may receive the information you choose to provide, the information we obtain from other sources, and the information we collect automatically but would not receive your payment information or message data.

## Within Our Corporate Group

We may share all of the information we collect with a parent, subsidiary, or other affiliate of our corporate group.

## In Connection with a Sale, Merger, or Other Business Transfer

We may share all of the information we collect in connection with a substantial corporate transaction, such as the sale of a website, a merger, consolidation, asset sales, or in the unlikely event of bankruptcy.

## For Legal Reasons

We may disclose any of the information we collect to respond to subpoenas, court orders, legal process, law enforcement requests, legal claims, or government inquiries, and to protect and defend the rights, interests, safety, and security of TikTok Inc., the Platform, our affiliates, users, or the public. We may also

A170

share any of the information we collect to enforce any terms applicable to the Platform, to exercise or defend any legal claims, and comply with any applicable law.

## With Your Consent

We may share your information for other purposes pursuant to your consent or at your direction.

If you access third-party services, such as Facebook, Google, or Twitter, to login to the Platform or to share information about your usage on the Platform with others, these third-party services may be able to collect information about you, including information about your activity on the Platform, and they may notify your connections on the third-party services about your use of the Platform, in accordance with their privacy policies. If you choose to allow a third-party service to access your account, we will share certain information about you with the third party. Depending on the permissions you grant, the third party may be able to obtain your account information and other information you choose to provide.

If you choose to engage in public activities on the Platform, you should be aware that any information you share may be read, collected, or used by other users. You should use caution in disclosing personal information while using the Platform. We are not responsible for the information you choose to submit.

## Your Rights                                                                                      ⌃

You may submit a request to access or delete the information we have collected about you by sending your request to us at the email or physical address provided in the Contact section at the bottom of this policy. You may be entitled, in accordance with applicable law, to submit a request through an authorized agent. To designate an authorized agent to exercise choices on your behalf, please provide evidence that you have given such agent power of attorney or that the agent otherwise has valid written authority to submit requests to exercise rights on your behalf. We will respond to your request consistent with applicable law and subject to proper verification. We will verify your request by asking you to send it from the email address associated with your account or to provide information necessary to verify your account. We do not discriminate based on the exercise of any privacy rights that you might have.

The metrics for requests to access and requests to delete received by TikTok during the previous calendar year can be found here.

## Your Choices                                                                                    ⌃

- You may be able to control some of the information we collect by adjusting your browser settings to refuse or disable Cookies. Because each browser is different, please consult

the instructions provided by your browser. Please note that you may need to take additional steps to refuse or disable certain types of Cookies. In addition, your choice to disable cookies is specific to the particular browser or device that you are using when you disable cookies, so you may need to separately disable cookies for each type of browser or device. If you choose to refuse, disable, or delete Cookies, some of the functionality of the Platform may no longer be available to you. Without this information, we are not able to provide you with all the requested services.

- Depending on the version of the Platform you are using, you may be able to decide whether you see certain types of interest-based advertising on the Platform by visiting your in-app settings.

- You may be able to manage third-party advertising preferences for some of the third parties we work with to serve advertising across the Internet by using the choices available at https://www.networkadvertising.org/managing/opt_out.asp and https://www.aboutads. info/choices.

- Your device may have controls that determine what information we collect or how we can use that information. For example, you can control whether we can use your mobile advertising identifier for advertising through settings on your Apple and Android devices.

- You can opt out of marketing or advertising emails by using the "unsubscribe" link or mechanism noted in marketing or advertising emails.

- If you previously chose to share precise location information, you can prevent your device from sharing precise location information (e.g. GPS location information) with the Platform at any time through your device's operating system settings.

- If you have registered for an account, you may access, review, and update certain personal information that you have provided to us by logging into your account and using available features and functionalities.

- Some browsers transmit "do-not-track" signals to websites. Because of differences in how browsers incorporate and activate this feature, we currently do not take action in response to these signals.

## Security and Storage    ^

We use reasonable measures to help protect information from loss, theft, misuse and unauthorized access, disclosure, alteration, and destruction. You should understand that no data storage system or

A172

transmission of data over the Internet or any other public network can be guaranteed to be 100 percent secure. Please note that information collected by third parties may not have the same security protections as information you submit to us, and we are not responsible for protecting the security of such information.

TikTok may transmit your data to its servers or data centers outside of the United States for storage and/or processing. Third parties with whom TikTok may share your data as described herein may be located outside of the United States.

## Children                                                                              ^

The privacy of users under the age of 13 ("Younger Users") is important to us. We provide a separate experience for Younger Users in the United States on the Children's Platform, in which we collect only limited information. For more information on our United States data collection practices for Younger Users, please visit the Privacy Policy for Younger Users.

The Platform otherwise is not directed at children under the age of 13. If we become aware that personal information has been collected on the Platform from a person under the age of 13 we will delete this information and terminate the person's account. If you believe that we have collected information from a child under the age of 13 on the Platform, contact us at: https://tiktok.com/legal/report/privacy.

## Other Rights                                                                          ^

### Sharing for Direct Marketing Purposes (Shine the Light)

If you are a California resident, once a calendar year, you may be entitled to obtain information about personal information that we shared, if any, with other businesses for their own direct marketing uses. If applicable, this information would include the categories of customer information, as well as the names and addresses of those businesses with which we shared customer information for the immediately prior calendar year. To submit a request, contact us at: https://www.tiktok.com/legal/report/privacy.

### Content Removal for Users Under 18

Users of the Platform who are California residents and are under 18 years of age may request and obtain removal of User Content they posted by contacting us at: https://www.tiktok.com/legal/report/privacy. All requests must be labeled "California Removal Request" on the email subject line. All requests must provide a description of the user Content you want removed and information reasonably sufficient to permit us to locate that User Content. We do not accept California Removal Requests via postal mail,

telephone, or facsimile. We are not responsible for notices that are not labeled or sent properly, and we may not be able to respond if you do not provide adequate information. Please note that your request does not ensure complete or comprehensive removal of the material. For example, materials that you have posted may be republished or reposted by another user or third party.

## Changes ⌃

We may update this Privacy Policy from time to time. When we update the Privacy Policy, we will notify you by updating the "Last Updated" date at the top of this policy and posting the new Privacy Policy and providing any other notice required by applicable law. We recommend that you review the Privacy Policy each time you visit the Platform to stay informed of our privacy practices.

## Contact ⌃

Questions, comments and requests regarding this policy should be addressed to:

- Mailing Address: TikTok Inc., Attn: TikTok Legal Department 5800 Bristol Parkway, Suite 100, Culver City, CA 90230

- Contact us: https://www.tiktok.com/legal/report/privacy

# EXHIBIT "C"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA
## PITTSBURGH DIVISION

| | |
|---|---|
| Bailey Ziencik<br><br>Kelly Ziencik<br><br>Pascale Wasson,<br>                   Plaintiffs,<br><br>      v.<br><br>Snap Inc. d/b/a Snapchat,<br><br>            Defendant. | Civil Action No. <u>2:21-cv-49</u><br><br>**NOTICE OF REMOVAL UNDER 28 U.S.C. SECTIONS 1332, 1441, AND 1446** |

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, Defendant Snap Inc. d/b/a Snapchat ("Snap"), through its counsel, hereby files its Notice of Removal of the above-captioned action from the Court of Common Pleas of Allegheny County, Pennsylvania, to the United States District Court for the Western District of Pennsylvania, Pittsburgh Division. In support of this Notice, Snap states the following:

### PROCEDURAL REQUIREMENTS FOR REMOVAL

1.  This is a purported product liability suit wherein Plaintiffs Bailey Ziencik, Kelly Ziencik, and Pascale Wasson seek monetary damages from Snap for claims relating to materials posted by users of an electronic application produced by Snap. Plaintiffs allege that they faced threats of imminent death or serious bodily injury based on communications sent by third parties using Snap's application, Snapchat, and that they suffered emotional and physical injuries. Plaintiffs attempt to assert sixteen causes of action, including various tort, product liability, and

breach of warranty claims, in addition to a claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Laws.

2.      On or about December 4, 2020, Plaintiffs filed a Complaint in the Court of Common Pleas of Allegheny County, Pennsylvania, where the matter was assigned Case No. GD-20-012327 (the "State Court Action"). True and correct copies of the court record in the State Court Action are attached hereto as Exhibit A.

3.      On December 14, 2020, Snap was served with the Complaint in the State Court Action. A true and correct copy of the receipt of service is attached hereto as Exhibit B.

4.      On December 18, 2020, Plaintiffs, through counsel, agreed to extend Snap's time to respond to the complaint in the State Court Action to January 25, 2021. A true and correct copy of an email memorializing that agreement is attached hereto as Exhibit C.

5.      As of the date of this filing, no additional pleadings, process, or orders have been served upon Snap in the State Court Action.

6.      As shown below, this Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), because there is complete diversity of citizenship between Plaintiffs and Snap and the amount in controversy exceeds the sum or value of $75,000, excluding interest and costs. *See* 28 U.S.C. § 1332(a) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States" or "citizens of a State and citizens or subjects of a foreign state.").

7.      Because Snap is not a Pennsylvania citizen, the forum defendant rule does not bar removal. *See* 28 U.S.C. § 1441(b).

A177

8.      Removal to this Court is proper under 28 U.S.C. § 1441(a) because the Court of Common Pleas of Allegheny County, where this action was filed, is within the Western District of Pennsylvania. *See* 28 U.S.C. § 110.

9.      Snap files this notice of removal less than thirty days after being served with the Complaint. *See* ¶¶ 2-3, *supra*.  Thus, this Notice of Removal is filed in a timely manner in accordance with 28 U.S.C. § 1446(b)(1).

10.     Pursuant to 28 U.S.C. § 1446(d), Snap will also file written notice of the filing of this Notice of Removal with the Clerk of the Court of Common Pleas in Allegheny County, with a copy to counsel for Plaintiffs: Lee W. Davis, Esquire, Law Offices of Lee W. Davis, Esquire, L.L.C., 5239 Butler Street, Suite 201, Pittsburgh, PA 15201.

11.     Pursuant to Federal Rule of Civil Procedure 7.1 and Rule 7.1(A) of the Western District of Pennsylvania Local Civil Rules, two copies of Snap's Corporate Disclosure Statement are attached hereto as Exhibit D.

12.     By filing this Notice of Removal, Snap does not waive any jurisdictional or other defenses, objections, or exceptions that may be available. *See Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 131-32 (3d Cir. 2020) (removal does not waive objection to personal jurisdiction); *Lionti v. Dipna, Inc.*, No. CV 17-01678, 2017 WL 2779576, at *2 (E.D. Pa. June 27, 2017) ("Defendants did not waive their ability to contest the Court's exercise of personal jurisdiction over them pursuant to Rule 12(b)(2) by removing the case.").   Snap expressly reserves the right to file, at the appropriate time, a motion raising lack of personal jurisdiction over Snap and/or improper venue. Moreover, nothing herein constitutes an admission to any of the allegations in the Complaint.

13.     Snap reserves the right to amend or supplement this Notice of Removal.

3

### DIVERSITY OF CITIZENSHIP

14.     Plaintiff Bailey Ziencik is a Pennsylvania resident, and a citizen of Pennsylvania for purposes of determining subject matter jurisdiction. *See* Ex. B ¶ 1.

15.     Plaintiff Kelly Ziencik is a Pennsylvania resident, and a citizen of Pennsylvania for purposes of determining subject matter jurisdiction. *Id.* ¶ 2.

16.     Plaintiff Pascale Wasson is a Massachusetts resident, and a citizen of Massachusetts for purposes of determining subject matter jurisdiction. *Id.* ¶ 3.

17.     For the purposes of federal jurisdiction, corporations are deemed to be citizens of the States in which they were incorporated and the States in which they have principal places of business. 28 U.S.C. § 1332(c)(1), (d)(10).  Defendant Snap is organized and incorporated under the laws of the state of Delaware with its principal place of business in the state of California. Accordingly, Snap is a citizen of Delaware and California—not Pennsylvania.

18.     Pursuant to 28 U.S.C. § 1332, because Snap, the only defendant identified in the Complaint, is a citizen of Delaware and California, and Plaintiffs are citizens of Pennsylvania and Massachusetts, there is complete diversity in this action.

### AMOUNT IN CONTROVERSY[1]

19.     The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(a).

20.     In its Prayer for Relief, the Complaint alleges that each Plaintiff "individually" has "been damaged and claim[s] damages" from Snap "in an amount in *excess* of Thirty Five

---

[1] Because Pennsylvania Rule of Civil Procedure 1021(b) does not permit demands for a specific sum, Snap may assert the amount in controversy in its notice of removal.  28 USC § 1446(c)(2)(A)(ii). Snap denies that any injury occurred and that there is any liability under any of the claims asserted in this action and expressly reserves all arguments and defenses in this regard.

Thousands ($35,000.00) Dollars, which is in excess of the arbitration jurisdiction of the Court of Common Pleas of Allegheny County." Compl. Prayer for Relief (emphasis added). Nowhere in the Complaint do Plaintiffs plead that the amount in controversy is *less* than $75,000.

21.     Where, as here, the plaintiff has not specifically pled that the amount in controversy is *less* than $75,000, jurisdiction is proper unless it "appears to a legal certainty that the plaintiff *cannot* recover the jurisdictional amount." *Frederico v. Home Depot*, 507 F.3d 188, 196 (3d Cir. 2007) (emphasis in original); *see also, e.g.*, *Williams v. GSell Moving & Storage*, No. 08-0066, 2008 WL 282205, at *1–2 (E.D. Pa. Jan. 31, 2008); *Howlett v. Irwin*, No. 10-465, 2011 WL 722373, at *2 (E.D. Pa. Mar. 1, 2011). There is no such "legal certainty" here. Rather, Plaintiffs' allegations make clear that, for jurisdictional purposes, there is a "reasonable probability" that the amount in controversy exceeds $75,000. *Kopko v. Range Res. - Appalachia, LLC*, No. 2:20-CV-00423-MJH, 2020 WL 3496277, at *1 (W.D. Pa. June 29, 2020).

22.     Together, Plaintiffs' various forms of requested relief easily total over $75,000. As the Complaint is based on events that allegedly took place in December 2018, Plaintiffs appear to seek compensation for approximately two years' worth of alleged past harm, and for alleged harm extending indefinitely into the future. *See* Compl. ¶¶ 25, 96. In light of the allegedly "ongoing" injuries, jurisdiction is proper because a jury could award more than $75,000 in such circumstances, particularly in light of Plaintiffs' claims for treble damages, attorney's fees, and punitive damages. *Varzally v. Sears, Roebuck & Co.*, No. 09-CV-6137, 2010 WL 3212482, at *2 (E.D. Pa. July 30, 2010). For instance, a finding of just $25,000 in damages (or $35 a day—or $11.67 per plaintiff per day—for two years) would result in a jury award of over $75,000, even without any award of attorney's fees or punitive damages.

A180

23.     Plaintiffs claim to seek "compensation for great suffering and inconvenience, compensation for Plaintiff Bailey Ziencik's and Plaintiff Pascale Wasson's limitation and preclusion from performing normal activities, compensation for great emotional distress, [and] compensation for Plaintiffs' loss of their general health, strength and vitality." Compl. Prayer for Relief. Plaintiffs allege that they "suffered and continue to suffer from injuries including Acute Stress Disorder, Depressive Disorder, Anxiety and Insomnia." Compl. ¶ 96; *see also id.* ¶¶ 150, 152, 155, 215, 237, 257, 285, 291, 292, 305, 313-314, 320, 330, 340. In addition, Plaintiffs seek treble damages, attorney's fees, and costs on their claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Laws ("UTPCPL"), 73 P.S. §§201-1 *et seq.* *See* Compl. ¶ 307.

24.     Treble damages are "properly considered in determining whether the jurisdictional amount is satisfied." *Lockwood v. Auto. Fin. Corp.*, No. C.A. 04-0128 E, 2005 WL 2107165, at *3 (W.D. Pa. Aug. 30, 2005). To the extent that Plaintiffs' Complaint seeks an award trebling the compensatory, punitive and exemplary damages that they claim are "in excess of Thirty Five Thousands ($35,000.00) Dollars"—Compl. Prayer for Relief; *cf. id.* ¶ 307 (claiming treble damages under the UTPCPL "[i]n addition" to other forms of damages)—the amount in controversy is satisfied on this basis alone. Three times a damages award exceeding $35,000 yields an amount in controversy in excess of $105,000. *See, e.g., O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 278 (E.D. Pa. 2003) ("His claim meets the amount in controversy requirement because O'Keefe has properly requested treble damages under the UTPCPL."); *McLaughlin v. Volkswagen of Am., Inc.*, No. CIV. A. 00-3295, 2000 WL 1793071, at *2 (E.D. Pa. Dec. 6, 2000) (where treble damages are sought with a baseline damages allegation of $50,000, "then the treble damage available under the UTPCL could lead to an

A181

award of approximately $150,000 per plaintiff before punitive damages and attorney's fees");

*see also Rosen v. Chrysler Corp.*, 205 F.3d 918, 922 (6th Cir. 2000) (holding that amount-in-

controversy threshold was met where plaintiffs sought rescission of purchase contract for

vehicles valued at approximately $30,000, plus treble damages pursuant to New Jersey

Consumer Fraud Act).

25.     Plaintiffs have not stated that damages do not exceed $75,000.  Even if Plaintiffs

intended their prayer for damages "in excess of Thirty Five Thousands ($35,000.00) Dollars" to

include treble damages under the UTPCPL, they certainly do not plead that their total damages

are *less than* $75,000, and there is no basis for finding "to a legal certainty" that Plaintiffs'

claims could not exceed the jurisdictional amount.  Rather, Plaintiffs' "*ad damnum* clause

claiming damages greater than" the applicable state arbitration limit also supports a finding that

the amount-in-controversy requirement is satisfied, especially considering the other elements of

damages sought. *Williams*, 2008 WL 282205, at *1–2.

26.     Attorney's fees are "part of the amount in controversy if such fees are available to

successful plaintiffs under the statutory cause of action." *Suber v. Chrysler Corp.*, 104 F.3d 578,

585 (3d Cir. 1997), *as amended* (Feb. 18, 1997); *see also Frederico*, 507 F.3d at 199 ("We must

also consider attorney's fees" when calculating the amount in controversy, which "could be as

much as thirty percent of the judgment" (citations omitted)).

27.     On top of all that, Plaintiffs seek "punitive and exemplary damages," alleging that

Snap "acted in such a manner which was willful, wanton, gross and in total disregard for the

health and safety of the user or consumer."  Compl. ¶ 213 & Prayer for Relief; *see also id.* ¶¶

214, 235, 271, 293, 334.  *See generally Phillips v. Cricket Lighters*, 883 A.2d 439, 445–46

(2005) ("Punitive damages may be appropriately awarded only when the plaintiff has established

A182

that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others." (quotation marks and citations omitted)). "When both actual and punitive damages are recoverable, punitive damages are properly considered in determining whether the jurisdictional amount has been satisfied." *Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1046 (3d Cir. 1993). In Pennsylvania, no "reasonable relationship" or "mathematical proportionality" need exist between compensatory and punitive damages, but rather, turn on "the twin goals of punishment and deterrence, the character of the tortious act, the nature and extent of the harm suffered by the plaintiff, and the wealth of the defendant." *Sprague v. Walter*, 656 A.2d 890, 925 (Pa. 1995) (citing *Kirkbride v. Lisbon Contractors, Inc.*, 555 A.2d 800, 803–04 (Pa. 1989)).[2]

28.     Any differences in the damages claimed by the three Plaintiffs would not undermine this Court's jurisdiction. The amount in controversy with respect to at least one Plaintiff is in excess of $75,000. Accordingly, this Court may exercise supplemental jurisdiction over any other Plaintiff whose amount in controversy does not exceed $75,000. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558–59 (2005).

29.     Therefore, the amount in controversy exceeds $75,000.[3]

---

[2] *See also, e.g., Hayfield v. Home Depot U.S.A., Inc.*, 168 F. Supp. 2d 436, 458–59 (E.D. Pa. 2001) (noting that, in a breach of contract dispute, "[p]laintiff's version of events is believed by the trier of fact, a penalty of over $65,000 may well be appropriate to send a message to Defendant and other would-be offenders"); *Delahanty v. First Pa. Bank, N.A.*, 464 A.2d 1243, 1248 (Pa. 1983) (upholding awards of $40,000 compensatory and $440,000 punitive damages in a contract dispute).

[3] Snap reserves the right to submit proof of this amount if challenged by Plaintiffs. *See Dart*, 574 U.S. at 88. While jurisdiction is clear from the face of the Complaint, Snap reserves the right to request jurisdictional discovery if this amount is challenged by Plaintiffs. *See, e.g., Ciccone v. Progressive Specialty Ins. Co.*, No. 3:20-CV-981, 2020 WL 7319777, at *6 (M.D. Pa. Dec. 11, 2020) ("We will defer ruling on the motion as to the CAFA amount in controversy pending a period of jurisdictional discovery"); *see also, e.g., Cty. of Washington, Pa. v. U.S. Bank Nat. Ass'n*, No. CIV.A. 11-1405, Dckt. En. 28 (W.D. Pa. Mar. 5, 2012); *Mithril GP*

A183

## CONCLUSION

WHEREFORE, Snap requests that this Notice of Removal be filed, that the above-captioned action from the Court of Common Pleas of Allegheny County, Pennsylvania, be removed to and proceed in this Court, and that no further proceedings be had in said case in the Court of Common Pleas of Allegheny County, Pennsylvania.

Dated: January 11, 2021                          /s/ Stephen A. Loney Jr.

Stephen A. Loney, Jr. (PA 202535)
stephen.loney@hoganlovells.com
Hogan Lovells US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
Tel:  (267) 675-4600
Fax:  (267) 675-4601

---

*Employee Feeder LLC v. McKellar*, No. 19-CV-2144-RGA, 2020 WL 3206555, at *1 (D. Del. June 15, 2020).

A184

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 11th day of January, 2021, I caused a true copy of the foregoing Notice of Removal to be filed electronically and furnished via U.S. Mail to:

>Lee W. Davis
>Law Offices of Lee W. Davis, Esquire, L.L.C.
>5239 Butler St., STE 201
>Pittsburgh, PA 15201
>*Counsel for Plaintiffs*

>/s/ Stephen A. Loney, Jr.
>Stephen A. Loney, Jr.

# EXHIBIT "D"

Frank E. Scherkenbach (SBN 142549 / scherkenbach@fr.com)
Adam J. Kessel (*pro hac vice* application to be filed / kessel@fr.com)
Proshanto Mukherji (*pro hac vice* application to be filed / mukherji@fr.com)
Jeffrey Shneidman (*pro hac vice* application to be filed / shneidman@fr.com)
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210
Telephone: (617) 542-5070
Facsimile: (617) 542-8906

Michael R. Headley (SBN 220834 / headley@fr.com)
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

Attorneys for Plaintiffs
BYTEDANCE INC. and TIKTOK INC.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BYTEDANCE INC. AND TIKTOK INC., | Case No. 3:20-cv-7572 |
| Plaintiffs | **COMPLAINT FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 9,691,429** |
| v. | |
| TRILLER, INC., | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiffs ByteDance Inc. ("BDI") and TikTok Inc. ("TTI") (collectively, "Plaintiffs") hereby allege for their Complaint against Defendant Triller, Inc. ("Triller" or "Defendant") as follows:

1

COMPLAINT FOR DECLARATORY JUDGMENT OF
NON-INFRINGEMENT
Case No 3:20-cv-7572.

A187

**NATURE OF ACTION**

1.      This is an action for a declaratory judgment of non-infringement of U.S. Patent No. 9,691,429 ("the '429 patent," attached as Exhibit A). Plaintiffs seek a declaratory judgment that they do not infringe any claim of the '429 patent.

2.      Plaintiffs are technology companies that provide and support a variety of mobile software applications that enable people around the world to connect with, consume, and create entertainment content, including via an application called "TikTok." TikTok is a mobile software application that millions of Americans, including many in this judicial district, use to create and share short videos composed of expressive content.

3.      Defendant Triller operates an app called "Triller" which it characterizes as "an entertainment platform built for creators."[1] Defendant Triller has alleged that TikTok infringes the '429 patent, and Plaintiffs disagree.

4.      Specifically, on July 29, 2020, Triller filed a lawsuit against the entities TikTok Inc. and Bytedance Ltd. in the Western District of Texas (C.A. No. 20-cv-00693) ("the Texas Litigation") alleging that those entities "directly and indirectly infringe the ['429] Patent by making, using, offering for sale, selling, and importing the popular iOS and Android software application known as 'TikTok.'" *Id.*, Dkt. No. 1 ¶3. Triller has alleged that the "Accused Products" in that lawsuit (the "Accused TikTok Products") are "software products [that] are available for iOS and Android hand-held or tablet devices and are distributed under the TikTok brand name." *Id.*, ¶14. Triller has alleged that "making, using, offering for sale, selling and/or importing the Accused Products" constitutes patent infringement and violates at least 35 U.S.C. § 271(a), (b), and (c). *Id.* ¶34 *et seq.* Triller has also alleged that Plaintiffs' training videos, demonstrations, brochures, and user guides instruct users of the TikTok apps to infringe the '429 patent. *Id.* Triller has alleged that making the Accused TikTok Products (among other acts) infringes at least claims 1, 3, 4, 5, 6, and 7 of the '429 patent. *Id.*

---

[1] https://apps.apple.com/us/app/triller-social-video-platform/id994905763 (accessed Oct. 27, 2020).

COMPLAINT FOR DECLARATORY JUDGMENT OF
NON-INFRINGEMENT
Case No 3:20-cv-7572.

5.     Notwithstanding Triller's allegations in the Texas Litigation, that district is not a proper forum for a dispute concerning the Accused TikTok Products. Bytedance Ltd., a defendant in that case, is a holding company based outside of the United States that does not have employees or property in Texas. TTI, the other defendant in that case, has no employees or facilities in the State of Texas and, more specifically, does not have any regular and established place of business in that forum, and thus is not subject to venue under the Supreme Court's decision in *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 581 U.S. ___ , 137 S. Ct. 1514 (2017). Plaintiffs thus bring the instant action in a proper forum — in the state where all of the relevant parties are based, and in the judicial district where a substantial part of the events or omissions giving rise to Triller's alleged infringement claims have occurred and continue to occur.

6.     BDI and TTI are the only companies based in the United States responsible for developing, providing, and supporting the Accused TikTok Products. Triller's actions and allegations have created a real and immediate controversy between Triller and Plaintiffs as to whether the Accused TikTok Products infringe any claim of the '429 patent. Triller's lawsuit and statements that "making" the Accused TikTok Products infringes the '429 patent demonstrate that it is highly likely that Defendant Triller will assert infringement against BDI in addition to its previous allegations against TTI. In the meantime, the cloud of Triller's allegations, including that making the Accused TikTok Products infringes the '429 patent, hangs over BDI.

7.     As set forth herein, Plaintiffs do not infringe the '429 patent. Therefore, an actual and justiciable controversy exists between the parties as to whether Plaintiffs' Accused TikTok Products infringe any claim of the '429 patent. A judicial declaration is necessary to resolve the real, immediate, and justiciable controversy concerning these issues and to determine the respective rights of the parties regarding the '429 patent. Plaintiffs respectfully seek a judicial determination that the '429 patent is not directly or indirectly infringed by Plaintiffs, including by their products and/or services.

COMPLAINT FOR DECLARATORY JUDGMENT OF
NON-INFRINGEMENT
Case No 3:20-cv-7572

1                       **PARTIES**

2         8.      Plaintiff BDI is a Delaware corporation having its principal place of business at 250

3 Bryant Street, Mountain View, California, 94041.

4         9.      Plaintiff TTI is a California corporation having its principal place of business at 5800

5 Bristol Parkway, Culver City, California, 90230.

6        10.     On information and belief, and based on its allegations in the Texas Litigation,

7 Defendant Triller, Inc. is a Delaware corporation having its principal place of business at 2121

8 Avenue of the Stars, Suite 2320, Los Angeles, California, 90067.

9        11.     On information and belief, and based on its allegations in the Texas Litigation, Triller

10 is the owner of the '429 patent.

11              **JURISDICTION AND VENUE**

12                Subject Matter Jurisdiction

13        12.     This action arises under the Declaratory Judgment Act, 28 U.S.C. §§2201-2202, and

14 under the Patent Laws of the United States, 35 U.S.C. §§1 *et seq.*

15        13.     This Court has subject matter jurisdiction over the claims alleged in this action

16 because this Court has jurisdiction over declaratory judgment claims arising under the Patent Laws

17 pursuant to 28 U.S.C. §§1331, 1338, 2201, and 2202.

18        14.     This Court can provide the relief sought in this Declaratory Judgment Complaint

19 because an actual case and controversy exists between the parties within the scope of this Court's

20 jurisdiction pursuant to 28 U.S.C. § 2201, at least because Triller has accused the Accused TikTok

21 Products of infringing its patent, e.g., by suing others (including TTI) for patent infringement

22 alleging infringement by "making" the Accused TikTok Products.

23        15.     Plaintiff BDI makes the Accused TikTok Products that Triller alleges infringe, and

24 thus, BDI, in addition to TTI, should be the subject of Triller's allegations. Triller has also alleged

25 that "portions of the Accused [TikTok] Products" are "especially made or adapted for use in

26 infringement of the '429 Patent, and ... [are] not suitable for substantial non-infringing use." *See*

27 Texas Litigation Dkt. No. 1 ¶ 36, which implies that TTI and BDI's roles in the development of

28                                   4

1    those products is an act of contributory infringement. Triller's allegations against TTI and users of

2    the Accused TikTok Products cast a cloud over TTI and BDI's business, causing uncertainty for

3    TTI and BDI, regarding the ongoing provision or use of the Accused TikTok Products.

4        16.    Triller has maintained this charge despite the fact that the Accused TikTok Products

5    (and use thereof) do not in fact infringe, and have not infringed, any claims of the '429 patent.

6    Triller's allegations and actions have created a real, live, immediate, and justiciable case or

7    controversy between Triller and Plaintiffs.

8                                    <u>Personal Jurisdiction</u>

9        17.    This Court has personal jurisdiction over Triller. Triller's principal place of business

10   is in California. Triller's Terms of Service state that "Triller, Inc.['s] address is at 2121 Avenue of

11   the Stars Suite 2350, Los Angeles, California 90067." *See* Exhibit B.

12       18.    Triller also lists both Los Angeles and San Francisco among the locations of its

13   worldwide offices on its website, including at https://www.triller.co/faq/index.html:



17       19.    Moreover, Triller has purposefully directed its activities toward and engaged in

18   numerous specific contacts within this District, including by soliciting and providing goods and

19   services to people in this District (in the form of Triller's own products, including the Triller app),

20   and by soliciting investment and receiving funding from persons in this District. On information and

21   belief, Triller also has a number of users in this District, including users who post and view videos

22   located in this district, as shown in the exemplary screenshots below.

23

24

25

26

27

28

<div align="center">5</div>

                                            COMPLAINT FOR DECLARATORY JUDGMENT OF
                                                        NON-INFRINGEMENT
                                                      Case No 3:20-cv-7572



20.    Triller has also purposefully directed its conduct at this District with its attempt to enforce the '429 patent by making accusations of infringement against the Accused TikTok Products, which are made in this District.

<u>Venue</u>

21.    Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim presented in this Complaint occurred in this district (28 U.S.C. §1391(b)(2)). For example, BDI makes the TikTok Accused Products in this district. Venue is also proper in this district because Triller's principal place of business is in California, and Triller "resides" in this district under Federal venue laws because it is subject to personal jurisdiction in this district (*see* 28 U.S.C. §1391(c)(2) & (d)).

22.    In addition, the TikTok Accused Products are distributed to users in the United States exclusively through Apple's App Store and Google Play, both of which are run by companies with principal places of business in California and more specifically in this judicial district. Apple's principal place of business is in Cupertino, California, and Google's principal place of business is in Mountain View, California.

COMPLAINT FOR DECLARATORY JUDGMENT OF
NON-INFRINGEMENT
Case No 3:20-cv-7572.

A192

**CLAIM FOR RELIEF**

**FIRST CLAIM FOR RELIEF –**
**Declaratory Judgment of Noninfringement of the '429 Patent**

23.    Plaintiffs incorporate the allegations set forth in paragraphs 1-22 as though fully set forth herein.

24.    Neither Plaintiffs nor their products have infringed, induced others to infringe, or contributed to infringement by others of, any claim of the '429 patent. Nor do any end-users of Plaintiffs' products infringe any such claim.

25.    By way of example, neither Plaintiffs nor their products infringe, induce others to infringe, or contribute to any infringement by others of, claims 1-10 of the '429 patent, at least because Plaintiffs and their products do not perform the method step of "synchronizing each video take of the plurality of captured video takes with the selected audio track while each video take of the plurality of video takes is being captured, wherein synchronizing further comprises playing, from a first beginning, the selected audio track at substantially the same time as a second beginning of capturing each video take of the plurality of video takes." Nor do any end-users of Plaintiffs' products perform this method step.

26.    By way of further example, Plaintiffs' products do not infringe, induce others to infringe, or contribute to any infringement by others of, claims 11-16 of the '429 patent, at least because their products are not a "user device, comprising … at least one processor operable to: … synchronize each video take of the plurality of captured video takes to the recorded audio track as each video take of the plurality of video takes is being captured, wherein synchronizing further comprises playing, from a first beginning, the selected audio track at substantially the same time as a second beginning of capturing each video take of the plurality of video takes." Nor are Plaintiffs' products installed or otherwise used by end-users in a way that satisfies this claim limitation.

27.    By way of example, neither Plaintiffs nor their products infringe, induce others to infringe, or contribute to any infringement by others of, claims 17-19 of the '429 patent, at least because Plaintiffs and their products do not perform the method step of "synchronizing, while the

COMPLAINT FOR DECLARATORY JUDGMENT OF
NON-INFRINGEMENT
Case No 3:20-cv-7572.

A193

1 plurality of video takes are being captured, each video take of the plurality of captured video takes

2 to the selected audio track, wherein synchronizing further comprises playing, from a first beginning,

3 the selected audio track at substantially the same time as a second beginning of capturing each video

4 take of the plurality of video takes; and creating a music video comprising the selected audio track

5 and at least a subset of the plurality of captured video takes synchronized to the selected audio track;

6 wherein creating comprises: displaying the subset of the plurality of captured video takes based on

7 the number of faces determined to be within each video take." Nor do any end-users of Plaintiffs'

8 products perform this method step.

9     28.     As a result of the acts described in the foregoing paragraphs, there exists a definite

10 and concrete, real and substantial, justiciable controversy between Triller and Plaintiffs regarding

11 the noninfringement of the '429 patent, including with respect to Plaintiffs' Accused TikTok

12 Products. This controversy is of sufficient immediacy and reality to warrant issuance of a

13 Declaratory Judgment.

14

15                    **DEMAND FOR JURY TRIAL**

16     29.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial

17 by jury on all issues triable to a jury.

18                    **PRAYER FOR RELIEF**

19     **WHEREFORE**, Plaintiffs respectfully request the Court to enter judgment in their favor

20 against Triller:

21     A. For judgment that Plaintiffs, Plaintiffs' products, and users of Plaintiffs' Products do not

22          infringe and have not infringed under 35 U.S.C. § 271 (or any subsection thereof) any claim

23          of the '429 patent, either literally or under the doctrine of equivalents, and that none of them

24          are liable for damages or injunctive relief based on any claim of the '429 patent;

25     B. That the case be found exceptional under 35 U.S.C. § 285 and that Plaintiffs be awarded

26          their reasonable attorneys' fees incurred in connection with this action;

27     C. For costs and expenses in this action; and

28                                   8                    COMPLAINT FOR DECLARATORY JUDGMENT OF
                                                          NON-INFRINGEMENT
                                                          Case No 3:20-cv-7572.

1     D. For such other and further relief as the Court deems just and proper.

2

3    Dated:  October 28, 2020                    Respectfully submitted,

4                                   By: /s/ Michael R. Headley
                                       Frank E. Scherkenbach
5                                      (SBN 142549 / scherkenbach@fr.com)
                                       Adam J. Kessel
6                                      (pro hac vice application to be filed / kessel@fr.com)
                                       Proshanto Mukherji
7                                      (pro hac vice application to be filed / mukherji@fr.com)
                                       Jeffrey Shneidman
8                                      (pro hac vice application to be filed / shneidman@fr.com)
9                                      FISH & RICHARDSON P.C.
                                       One Marina Park Drive
10                                     Boston, MA 02210
                                       Telephone: (617) 542-5070
11                                     Facsimile: (617) 542-8906

12
                                       Michael R. Headley (SBN 220834 / headley@fr.com)
13                                     FISH & RICHARDSON P.C.
                                       500 Arguello Street, Suite 500
14                                     Redwood City, CA 94063
                                       Telephone: (650) 839-5070
15                                     Facsimile: (650) 839-5071

16
                                       Attorneys for Plaintiffs
17                                     ByteDance Inc. and TikTok Inc.

18

19

20

21

22

23

24

25

26

27

28
                                    9          COMPLAINT FOR DECLARATORY JUDGMENT OF
                                                              NON-INFRINGEMENT
                                                              Case No 3:20-cv-7572.

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TAWAINNA ANDERSON, Individually and as Administratrix of the ESTATE OF NYLAH ANDERSON, a deceased minor, | |
| *Plaintiff,* | Case No.: 2:22-cv-01849-PD |
| vs. | |
| TIKTOK INC. AND BYTEDANCE, INC., | |
| *Defendants.* | |

## <u>REPLY IN SUPPORT OF MOTION TO DISMISS</u>

Joseph E. O'Neil
Katherine A. Wang
**CAMPBELL CONROY & O'NEIL, PC**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
Telephone: (610) 964-1900
Facsimile: (610) 964-1981

Geoffrey M. Drake (*Pro Hac Vice*)
TaCara D. Harris (*Pro Hac Vice*)
**KING & SPALDING LLP**
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

Albert Giang (*Pro Hac Vice*)
**KING & SPALDING LLP**
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

*Counsel for TikTok Inc. and ByteDance Inc.*

August 11, 2022

Plaintiff's Opposition actually confirms key allegations that require dismissal of the Complaint: "Blackout Challenge" choking videos were created and posted by third-party users; such "viral" videos were shared or accessible by users in many states and countries; this "content" is "placed" by an intangible algorithm, through TikTok's video-sharing platform that is downloaded *by users* "worldwide"; and the connection to Nylah Anderson arises from her download and usage of the app in Pennsylvania, not any unique targeting by Defendants into Pennsylvania. Opp. at 1; Compl. ¶¶ 23-27, 50.[1] These concessions create several defects, which cannot be overcome by inapposite legal citations and contradictory factual allegations:[2]

- *First*, Plaintiff fails to establish personal jurisdiction. Plaintiff's Opposition relies on the alleged facts that, while in Pennsylvania, Nylah Anderson (1) accepted TTI's Terms of Service ("ToS") and Privacy Policy and (2) downloaded and used the TikTok application. Opp. at 4-5. But unilateral decisions and actions by others do not (and cannot) equate to Defendants' "purposeful availment" in Pennsylvania. Otherwise, mobile application owners would be subject to limitless jurisdiction across all states.

- *Second*, Plaintiff's Opposition (and her attempted labeling of this case as a "product liability" action) does nothing to escape Communications Decency Act ("CDA") immunity. At bottom, Plaintiff seeks to hold Defendants liable for two things inextricably intertwined with "content" created and shared by third-party users of the TikTok platform: (1) "[f]ailing to timely remove [and]

---

[1] *See also* Mot. at 4 n.2 (noting that online choking videos, including on other video platforms, date back to 2007 or earlier).

[2] *Compare* Compl. ¶ 127(i) (alleging damages caused by Defendants "*[f]ailing to timely remove* all dangerous and deadly videos and challenges from its app, including but not limited to the Blackout Challenge") with Opp. at 11 n.3 ("Plaintiff's legal theories against Defendants *are not based on whether Defendants should have removed* the Blackout Challenge videos…") (emphases added).

1

to prevent videos of the Blackout Challenge from being posted, shared, circulated, and/or recommended to users," and (2) employing an algorithm that presented the user-generated "Blackout Challenge" to Nylah via her For You Page ("FYP"). *See* Compl. ¶¶ 3, 127(i), (r); Opp. at 1. Both are CDA-protected publisher functions barring Plaintiff's claims.

- *Finally and independently*, Plaintiff still fails to state a claim for each cause of action pled.

## I. Plaintiff's New, Unpled Assertions Fail to Establish Specific Jurisdiction.

Plaintiff does not dispute that this Court lacks *general* jurisdiction over Defendants, but claims for the first time that specific jurisdiction exists by virtue of TTI's ToS and Privacy Policy. But Plaintiff cannot escape her own core allegation: that Nylah was harmed after seeing choking videos that were admittedly available *in other states and countries*, on an app downloaded by users "worldwide." Compl. ¶¶ 43, 66-70. And that specific allegation anchors the jurisdictional analysis, and defeats vague references to generic "algorithms," "contracts," "policies," "personal" or "location data"—all of which are general characteristics of technology usage, none of which are limited to Pennsylvania, and none of which are specific (or even relevant) to Nylah's particular harm.

*First*, there is no "purposeful availment" by Defendants where Plaintiff concedes that *users* initiate the applicability of the ToS and Privacy Policy, by "downloading TikTok" and "using" TikTok's services. Opp. at 5 (data collection occurred after Nylah downloaded app and agreed to ToS), Ex. A; Compl. ¶¶ 23-24. These user-initiated actions cannot establish specific jurisdiction over Defendants.

2

A198

*Walden v. Fiore*, 571 U.S. 277, 284 & n.6 (2014) (specific jurisdiction "must arise out of contacts that the '*defendant* himself' creates with the forum State").

*Second*, neither the ToS nor Privacy Policy specifically references Pennsylvania law or residents; they apply universally regardless of user location. And in any event, application of the ToS alone is insufficient to confer jurisdiction. *See Ziencik v. Snap, Inc.*, No. 21-49, 2021 WL 4076997, at *4 (W.D. Pa. Sept. 8, 2021) (finding lack of personal jurisdiction notwithstanding existence of Terms of Service); *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 64 (3d Cir. 1984) (no personal jurisdiction despite contract with Pennsylvania resident).

*Third*, numerous problems doom Plaintiff's attempt to bootstrap onto "harvest[ed] data from Nylah's Pennsylvania-based mobile device; from her Pennsylvania-based IP address . . . while she was located in Pennsylvania." Opp. at 5. Again, this new allegation is based entirely on a *widely applicable* Privacy Policy. *See id.* To the extent there was "Pennsylvania data," its locus was admittedly controlled by Nylah and not purposefully targeted by Defendants. And any suggestion that collected data may have been used to "target" choking videos towards Nylah in Pennsylvania is contradicted by Plaintiff's specific allegation that such videos were seen in other states and countries, and that Defendants failed to prevent "viral" videos from "spreading" to "users" generally. *See* Compl. ¶¶ 67-72.

A199

Plaintiff's musings about "promotional materials" based on the "geographic location of the user" (Opp. at 6) fail for similar reasons:  no such materials are identified or connected to Nylah's harm.  Nor is this a case about promotion of the Philadelphia Eagles or Pennsylvania-specific advertisements targeting local residents.  Like other courts, this Court should reject Plaintiff's conflation of general business policies with jurisdiction-targeted activities, because it would impermissibly extend specific jurisdiction over the countless technology companies that also have widely applicable policies and/or receive data from users who happen to be from (or passing through) Pennsylvania.  *See Toys R Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 454 (3d Cir. 2003) ("[M]ere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world.")*; Gullen v. Facebook*, No. 15 C 7681, 2016 WL 245910, at *3 (N.D. Ill. Jan. 21, 2016) (no specific personal jurisdiction where Facebook's collection of biometric data was not targeted at the forum state).

*Fourth*, Plaintiff also fails in her attempt to distinguish *Ziencik* and *Toys R Us*. For instance, the age of the TikTok platform and users' level of interactivity on the platform (*see* Opp. at 14) does not change the fact that Defendants—like the defendant in *Toys R Us*—did not target any activity to Pennsylvania.  And if anything, the allegations in *Ziencik* included a greater degree of defendant-related contacts.  There, the plaintiff argued that the Snapchat application had a design

4

A200

defect that shielded perpetrators from threats of law enforcement investigations and delayed law enforcement investigations in Pennsylvania. *Ziencik*, 2021 WL 4076997, at *4. In rejecting plaintiff's jurisdictional arguments—and finding that Snap did not expressly aim tortious conduct at Pennsylvania—the court noted that Snap's conduct could have occurred in any state. *Id.* That is exactly the case here.

*Finally*, there is no basis for jurisdictional discovery, especially where Plaintiff failed to carry her prima facie burden and it would be futile even accepting Plaintiff's allegations. *Crockett v. Luitpold Pharm., Inc.*, No. 19-276, 2020 WL 3096527, at *5 (E.D. Pa. June 11, 2020) (denying jurisdictional discovery where plaintiff did not make a prima facie showing of personal jurisdiction).

## II.    Plaintiff's Claims Are Barred by Section 230

Plaintiff concedes that her claims are "barred under Section 230 if they seek to treat Defendants 'as the publisher or speaker' of third-party content." Opp. at 10. And she admits that claims "founded on . . . editing, monitoring, or removing third-party content" treat Defendants as a publisher or speaker. Opp. at 10–15. At the same time, the Complaint repeatedly alleges Defendants are liable for:

- "[f]ailing to timely remove all dangerous and deadly videos and challenges from its app, including but not limited to the Blackout Challenge," Compl. ¶ 127(i), (l);
- "[f]ailing to prevent dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, from being posted, shared, and/or circulated to users on the TikTok app," *id.* ¶ 127(d);

A201

- "[f]ailing to prevent videos of the Blackout Challenge from being posted, shared, circulated, and/or recommended to users, including Nylah Anderson, through their FYP," *id*. ¶ 127(r);
- failing to "extinguish and prevent the spread" of videos, *id*. ¶ 75; and
- breaching its "duty to monitor the videos and challenges shared, posted, and/or circulated on their app," *id*. ¶ 119.

The Complaint thus unequivocally seeks to hold Defendants liable for "deciding whether to publish, withdraw, postpone, or alter content"—traditional "publisher" functions immunized by the CDA. *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003).

Rather than grapple with these allegations, Plaintiff argues that "product liability" claims fall outside of Section 230. *See* Opp. at 11–15, 18. But as the Third Circuit has long held, CDA immunity does not depend on an action's "label," but whether Plaintiff fundamentally seeks to hold Defendants "negligent in promulgating harmful content and in failing to address certain harmful content on its network." *Green*, 318 F.3d at 471. Here, "[t]he nature of the alleged design flaw in this case—and the harm that is alleged to flow from that flaw—is directly related to the posting of third-party content," which puts Plaintiff's theory in Section 230's heartland. *Doe v. Twitter, Inc.,* 555 F. Supp. 3d 889, 930 (N.D. Cal. 2021). Plaintiff's design theory is that the TikTok platform is defective because "[t]he viral and deadly TikTok Blackout Challenge was thrust in front of Nylah on her TikTok For You Page ('FYP') as a result of TikTok's algorithm." Compl. ¶ 3. But without allegations about this third party content, the Complaint pleads no "defect" at all.

A202

And contrary to the Opposition's claims (at 10–11, 14), the Complaint *repeatedly* identifies TikTok's "defect" as a supposed failure to monitor and remove content. *See, e.g.*, Compl. ¶ 127 (d), (i), (l), (r).

Plaintiff's attempt to analogize to the Ninth Circuit's decision in *Lemmon* utterly fails. *See* Opp. at 11–15. In that case, the "danger" was a unique "speed filter" created by Snap, that "superimpose[d]" and "overlay[ed]" driving speed onto the user's photo or video and allegedly "reward[ed]" users for driving over 100 miles per hour. *Lemmon v. Snap*, 995 F.3d 1085, 1093 (9th Cir. 2021) (emphasizing "*the creation* of the Speed Filter"). Snap's alleged duty was "fully independent of [its] role in monitoring or publishing third-party content," and the plaintiffs' claim "st[ood] independently of the content." *Id.* Notably, the court distinguished that case from "creative attempt[s] to plead around" Section 230, where "the plaintiff's claims, at bottom, depended on a third party's content, without which no liability could have existed." *Id.* at 1094. Here, "no liability could have existed" absent specific, third-party-generated choking videos that Nylah allegedly saw. *Id.* Plaintiff seeks "to fault [TikTok] for publishing other [TikTok]-user content . . . that may have incentivized [minors] to engage in dangerous behavior"—the kinds of allegations *Lemmon* itself says are barred by Section 230. *Id.* at 1093 n.4.

Plaintiff also suggests that "the CDA [does] not apply to product[s] liability claims" at all under *Lemmon*. Opp. at 18. Indeed, that is Plaintiff's sole basis to

A203

distinguish nearly all of the authorities cited in the Motion to Dismiss. *See id*. But nothing in *Lemmon* supports that proposition, and other courts have since considered *Lemmon* and nevertheless applied Section 230 to bar products liability claims. *Twitter*, 555 F. Supp. 3d at 930; *Doe v. Snap, Inc.*, No. H-22-00590, 2022 WL 2528615, at *14 (S.D. Tex. July 7, 2022) (Section 230 barred design claims that were based on "messages and photos" sent by a user); *Quinteros v. InnoGames*, No. C19-1402RSM, 2022 WL 898560, at *7 (W.D. Wash. Mar. 28, 2022) (Section 230 barred all claims, including product liability).

Plaintiff's failure to warn theory (Opp. at 12, 14) is similarly based on Defendants' purported failure to warn about user content—for example, "[f]ailing to warn users of the risks associated with dangerous and deadly videos and challenges circulating the TikTok app and recommended to user." Compl. ¶ 107(z). While Plaintiff cites *Internet Brands*, that decision confirmed that Section 230 bars duty-to-warn theories based on a failure "to remove any user content or otherwise affect how [a platform] publishes or monitors such content," including "offensive content." *Id*. There was no allegation in *Internet Brands* that the defendant website transmitted harmful content—unlike Plaintiff's claims here. *See Herrick v. Grindr LLC*, 765 F. App'x 586, 591 (2d Cir. 2019) (distinguishing *Internet Brands*). Instead, the plaintiff was a model who alleged a talent-scout website failed to warn

A204

her it had matched her with known, "criminally charged" predators. *Internet Brands*, 824 F.3d at 849. Her failure to warn theory did not turn on user content itself. *Id*.

Thus, it is ironic that Plaintiff suggests that Ninth Circuit cases should "carry tremendous weight under Pennsylvania law" (Opp. at 15), and then ignores the many times the Ninth Circuit has rejected identical arguments in other suits involving platforms, including video platforms. In particular, Plaintiff argues that Section 230 does not apply because TikTok's "algorithm took the affirmative step of sending the dangerous content to the user." Opp. at 16, 17. Just last year in *Gonzalez*, the Ninth Circuit held that Section 230 barred claims that YouTube's recommendation algorithm promoted terrorism-related content. *Gonzalez v. Google LLC*, 2 F.4th 871, 894 (9th Cir. 2021). Gonzalez argued that YouTube's algorithm "recommends content . . . to users based upon users' viewing history and what is known about the users," *id*., just as Plaintiff alleges that TikTok's "algorithm recommended the Blackout Challenge" based on "the users demographics" and "user interactions such as the videos viewed". Compl. ¶¶ 53, 67. None of Gonzalez's claims fell outside of Section 230, and Plaintiff's claims do not here. *See also Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019) (algorithmic recommendations are protected publisher functions).

### III. Plaintiff Cannot Otherwise State a Claim.

*a. The TikTok app and algorithm are not "products" (Count I).*

9

A205

Pennsylvania limits products liability claims to "finished items with a *tangible* form," excluding ideas, services, or other intangible items. *Snyder v. ISC Alloys, Ltd.*, 772 F. Supp. 244, 251 (W.D. Pa. 1991) (emphasis added). Numerous cases in other jurisdictions say that apps or other video platforms do not have a "tangible" form. *See, e.g.*, *Doe v. Facebook, Inc.*, No. 2019-16262 (151st Dist. Ct., Harris Cty., Tex. Oct. 4, 2019) (Instagram is "not a product" under Texas law adopting Restatement (Second) of Torts); *Est. of B.H. v. Netflix, Inc.*, No. 4:21-cv-06561-YGR, 2022 WL 551701, at *3 (N.D. Cal. Jan. 12, 2022) (rejecting strict-product liability claims against Netflix "premised on the content and dissemination" of video content); Mot. at 20 (collecting cases). Those cases confirm the legal distinction between "tangible" items—which are subject to strict product liability—and intangible items and services, which are not. And contrary to Plaintiff's assertion (Opp. at 24), *both* Second and Third Restatement jurisdictions follow this distinction. *See Rodgers v. Christie,* 795 F. Appx. 878, 880 (3d Cir. 2020) ("algorithm" is not a "product" under Restatement (Third) of Torts).

Instead of meaningfully responding to these cases, Plaintiff attempts to distract with cherry-picked references to TikTok as a "product." These out-of-context references do not say anything about whether TikTok is "tangible," or control whether TikTok is a "tangible" product. Opp. at 20–21. For example, the TikTok ToS, which states that "[o]ur automated systems analyze your content . . . to

10

A206

provide you personally relevant product features," describes TikTok as a service, not as a "tangible" product. Opp., Ex. A. Nor does the characterization of TikTok in unrelated litigation—based on an opposing party's framing of the issues—control whether TikTok is a "tangible" product. Opp., Ex. D. Here, *Plaintiff's own theory* is an alleged defect in an invisible and intangible "algorithm that determines the videos and content that each user . . . sees." Compl. ¶ 102. That fails to meet the legal definition of a "product" as "finished items with a tangible form." *Snyder*, 772 F. Supp. at 251.[3]

### b. Plaintiff cannot establish a legal duty of care (Count II).

Plaintiff does not address Defendants' numerous cases—involving TikTok or other Internet platforms—where courts have rejected claimed duties to users, including to prevent self-harm; to modify content; or to implement proper methods and controls. Mot. at 21-22. She merely falls back on a more generalized duty "as

---

[3] None of Plaintiff's citations are applicable or alter this conclusion. *See Est. of Alex through Coker v. T-Mobile US, Inc.*, 313 F. Supp. 3d 723, 732 (N.D. Tex. 2018) (no litigation or ruling on whether defendant's software constituted a "product"); *Maynard v. Snapchat, Inc.*, 313 Ga. 533, 533, 870 S.E.2d 739, 743 (2022) (same); *Holbrook v. Prodomax Automation Ltd.*, No. 1:17-cv-219, 2021 WL 4260622, at *3 (W.D. Mich. Sept. 20, 2021) (assembly-line software could constitute a "product" as a component of a separate, tangible product and where Michigan law did not follow the Restatement). Here, the alleged defect relates to "plac[ing] content on the users FYP" (Opp. at 1), and such "transmission of words" "is not the same as selling items with physical properties." *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1035, 1036 n.6 (9th Cir. 1991) (noting that strict liability in those circumstances "could seriously inhibit those who wish to share thoughts and theories"). Plaintiff cites no authority for the idea that "policy" considerations (Opp. at 24) have extended product liability to intangible apps and algorithms, and certainly nothing to override the countervailing policies in the CDA.

product designers, manufacturers, sellers, and/or suppliers[.]"  Opp. at 24.  But Plaintiff's cases discussing the duty of care under a traditional product liability regime—involving tangible products like cigarette lighters or cars—are inapposite, where TikTok's app and algorithm are not "products" and where Congress has in fact immunized platforms from taking on such obligations or failing to prevent such harms.  *See, e.g.*, *Winter v. Facebook, Inc.*, No. 21-CV-1046 JAR, 2021 WL 5446733, at *6 (E.D. Mo. Nov. 22, 2021) (dismissing claim that TikTok was negligent by failing to prevent cyberbullying because "[S]tate law cannot predicate liability for publishing decisions on the mere existence of the very relationship that Congress immunized from suit").[4]

     *c.  Plaintiff cannot establish her other claims (Counts III-V).*

Plaintiff did not even respond to the numerous defects Defendants identified in her UTPCPL and CLRA claims (Mot. at 23-25), and those counts should be dismissed with prejudice.  *See Walsh v. Fusion Japanese Steakhouse, Inc.*, 548 F.Supp.3d 513, 522 (W.D. Pa. 2021) (failure to address an argument in opposition waives that argument).

Because these legal defects cannot be cured by amendment, TikTok and ByteDance respectfully request that the Court dismiss the Complaint.

---

[4] For these reasons, Plaintiff's derivative claims for wrongful death and survival should be dismissed as well. *See* Mot. at 25.

A208

Dated: August 11, 2022

Respectfully submitted,

/s/Joseph E. O'Neil
Joseph E. O'Neil
Katherine A. Wang
Albert Giang (*Pro Hac Vice*)
Geoffrey Drake (*Pro Hac Vice*)
TaCara Harris (*Pro Hac Vice*)

*Counsel for TikTok Inc. and ByteDance Inc.*

13

A209

## <u>CERTIFICATE OF SERVICE</u>

I, Joseph E. O'Neil, Esquire, hereby certify that on August 11, 2022, I electronically filed the foregoing with the Clerk of Court using the Court's electronic filing system (ECF), which will send notification of such filing to all counsel of record. The foregoing document is also available for viewing and/or downloading from ECF.

**<u>Plaintiff's Counsel</u>**
Robert J. Mongeluzzi, Esquire
Jeffrey P. Goodman, Esquire
Samuel B. Dordick, Esquire
Rayna McCarthy, Esquire
Saltz Mongeluzzi & Bendesky, P.C.
One Liberty Place
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
E-mail: rmongeluzzi@smbb.com
jgoodman@smbb.com
sdordick@smbb.com
rmccarthy@smbb.com

Mark A. DiCello, Esquire
DiCello Levitt Gutzler LLC
7556 Mentor Avenue
Western Reserve
Law Building
Mentor, OH 44060
E-mail: madicello@dicellolevitt.com

**CAMPBELL CONROY & O'NEIL, P.C.**

By: */s/ Joseph E. O'Neil*
        Joseph E. O'Neil, Esquire

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **TAWAINNA ANDERSON,** **Individually and as Administratrix of the ESTATE OF NYLAH ANDERSON, a deceased minor** | |
| *Plaintiff,* | **No. 2:22-cv-01849-PD** |
| v. | |
| **TIKTOK, INC. AND BYTEDANCE, INC.** | |
| *Defendants.* | |

## PLAINTIFF'S SUR-REPLY IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Robert J. Mongeluzzi
Jeffrey P. Goodman
Samuel B. Dordick
Rayna McCarthy
**SALTZ MONGELUZZI & BENDESKY, P.C.**
One Liberty Place
1650 Market Street, 52nd Floor
Philadelphia, Pennsylvania 19103
Tel.: (215) 496-8282
rmongeluzzi@smbb.com
jgoodman@smbb.com
sdordick@smbb.com
rmccarthy@smbb.com

Mark A. DiCello
**DICELLO LEVITT GUTZLER LLC**
Western Reserve Law Building
7556 Mentor Avenue
Mentor, Ohio 44060
Tel.: (440) 953-8888
madicello@dicellolevitt.com

Dated: August 18, 2022

Defendants' Reply continues to assert the same demonstrably incorrect arguments that were raised in their Motion concerning specific personal jurisdiction, immunity under the Communications Decency Act ("CDA"), and Pennsylvania products liability law. Defendants' arguments are unpersuasive, and the facts remain unchanged.

Defendants have purposefully availed themselves of Pennsylvania and either outright ignore or misrepresent their intentional collection of data directly from Nylah Anderson in Pennsylvania that ultimately gives rise to Plaintiff's claims. Instead of squarely addressing their intentional and directed data harvesting, Defendants confusingly argue that their purposeful actions in this regard are somehow unilateral actions taken by 10-year-old Nylah. Not true.

Defendants' CDA immunity arguments are similarly unavailing and ignore the fundamental reason why Plaintiff's claims do not seek to treat Defendants as publishers or speakers. The fact that Defendants could have satisfied their duties *without altering the content generated by third-partie*s, strips them of any arguable CDA protection. *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021); *A.M. v. Omegle.com, LLC*, No. 3:21-cv-01674, 2022 WL 2713721, *4 (D. Or. July 13, 2022) (plaintiff's claims did not seek to treat defendant as a publisher or speaker because defendant "would not have to alter the content posted by its users—it would only have to change its design and warnings."). Defendants neglected to address

A212

this critical issue and instead continued their efforts to shoehorn this case into the CDA by focusing on factual information within plaintiff's complaint which is immaterial to the maintenance of Plaintiff's claims. The CDA does not bar Plaintiff's claims.

Finally, Defendants ask this Court to ignore the fundamental policy considerations underlying Pennsylvania strict products liability law. These considerations command that the law adapt and evolve with technological advancements just as other courts have done in order to classify computer programs and software as "products." Defendants also urge this Court to disregard their own representations in pleadings in other actions which classify their app and algorithm as "products." The Court should do neither. Defendants' app and algorithm are products, and their defective and dangerous designs and lack of warnings that caused Nylah Anderson's death properly subjects Defendants to Pennsylvania strict products liability law.

## I.    Specific Personal Jurisdiction Exists.

Defendants glaringly avoid a direct discussion of their purposeful Pennsylvania-based data harvesting that gave rise to Plaintiff's claims. This is because it is fatal to their jurisdiction argument. As Plaintiff pointed out in her Opposition, Defendants intentionally reached into Pennsylvania and extracted data directly from Nylah's phone, other social media accounts, internet network, and

A213

from Nylah's person (such as her biometric data) which was then utilized by Defendants' algorithm to target her. *See* D.E. 17 ("Opp.") at 5 (citing Defendants' Privacy Policy). This is unquestionably purposeful availment and Defendants' arguments to the contrary are meritless.

Defendants first argue that there cannot possibly be specific personal jurisdiction over them because the Blackout Challenge videos are available on their app all over the world. *See* D.E. 21 ("Reply") at 2. Defendants double down on this argument by claiming that the Privacy Policy is "widely applicable" and permits Defendants to extract users' data all over the world. *Id.* at 3. Defendants' argument essentially boils down to: "we purposefully avail ourselves *everywhere*, so you can't sue us *anywhere*." Defendants have not cited any authority which suggests that if a defendant is able to intentionally conduct business activities and purposefully avail itself in enough jurisdictions, specific jurisdiction cannot exist in any of them. No such authority exists and the law holds the exact opposite. *See Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S.Ct. 1017, 1027 (2021).

In an unsupported attempt to avoid the consequences of its intentional Pennsylvania-based conduct, Defendants preposterously claim that its collection of Pennsylvania-based data was Nylah's own doing. *See* Reply at 3 ("[t]o the extent there was 'Pennsylvania data,' its locus was admittedly controlled by Nylah and not purposefully targeted by Defendants."). Defendants' attempts to shift blame for

3

A214

*their own* data collection efforts to Nylah is unsupported and defies logic. Further, Defendants could have easily decided not to extract massive amounts of data from Pennsylvania citizens, including Nylah Anderson, and jurisdiction may have been avoided. Defendants consciously chose not to, and they thus had clear notice they were subject to suit in Pennsylvania. *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1126-27 (W.D. Pa. 1997). Notably, amongst the data they extracted, harvested and utilized was Nylah's location.

Defendants also argue that Plaintiff's allegations that their algorithm used the harvested data to target Nylah is contradicted by the fact that Blackout Challenge videos were seen "in other states and other countries[.]" Reply at 3. This is nonsensical and does nothing to chip away at the clear basis for holding specific personal jurisdiction over Defendants in this action. Just because Defendants' defective and dangerous algorithm may have also shown other vulnerable children choking videos in other states in no way means Nylah was not specifically targeted here. Indeed, this is the very reason why Plaintiff alleges the algorithm and app are defectively designed.

Specific personal jurisdiction over Defendants exists, and Defendants' motion should be denied.

## II.    Plaintiff's Claims Are Not Barred by the CDA.

Defendants' Reply repeatedly focuses on factual information in Plaintiff's Complaint pointing out that Defendants failed to timely remove Blackout Challenge videos or failed to prevent them from being posted in the first place.  *See* Reply at 5-6.  These factual allegations are immaterial to Plaintiff's core legal theory and allegations—Defendants' app and algorithm are defectively designed products that knowingly delivered a dangerous video to a vulnerable 10-year-old girl.  As Plaintiff stated in her Opposition, "the Blackout Challenge can exist on TikTok without necessarily exposing TikTok to liability."  Opp. at 17.  Should the Court feel so inclined it may strike any such factual allegations (which are true but merely *dicta* in Plaintiff's Complaint) concerning Defendants' failure to remove the Blackout Challenge video or prevent it from being posted in the first place, but this does not result in the dismissal of Plaintiff's case.  Plaintiff's case is, and always has been, about how Defendants' defectively designed product functioned to send the dangerous video directly to Nylah.

In focusing on immaterial aspects of Plaintiff's allegations, Defendants glaringly ignore the fundamental holding of *Lemmon*: the plaintiffs' claims did not seek to treat the defendant as a publisher or speaker because defendant "could have satisfied" its duty "to design a product more useful than it was foreseeably dangerous—***without altering the content that [defendant's] users generate***."  995

5

A216

F.3d at 1092 (emphasis added).  The focus of the *Lemmon* court's analysis was whether defendant could satisfy its alleged duty without altering user content and if defendant could, then CDA immunity did not apply.  *Id.*  Defendants aim to distract this Court from engaging in this determinative analysis because the outcome of such an analysis is inevitably a finding that Defendants could have satisfied their duty to design a non-defective product without altering any aspect of third-party content whatsoever.  Defendants need not alter the Blackout Challenge video, their product just shouldn't knowingly send it to a 10-year-old.

Defendants emphasize footnote 4 of the *Lemmon* decision, which states that the plaintiffs could not fault the defendant for publishing third-party content generally on its app.  *Id.* at 1093 n. 4.  This *dicta* does nothing to support Defendants' arguments.  Plaintiff here is not seeking to fault Defendants for simply publishing Blackout Challenge videos on its platform—indeed Plaintiff has unequivocally stated that the Blackout Challenge videos can exist on Defendants' platform without necessarily subjecting them to liability.  Opp. at 17.  Instead, Defendants' liability here is grounded in its defectively designed product taking deliberate action to target 10-year-old Nylah Anderson and send her the dangerous video.  This is clearly distinguishable from the scenario discussed by the *Lemmon* court in footnote 4. The court stated, "allow[ing] its users to transmit user-generated content to one another does not detract from the fact that [a plaintiff] seek[s] to hold [the defendant] liable

6

A217

for its role in violating its distinct duty to design a reasonably safe product."
*Lemmon*, 995 F.3d at 1092.

The recent decision of *A.M. v. Omegle.com, LLC* confirms that this Court's
determinative focus should be on whether Defendants can satisfy their alleged duties
*without altering third-party content* (they can).   2022 WL 2713721, at *4.   In
*Omegle*, a 11-year-old user of an online chat room, called Omegle, was paired with
a man in his late thirties who forced her to send him pornographic images and videos
of herself.   *Id.* at *1.   After the man was apprehended by his local authorities, the
minor brought a product liability action against Omegle alleging that the online chat
room was defectively designed because it paired vulnerable minors, such as plaintiff,
with adults.   *Id.* at *1.   Relying on *Lemmon*, **the Omegle court held that the
plaintiff's product liability claims were not subject to the CDA's immunity
provisions** because "Omegle could have satisfied its obligation to Plaintiff by
designing its product differently" and because the plaintiff was "not claiming that
Omegle needed to review, edit, or withdraw any third-party content to meet this
obligation."   *Id.* at *3.   Omegle could have satisfied its obligations by simply not
pairing an 11-year-old user with this adult for chatting purposes.   This is analogous
to how Defendants here could have satisfied their obligations by not sending a 10-
year-old user a dangerous video.

A218

The *Omegle* court also shot down the defendant's argument that its holding that the plaintiff's product liability claims were not subject to the CDA would contradict *Doe v. Twitter, Inc.*, 555 F.Supp.3d 889 (N.D. Cal. 2021). As noted by the *Omegle* court, the *Twitter* court found that the publication function, and thus the CDA, was implicated because, "[i]n other words…***Twitter would have to alter the content posted by its users***" by preventing the posting of third-party content containing child pornography. *Omegle*, 2022 WL 2713721, at *4 (quoting *Twitter*, 555 F.Supp.3d at 930) (emphasis added). Defendants' *Twitter* argument here fails for exactly the same reason (i.e. Defendants here would not need to edit content to satisfy their obligation to Plaintiff).

Defendants' reliance on *Gonzalez v. Google LLC*, 2 F.4th 871, 894 (9th Cir. 2021) serves them no better and *Gonzalez* only further emphasizes that Plaintiff's claims here are not subject to the CDA. In *Gonzalez*, the plaintiffs were family members of victims of fatal shootings in Paris, Istanbul, and San Bernardino, California which were committed by persons associated with designated terrorist groups. *Id.* 880-83. The plaintiffs brought claims under the Anti-Terrorism Act ("ATA"). *Id.* at 880. At bottom, the *Gonzalez* plaintiff's claims were founded on allegations that the defendants (Google, Twitter, and Facebook) shouldn't have allowed ISIS to post certain content on defendants' social media platforms. *Id.* at 880. The duty alleged by the *Gonzalez* plaintiffs was a simple "duty not to support

8

A219

terrorists." *Id.* at 891.  In order to satisfy the alleged duty, the defendants would have had to perform quintessential publisher functions such as deciding whether to alter third-party content, and the claims thus fell under the CDA.

Importantly, the *Gonzalez* plaintiff argued that the defendants' use of algorithms transformed them into information content *creators* that are explicitly exempt from immunity by the terms of the CDA.  *Id.* at 892.  This was the context of the *Gonzalez* court's algorithm discussion that Defendants emphasize, but it has nothing to do with Plaintiff's claims here.  Plaintiff has never alleged that Defendants' use of algorithms transforms them into information content creators. Instead, Plaintiff alleges Defendants violated a distinct product liability duty to design a non-defective product and duties under common law negligence—claims and duties which were not discussed at all in *Gonzalez*.  *Gonzalez* provides no guidance here.

In their Reply and Motion, Defendants repeatedly attempt to draw parallels between this case and those involving ones in which the plaintiffs sought to hold interactive computer service providers accountable under the ATA for terrorists using defendants' platforms to communicate.  This is clearly not the case here.  The more appropriate analogy is a situation in which a defendant's defectively designed algorithms detected an individual with extremist and anti-American views and intentionally fed that individual with content concerning the creation of homemade

A220

bombs. It is hard to imagine a court condoning such behavior or finding that the defendant would be immunized under the CDA.

This Court's focus should properly be on the fundamental question of whether Defendants can satisfy their alleged duty—here, to design a non-defective product—without altering any third-party content. *Lemmon*, 995 F.3d at 1092; *Omegle*, 2022 WL 2713721, *4. It is apparent that Defendants could satisfy their duties without altering the third-party content whatsoever, and the CDA is thus inapplicable. Defendants' motion should be denied.

### III.    Defendants' App and Algorithm Are Products.

Defendants ask this Court to hold that computer software and programs, like Defendants' app and algorithm, are not "products" subject to Pennsylvania's product liability law. In doing so, Defendants regurgitate the same exact cases they cited in their Motion. Defendants' product is nothing like the professional design service at issue in *Snyder v. ISC Alloys, Ltd.*, 772 F.supp. 244 (W.D. Pa. 1991), and the other cases are distinguishable for the reasons discussed in Plaintiff's Opposition. Opp. at 22-24. Defendants offer nothing new at all aside from after-the-fact excuses for why Defendants represented their app and algorithm to be "products" in one court (*see* Opp. at 21) but "not products" in this Court. Defendants cannot recharacterize their product simply because it is convenient here. Defendants' app and algorithm are products, as other courts have found. *See* Opp. at 21-22 (collecting cases); *see also*

10

A221

*Omegle*, 2022 WL 2713721, at *4 (treating the defendant's online chat room as a product that was subject to the plaintiff's product liability design defect claims).

Defendants also continue to urge this Court to draw the very "[b]right lines and broad rules" that "elevate the lull of simplicity over the balancing of interests embodied by the principles underpinning [the jurisprudence of the relevant area of law]" that the Pennsylvania Supreme Court has admonished.  *Tincher v. Omega Flex, Inc.*, 103 A.3d 328, 425 (Pa. 2014).  Pennsylvania product liability law must adapt along with technological innovations, and a finding that software and computer programs are not "products" will have disastrous consequences in a world that is becoming increasingly software based.  Defendants have also not offered any proof that software and computer programs are "intangible" like the "ideas" and "expressions" at issue in the cases Defendants rely upon.  To the contrary, computer software and programs *are* tangible. *See, e.g. Application of Bernhart*, 417 F.2d 1395, 1400 (Cust. & Pat. App. 1969) (United States Court of Customs and Patent Appeals stating that "if a machine is programmed in a certain new and unobvious way, ***it is physically different from the machine without that program***.") (emphasis added).

Defendants would argue that if a Tesla vehicle's autopilot software was programmed such that it functioned to steer the vehicle into oncoming traffic, the operators of the Tesla or the vehicles struck by the Tesla cannot bring a product

liability claim under Pennsylvania law because it was the defective software that caused the accident, and software is not a "product." Adopting Defendants' position and drawing such a "[b]right line[] and broad rule[]" that computer programs and software are not "products" will inevitably lead to absurd results.

Moreover, even if this Court were to agree with Defendants, contrary to Pennsylvania law, that Defendants' app and algorithm are not "products," this still should not result in the dismissal of Plaintiff's case. Plaintiff also pled a common law negligence claim. *See* D.E. 1 at Count II. Had a TikTok employee, in an effort to carry out his official job responsibilities, spied on 10-year-old Nylah and then used that information to determine Nylah was likely to view and partake in dangerous challenges involving choking activity, and texted the Blackout Challenge video to Nyah and said, "try this," there is little doubt that TikTok could be found negligent. This is what Plaintiff pled, and Defendants accomplishing this through an app does not change the calculus. Plaintiff also pled a claim for negligent failure to warn. *Id.* at ¶ 127(pp), (qq). This was the precise claim that survived dismissal efforts in *Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016), and it should similarly survive here.

For all of the foregoing reasons, Defendants' Motion to Dismiss should be denied.

12

A223

Dated: August 18, 2022

<div style="margin-left:40%">

*/s/ Robert J. Mongeluzzi*
Robert J. Mongeluzzi
Jeffrey P. Goodman
Samuel B. Dordick
Rayna McCarthy
**SALTZ MONGELUZZI &**
**BENDESKY P.C.**
One Liberty Place
1650 Market Street, 52nd Floor
Philadelphia, Pennsylvania 19103
Tel: (215) 496-8282
rmongeluzzi@smbb.com
jgoodman@smbb.com
sdordick@smbb.com
rmccarthy@smbb.com

Mark A. DiCello
**DiCELLO LEVITT GUTZLER LLC**
7556 Mentor Avenue
Western Reserve
Law Building
Mentor, OH 44060
Tel: (440) 953-8888
madicello@dicellolevitt.com

***Counsel for Plaintiff***

</div>

13

A224

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 18, 2022, I electronically filed the foregoing

document with the Clerk of Court using CM/ECF. I also certify that the foregoing

document is being served this day on all counsel of record or pro se parties either via

transmission of Notices of Electronic Filing generated by CM/ECF or in some other

authorized manner for those counsel or parties who are not authorized to receive

electronically Notices of Electronic Filing.

*/s/ Jeffrey P. Goodman*

14

A225

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I certify that on this 9th day of January, the foregoing Appellant's Appendix Volume 2 was filed through CM/ECF system and served on all parties or their counsel of record through the CM/ECF system.

Dated: January 9, 2023

By: /s/ Samuel B. Dordick

Samuel B. Dordick