No. 22-3061

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

TAWAINNA ANDERSON, INDIVIDUALLY AND AS ADMINISTRA-
TRIX OF THE ESTATE OF N.A., A DECEASED MINOR,

*Plaintiff-Appellant,*

v.

TIKTOK INC.; BYTEDANCE INC.,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Eastern Dis-
trict of Pennsylvania No. 2:22-cv-1849 (Diamond, J.)

## BRIEF FOR DEFENDANTS-APPELLEES
## TIKTOK INC. AND BYTEDANCE INC.

Benjamin D. Bright
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500

Geoffrey M. Drake
TaCara D. Harris
KING & SPALDING LLP
1180 Peachtree Street NE,
    Suite 1600
Atlanta, GA 30309
(404) 572-4726

Albert Giang
KING & SPALDING LLP
633 West 5th Street, Suite 1600
Los Angeles, CA 90071
(213) 443-4335

David Mattern
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 626-2946

Andrew J. Pincus
Nicole A. Saharsky
Minh Nguyen-Dang
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3000
apincus@mayerbrown.com

Mark J. Winebrenner
FAEGRE DRINKER BIDDLE & REATH LLP
90 South Seventh Street
2200 Wells Fargo Center
Minneapolis, MN 55402
(612) 766-1600

Joseph O'Neil
Katherine A. Wang
CAMPBELL CONROY & O'NEIL
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
(610) 964-1900

*Counsel for Defendants-Appellees TikTok Inc. and ByteDance Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Rule 26.1, Defendant-Appellees state as follows:

ByteDance Inc. is a wholly owned subsidiary of ByteDance Ltd. ByteDance Ltd. is a privately held corporation, and no publicly held company owns 10% or more of ByteDance Ltd.'s stock.

TikTok Inc. is a wholly owned subsidiary of TikTok LLC.  TikTok LLC is a wholly owned subsidiary of TikTok Ltd., which in turn is wholly owned by ByteDance Ltd.

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................. 1

STATEMENT OF THE ISSUE ................................................ 4

STATEMENT OF RELATED CASES AND PROCEEDINGS ............... 5

STATEMENT OF THE CASE ................................................ 5

    A.   Factual Background ................................................ 5

    B.   Procedural History ................................................ 7

SUMMARY OF ARGUMENT ................................................ 10

STANDARD OF REVIEW .................................................... 14

ARGUMENT .................................................................... 14

SECTION 230 BARS ANDERSON'S CLAIMS ............................ 14

    A.   Section 230 Applies Regardless Of A Cause Of Action's Label, And There Is No Exception For Product-Liability Claims .......................................................... 16

    B.   Section 230 Bars Anderson's Claims Relating To The Alleged Publication Of Or Failure To Remove The Blackout Challenge Video ........................................ 20

    C.   Section 230 Applies To Algorithmic Recommendations ...... 23

        1.   Claims Based On Algorithmic Recommendations Treat The Service Provider As A Publisher .............. 24

        2.   Anderson's Claims Would Impermissibly Impose Liability Based On Third-Party Content .................. 46

CONCLUSION .................................................................. 53

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.M. v. Omegle.com, LLC,*
  614 F. Supp. 3d 814 (D. Or. 2022) ...................................................... 39

*In re Asbestos School Litig.,*
  46 F.3d 1284 (3d Cir. 1994) ......................................................... 51, 52

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................ 14

*Barnes v. Yahoo!, Inc.,*
  570 F.3d 1096 (9th Cir. 2009) ....................................... 11, 19, 21, 37

*Bennett v. Google, LLC,*
  882 F.3d 1163 (D.C. Cir. 2018) ....................................................... 47

*Bruni v. City of Pittsburgh,*
  824 F.3d 353 (3d Cir. 2016) ............................................................... 5

*Carafano v. Metrosplash.com, Inc.,*
  339 F.3d 1119 (9th Cir. 2003) ................................................... 15, 31

*Doe v. Internet Brands, Inc.,*
  824 F.3d 846 (9th Cir. 2016) ..................................................... 35, 36

*Doe v. MySpace, Inc.,*
  528 F.3d 413 (5th Cir. 2008) ........................................................... 40

*Doe v. Snap, Inc.,*
  No. H-22-00590, 2022 WL 2528615
  (S.D. Tex. July 7, 2022) ....................................................... 19, 34, 39

*Doe v. Twitter, Inc.,*
  555 F. Supp. 3d 889 (N.D. Cal. 2021) ...................................... 20, 39

*Dyroff v. Ultimate Software Grp., Inc.,*
  934 F.3d 1093 (9th Cir. 2019) ............................................... 9, 12, 31

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Fair Housing Council of San Fernando Valley v.
  Roommates.Com, LLC,*
  521 F.3d 1157 (9th Cir. 2008) .............................................. 23

*Foglia v. Renal Ventures Mgmt., LLC,*
  754 F.3d 153 (3d Cir. 2014) ................................................ 14

*Force v. Facebook, Inc.,*
  934 F.3d 53 (2d Cir. 2019) ......................................... *passim*

*Gaglia v. First Fed. Sav. & Loan Ass'n,*
  889 F.2d 1304 (3d Cir. 1989) .............................................. 18

*Garza v. Citigroup Inc.,*
  881 F.3d 277 (3d Cir. 2018) ................................................ 48

*Gonzalez v. Google LLC,*
  2 F.4th 871 (9th Cir. 2021) ........................................... 33, 37

*Gonzalez v. Google LLC,*
  143 S. Ct. 1191 (2023) ....................................................... 33

*Green v. Am. Online (AOL),*
  318 F.3d 465 (3d Cir. 2003) ....................................... *passim*

*Herrick v. Grindr LLC,*
  765 F. App'x 586 (2d Cir. 2019) ......................................... 20

*HomeAway.com, Inc. v. City of Santa Monica,*
  918 F.3d 676 (9th Cir. 2019) .............................................. 36

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
  515 U.S. 557 (1995)........................................... 12, 26, 49, 50

*Jackson v. Airbnb, Inc.,*
  No. CV 22-3084 DSF, 2022 WL 16753197
  (C.D. Cal. Nov. 4, 2022) ..................................................... 39

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Klayman v. Zuckerberg,*
   753 F.3d 1354 (D.C. Cir. 2014) ......................................................... 21

*L.W. v. Snap Inc.,*
   No. 22cv619-LAB-MDD, 2023 WL 3830365
   (S.D. Cal. June 5, 2023) ...................................................................... 39

*Lemmon v. Snap, Inc.,*
   995 F.3d 1085 (9th Cir. 2021) ........................................................... 38

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC,*
   141 S. Ct. 13 (2020) ........................................................................... 29

*Marshall's Locksmith Serv. Inc. v. Google, LLC,*
   925 F.3d 1263 (D.C. Cir. 2019) ................................................... 19, 31

*Mia. Herald Publ'g Co. v. Tornillo,*
   418 U.S. 241 (1974) ..................................................................... 26, 50

*NetChoice, L.L.C. v. Paxton,*
   49 F.4th 439 (5th Cir. 2022) .............................................................. 50

*NetChoice, LLC v. Att'y Gen., Fla.,*
   34 F.4th 1196 (11th Cir. 2022) ............................................... 14, 50, 52

*In re Niaspan Antitrust Litig.,*
   67 F.4th 118 (3d Cir. 2023) ......................................................... 13, 48

*Obado v. Magedson,*
   612 F. App'x 90 (3d Cir. 2015) ................................................. 3, 12, 30

*O'Kroley v. Fastcase, Inc.,*
   831 F.3d 352 (6th Cir. 2016) ............................................................. 31

*Panzarella v. Navient Sols., Inc.,*
   37 F.4th 867 (3d Cir. 2022) ......................................................... 17, 25

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Sw. Airlines Co. v. Saxon,*
142 S. Ct. 1783 (2022) ........................................................................ 17

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994) ..................................................................... 26, 50

*Twitter, Inc. v. Taamneh,*
143 S. Ct. 1206 (2023) .............................................................. *passim*

*Zeran v. Am. Online, Inc.,*
129 F.3d 327 (4th Cir. 1997) ...................................................... 15, 42

## Statutes

47 U.S.C. § 230 .......................................................................... *passim*

## Other Authorities

Dan B. Dobbs *et al.*, HORNBOOK ON TORTS § 37.4 (2d ed. 2016) ............. 29

MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2019) .............. 25

PROSSER AND KEETON ON THE LAW OF TORTS § 113 (5th ed. 1984) ......... 29

WEBSTER'S THIRD NEW INT'L DICTIONARY UNABRIDGED (3d ed. 2002) .... 25

## INTRODUCTION

This lawsuit arises from the tragic death of Plaintiff Tawainna Anderson's daughter, Nylah, who passed away after purportedly watching and attempting to recreate a user video depicting an alleged "blackout challenge," a type of choking game where participants choke themselves until they pass out.  Defendants TikTok Inc. and ByteDance Inc. take the safety of TikTok users seriously and extend their deepest condolences to Nylah's family.

Anderson seeks to hold Defendants—not the creators of the video— liable for her daughter's death.  Her core theory of liability is that Defendants' entertainment and communication service—TikTok—is defectively designed because it permitted circulation and viewing of this third-party video.

Anderson's claims are foreclosed by Section 230 of the Communications Decency Act (CDA), 47 U.S.C. § 230.  Section 230 immunizes internet-based services from claims that treat them as a "publisher or speaker" of "information" provided by a third party.  The district court correctly applied Section 230 to dismiss Anderson's claims because they are premised on TikTok Inc.'s actions as a "publisher" with respect to

third-party content posted on the TikTok service. Anderson proffers three arguments; none has any merit.

First, Anderson argues that common-law product-liability claims fall outside the scope of Section 230. But Section 230 by its terms applies to any claim that would hold the defendant liable for actions taken as a publisher or speaker with respect to third-party content. Further, Section 230 expressly excludes certain specified causes of action from immunity—but product-liability or similar tort claims are not on that list. Given those clear statutory directives, unanimous precedent applies Section 230 to a wide variety of causes of action, including product-liability claims.

Second, Anderson argued below that Section 230 does not apply to Defendants' actions allegedly allowing the posting of, or failing to remove, harmful third-party content. She does not appear to press that claim on appeal, and for good reason: This Court has long held that Section 230 bars claims seeking to hold a defendant liable for "promulgating harmful content and [for] failing to address certain harmful content on its network." *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003). That reasoning squarely precludes Anderson's claims, which allege that the

TikTok platform is defectively designed both because it allowed the posting of and failed to delete a user video depicting a "blackout challenge" that Nylah allegedly watched.

Third, Anderson argues that an internet-based service such as TikTok does not act as a "publisher or speaker" when it uses algorithms to recommend particular content to users.  But the core meaning of "publish[ing]" includes decisions about how to organize, recommend, and display content, and it is irrelevant whether those decisions are made manually or through use of an algorithm.  Every court of appeals to have considered the question—including this Court in an unpublished opinion—has concluded that Section 230 immunizes internet websites from liability for making algorithmic recommendations to users.  *See Obado v. Magedson*, 612 F. App'x 90, 93 (3d Cir. 2015).

Relatedly, Anderson argues that her claims seek to hold Defendants liable not for third parties' posting of the challenge video, but for the algorithmic recommendation's implicit message that this video is "cool."  Anderson forfeited that argument because she failed to assert it in the district court.  The argument is also wrong:  Every publisher implicitly conveys that the content it publishes is worth reading or viewing when it

engages in the act of publishing third-party content, yet Section 230 immunizes publishing third-party content. Anderson's argument would render Section 230 a nullity by allowing plaintiffs to circumvent its protections by invoking a claimed implicit message—a "message" that would apply to all publishers of third-party content—rather than focusing on the third-party content. In addition, if the supposed implicit message were considered TikTok Inc.'s own content, Anderson's claims would be barred because they would infringe on its First Amendment right to exercise editorial judgment.

In sum, Anderson's claims rest directly on TikTok Inc.'s methods for selecting, presenting, recommending, aggregating, and monitoring third-party content on the TikTok platform—quintessential publishing functions that are squarely protected under Section 230. Her claims are therefore barred as a matter of law. This Court should affirm the district court's decision granting Defendants' motion to dismiss.

## STATEMENT OF THE ISSUE

Whether the district court correctly held that Section 230 of the Communications Decency Act, 47 U.S.C. § 230, bars Anderson's claims,

which seek to hold Defendants-Appellees liable for content posted by third parties. *See* A1-A9.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this Court previously, nor has any other related case or proceeding.

## STATEMENT OF THE CASE

These facts are drawn from Anderson's complaint, which is taken as true at the pleadings stage. *See Bruni v. City of Pittsburgh*, 824 F.3d 353, 360 (3d Cir. 2016).

### A.    Factual Background

TikTok is an internet-based platform on which users can create, share, and view short-form video clips. A27 (Compl. ¶ 50).[1] In 2021, Tik-Tok had 1 billion active global users. *Id.* (Compl. ¶ 47).

TikTok's third-party users upload a vast number of videos onto the platform; to make that data usable, TikTok employs "a recommendation

---

[1]   The TikTok platform is made available in the United States by Defendant TikTok Inc., and the complaint pleads no facts specific to Defendant ByteDance Inc. Accordingly, although both TikTok Inc. and ByteDance Inc. are protected by Section 230, TikTok Inc. is the only defendant that took any action allegedly relevant to this litigation. In the discussion below, we use "TikTok" to refer to the platform and "TTI" to refer to TikTok Inc.

system that delivers content to each user that is likely to be of interest to that particular user. [E]ach person's feed is unique and tailored to that specific individual." A19 (Compl. ¶ 3). This "proprietary algorithm" is alleged to "select[] which videos are shown to each user based on the user's demographics, including age [and] user interactions such as the videos viewed and shared." A28 (Compl. ¶¶ 51, 53) (emphasis omitted). TikTok users may view this "stream of curated videos" on the "For You" page in their TikTok app. A28 (Compl. ¶ 51).

According to the complaint, "challenge" videos have become a popular category of user-generated content on TikTok. A29 (Compl. ¶ 60). The complaint alleges that these videos "involve users filming themselves engaging in behavior that mimics and often times 'one-ups' other users posting videos performing the same or similar conduct." *Id.* (Compl. ¶ 61). At issue in this appeal is a so-called "blackout challenge" video, which allegedly "encourages users to choke themselves with belts, purse strings, or anything similar until passing out." A31 (Compl. ¶ 64). The complaint does not allege that Defendants created or otherwise contributed to these user-generated challenge videos. A8 ("Defendants did not

create the Challenge; rather, they made it readily available on their site.").[2]

Anderson asserts that her daughter Nylah viewed a blackout challenge video created by a third party on the TikTok platform. A33-34 (Compl. ¶ 82). Nylah died after allegedly attempting to perform the challenge. A31 (Compl. ¶ 65).

## B.    Procedural History

Anderson brought this personal-injury case on behalf of herself and as the administrator of her daughter's estate. A18. She asserts claims for strict product liability, negligence, and wrongful death, as well as survival claims. A36-62 (Compl. ¶¶ 101-86). The gravamen of each claim is that the TikTok platform is defectively designed because its algorithm recommended the blackout challenge video to her daughter and that Defendants failed to warn her daughter that the video was dangerous. *See id*.[3] She further contends that Defendants are liable for failing to remove

---

[2]  *Cf.* A83 (citing CDC and academic studies noting that "Unintentional strangulation deaths of youth from participation in 'choking games' date back to at least 1995, including online versions of blackout challenges on websites such as YouTube dating back to 2007 or earlier").

[3]  Anderson also brought claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law and the California Consumer Legal Remedies Act. A50-56 (Compl. ¶¶ 135-55). Anderson abandoned

third-party content, particularly videos depicting dangerous activity like choking or blacking out. For example, she alleges that Defendants "took no and/or completely inadequate action to extinguish and prevent the spread of the Blackout Challenge"; "failed to change, update, and/or correct their algorithm to prevent it from presenting users, specifically children, with the dangerous and deadly Blackout Challenge"; and "fail[ed] to timely remove all dangerous and deadly videos." A32-33 (Compl. ¶¶ 75-76, 127).

The district court dismissed Anderson's claims, holding them barred by Section 230 of the CDA. A3-A8. The court explained that Section 230 provides a defense to liability when three conditions are met: (1) "the defendant is an interactive computer service provider"; (2) "the plaintiff seeks to treat the defendant as a publisher or speaker of information"; and (3) "the information is provided by another content provider." A4 (citing 47 U.S.C. § 230(c)(1)). Anderson did not dispute that the first and third conditions are met—*i.e.*, that TikTok is an interactive computer service and that the challenge video was created by a third

---

those claims below, and the district court accordingly dismissed them. A2-A3.

party.  *Id.*  Thus, the only question before the district court was whether Anderson sought to hold Defendants liable as a "publisher" of the video. *Id.*

The district court answered that question "yes."  A1.  The court explained:  "Anderson bases her allegations entirely on Defendants' presentation of 'dangerous and deadly videos' created by third parties and uploaded by TikTok users."  A5.  In other words, the court explained, the claims are premised "on the 'defective' manner in which Defendants *published* a third party's dangerous content."  A5.

The district court also rejected Anderson's argument that Section 230 does not apply because TikTok uses an algorithm to recommend content:  "Courts have repeatedly held that such algorithms are 'not content in and of themselves,'" and that "the use of 'tools such as algorithms that match information with a consumer's interests' is well within the range of publisher functions covered by Section 230."  A5 (quoting *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019) and *Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019) (alterations omitted)). That is "exactly the activity Section 230 shields from liability."  A8.  The court held that because Anderson's claims "are inextricably linked to the

9

manner in which Defendants choose to publish third-party user content,

Section 230 immunity applies." A7 (internal quotation marks omitted).

Anderson appeals those determinations. *See* Dkt. 1.

## SUMMARY OF ARGUMENT

The district court correctly held that Section 230 forecloses Anderson's claims as a matter of law. Section 230 bars any cause of action (1) against a provider of an "interactive computer service"; (2) that seeks to treat that service provider as the "publisher or speaker" of any "information"; (3) where that information was provided by a third party. 47 U.S.C. § 230(c)(1). Anderson makes three arguments about why Section 230 does not apply to her claims. Each is incorrect.

First, she contends that product-liability claims fall outside of Section 230's protections. But Section 230's application turns on whether the plaintiff's claims seek to hold the defendant liable as a "publisher or speaker," regardless of the specific cause of action asserted. And far from excluding state-law claims, Section 230 expressly preempts state law by providing that "no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). Section 230 also expressly exempts several causes of action from immunity; product-

liability and negligence claims are *not* among those exemptions. *See id.* § 230(e)(1)-(2) & (4)-(5). It therefore is not surprising that the courts of appeals have unanimously held that Section 230's protections do not depend on a cause of action's "name," but rather apply whenever any claim treats the defendant as a publisher or speaker. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101-02 (9th Cir. 2009) (collecting cases).

Second, Anderson asserted, but now appears to have abandoned, an argument based on Defendants' failure to remove third-party content. Section 230 immunizes defendants from claims seeking to hold them liable for "monitoring, screening, and deletion of [third-party] content," which are "actions quintessentially related to a publisher's role." *Green*, 318 F.3d at 471. In the complaint, Anderson attempts to hold Defendants liable for purportedly failing to remove a blackout challenge video. *See, e.g.*, A45 (Compl. ¶¶ 127(i) & (l)). That failure-to-remove theory is plainly barred by Section 230.

Third, Anderson argues that Section 230 does not apply to the use of automated algorithms to recommend third-party content to users. Opening Br. 15-16, 29-32. But the plain meaning of "publishing" includes selecting and organizing information for display in order to make that

information useful for an audience. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995) (publishing encompasses "the presentation of an edited compilation of speech generated by other persons."). The statute does not distinguish between publishing functions that are performed manually and those that use an algorithm, and there is no principled basis for doing so. To the contrary, the text of Section 230 specifically reflects Congress's aim to protect tools that "filter," "pick," "choose," "digest," and "organize" content. 47 U.S.C. § 230(f)(4)(A)-(C). Every court of appeals to have considered the issue (including this Court) has held that Section 230 applies to algorithmic recommendations. *See, e.g.*, *Force*, 934 F.3d at 67; *Dyroff*, 934 F.3d at 1098; *Obado*, 612 F. App'x at 93.

Anderson relies on selective quotes from Section 230's policy findings, asserting that Congress intended only to maximize user control and incentivize the development of blocking and filtering technologies that protect children. *See* 47 U.S.C. § 230(b)(3)-(4). But in addition to distorting these goals, she ignores the statute's other policy goals, which include promoting the development of the internet and preserving a competitive free market. *Id.* § 230(b)(1)-(2). Algorithms are indispensable

tools for organizing the vast quantities of data available on the internet and publishing that data in a user-friendly format; without them, the modern internet could not function.  Section 230 should not be construed to be self-defeating.

Anderson also contends that algorithmic recommendations convey an implicit message to the user that "this video is cool."  She argues that she seeks to hold Defendants liable for that message rather than for publishing the blackout challenge video uploaded by third parties.  Opening Br. 26-29.  Anderson did not make this argument in the district court and therefore has forfeited it.  *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 136 (3d Cir. 2023).

She also is wrong.  Section 230 would be a dead letter if plaintiffs could evade it merely by relying on an implicit message that is inherent to organizing and displaying all third-party content.  Further, if this supposed message could be considered TTI's own content that is unprotected by Section 230, Anderson's claims would fail for the separate reason that they would infringe on TTI's First Amendment rights.  Specifically, TTI has a First Amendment right to determine "whether, to what extent, and in what manner to disseminate third-party-created content to the

public." *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1212 (11th Cir. 2022).

## STANDARD OF REVIEW

The Court reviews *de novo* the dismissal of a complaint for failure to state a claim. *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## ARGUMENT

## SECTION 230 BARS ANDERSON'S CLAIMS

Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Section 230 also expressly preempts liability under "any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). Together, these sections "provide[] immunity to [an interactive computer

service provider] as a publisher or speaker of information originating from another information content provider." *Green*, 318 F.3d at 471.

Accordingly, this Court has held that Section 230 "bars 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content.'" *Green*, 318 F.3d at 471 (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)). Section 230 also precludes liability for an interactive computer service's "decisions relating to the monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role." *Id.*

Section 230 serves important policy goals. In particular, it "promote[s] the free exchange of information and ideas over the Internet and [it] encourage[s] voluntary monitoring for offensive or obscene material." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003). Section 230 achieves these goals both by eliminating "the threat that tort-based lawsuits pose to freedom of speech" and by "forbid[ding] the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions." *Zeran*, 129 F.3d at 330-31.

15

To determine whether Section 230 bars a cause of action, a court asks whether (1) the defendant is a "provider . . . of an interactive computer service"; (2) the plaintiff seeks to hold the defendant liable as the "publisher or speaker" of content; and (3) the allegedly harmful content was "provided by another information content provider," not by the defendant. 47 U.S.C. § 230(c)(1). Anderson did not contest the first element in the district court, and does not do so on appeal. Her arguments contesting the second and third elements lack merit.

## A. Section 230 Applies Regardless Of A Cause Of Action's Label, And There Is No Exception For Product-Liability Claims

Anderson argues (Br. 16) that her product-liability and failure-to-warn claims fall outside of Section 230's protections. But when Congress drafted Section 230, it focused on the conduct for which the provision bars liability and did not limit that protection to particular causes of action. Congress instead expressly identified the specific legal actions to which the defense does not apply. Because those exclusions do not include product-liability and similar common-law claims, there is no basis for categorically precluding assertion of the Section 230 defense with respect to

those causes of action. In fact, this Court has already applied Section 230 to bar negligence claims. *Green*, 318 F.3d at 470.

This Court interprets statutory language based on its ordinary meaning. *Panzarella v. Navient Sols., Inc.*, 37 F.4th 867, 872 (3d Cir. 2022). Words in a statute also "must be read and interpreted in their context, not in isolation." *Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1788 (2022) (internal quotation marks omitted). Here, the plain meaning of Section 230(c) and its surrounding context confirm that the statute applies to product-liability claims.

To begin with, Section 230 is framed broadly, focusing on whether the plaintiff seeks to hold the defendant liable for its role as a "publisher or speaker" of third-party content. 47 U.S.C. § 230(c)(1). The statute's protection is not tied to any particular cause of action. The statute also has broad preemptive effect: Section 230(e)(3) states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). Even a "State['s]" enforcement authority is limited to actions that are "[]consistent with this section." *Id.* Congress thus made clear that Section

230(c) applies to state-law claims, without any carveout for product-liability or other common-law causes of action.

That conclusion is confirmed by the absence of product liability claims from Section 230's express list of excluded causes of action. In particular, the statute excludes:

- specified federal statutory provisions relating to obscenity and sexual exploitation of children, and "any . . . Federal criminal statute";

- "any law pertaining to intellectual property";

- "the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law"; and

- specified federal and state laws relating to sex trafficking.

47 U.S.C. § 230(e)(1)-(2) & (4)-(5). Product-liability and negligence claims are not on this list.

These exclusions confirm that Congress intended Section 230 to apply to all claims other than those expressly excluded. And Congress's failure to include common-law torts on its list of excluded actions makes clear that it intended Section 230(c) to apply to such claims. *See Gaglia v. First Fed. Sav. & Loan Ass'n*, 889 F.2d 1304, 1311 (3d Cir. 1989) (declining to read additional exemptions into a statute because the language

"demonstrate[d] that Congress knew how to exempt certain creditors from the operation of [the statute], and could do so with precision").

Accordingly, "what matters" for purposes of Section 230 immunity "is not the name of the cause of action," *Barnes*, 570 F.3d at 1101-02, but rather whether the plaintiff seeks to hold the defendant liable for "promulgating harmful content and [for] failing to address certain harmful content on its network," *Green*, 318 F.3d at 471. "As courts uniformly recognize, § 230 immunizes internet services for third-party content that they publish, . . . against causes of action of all kinds." *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1267 (D.C. Cir. 2019); *see Force*, 934 F.3d at 64 n.18 (noting that courts have applied Section 230 to housing-discrimination, negligence, securities-fraud, and cyberstalking claims).

Other courts of appeals also have applied Section 230 immunity to product-liability claims that seek to hold the defendant liable for harms resulting from third-party content. *See, e.g.*, *Doe v. Snap, Inc.*, No. H-22-00590, 2022 WL 2528615, at *14 (S.D. Tex. July 7, 2022) (negligent design claims—including "alleged lack of safety features"—barred by Section 230), *aff'd*, No. 22-20543, 2023 WL 4174061 (5th Cir. June 26, 2023);

*Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 930 (N.D. Cal. 2021), *aff'd in part, rev'd in part on other grounds sub nom.*, *Doe #1 v. Twitter, Inc.*, Nos. 22-15103, 22-15104, 2023 WL 3220912 (9th Cir. May 3, 2023) (barring claims under Section 230 where "the nature of the alleged design flaw in this case—and the harm that is alleged to flow from that flaw—is directly related to the posting of third-party content"); *Herrick v. Grindr LLC*, 765 F. App'x 586, 590 (2d Cir. 2019) (barring claims under Section 230 where "manufacturing and design defect claims seek to hold [defendant] liable for its failure to combat or remove offensive third-party content").  And this Court has specifically applied Section 230 to bar tort-law claims. *Green*, 318 F.3d at 470.

In sum, there is no support for Anderson's argument that product-liability claims are per se excluded from Section 230 immunity.  Regardless of the cause of action, Section 230 applies if the claim treats the defendant as a publisher or speaker of third-party content.

### B.    Section 230 Bars Anderson's Claims Relating To The Alleged Publication Of Or Failure To Remove The Blackout Challenge Video

The district court correctly held that Anderson's claims treat Defendants as the "publisher" of third-party content.  On appeal, Anderson

appears to have abandoned her claim that online platforms are not protected when they merely post or fail to remove third-party content—and for good reason.  This Court has long held that the decision to post or remove third-party content is in the heartland of conduct protected by Section 230 immunity.

The Court has explained that Section 230 "precludes courts from entertaining claims that would place a computer service provider in a publisher's role, and therefore bars lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions." *Green*, 318 F.3d at 471 (cleaned up).  In applying this element, courts "ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.' If it does, section 230(c)(1) precludes liability." *Barnes*, 570 F.3d at 1102.

As this Court has held, traditional publication functions include deciding whether to "publish, withdraw, postpone, or alter content." *Green*, 318 F.3d at 471; *see Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014) ("[T]he very essence of publishing is making the decision whether to print or retract a given piece of content.").

21

Here, the allegations in the complaint make clear that Anderson

seeks to hold Defendants liable for the display of certain user-generated

content on the TikTok platform. *E.g.*, A28 (Compl. ¶ 56) ("show users

videos and content"). And as the district court recognized, Anderson also

seeks to hold Defendants liable on the theory that they failed to remove

"'dangerous and deadly videos' created by third parties and uploaded by

TikTok users." A5. For example, Anderson alleges that Defendants are

liable for:

- "[f]ailing to timely remove all dangerous and deadly videos and challenges from its app, including but not limited to the Blackout Challenge," A45 (Compl. ¶ 127(i), (l));

- "[f]ailing to prevent dangerous and deadly videos and challenges, including but not limited to the Blackout Challenge, from being posted, shared, and/or circulated to users on the TikTok app," A45 (Compl. ¶ 127(d));

- "[f]ailing to prevent videos of the Blackout Challenge from being posted, shared, circulated, and/or recommended to users, including Nylah Anderson, through their FYP," A46 (Compl. ¶ 127(r));

- failing to "extinguish and prevent the spread" of videos, A32 (Compl. ¶ 75); and

- breaching its "duty to monitor the videos and challenges shared, posted, and/or circulated on their app," A43 (Compl. ¶ 119).

These claims, at bottom, seek to hold Defendants liable in connec-

tion with decisions regarding the "monitoring, screening, and deletion of

[third-party] content"—"actions quintessentially related to a publisher's role" that are immune under Section 230. *Green*, 318 F.3d at 471; *see, e.g.*, *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230."). Put another way, her claims seek to hold Defendants liable for "promulgating" and "failing to address" harmful third-party content. *Green*, 318 F.3d at 471. By its plain terms, Section 230 bars those claims.

## C.    Section 230 Applies To Algorithmic Recommendations

Trying to escape this straightforward result, Anderson argues that Defendants were not acting as a publisher under Section 230 because they use algorithms to determine which third-party content is recommended to a particular user. Opening Br. 15-16, 29-32. As alleged in the complaint, the TikTok algorithm is "a recommendation system that delivers content to each user that is likely to be of interest to that particular user. . . . [E]ach person's feed is unique and tailored to that specific individual." A19 (Compl. ¶ 3).

Anderson appears to advance two contentions—first, that imposing liability based upon such recommendations does not treat the service provider as a "publisher"; and, second, that it does not impose liability based on third-party content. Those arguments are inconsistent with the statutory text and have been rejected by every court of appeals that has considered them.

### 1. Claims Based On Algorithmic Recommendations Treat The Service Provider As A Publisher

The statutory text, precedent, and congressional declaration of policy set forth in Section 230 all demonstrate that a service provider acts as a publisher when it organizes third-party content, including when it uses an algorithm to do so. Moreover, because virtually all websites and search engines use algorithms to organize third-party content, a decision excluding that activity from Section 230 protection would render Section 230 self-defeating. It would impose liability for actions that are necessary for any website that hosts third-party content.

**a.   Text.** Section 230(c)(1) protects websites from claims that "treat[]" them as the "publisher or speaker" of third-party content. This Court interprets statutory language based on its ordinary meaning.

*Panzarella*, 37 F.4th at 872.  Here, the plain meaning of the terms "publisher" and "speaker" include recommending third-party content.

A "publisher" is "one that publishes."  MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2019).  To "publish" is "to place before the public."  WEBSTER'S THIRD NEW INT'L DICTIONARY UNABRIDGED (3d ed. 2002).  Publishing thus includes more than randomly transmitting information; rather, publishers necessarily select and organize content as part of how they "place" information before their readers.  *Id.*; *see, e.g.*, *Green*, 318 F.3d at 471 ("deciding whether to publish, withdraw, postpone, or alter content" is "a publisher's traditional editorial function[]").

Similarly, a "speaker" is "one who speaks."  MERRIAM WEBSTER'S COLLEGIATE.  "Speak" means to give "expression to thoughts, opinions, or feelings."  WEBSTER'S THIRD 2185.  One whose role is to "express[]" the views of numerous third parties necessarily must decide the order in which she will state them and which views will be "express[ed]" to particular audiences.

Consistent with these definitions, the Supreme Court has explained that publishers such as broadcasters "select programming originally produced by others" and "present[] an edited compilation of speech."

*Hurley*, 515 U.S. at 570.  The same is true of cable television operators, who exercise "editorial discretion over which stations or programs to include." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994).  And newspapers exercise "editorial judgment" on "content," "layout," "stories," "columnists," and "contributors." *Mia. Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 255 (1974).  Indeed, "the presentation of an edited compilation of speech generated by other persons is a staple of most newspapers' opinion pages." *Hurley*, 512 U.S. at 570.  In sum, publishers publish by selecting and organizing information in order to make that information useful for an audience.

Algorithms are the means by which a website organizes the third-party content it contains for presentation to users.  *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1227 (2023) ("'[R]ecommendation' algorithms are merely part of th[e] infrastructure" through which "[a]ll the content on [websites] is filtered.").  Imposing liability for those recommendations therefore would base liability on the website's publishing activity—precisely what Section 230 prohibits.

Other portions of Section 230 confirm that conclusion.  Section 230's definition of "interactive computer service" includes an "access software

26

provider," 47 U.S.C. § 230(f)(2), which the statute defines as a provider of "software" or "enabling tools" that "filter, screen, allow, or disallow content," "pick, choose, analyze, or digest content," or "transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content," *id.* § 230(f)(4)(A), (B), (C).

By specifically protecting under Section 230 entities providing "enabling tools" that "choose," "organize," and "reorganize" content, Congress made clear that those activities qualify as "publish[ing]" conduct protected against liability.  The express inclusion of those activities otherwise would make no sense.

Here, Anderson's claims treat Defendants as "the publisher or speaker" by seeking to hold them liable for organizing and displaying a third-party video depicting a blackout challenge.  As the district court observed, Anderson claims that "Defendants' algorithm was a way to bring the Challenge to the attention of those likely to be most interested in it."  A8.  That alleged compilation of videos is no different from the layout of a newspaper or the primetime lineup of a cable news operator.

Publishers organize content to make it useful for an audience and to drive audience engagement.  Traditional media do so via editors and

producers; communications services such as TikTok accomplish the same goals via algorithms. Both are engaged in traditional publishing functions of selecting, organizing, and recommending content. There is no principled basis in the statutory text for distinguishing publishing functions performed manually from those performed using an algorithm.

Anderson nonetheless asserts (Br. 22-24) that personalized targeted recommendations are somehow different from what she calls traditional publisher functions. In support of this argument, she contends (*id.* at 22-23) that when the editors of the *New York Times* publish articles, they do not recommend specific articles. That is incorrect: The *New York Times* has always arranged stories, opinion pieces, and letters to the editor to focus the reader's attention on some more than others.

Further, a publisher of multiple magazines like Condé Nast, for example, chooses which articles to run in which magazines based on the expected audience for each magazine. The same is true of television stations, which make editorial choices about which programs to run at what time. Personalized recommendations are merely an evolution of this principle—instead of a dozen print magazine titles for a dozen different

audiences or a lineup of television programs, TTI publishes a compilation of videos for each user.  That qualifies as "publishing" under Section 230.

Anderson also cites (Br. 24-25) Justice Thomas' dissent respecting the denial of certiorari in *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13 (2020), in which Justice Thomas suggested that "publisher" or "speaker" immunity does not extend to "distributors." *Id.* at 15.  According to that theory, which has not been adopted by any court, Section 230 does not apply to claims alleging that a website distributed third-party content that it knew or had reason to know was unlawful. *See id.* at 14.

But there is nothing in the statutory text of Section 230 that distinguishes publisher from distributor liability.  Moreover, by the time Section 230 was enacted, any distinction between publishers and subsequent distributors had eroded and leading authorities referred to both as "publishers."  PROSSER AND KEETON ON THE LAW OF TORTS § 113, at 799-800, 803-04 (5th ed. 1984); Dan B. Dobbs *et al.*, HORNBOOK ON TORTS § 37.4, at 940 (2d ed. 2016).

Finally, the distinction between publisher and distributor liability traditionally recognized at common law makes no sense in the context of

the internet, where initial publication and general distribution happen simultaneously.  When a user posts a video on TikTok, TTI both publishes the video by releasing it and distributes the video by making it available to users.  If Section 230 did not immunize the distribution of third-party content, the statute's protections would be meaningless.

**b.    Precedent.**  Every court of appeals to consider the question has held that Section 230 immunity applies when a platform uses algorithms to recommend third-party content, including this Court in an unpublished opinion.  *See Obado*, 612 F. App'x at 93 ("[A]n allegation that the defendants manipulated search engines to maximize search results relating to the alleged defamatory content does not affect their immunity from suit.").

For example, in *Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019), the plaintiffs alleged that Facebook unlawfully provided the terrorist organization Hamas with a communications platform that enabled the terrorist attacks that injured them.  *Id.* at 57.  The Second Circuit concluded that the ordinary meaning of "publisher" defeated the plaintiffs' argument that "Facebook's use of algorithms renders it a non-publisher." *Id.* at 66 (collecting cases).  The court held that it makes no difference *how* a

publisher selects the third-party content to provide to users—whether curating manually or automating curation through an algorithm—because "so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific edit[orial] or selection process." *Id.* at 67 (quoting *Carafano*, 339 F.3d at 1124); *see Marshall's Locksmith Serv. Inc.*, 925 F.3d at 1271 (holding that "automated editorial act[s]" are protected by Section 230) (quoting *O'Kroley v. Fastcase, Inc.*, 831 F.3d 352, 355 (6th Cir. 2016)).

The Ninth Circuit reached the same conclusion in *Dyroff v. Ultimate Software Group, Inc.*, 934 F.3d 1093 (9th Cir. 2019). There, a website user posted an inquiry on an online messaging board to purchase heroin, and a drug dealer responded. *Id.* at 1095. The user later died because the heroin he purchased had been laced with fentanyl. *Id.* The user's mother sued the website operator, and she argued that the website was not protected under Section 230 as a publisher because it "used features and functions, including algorithms, to analyze user posts . . . and recommend other user groups." *Id.* at 1098.

The Ninth Circuit rejected that argument.  It concluded that Section 230 immunity applied to claims attacking a service's "algorithms" used to "analyze user posts" and "recommend[]" third-party content to users.  *Dyroff*, 934 F.3d at 1098.  "These functions—recommendations and notifications—[were] tools meant to facilitate the communication and content of others," and "not content in and of themselves."  *Id*.  They therefore fell within the scope of "publish[ing]" for purposes of Section 230.  *Id.*

That reasoning applies directly to TikTok's algorithm.  Anderson alleges that the algorithm "recommended the Blackout Challenge" video based on factors such as "user[] demographics" and "user interactions such as the videos viewed and shared."  A28, A31 (Compl. ¶¶ 53, 67). Thus, a user's voluntary actions on the platform inform TikTok about that user's preferences, and TikTok's algorithm selects content to display based on that input.  Accordingly, TikTok's use of an algorithm to recommend third-party content does not deprive it of Section 230 immunity. *Accord Taamneh*, 143 S. Ct. at 1226-27 ("Viewed properly, defendants' 'recommendation' algorithms are merely part of that infrastructure.  All the content on their platforms is filtered through these algorithms, which

allegedly sort the content by information and inputs provided by users and found in the content itself.").

Anderson cites (Br. 15-16) Judge Berzon's concurrence in *Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021), *vacated on other grounds*, 143 S. Ct. 1191 (2023), in which she argued that targeted recommendations "are well outside the scope of traditional publication." *Id.* at 914. But as explained above, *see* pp. 27-29, *supra*, recommending content is in reality a core function of publishing. And as the Second Circuit has explained, website operators have long targeted third-party content to specific users "based on, among other things, users' geolocation, language of choice, and registration information." *Force*, 934 F.3d at 66-67. "[I]t would turn Section 230(c)(1) upside down to hold that Congress intended that when publishers of third-party content become especially adept at performing the functions of publishers, they are no longer immunized from civil liability." *Id.* at 67.[4]

---

[4]  Anderson also points (Br. 32-34) to the Supreme Court's grant of review in *Gonzalez*. But the Court's decision did not address the scope of Section 230, instead resolving the case on other grounds. *Gonzalez v. Google LLC*, 143 S. Ct. 1191, 1192 (2023) (per curiam).

Anderson also cites (Br. 27-28) Judge Katzmann's dissent in *Force*, which argued that Facebook's recommendations "contribute to the creation of real-world social networks," which "goes far beyond and differs in kind from traditional editorial functions." 934 F.3d at 82 (Katzmann, J., dissenting). But this is far afield from Anderson's allegations, which only target the "consum[ption] [of] a third party's content." *Id.* She does not allege that TikTok facilitated arranging connections or matches with other users.

In any event, the majority opinion squarely rejected Judge Katzmann's argument. The court reasoned that "arranging and distributing third-party information inherently forms 'connections' and 'matches' among speakers, content, and viewers of content . . . That is an essential result of publishing." *Force*, 934 F.4th at 66 (majority opinion); *accord Snap, Inc.*, 2022 WL 2528615, at *14 (holding that claims seeking to hold Snap liable for "content and messages sent between parties on its platform" are barred by Section 230). Anderson's contrary argument would "eviscerate" Section 230. *Force*, 934 F.4th at 66.

In sum, the courts of appeals are unanimous in holding that Section 230 applies when a website uses algorithms to recommend third-party

content to users.  Because Anderson's claims seek to hold Defendants liable for performing quintessential publisher functions, they are barred by Section 230.

Anderson contends that several Ninth Circuit cases support her contention that Section 230 does not apply to her claims.  Opening Br. 16-20.  But as the district court held, in none of these cases did the plaintiff seek to hold the internet platform liable for determining what content was displayed to users.  A6-A7.  And as just discussed, the Ninth Circuit expressly held in *Dyroff* that Section 230 *does* encompass algorithmic recommendations—which means that the Ninth Circuit itself necessarily found algorithmic recommendations distinguishable from the conduct at issue in the cases invoked by Anderson.

First, Anderson cites *Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016), in which the plaintiff alleged that a talent-scout website was defective because it had failed to warn her that she had matched with two known criminals.  *Id.* at 848-49.  Critically, the plaintiff did not allege that the two criminals had "posted anything to the website," or that she had been "lured by any posting that [the defendant] failed to remove."  *Id.* at 851.  In that context, the court held that Section 230 immunity did not

apply because the duty to warn "[did] not arise from an alleged failure to adequately regulate access to user content" and would not "affect how [the defendant] publishes or monitors such content." *Id.* at 851, 853; *see HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019) (noting that although the defendant in *Internet Brands* "did, in its business, act as a publisher of third-party content, the underlying legal duty at issue did not seek to hold the defendant liable as a 'publisher or speaker' of third-party content"). *Internet Brands* is therefore entirely unlike this case, because Anderson's claims rest on third-party content, and imposing liability here would directly affect how TTI regulates and publishes third-party content.

Anderson also argues (Br. 24) that the district court applied a "but-for" test rejected by *Internet Brands*, which explained that "[p]ublishing activity is a but-for cause of just about everything [an internet publishing business] is involved in." 824 F.3d at 853.

But Anderson recognizes that, rather than relying solely on a but-for relationship, courts must look "to what the duty at issue actually requires" to determine whether the claim relates to the defendant's actions as a publisher. Opening Br. 24 (quoting *HomeAway.com, Inc.*, 918 F.3d

at 682). That is precisely the analysis that the district court performed. The court first asked "whether the duty that Anderson alleges that Defendants violated derives from Defendants' status or conduct as a 'publisher or speaker.'" A5 (quoting *Barnes*, 570 F.3d at 1101 (alterations omitted)). The court then correctly concluded that it did, because Anderson's claims are premised entirely "on the 'defective' manner in which Defendants *published* a third party's dangerous content." A5. Accordingly, there is no support for Anderson's argument that the district court applied a but-for test; rather, the court correctly held that "the duty Anderson invokes directly implicates the manner in which Defendants have chosen to publish third-party content." A6.

Moreover, that conclusion is confirmed by the Ninth Circuit's own decision in *Dyroff* holding that determining which of the myriad pieces of third-party content will be presented to a user falls squarely within the "publishing" activities protected by Section 230. *See Gonzalez*, 2 F.4th at 894-95 (applying *Dyroff* to uphold dismissal of claim based on algorithmic recommendations). Those cases would have come out differently if, as Anderson claims, applying Section 230 to algorithmic recommendations were precluded by *Internet Brands*.

Second, Anderson cites *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021), for its holding that the plaintiffs' negligent-design claim was premised on a "duty to exercise due care in supplying products that do not present an unreasonable risk of injury or harm to the public," which "differs markedly from the duties of publishers as defined in the CDA." *Id.* at 1092. But that case concerned a claim that the "Speed Filter" provided by Snap caused a fatal car accident by "superimpos[ing]" driving speed onto the user's photo or video, which users believed would reward them for driving faster than 100 miles per hour. *Id.* at 1088-89. Accordingly, Snap's alleged duty was "fully independent of [its] role in monitoring or publishing third-party content," and the plaintiffs' claim "st[ood] independently of the content that Snapchat's users create with the Speed Filter" because it rested on content provided by Snap itself. *Id.* at 1093. The court expressly distinguished the *Lemmon* plaintiffs' negligent-design claim from cases—like this one—that "depend[] on a third party's content, without which no liability could have existed." *Id.* at 1094.

Courts have repeatedly recognized that *Lemmon* in no way precludes applying Section 230 to bar product-liability claims—including

claims based on algorithmic "features"—where (as here) the "alleged design flaw" is "directly related to the posting of third-party content." *Twitter, Inc.*, 555 F. Supp. 3d at 929-30; *see, e.g.*, *Snap, Inc.*, 2022 WL 2528615, at \*14 (same); *L.W. v. Snap Inc.*, No. 22cv619-LAB-MDD, 2023 WL 3830365, at \*5 (S.D. Cal. June 5, 2023) (distinguishing *Lemmon* and dismissing product-liability claim as barred by Section 230); *Jackson v. Airbnb, Inc.*, No. CV 22-3084 DSF (JCx), 2022 WL 16753197, at \*2 (C.D. Cal. Nov. 4, 2022) (same).

Finally, Anderson cites *A.M. v. Omegle.com, LLC*, 614 F. Supp. 3d 814 (D. Or. 2022), in which the district court held that a product-liability claim was not subject to Section 230 because the defendant could have "design[ed] its product differently" without "review[ing], edit[ing], or withdraw[ing] any third party content." *Id.* at 819. But in that case, the plaintiff was a minor who alleged that a chat room website was defectively designed because it paired her with an adult who sexually abused her. *Id.* at 817. The alleged design flaw therefore bore no "relat[ion] to the posting of third-party content." *Id.* at 820.

Here, by contrast, Anderson's claims directly implicate the manner in which Defendants publish third-party content, *see* A38-41 (Compl.

¶ 107), and seek to hold Defendants liable for "promulgating harmful content and [for] failing to address certain harmful content," *Green*, 318 F.3d at 471; *cf. Doe v. MySpace, Inc.*, 528 F.3d 413, 419-20 (5th Cir. 2008) (holding claims "predicated solely on [service provider's] failure to implement basic safety measures to protect minors" barred by Section 230 as "merely another way of claiming that [service provider] was liable for publishing the communications").

c.   **Congressional findings.**  Attempting to sidestep the plain meaning of Section 230's operative provisions and the decisions of other courts of appeals, Anderson selectively quotes (Br. 29-32) from the statutory findings to argue that Congress did not intend Section 230 to immunize service providers' use of algorithmic recommendations.  In particular, she cites Sections 230(b)(3) and (b)(4), which state that two of the policies behind Section 230 are to "maximize user control" of information received over the internet and to "remove disincentives" to developing "blocking and filtering technologies" that empower parents' supervision of their children's internet consumption.  47 U.S.C. § 230(b)(3)-(4).

Anderson's argument that the TikTok algorithm deprives users of control over the content they view is flatly contradicted by her own

allegations.  As noted above, the algorithm delivers content "likely to be of interest" to each user based on factors such as "user[] demographics" and "user interactions such as the videos viewed and shared."  A28 (Compl. ¶¶ 53, 54).  "[E]ach person's feed is unique and tailored to that specific individual."  *Id.* (Compl. ¶ 54).  The allegations in the complaint thus confirm that the essential purpose of TikTok's algorithm is to maximize user control.

Moreover, Anderson ignores Congress's other statutory purposes: "(1) to promote the continued development of the Internet and other interactive computer services and other interactive media; [and] (2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."  47 U.S.C. § 230(b)(1)-(2).  As the Fourth Circuit explained in its seminal decision interpreting Section 230:

> It would be impossible for service providers to screen each of their millions of postings for possible problems.  Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted.  Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.

41

*Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997).  Section 230 thus was intended to incentivize the continued development of the internet and maximize the proliferation of speech, while at the same time encouraging online service providers to develop technologies that better enable user control.

Targeted recommendations serve each of those policy goals.  Given the "staggering" amount of information on the internet, *Zeran*, 129 F.3d at 331, algorithmic tools are indispensable to a functional internet.  Online service providers use algorithms to sift through billions of pieces of content and publish information in a form most useful to individual users.  *Cf. Taamneh*, 143 S. Ct. at 1216.  Without algorithmic sorting, users would have to sort through that vast content themselves—making the internet functionally useless.  That result would frustrate Congress' goal of promoting the development of the internet with tools to search, filter, and organize third-party content.  *See* 47 U.S.C. § 230(b)(1), (f)(4).

Anderson is therefore wrong to suggest that Congress did not intend Section 230 to immunize targeted recommendations.  To the contrary, algorithmic sorting is precisely the kind of technology that Congress intended to encourage when it enacted Section 230.

**d.    Practical consequences**.  The *amicus* filings before the Supreme Court in *Gonzalez v. Google* explained that, if Section 230 permitted liability for algorithmic recommendations, the provision would be rendered meaningless, because the use of algorithms is essential to manage third-party content.

Dozens of *amicus* briefs addressed this issue.  For example, Microsoft explained:

> [I]f you type a query into Microsoft's search engine Bing, the results that it selects are based on algorithmic recommendations.  And the way it does so is fundamentally the same way that Microsoft's professional networking site LinkedIn uses algorithms to suggest jobs or contacts to users.  And that is, at heart, no different from how another Microsoft service, Microsoft Start, aggregates news and other content that it then presents to its users.  All of these services use sophisticated algorithms to determine what content to display to users, based on information about those users.[5]

The Center for Democracy and Technology, joined by six technologists:

> Every interactive computer service provider that displays content must choose what to display from an overwhelming number of available possibilities and order it in some way.  Those choices are

---

[5]  Microsoft Corp. *Amicus* Br. at 3, *Gonzalez v. Google LLC*, U.S. No. 21-1333 (Jan. 19, 2023).

inherently the provider's "recommendations" as to what content a user should view, typically made using algorithms that rank all possible content according to a set of criteria chosen by the provider, with the highest-ranked items displayed to the user. . . .  Recommendation is functionally indistinguishable from selecting and ordering or ranking items for display, something every provider must do.

. . . .

[A] holding excluding "recommendations" made using ranking algorithms from Section 230's liability shield will create strong incentives for providers to limit speech.  Because content moderation inevitably results in errors, a provider cannot perfectly remove or block only content that exposes it to liability.  Instead, a provider would rationally seek to minimize the risk of liability by taking steps such as imposing categorical limits on the type of content it ranked and displayed or increasing its reliance on automated content moderation tools, the inherent limitations of which will exacerbate the tendency to over-remove innocuous or even beneficial content.  As a result, Internet users will be less able to speak freely and everyone will have less access to information.[6]

The Cato Institute, R Street Institute, and Americans for Tax Reform:

[P]erfectly policing unlawful content is impossible. Any system that caught every piece of illegal content would also block an unacceptable number of

---

[6]  Center for Democracy & Technology and 6 Technologists *Amicus* Br. at 3-5, *Gonzalez v. Google LLC*, U.S. No. 21-1333 (Jan. 18, 2023).

false positives, ultimately quashing valuable speech. . . .

If algorithmic recommendations were held to be outside Section 230's protections, the false positive problem would immediately become very real, with the potential for enormous harm to lawful speakers and listeners. If [a website] could not rely on Section 230 to shield it from suits over its recommendation of allegedly illegal, tortious, or harmful videos, it would have to either engage in continual litigation or ensure that such videos were not recommended by its algorithms. . . .

In order to ensure that potentially actionable videos were not recommended by its algorithm, [a website] would have two options. First, it could train its algorithm to exclude anything resembling the unwanted content, eliminating false negatives by embracing false positives. Alternatively, it could recommend only content pre-screened by . . . employees. In either case, much lawful, valuable expression would be excluded from [the website's] speech discovery algorithms along with the bad.

Crucially, controversial but lawful speech about religion, politics, and health would likely face the most exclusion.[7]

As the Supreme Court explained in *Taamneh*, algorithmic recommendations are the ubiquitous and essential "infrastructure" through which "[a]ll the content on [internet] platforms is filtered." 143 S. Ct. at

---

[7] Cato Institute, R Street Institute, and Americans for Tax Reform *Amicus* Br. at 24-25, *Gonzalez v. Google LLC*, U.S. No. 21-1333 (Jan. 19, 2023).

1226-27.  If the Court were to hold that Section 230 does not apply to algorithmic recommendations, as Anderson urges in this appeal, the consequences for the functioning of the modern internet, and its continued availability as a forum for third-party speech, would be devastating.  The Court should reject that interpretation—because the text, precedent, and congressional findings definitely preclude it.

### 2.   Anderson's Claims Would Impermissibly Impose Liability Based On Third-Party Content

Anderson's claims satisfy the third requirement for Section 230 immunity because the allegedly harmful "information [was] provided by another information content provider."  47 U.S.C. § 230(c)(1).  Anderson did not contest this element in the district court, *see* A4, but she now argues that the TikTok algorithm contains a subliminal message that the user will like the recommended content, Opening Br. 26.  That argument is forfeited on appeal, and in any event is wrong.

Under Section 230, an "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).  "[A] website does not create or develop content when it merely provides a neutral means

by which third parties can post information of their own independent choosing online." *Bennett v. Google, LLC*, 882 F.3d 1163, 1167 (D.C. Cir. 2018).

The allegations in the complaint easily satisfy this third-party content requirement. TikTok is described as "a video sharing social media app and product which allows and encourages *users* to create, share, and view short video clips." A27 (Compl. ¶ 50) (emphasis added). These clips allegedly include "challenge[]" videos, in which "users film[] themselves engaging in behavior that mimics and often times 'one-ups' other users posting videos performing the same or similar conduct." A29 (Compl. ¶ 61). The "blackout challenge," which is the type of challenge video that allegedly resulted in Nylah Anderson's death, "encourages users to choke themselves with belts, purse strings, or anything similar until passing out" and post videos of themselves to the platform. A31 (Compl. ¶ 64). Anderson does not allege that Defendants created or developed any of this content.

On appeal, Anderson argues that TikTok's algorithmic recommendation contains an implicit message overlaying each third-party video that says: "Click here. This is cool. Try this. You will like this." Opening

Br. 26 (citing *Force*, 934 F.3d at 82 (Katzmann, J., dissenting)). Anderson's argument is forfeited in this appeal because she did not raise it in the district court. "To preserve a matter for appellate review, a party must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits." *Garza v. Citigroup Inc.*, 881 F.3d 277, 284 (3d Cir. 2018) (internal quotation marks omitted). "It is well established that arguments not raised before the District Court are forfeited on appeal." *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 136 (3d Cir. 2023) (alterations omitted).

Anderson's argument also fails on the merits for two main reasons. First, it would render Section 230 a dead letter: *Every* publisher implicitly sends the message that the content it publishes is worth reading or watching. A newspaper implicitly telegraphs to readers that articles "above the fold" are the ones most worth reading; that the opinion pieces at the top of the op-ed page are the most interesting; and that the most important letters to the editor are published most prominently. Likewise for television stations, which implicitly convey that primetime programs are the most worth watching.

The same is true of interactive computer services like TikTok. The TikTok app delivers a "stream of curated videos" to each user "that is likely to be of interest to that particular user." A19, A28 (Compl. ¶¶ 3, 51). If Anderson's argument were correct, no publisher of third-party content could be immunized under Section 230—because every website that hosts third-party content chooses which content to deliver to each of its users and uses techniques, almost always algorithms, designed to deliver content that will interest the user.

Because it would impose liability for a "message" that is integral to acting as a publisher, Anderson's argument is precluded by Section 230.

Second, even if those supposed implicit messages could be considered content attributable to TTI that falls outside Section 230, Anderson's claims would still fail because they would infringe on TTI's First Amendment right to free speech. As noted above, *see* pp. 25-26, *supra*, the Supreme Court has held that "the presentation of an edited compilation of speech generated by other persons . . . fall[s] squarely within the core of First Amendment security." *Hurley*, 515 U.S. at 570. The Supreme Court has applied this bedrock principle in many contexts,

49

including newspapers, *see Tornillo*, 418 U.S. at 258; cable operators, *see Turner Broad. Sys.*, 512 U.S. at 636; and parades, *Hurley*, 515 U.S. at 570.

Most recently, the Eleventh Circuit extended First Amendment protection to "social-media platforms' content-moderation decisions" on the ground that they "constitute the same sort of editorial judgments." *NetChoice, LLC v. Att'y Gen'l, Fla.*, 34 F.4th 1196, 1212 (11th Cir. 2022); *but see NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 463-65 (5th Cir. 2022). That decision would apply equally to TikTok's algorithmic recommendations. As the Eleventh Circuit explained, "a private entity's decisions about whether, to what extent, and in what manner to disseminate third-party-created content to the public are editorial judgments protected by the First Amendment." *NetChoice, LLC*, 34 F.4th at 1210.

TTI is in "the business of delivering curated compilations of speech created, in the first instance, by others"; and just like a newspaper, cable operator, or parade organizer, it "employ[s] editorial judgment to convey some messages but not others and thereby cultivate different types of communities that appeal to different groups." *NetChoice, LLC*, 34 F.4th at 1213. Accordingly, TTI's "decisions about what speech to permit,

disseminate, prohibit, and deprioritize—decisions based on platforms' own particular values and views—fit comfortably within the Supreme Court's editorial-judgment precedents." *Id.* at 1214.

This Court has also applied First Amendment scrutiny to a case involving product liability. In *In re Asbestos School Litigation*, 46 F.3d 1284 (3d Cir. 1994) (Alito, J.), the plaintiffs brought conspiracy and concert-of-action claims against Pfizer, a product manufacturer, for allegedly conspiring with asbestos manufacturers to disseminate false information about asbestos hazards to the public and Congress. *Id.* at 1286. Pfizer sought a writ of mandamus on the ground that the plaintiffs' claims implicated Pfizer's First Amendment-protected activities, including "[j]oining organizations that participate in public debate, making contributions to them, and attending their meetings." *Id.* at 1294. This Court agreed: "[T]he district court's holding, if generally accepted, would make these activities unjustifiably risky and would undoubtedly have an unwarranted inhibiting effect upon them. For these reasons, we are convinced that Pfizer has shown that its right to the issuance of the writ is 'clear and indisputable.'" *Id.*

The same reasoning applies here.  Anderson seeks to hold Defend-
ants liable for TikTok's conveying an implicit "this video is cool" message
through its algorithmic recommendations.   But under long-established
Supreme Court precedent, those recommendations boil down to constitu-
tionally protected editorial decisions about "what speech to permit, dis-
seminate, prohibit, and deprioritize." *NetChoice, LLC*, 34 F.4th at 1214.
And Anderson's claims, in turn, would have an "unwarranted" chilling
effect on that editorial judgment.  *In re Asbestos Sch. Litig.*, 46 F.3d at
1294.  Anderson's claims thus fail for the additional reason that they
would unconstitutionally infringe on TTI's freedom of speech.

# CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

/s/ *Andrew J. Pincus*

Benjamin D. Bright
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500

Geoffrey M. Drake
TaCara D. Harris
KING & SPALDING LLP
1180 Peachtree Street NE,
    Suite 1600
Atlanta, GA 30309
(404) 572-4726

Albert Giang
KING & SPALDING LLP
633 West 5th Street, Suite 1600
Los Angeles, CA 90071
(213) 443-4335

David Mattern
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 626-2946

Andrew J. Pincus
Nicole A. Saharsky
Minh Nguyen-Dang
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3000
nsaharsky@mayerbrown.com

Mark J. Winebrenner
FAEGRE DRINKER BIDDLE & REATH
LLP
90 South Seventh Street
2200 Wells Fargo Center
Minneapolis, MN 55402
(612) 766-1600

Joseph O'Neil
Katherine A. Wang
CAMPBELL CONROY & O'NEIL
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
(610) 964-1900

*Counsel for Defendants-Appellees TikTok Inc. and ByteDance Inc.*

Dated: July 12, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g) and Circuit Rules 28.3(d) and 31.1(c), the undersigned counsel certifies that:

(i) undersigned counsel is a member of the bar of this Court;

(ii) this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 9,839 words, including footnotes and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f);

(iii) this brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it was prepared using Microsoft Office Word 2016 and is set in 14-point Century Schoolbook font;

(iv) the electronic version of the brief is identical to the paper version; and

(v) the electronic version of this brief was scanned with the virus-detection program Windows Defender Antivirus, version 1.393.120.0, and no virus was detected.

/s/ *Andrew J. Pincus*
Andrew J. Pincus

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 12, 2023, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter, who are registered with the Court's CM/ECF system.

*/s/ Andrew J. Pincus*
Andrew J. Pincus