No. 22-3061

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

———————————

TAWAINNA ANDERSON, INDIVIDUALLY AND AS ADMINISTRATIX
OF THE ESTATE OF N.A., A DECEASED MINOR,

*Plaintiff-Appellant*,

v.

TIKTOK, INC.; BYTEDANCE, INC.,

*Defendants-Appellees*.

———————————

On Appeal from the United States District Court for the
Eastern District of Pennsylvania,
No. 2:22-cv-1849

———————————

## PETITION FOR REHEARING AND REHEARING EN BANC

———————————

GEOFFREY M. DRAKE
KING & SPALDING LLP
1180 Peachtree Street NE, Suite 1600
Atlanta, GA 30309
(404) 572-4726

DAVID MATTERN
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 626-2946

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
JAMES Y. XI[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*(Additional counsel listed on inside cover)*
*Counsel for Defendants-Appellees*

October 1, 2024

JOSEPH O'NEIL
KATHERINE A. WANG
CAMPBELL CONROY & O'NEIL
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
(610) 964-1900

*Supervised by principals of the firm who are
members of the Virginia bar

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Rule 26.1, Defendant-Appellees state as follows:

ByteDance Inc. is a wholly owned subsidiary of ByteDance Ltd. ByteDance Ltd. is a privately held corporation, and no publicly held company owns 10% or more of ByteDance Ltd.'s stock.

TikTok Inc. is a wholly owned subsidiary of TikTok LLC. TikTok LLC is a wholly owned subsidiary of TikTok Ltd., which in turn is wholly owned by ByteDance Ltd.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES.................................................................................. iii

RULE 35.1 STATEMENT ..................................................................................... 1

INTRODUCTION .................................................................................................. 2

STATEMENT OF THE ISSUE............................................................................... 4

STATEMENT OF THE CASE................................................................................ 5

REASONS FOR GRANTING REHEARING ......................................................... 8

I.      The Panel Decision Concededly Departs From Decades Of Precedent In Both This Circuit And Others..................................................... 8

II.     This Case Presents An Exceptionally Important Question........................... 15

CONCLUSION ..................................................................................................... 17

CERTIFICATE OF COMPLIANCE WITH WORD COUNT

CERTIFICATE OF BAR MEMBERSHIP

IDENTICAL PDF AND HARD COPY CERTIFICATE

VIRUS SCAN CERTIFICATE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Ben Ezra, Weinstein, & Co. v. Am. Online*,
  206 F.3d 980 (10th Cir. 2000)................................................................9

*Doe v. MySpace*,
  528 F.3d 413 (5th Cir. 2008).................................................................9

*Dyroff v. Ultimate Software Grp.*,
  934 F.3d 1093 (9th Cir. 2019)...........................................................9, 10

*Estate of Bride ex rel. Bride v. Yolo Techs., Inc.*,
  112 F.4th 1168 (9th Cir. 2024) ............................................................10

*Force v. Facebook*,
  934 F.3d 53 (2d Cir. 2019) ............................................... 9, 10, 13, 14

*Gonzalez v. Google*,
  598 U.S. 617 (2023)........................................................................3, 11

*Green v. Am. Online*,
  318 F.3d 465 (3d Cir. 2003)...............................................................7, 8

*Hustler Magazine v. Falwell*,
  485 U.S. 46 (1988)..............................................................................16

*Johnson v. Arden*,
  614 F.3d 785 (8th Cir. 2010).................................................................9

*Jones v. Dirty World Ent. Recordings LLC*,
  755 F.3d 398 (6th Cir. 2014).................................................................9

*Klayman v. Zuckerberg*,
  753 F.3d 1354 (D.C. Cir. 2014) ............................................................9

*Monsarrat v. Newman*,
  28 F.4th 314 (1st Cir. 2022) .................................................................9

*Moody v. NetChoice, LLC*,
  144 S.Ct. 2383 (2024).....................................................................3, 11

*Obado v. Magedson*,
    612 F.App'x 90 (3d Cir. 2015)...............................................................................8

*Sekhar v. United States*,
    570 U.S. 729 (2013)..............................................................................................12

*Stratton-Oakmont v. Prodigy*,
    1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)...........................................3, 13

*Zeran v. Am. Online*,
    129 F.3d 327 (4th Cir. 1997).............................................................................7, 9

**Statutes**

47 U.S.C. §230(a)(3)................................................................................................2

47 U.S.C. §230(c)(1)...........................................................................................2, 13

47 U.S.C. §230(f)(2)..............................................................................................14

**Other Authorities**

Brief of Respondent, *Gonzalez v. Google*, No. 21-1333
    (U.S. filed Jan. 12, 2023)....................................................................................11

Jeff Kosseff, *The Twenty-Six Words That Created the Internet* (2019) ...............3, 15

Oral Arg. Tr., *Gonzalez v. Google*, No. 21-1333 (U.S. Feb. 21, 2023)...................12

Oral Arg. Tr., *Moody v. Netchoice*, No. 22-277 (U.S. Feb. 26, 2024) ....................11

Oral Arg. Tr., *Netchoice v. Paxton*, No. 22-555 (U.S. Feb. 26, 2024) ....................11

S. Rep. No. 104-230 (1996) ....................................................................................13

## RULE 35.1 STATEMENT

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to decisions of this Court, and that en banc consideration is necessary to secure and maintain uniformity of decisions in this Court. The panel decision conflicts with *Green v. America Online*, 318 F.3d 465 (3d Cir. 2003), and involves questions of exceptional importance, as it upends the uniform understanding of a federal statute that has been critical to the development of the modern Internet.

/s/ Paul D. Clement
Paul D. Clement

## INTRODUCTION

For the better part of three decades, every federal court of appeals to consider the issue held that §230 bars lawsuits that seek to hold websites liable for their decisions about which third-party content to display to their users, including decisions about how to organize that content and which materials to prioritize or recommend. That universal understanding of §230 has been pivotal to the development of the modern Internet. Given the sheer amount of user-generated content online, websites have no realistic choice but to decide how to filter, organize, and sort it. That is the only way to make that information useful and accessible to users. And Congress affirmatively wanted to ensure that websites can remove some offensive third-party content without becoming liable as a common-law publisher of all the third-party content that is not removed. By commanding that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," 47 U.S.C. §230(c)(1), §230 ensures that websites can freely organize, filter, and disseminate third-party content without fear of liability, preserving the Internet as "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity," *id.* §230(a)(3).

The panel opinion upends that regime. In a mere 10 pages, the panel broke with every other federal court of appeals to consider the issue and held that §230

does *not* bar lawsuits that seek to hold websites liable for their "editorial judgments" about what third-party content to disseminate. The panel did so on the theory that, just one year after studiously avoiding disturbing the lower-court consensus on §230, *see Gonzalez v. Google*, 598 U.S. 617 (2023), the Supreme Court upended it *sub silentio* in *Moody v. NetChoice, LLC*, 144 S.Ct. 2383 (2024), by accepting the industry's argument that websites like TikTok "engage in protected first-party speech under the First Amendment when they curate compilations of others' content via their expressive algorithms." Op.9.

That conclusion is implausible and would render the 26 words that built the Internet a nullity. *See* Jeff Kosseff, *The Twenty-Six Words That Created the Internet* (2019). *NetChoice* simply accepted the industry's argument that websites engage in First Amendment protected editorial judgment in deciding whether and how to display content. It did not hold that third-party speech becomes a website's own speech simply because the website displays and organizes it. Indeed, Congress enacted §230 to encourage websites to exclude problematic third-party content by effectively overruling a case that held that, so long as a website exercised "editorial control over the content of messages posted on its" site, it could be held liable for publishing the third-party speech that escaped the editor's pen. *See Stratton-Oakmont v. Prodigy*, 1995 WL 323710, at *2 (N.Y. Sup. Ct. May 24, 1995). If the panel were correct that websites lose §230 protection whenever they exercise

"editorial judgment" over the third-party content on their services, Op.9, then §230 accomplished nothing.

This Court should grant rehearing. The panel decision undercuts a central building block of the modern Internet and threatens chaos across the industry. Worse still, it does so by upending decades of settled precedent and opening a circuit split based on a palpable misreading of a Supreme Court decision that did not resolve an issue that the Court unanimously side-stepped just one Term earlier. Even the panel was forced to admit that its decision "may be in tension" with this Court's precedent and "may depart" from decisions of at least seven other courts of appeals. Op.12-13. Yet instead of grappling with the reasoning of that unbroken line of decisions from multiple courts spanning nearly three decades, the panel brushed them aside in a footnote—after barely engaging with *NetChoice*. Rather than force the Supreme Court to needlessly intervene on an issue it carefully avoided, this Court should consider this case en banc and take the time to weigh all the consequences of the panel's position. Simply put, the Court should not allow the panel decision to be the Third Circuit's last word on an issue of such profound importance.

## STATEMENT OF THE ISSUE

Whether §230 prohibits lawsuits that seek to hold websites liable for their "editorial judgments" "when they curate compilations of others' content via their expressive algorithms." Op.9.

## STATEMENT OF THE CASE

1. TikTok is an online service on which users can share and interact with content. Because of the sheer volume and breadth of the content on TikTok, TikTok has invested significant resources into developing tools to curate and organize that user-created content, including by employing "a recommendation system that delivers content to each user that is likely to be of interest to that particular user." A19. Users may view this "stream of curated videos" on the "For You" page in their TikTok app. A28.

2. In this case, which has not gone beyond the motion-to-dismiss stage, Plaintiff Tawainna Anderson alleges that TikTok's algorithm delivered to her daughter Nylah a so-called "blackout challenge" video, which "encourages users to choke themselves with belts, purse strings, or anything similar until passing out." A31. Anderson alleges that Nylah died after attempting to replicate the content depicted in the video. A33-34, 45.

Anderson brought this lawsuit on behalf of herself and as the administrator of Nylah's estate. A18. She asserts claims for strict product liability, negligence, and wrongful death, as well as survival claims. A36. The gravamen of each claim is that the TikTok platform is defectively designed because its algorithm recommended the blackout challenge video to her daughter, and that TikTok failed to warn her daughter that replicating the content of the video was dangerous. Anderson alleges that

TikTok "took no and/or completely inadequate action to extinguish and prevent the spread of the Blackout Challenge"; "failed to change, update, and/or correct their algorithm to prevent it from presenting users, specifically children, with the dangerous and deadly Blackout Challenge"; and "fail[ed] to timely remove all dangerous and deadly videos." A32-33.

3. The district court dismissed Anderson's claims on §230 grounds, but a panel of this Court reversed. The panel began by noting that, under §230(c)(1), websites "are immunized only if they are sued for someone else's expressive activity or content (i.e., third-party speech), but they are not immunized if they are sued for their own expressive activity or content (i.e., first-party speech)." Op.7. The Court then noted that *NetChoice* "held that a platform's algorithm that reflects 'editorial judgments' about 'compiling the third-party speech it wants in the way it wants' is the platform's own 'expressive product' and is therefore protected by the First Amendment." Op.9. From there, the panel reasoned that *NetChoice* concluded "that platforms engage in protected first-party speech under the First Amendment when they curate compilations of others' content via their expressive algorithms," and that it therefore "follows that doing so amounts to first-party speech under §230, too." Op.9. Because TikTok's algorithm "decides on the third-party speech that will be included in or excluded from a compilation—and then organizes and presents the included items" on users' "For You" page, the panel concluded that the algorithm is

"TikTok's own 'expressive activity.'"   Op.10.   And because "TikTok's own expressive activity" is the "basis of Anderson's lawsuit," the panel concluded that "§230 does not bar Anderson's claims."  Op.10-11.

The panel recognized that its holding "may be in tension" with this Court's decision in *Green v. Am. Online*, 318 F.3d 465 (3d Cir. 2003).  Op. 11-12.  And it acknowledged that it "may depart" from decisions from "other circuits," Op.12-13 (listing decisions from the First, Second, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and D.C. Circuits), which have unanimously held that §230 prohibits lawsuits that seek to hold a website liable for "its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Zeran v. Am. Online*, 129 F.3d 327, 330 (4th Cir. 1997).  The panel did not engage with the reasoning of any of those decisions.  It instead dismissed them all as having "pre-dated *NetChoice*."  Op.12.

Judge Matey concurred in the judgment in part and dissented in part.  In his view, §230 bars Anderson from seeking to hold TikTok liable for "hosting videos created and uploaded by third parties," but not from seeking to hold TikTok liable for "knowing distribution and targeted recommendation of videos it knew could be harmful."  Concurrence.1-2.

## REASONS FOR GRANTING REHEARING

### I.    The Panel Decision Concededly Departs From Decades Of Precedent In Both This Circuit And Others.

1. The panel concluded that §230 does not bar lawsuits that seek to hold websites liable for the "editorial judgments" they make "when they curate compilations of others' content via their expressive algorithms." Op.9. That decision cannot be squared with this Court's precedents and opens up a massive circuit split. Along with every other circuit to consider the issue, this Court has held that §230(c)(1) "bars 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content.'" *Green*, 318 F.3d at 471. In *Green*, for example, the plaintiff sued AOL on the theory that "AOL was negligent in promulgating harmful content and in failing to address certain harmful content on its network," including allegedly defamatory statements about the plaintiff. *Id.* This Court held that §230 barred the plaintiff's claims because they sought to hold AOL liable "for decisions relating to the monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role." *Id.* And the Court later invoked *Green* to hold that §230 bars claims that seek to hold websites liable for recommending content via algorithms. *See Obado v. Magedson*, 612 F.App'x 90, 93 (3d Cir. 2015).

Those decisions are no outliers.  Every other circuit to consider the issue has held that §230(c)(1) bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Zeran*, 129 F.3d at 330.[1]  That is so regardless of whether the website uses algorithms to help it decide which third-party content to display.  In *Force v. Facebook*, 934 F.3d 53 (2d Cir. 2019), for example, the Second Circuit held that §230 barred a lawsuit seeking to hold Facebook liable for "us[ing] algorithms to suggest content to users." *Id.* at 65.  The court held that it made no difference *how* a publisher presents third-party content to users.  "[S]o long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editorial or

---

[1] *Accord Monsarrat v. Newman*, 28 F.4th 314, 319 (1st Cir. 2022) (holding that §230 barred claim for "reposting … libelous information" authored by a third party); *Force v. Facebook*, 934 F.3d 53, 65 (2d Cir. 2019) (holding that §230 barred claim for "us[ing] algorithms to suggest content to users"); *Doe v. MySpace*, 528 F.3d 413, 420 (5th Cir. 2008) (holding that §230 barred claim for "decisions relating to the monitoring, screening, and deletion of content"); *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) (holding that §230 barred claim for website's "exercise of a publisher's traditional editorial functions"); *Johnson v. Arden*, 614 F.3d 785, 791-92 (8th Cir. 2010) (same); *Dyroff v. Ultimate Software Grp.*, 934 F.3d 1093, 1098 (9th Cir. 2019) (holding that §230 barred claim for decision to "publish[] information created or developed by third parties," including by using "algorithms" to "recommend" certain posts); *Ben Ezra, Weinstein, & Co. v. Am. Online*, 206 F.3d 980, 986 (10th Cir. 2000) (explaining that "Congress clearly enacted §230 to forbid the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions"); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014) (holding that §230 barred claim for "decision whether to print or retract a given piece of content").

selection process." *Id.* at 67. The Ninth Circuit reached the same conclusion in *Dyroff v. Ultimate Software Group*, 934 F.3d 1093 (9th Cir. 2019), holding that §230 barred a lawsuit seeking to hold a website liable for "us[ing] features and functions, including algorithms, to analyze user posts … and recommend[] other user groups." *Id.* at 1098.

2. The panel opinion conflicts with all those decisions. Indeed, the panel acknowledged (with considerable understatement) that its decision "may be in tension" with this Court's opinion in *Green* and "may depart" from the "views of other circuits." Op.11-12. But it brushed that consensus aside on the ground that those cases "pre-dated *NetChoice*." Op.12. That is not even strictly true as a chronological matter, *see, e.g.*, *Estate of Bride ex rel. Bride v. Yolo Technologies, Inc.*, 112 F.4th 1168, 1181 (9th Cir. Aug. 22, 2024) (reaffirming, after *NetChoice*, *Dyroff*'s conclusion that "the automated processes contained in the site's algorithm were not themselves content but merely 'tools meant to facilitate the communication and content of others'"), and mystifying in all events. *NetChoice* was a First Amendment case, not a §230 case. The majority opinion does not even mention §230, let alone suggest that it was vitiating a veritable wall of lower court precedent concerning the scope of that unmentioned but enormously consequential statute. That was no oversight. There *were* §230 claims in both *NetChoice* cases below, but those claims were not before the Court—a point emphasized by the only opinion that

mentioned §230.  *See NetChoice*, 144 S.Ct. at 2425 n.8 (Alito, J., concurring in the judgment).

The notion that the Court upended nearly three decades of settled precedent about how to interpret §230 *sub silentio* in an opinion that did not even discuss §230 beggars belief.  That is particularly so because there was discussion at argument about the supposed tension between NetChoice's effort to obtain First Amendment protection for its members' own exercises of editorial judgment and their invocation of §230.  *See, e.g.*, Oral Arg. Tr. at 65:16-67:2, 85:3-86:16; 122:5-124:15; 147:9-149:20, No. 22-277 (U.S.); Oral Arg. Tr. at 9:3-14:10, 24:4-26:25, No. 22-555 (U.S.). But not even the Justices that declined to join the Court's opinion suggested that the majority's First Amendment conclusions undermined §230 protections; instead, as noted, they emphasized that §230 issues were not before them.

The panel's reasoning is all the more implausible given that *NetChoice* followed a mere year after the Court confronted the same argument in *Gonzalez* that the panel embraced here.  After receiving dozens of amicus briefs detailing the untenable ramifications of that argument, the Court declined to weigh in on §230 at all and instead decided the case on other grounds.  *See* 598 U.S. at 622.  The Court did so, moreover, even though Google *conceded* that it engages in its own First Amendment-protected activity when it "recommend[s]" content to users.  *See* Brief of Respondent 30, No. 21-1333 (U.S. filed Jan. 12, 2023).  The notion that the same

Justice who expressed caution that "[w]e … are not like the nine greatest experts on the internet," Oral Arg. Tr. at 46:1-3, No. 21-1333 (U.S.), and concern that accepting the argument that §230 does not protect a website's own First-Amendment-protected editorial judgments would "send us down the road such that §230 really can't mean anything at all," *id.* at 10:7-11, turned around and penned an opinion that silently vitiated decades of precedent and the essential protections of §230 is simply not tenable.  That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013).

3. In all events, the panel's reasoning fails on its own terms.  According to the panel, "[g]iven the Supreme Court's observations that platforms engage in protected first-party speech under the First Amendment when they curate compilations of others' content via their expressive algorithms," it necessarily "follows" that they must not be entitled to any protection under §230 for that activity because §230 prohibits liability for content "provided by *another*."  Op.9-10 (emphasis added). That gets matters backward.  The whole reason §230 protection is needed is because websites *do* exercise the kind of First-Amendment-protected editorial discretion that might otherwise give rise to publisher liability when they decide whether and how to disseminate third-party content.  Indeed, that was the precise concern that led to §230.

Congress enacted §230 in part to overrule *Stratton Oakmont*, which held that a website could be held liable for disseminating defamatory third-party content on the theory that it became a "publisher" of that content because it exercised "editorial control over the content of messages posted on its computer bulletin boards." 1995 WL 323710, at *2; *see* S. Rep. No. 104-230, at 194 (1996). While it is unusual for Congress to respond to an unpublished state trial-court decision, Congress well understood the threat that extending common-law publisher liability to websites that exercise editorial discretion posed to the then-nascent Internet. If the only way for services like Prodigy to avoid liability for third-party content was to refrain from exercising any editorial discretion, then the Internet would soon become dominated by all manner of offensive content. That is the last thing Congress wanted. Instead, it wanted to encourage websites to exercise their own editorial discretion in excluding the worst third-party materials without fear that they would become liable for any third-party speech that survived the editorial screen. And Congress did so by protecting websites from all claims that "treat[]" them "as the publisher or speaker" of "any information provided by another." 47 U.S.C. §230(c)(1).

That necessarily includes claims that seek to hold websites liable for their decisions about how to organize third-party content, as that is every bit as much a core "publisher" function as the decision whether to disseminate third-party content at all. *Force*, 934 F.3d at 68. That is evident not just from a long line of cases, but

from §230 itself. Section 230 defines an "interactive computer service" to include providers of "software" or "tools" that "filter," "pick, choose," "reorganize," "display," or "forward" content. 47 U.S.C. §230(f)(2), (4). The statute thus expressly contemplates that websites that use "tools" to "filter," "pick," "reorganize," and "forward" third-party content for "display" may invoke §230(c)(1)'s protections. Yet under the panel's logic, the very features that make services like TikTok "interactive computer service[s]" covered by §230—i.e., using tools to filter, pick, reorganize, and display content—render them ineligible for protection under §230(c)(1).

Judge Matey tried to get around that by distinguishing between "hosting" content and "recommending" it. Concurrence.1-2. But Anderson does not allege any separate communication from TikTok affirmatively endorsing the third-party content that underlies her claim. Her claim is that TikTok "recommended" that content by displaying a "stream of curated videos" on a user's "For You" page that is tailored to the user's interests. But that just reflects TikTok's efforts to organize and display third-party content to make it accessible and useful to its users—conduct that not only is at the heart of publishing and what §230 protects, but is unavoidable for websites given how the Internet works. *See Force*, 934 F.3d at 66. Moreover, it bears emphasis that efforts to draw subtle distinctions between hosting and recommending were central to *Gonzalez* and beside the point in *NetChoice*. Judge

Matey's opinion thus just underscores the problems with discarding decades of circuit precedent on the ground that *NetChoice* silently decided an issue that it pointedly did not even address.

## II.    This Case Presents An Exceptionally Important Question.

As the Supreme Court recognized when it granted certiorari to consider the issue in *Gonzalez*, and when it ultimately decided to leave the lower-court consensus undisturbed, whether and to what extent §230 precludes liability when a website engages in editorial functions is a question of exceptional importance.  "The modern Internet in the United States is built on more than two decades of reliance on Section 230."  Kosseff 8.  For decades, websites and users have hosted and posted and filtered and sorted third-party content without fear of liability.  The panel's conclusion that websites can be held liable for the "editorial judgments" they make when "curat[ing] compilations of others' content" casts that settled understanding aside, effectively rendering §230(c)(1) a dead-letter in the Third Circuit.

And what little of §230 might survive would create the precise kind of perverse incentives Congress sought to eliminate in enacting §230.  Some websites would inevitably seek to avoid liability by refusing to sort, filter, or take down *any* content.  After all, if making "editorial judgments" about what third-party speech "will be included in or excluded from a compilation" renders websites ineligible for §230's protections and vulnerable to crippling litigation, then many will simply

choose not to make those judgments, allowing all manner of third-party speech on their services without any filtering. That could lead to all sorts of objectionable material on the Internet—the very phenomenon that prompted §230.

On the other hand, some websites would err on the side of removing much more third-party speech. While that might buy some measure of litigation peace, it would come at the cost of free expression on the Internet—which, once again, is exactly what Congress did *not* want. Making matters worse, websites would have a natural incentive to remove any third-party content that challenges the existing orthodoxy. Speech that is particularly vital to the robust and uninhibited debate that the First Amendment is designed to foster would almost always be the loser in such a regime. After all, there is little risk of liability for disseminating content that toes the mainstream line, as that content will already be pervasive. Content that expresses heterodox views, by contrast, is much more likely to trigger costly litigation. Casting the settled understanding of §230 aside would ultimately undermine "the free flow of ideas and opinions on matters of public interest and concern." *Hustler Magazine v. Falwell*, 485 U.S. 46, 50-52 (1988).

Left standing, the panel's decision will also greatly reduce incentives to provide useful and innovative services over the Internet. Billions of people across the world use the Internet to search for information, read news, connect with friends, and more. The Internet is useful for those things because websites devote significant

resources to sorting and organizing the vast amount of information that people share, and they compete for users based on the usefulness of their offerings. TikTok is useful for sharing and finding new ideas and engaging with others largely because it has committed extraordinary resources to organizing the vast amount of information created by its users and presenting it in a way that facilitates meaningful connections and discovery. TikTok would not be nearly as useful if it displayed content randomly or chronologically, or ignored its users' preferences when making organizational decisions. Exposing websites to liability for responding to user demand would chill innovative services. Before imposing those untenable consequences (or forcing the Supreme Court to consider them itself), this Court should grant rehearing and give this profoundly consequential question the attention it deserves.

## CONCLUSION

The petition should be granted.

Respectfully submitted,

GEOFFREY M. DRAKE
KING & SPALDING LLP
1180 Peachtree Street NE, Suite 1600
Atlanta, GA 30309
(404) 572-4726

DAVID MATTERN
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 626-2946

s/Paul D. Clement
PAUL D. CLEMENT
ERIN E. MURPHY
JAMES Y. XI[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

17

JOSEPH O'NEIL
KATHERINE A. WANG
CAMPBELL CONROY & O'NEIL
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
(610) 964-1900

\*Supervised by principals of the firm who are members
of the Virginia bar

*Counsel for Defendants-Appellees*

October 1, 2024

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

This brief complies with the type-volume limitation of Fed. R. App. P. 35(b)(2) because it contains 3,898 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

October 1, 2024

<u>s/Paul D. Clement</u>
Paul D. Clement

**CERTIFICATE OF BAR MEMBERSHIP**

Pursuant to Third Circuit Rule 46.1(3), I certify that I am a member of the bar of the Third Circuit and am in good standing.

October 1, 2024

s/Paul D. Clement
Paul D. Clement

**IDENTICAL PDF AND HARD COPY CERTIFICATE**

I certify that this brief complies with Third Circuit Rule 31.1(c) because the text of the electronic brief will be identical to the text of any hard-copy briefs the Court may request.  Pursuant to Third Circuit Rule 35.2(a), no paper copies of this brief will be provide unless directed by the Court.

October 1, 2024

s/Paul D. Clement
Paul D. Clement

**VIRUS SCAN CERTIFICATE**

I certify that this brief complies with Third Circuit Rule 31.1(c) because a virus detection program (Windows Security, version 4.18.2207.5) has been run on the file and no virus was detected.

October 1, 2024

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

# ADDENDUM

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-3061
_____

TAWAINNA ANDERSON, INDIVIDUALLY
AND AS ADMINISTRATIX
OF THE ESTATE OF N.A., A DECEASED MINOR,
                                        Appellant

v.

TIKTOK, INC.; BYTEDANCE, INC.
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-22-cv-01849)
U.S. District Judge:  Honorable Paul S. Diamond
_____

Argued January 17, 2024
_____

Before:  SHWARTZ, MATEY, and PHIPPS, <u>Circuit Judges</u>.

(Filed: August 27, 2024)

Jeffrey P. Goodman [ARGUED]
Robert J. Mongeluzzi
Saltz Mongeluzzi & Bendesky
1650 Market Street
One Liberty Place, 52nd Floor
Philadelphia, PA 19103

<u>Counsel for Appellant Tawainna Anderson</u>

Geoffrey M. Drake
King & Spalding
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309

Albert Giang
King & Spalding
633 W 5th Street
Suite 1600
Los Angeles, CA 90071

David Mattern
King & Spalding
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC 20006

Joseph O'Neil
Katherine A. Wang
Campbell Conroy & O'Neil
1205 Westlakes Drive
Suite 330
Berwyn, PA 19312

Andrew J. Pincus [ARGUED]
Nicole A. Saharsky
Mayer Brown
1999 K Street NW
Washington, DC 20006

Mark J. Winebrenner
Faegre Drinker Biddle & Reath
90 S. Seventh Street
2200 Wells Fargo Center
Minneapolis, MN 55402

       <u>Counsel for Appellees TikTok, Inc. and ByteDance, Inc.</u>

_____

OPINION OF THE COURT
_____

SHWARTZ, <u>Circuit Judge</u>.

TikTok, Inc., via its algorithm, recommended and promoted videos posted by third parties to ten-year-old Nylah Anderson on her uniquely curated "For You Page." One video depicted the "Blackout Challenge," which encourages viewers to record themselves engaging in acts of self-asphyxiation. After watching the video, Nylah attempted the conduct depicted in the challenge and unintentionally hanged herself. Nylah's mother, Tawainna Anderson, sued TikTok and its corporate relative ByteDance, Inc., (collectively, "TikTok") for violations of state law. The District Court dismissed her

complaint, holding that the Communications Decency Act ("CDA"), 47 U.S.C. § 230, immunizes TikTok. For the following reasons, we will reverse in part, vacate in part, and remand.

## I

### A[1]

TikTok is a video-sharing social media platform that allows users to create, post, and view content. TikTok users can search the platform for content or, without searching, view content that TikTok's algorithm recommends by posting the content to a user's "For You Page" ("FYP").[2] TikTok's algorithm is not based solely on a user's online inputs. Rather, the algorithm curates and recommends a tailored compilation of videos for a user's FYP based on a variety of factors, including the user's age and other demographics, online interactions, and other metadata.

---

[1] We draw the facts from the complaint, accept them as true, Santiago v. Warminster Twp., 629 F.3d 121, 128 (3d Cir. 2010), and "view[] them in the light most favorable to [the] plaintiff," In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir. 1997) (citation omitted). "[W]e disregard legal conclusions and 'recitals of the elements of a cause of action, supported by mere conclusory statements.'" Santiago, 629 F.3d at 128 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

[2] An algorithm is a set of digital instructions that perform a task. See Force v. Facebook, Inc., 934 F.3d 53, 58 (2d Cir. 2019) (citation omitted).

Some videos that may appear on users' FYPs are known as "challenges," which urge users to post videos of themselves replicating the conduct depicted in the videos. The "Blackout Challenge . . . encourages users to choke themselves with belts, purse strings, or anything similar until passing out." App. 31 (Compl. ¶ 64). TikTok's FYP algorithm recommended a Blackout Challenge video to Nylah, and after watching it, Nylah attempted to replicate what she saw and died of asphyxiation.

B

Anderson, as the administratrix of Nylah's estate, sued TikTok in the United States District Court for the Eastern District of Pennsylvania, asserting claims for, among other things, strict products liability and negligence.[3] She alleges that TikTok: (1) was aware of the Blackout Challenge; (2) allowed users to post videos of themselves participating in the

---

[3] Anderson also brings claims for wrongful death and under Pennsylvania's Survival Act, 42 Pa. Cons. Stat. § 8302. Because those claims are derivative of her tort claims, her ability to pursue them depends on whether her tort claims survive the motion to dismiss. See Tulewicz v. Se. Pa. Transp. Auth., 606 A.2d 427, 431 (Pa. 1992) (survival action); Valentino v. Phila. Triathlon, LLC, 150 A.3d 483, 493 (Pa. Super. Ct. 2016) (wrongful death).

Anderson abandoned her claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. and Cons. Stat. § 201-1 et seq., and the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et seq. See Anderson v. TikTok, Inc., 637 F. Supp. 3d 276, 279 (E.D. Pa. 2022).

Blackout Challenge; and (3) recommended and promoted Blackout Challenge videos to minors' FYPs through its algorithm, including at least one such video to Nylah's FYP, which resulted in her death. The District Court dismissed the complaint, holding that TikTok was immune under § 230 of the CDA, 47 U.S.C. § 230. <u>Anderson v. TikTok, Inc.</u>, 637 F. Supp. 3d 276, 282 (E.D. Pa. 2022).

Anderson appeals.[4]

## II[5]

Congress enacted § 230 of the CDA to immunize interactive computer services ("ICSs")[6] from liability based on content posted by third parties in certain circumstances. <u>See</u>

---

[4] Anderson does not challenge the District Court's order denying her motion for leave to file an amended complaint.

[5] The District Court had jurisdiction pursuant to 28 U.S.C. § 1332(a). We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a district court's order granting a motion to dismiss. <u>Santiago</u>, 629 F.3d at 128 (citation omitted). "To survive a motion to dismiss, a complaint must . . . plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678 (citation omitted).

[6] TikTok is an "interactive computer service," which is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet[.]" 47 U.S.C. § 230(f)(2).

F.T.C. v. Accusearch Inc., 570 F.3d 1187, 1195 (10th Cir. 2009).[7]  Section 230 immunizes ICSs only to the extent that they are sued for "information provided by another information content provider."[8]  47 U.S.C. § 230(c)(1).[9]  In other words, ICSs are immunized only if they are sued for someone else's expressive activity or content (i.e., third-party speech), but they are not immunized if they are sued for their own expressive activity or content (i.e., first-party speech).

Anderson asserts that TikTok's algorithm "amalgamat[es] [] third-party videos," which results in "an expressive product" that "communicates to users . . . that the curated stream of videos will be interesting to them[.]"  ECF No. 50 at 5.  The Supreme Court's recent discussion about algorithms, albeit in the First Amendment context, supports

---

[7] Specifically, "Congress enacted the CDA in response to a state-court decision which held that the provider of an online messaging board could be liable for defamatory statements posted by third-party users of the board."  Accusearch Inc., 570 F.3d at 1195 (citations omitted).

[8] "The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other [ICS]."  47 U.S.C. § 230(f)(3).

[9] The immunity stems from the statutory language providing, with limited exceptions that do not apply here, that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent" with § 230(c)(1).  47 U.S.C. § 230(e).

this view.[10]   In <u>Moody v. NetChoice, LLC</u>, the Court considered whether state laws that "restrict the ability of social-

---

[10] In <u>Moody v. NetChoice, LLC</u>, the Supreme Court considered social media platforms' algorithms that construct feeds to relay content to users.  144 S. Ct. 2383, 2393 (2024). The Court described the platforms at issue in <u>NetChoice</u> as ones that "cull and organize uploaded posts in a variety of ways.  A user does not see everything . . . . The platforms will have removed some content entirely; ranked or otherwise prioritized what remains; and sometimes added warnings or labels." <u>Id.</u> at 2395.  The Court explained that, by engaging in such activity, the platforms "shape other parties' expression into their own curated speech products." <u>Id.</u> at 2393.  Although "[t]he selection and ranking is most often based on a user's expressed interests and past activities," the Court noted that "it may also be based on more general features of the communication or its creator[,]" particularly given that some platforms have guidelines that "detail the messages and videos that the platform[] disfavor[s.]" <u>Id.</u> at 2403.

In holding that "expressive activity includes presenting a curated compilation of speech originally created by others[,]" <u>id.</u> at 2400, the Court declined to address "algorithms [that] respond solely to how users act online[,]" <u>id.</u> at 2404 n.5. Accordingly, the presence or absence of a platform's standards or preferences that govern an algorithm's choices may dictate whether the algorithm is expressive speech, <u>id.</u> at 2410 (Barrett, J., concurring), as might whether the platform is a "passive receptacle[] of third-party speech . . . that emit[s] what [it is] fed" or whether it only responds to specific user inquiries, <u>id.</u> at 2431 (Alito, J., concurring in the judgment). <u>See also</u> <u>id.</u> at 2409-10 (Barrett, J., concurring) (distinguishing

media platforms to control whether and how third-party posts are presented to other users" run afoul of the First Amendment. 144 S. Ct. 2383, 2393 (2024). The Court held that a platform's algorithm that reflects "editorial judgments" about "compiling the third-party speech it wants in the way it wants" is the platform's own "expressive product" and is therefore protected by the First Amendment. Id. at 2394.

Given the Supreme Court's observations that platforms engage in protected first-party speech under the First Amendment when they curate compilations of others' content via their expressive algorithms, id. at 2409, it follows that doing so amounts to first-party speech under § 230, too. See Doe ex rel. Roe v. Snap, Inc., 144 S. Ct. 2493, 2494 (2024)

---

types of algorithms); id. at 2430-32 (Alito, J., concurring in the judgment) (same).

Because TikTok concedes that Anderson's complaint "describe[s] an algorithm indistinguishable from those addressed in NetChoice[,]" ECF No. 51 at 2, which the Supreme Court described as one that results in expressive speech, NetChoice, 144 S. Ct. at 2405 (holding that "social-media platforms are in the business, when curating their feeds, of combining multifarious voices to create a distinctive expressive offering" (internal quotation marks and citation omitted)), we need not weigh in on whether other algorithms result in expressive speech. Moreover, because TikTok's "algorithm, as described in the complaint, does not" "'respond solely to how users act online,'" ECF No. 51 at 2 (quoting NetChoice, 144 S. Ct. at 2404 n.5), TikTok makes choices about the content recommended and promoted to specific users, and by doing so, is engaged in its own first-party speech.

9

(Thomas, J., dissenting from denial of certiorari) (observing that "[i]n the platforms' world, they are fully responsible for their websites when it results in constitutional protections, but the moment that responsibility could lead to liability, they can disclaim any obligations and enjoy greater protections from suit than nearly any other industry.").

Here, as alleged, TikTok's FYP algorithm "[d]ecid[es] on the third-party speech that will be included in or excluded from a compilation—and then organiz[es] and present[s] the included items" on users' FYPs. <u>NetChoice</u>, 144 S. Ct. at 2402. Accordingly, TikTok's algorithm, which recommended the Blackout Challenge to Nylah on her FYP, was TikTok's own "expressive activity," <u>id.</u>, and thus its first-party speech. Such first-party speech is the basis for Anderson's claims. <u>See</u> App. 39 (Compl. ¶ 107(k), (o)) (alleging, among other things, that TikTok's FYP algorithm was defectively designed because it "recommended" and "promoted" the Blackout Challenge).[11]  Section 230 immunizes only information "provided by another[,]" 47 U.S.C. § 230(c)(1), and here, because the information that forms the basis of Anderson's lawsuit—i.e., TikTok's recommendations via its FYP

---

[11] We recognize that TikTok's first-party speech captures certain third-party speech. However, "'exercis[ing] editorial discretion in the selection and presentation' of content" qualifies as "'speech activity' . . . [whether] the content comes from third parties [or] it does not." <u>NetChoice</u>, 144 S. Ct. at 2402 (first alteration in original) (quoting <u>Ark. Educ. Television Comm'n v. Forbes</u>, 523 U.S. 666, 674 (1998)).

algorithm—is TikTok's own expressive activity, § 230 does not bar Anderson's claims.[12, 13]

### III

For the foregoing reasons, we will reverse in part, vacate in part, and remand.[14]

---

[12] We reach this conclusion specifically because TikTok's promotion of a Blackout Challenge video on Nylah's FYP was not contingent upon any specific user input. Had Nylah viewed a Blackout Challenge video through TikTok's search function, rather than through her FYP, then TikTok may be viewed more like a repository of third-party content than an affirmative promoter of such content. Given the type of algorithm alleged here, we need not address whether § 230 immunizes any information that may be communicated by the results of a user's search of a platform's content.

We need not address in this case the publisher/distributor distinction our colleague describes, nor do we need to decide whether the word "publisher" as used in § 230 is limited to the act of allowing third-party content to be posted on a website an ICS hosts, as compared to third-party content an ICS promotes or distributes through some additional action, because, in this case, the only distribution at issue is that which occurred via TikTok's algorithm, which as explained herein, is not immunized by § 230 because the algorithm is TikTok's own expressive activity.

[13] We recognize that this holding may be in tension with Green v. America Online (AOL), where we held that § 230 immunized an ICS from any liability for the platform's failure

_____

to prevent certain users from "transmit[ing] harmful online messages" to other users.  318 F.3d 465, 468 (3d Cir. 2003). We reached this conclusion on the grounds that § 230 "bar[red] 'lawsuits seeking to hold a service provider liable for . . . deciding whether to publish, withdraw, postpone, or alter content.'"  Id. at 471 (quoting Zeran v. Am. Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997)).  Green, however, did not involve an ICS's content recommendations via an algorithm and pre-dated NetChoice.  Similarly, our holding may depart from the pre-NetChoice views of other circuits.  See, e.g., Dyroff v. Ultimate Software Grp., 934 F.3d 1093, 1098 (9th Cir. 2019) ("[R]ecommendations and notifications . . . are not content in and of themselves."); Force v. Facebook, Inc., 934 F.3d 53, 70 (2d Cir. 2019) ("Merely arranging and displaying others' content to users . . . through [] algorithms—even if the content is not actively sought by those users—is not enough to hold [a defendant platform] responsible as the developer or creator of that content." (internal quotation marks and citation omitted)); Jane Doe No. 1 v. Backpage.com, LLC, 817 F.3d 12, 21 (1st Cir. 2016) (concluding that § 230 immunity applied because the structure and operation of the website, notwithstanding that it effectively aided sex traffickers, reflected editorial choices related to traditional publisher functions); Jones v. Dirty World Ent. Recordings LLC, 755 F.3d 398, 407 (6th Cir. 2014) (adopting Zeran by noting that "traditional editorial functions" are immunized by § 230); Klayman v. Zuckerburg, 753 F.3d 1354, 1359 (D.C. Cir. 2014) (immunizing a platform's "decision whether to print or retract a given piece of content"); Johnson v. Arden, 614 F.3d 785, 791-92 (8th Cir. 2010) (adopting Zeran); Doe v. MySpace, Inc., 528 F.3d 413, 420 (5th Cir. 2008) (rejecting an argument

that § 230 immunity was defeated where the allegations went to the platform's traditional editorial functions).

[14] To the extent that Anderson still pursues any claims not premised upon TikTok's algorithm, we leave to the District Court to determine, among other things, whether, consistent with this Opinion, those claims are barred by § 230. <u>See</u> Appellant's Br. at 21 (acknowledging that TikTok's "initial action in publishing the Blackout Challenge generally on the TikTok app may very well fall within the protections of the CDA"); Reply Br. at 9 n.1 (acknowledging that certain allegations in Anderson's complaint may be barred by the CDA).

MATEY, *Circuit Judge*, concurring in the judgment in part and dissenting in part.

TikTok reads § 230 of the Communications Decency Act, 47 U.S.C. § 230, to permit casual indifference to the death of a ten-year-old girl. It is a position that has become popular among a host of purveyors of pornography, self-mutilation, and exploitation, one that smuggles constitutional conceptions[1] of a "free trade in ideas" into a digital "cauldron of illicit loves" that leap and boil with no oversight, no accountability, no remedy.[2] And a view that has found support in a surprising number of judicial opinions dating from the early days of dial-up to the modern era of algorithms, advertising, and apps.

But it is not found in the words Congress wrote in § 230, in the context Congress acted, in the history of common carriage regulations, or in the centuries of tradition informing the limited immunity from liability enjoyed by publishers and distributors of "content." As best understood, the ordinary meaning of § 230 provides TikTok immunity from suit for

---

[1] Assumptions that find no support in the First Amendment, which "was not designed or originally understood to provide a font of judicially crafted doctrines protecting expressive freedom." Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L.J. 246, 320 (2017). And "[t]he problem with Section 230 is that in a bout of free speech zeal, courts have interpreted the law to be far more extensive than it is written or should be." Daniel Solove, *Restoring the CDA Section 230 to What It Actually Says*, TeachPrivacy (Feb. 4, 2021), https://teachprivacy.com/restoring-the-cda-section-230-to-what-it-actually-says/.

[2] Saint Augustine of Hippo, The Confessions of Saint Augustine 42 (Hackett Publishing Co. 2006).

hosting videos created and uploaded by third parties. But it does not shield more, and Anderson's estate may seek relief for TikTok's knowing distribution and targeted recommendation of videos it knew could be harmful. Accordingly, I concur in the judgment in part and dissent in part.

## I.

### A.

Ten-year-old Nylah Anderson died after attempting to recreate the "Blackout Challenge" she watched on TikTok. The Blackout Challenge—performed in videos widely circulated on TikTok—involved individuals "chok[ing] themselves with belts, purse strings, or anything similar until passing out." App. 31.[3] The videos "encourage[d]" viewers to record themselves doing the same and post their videos for other TikTok users to watch. App. 31. Nylah, still in the first year of her adolescence, likely had no idea what she was doing or that following along with the images on her screen would kill her. But TikTok knew that Nylah would watch because the company's customized algorithm placed the videos on her "For You Page"[4] after it "determined that the Blackout Challenge was 'tailored' and 'likely to be of interest' to Nylah." App. 31.

No one claims the videos Nylah viewed were created by TikTok; all agree they were produced and posted by other

---

[3] We must take the well-pleaded factual allegations drawn from the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[4] The For You Page displays a unique series of videos to each user based on TikTok's algorithm, which "selects

TikTok subscribers. But by the time Nylah viewed these videos, TikTok knew that: 1) "the deadly Blackout Challenge was spreading through its app," 2) "its algorithm was specifically feeding the Blackout Challenge to children," and 3) several children had died while attempting the Blackout Challenge after viewing videos of the Challenge on their For You Pages. App. 31–32. Yet TikTok "took no and/or completely inadequate action to extinguish and prevent the spread of the Blackout Challenge and specifically to prevent the Blackout Challenge from being shown to children on their [For You Pages]." App. 32–33. Instead, TikTok continued to recommend these videos to children like Nylah.

## B.

Following her daughter's death, Tawainna Anderson sued TikTok and its parent company, ByteDance, Inc. Anderson seeks to hold TikTok liable for 1) hosting the Blackout Challenge videos on its platform, 2) continuing to distribute the videos after it learned about the videos and the deaths that followed, and 3) recommending the videos to Nylah after TikTok knew the videos were likely to cause harm. TikTok moved to dismiss, arguing that Anderson sought to hold TikTok liable for acts completely immunized by § 230(c)(1). The District Court agreed.

---

which videos are shown to each user based on the user's demographics, including age, [and] user interactions such as the videos viewed and shared." App. 28 (emphasis omitted).

## II.

TikTok maintains that Anderson's claims are foreclosed by a nearly-limitless interpretation of § 230 adopted by several courts. But the best reading of the statute suggests a far narrower understanding of § 230 immunity.

## A.

Like any man-made law, § 230 did not appear in a vacuum, and "some context is key to understanding Congress's aim" and the precise language it selected. *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 166 (3d Cir. 2023), *cert. denied*, 144 S. Ct. 549 (2024); *see also* 1 William Blackstone, Commentaries *61, *87. Congress enacted § 230 following more than a century of state and federal law regulating the transmission of third-party information and against the backdrop of two widely discussed judicial decisions addressing the liability of online service providers. Those decisions tracked traditional liability regimes that shielded parties who merely sent along allegedly harmful information, while imposing duties on those who did so with specific knowledge of the harmful nature of the content.

**1.** Begin with the birth of long-distance communication. Like the chat rooms and bulletin boards provided by 1990s online service providers, telegraph companies long served as the conduit for communication for much of the late nineteenth and early twentieth centuries. Given the immense market power of the telegraph,[5] the law regularly imposed access and nondiscrimination duties

---

[5] *See* Matt Stoller, Goliath 5–7 (2019).

familiar to physical networks like railroads.[6] That raised questions about liability, since state laws often held companies responsible for negligent deliveries. *See* Adam Candeub, *The Common Carrier Privacy Model*, 51 U.C. Davis L. Rev. 805, 810–15 (2018). Liability could also attach based on the content of third-party information. *See* Adam Candeub, *Reading Section 230 as Written*, 1 J. of Free Speech L. 139, 145–47 & 146 n.26 (2021). While telegraph operators were ordinarily not responsible for the materials they transmitted, *see O'Brien v. W. U. Tel. Co.*, 113 F.2d 539, 541–43 (1st Cir. 1940), liability could attach if the company knew the content was harmful, *see Von Meysenbug v. W. U. Tel. Co.*, 54 F. Supp. 100, 101 (S.D. Fla. 1944); *see also Biden v. Knight First Amend. Inst. at*

---

[6] *See* Peter Huber, Law and Disorder in Cyberspace 26 (1997) ("Federal authorities had already been regulating railroads for decades. Congress figured that regulating phones would be much the same."); *see also* James B. Speta, *A Common Carrier Approach to Internet Interconnection*, 54 Fed. Comm. L.J. 225, 261–68 (2002); *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1223 & n.2 (2021) (Thomas, J., concurring); *Cellco P'ship v. FCC*, 700 F.3d 534, 545–46 (D.C. Cir. 2012). Common carriage arrangements pursued a regulatory bargain, with carriers receiving benefits (like immunities from suit and market control) in exchange for increased delivery obligations. *See* Adam Candeub, *Bargaining For Free Speech: Common Carriage, Network Neutrality, and Section 230*, 22 Yale J.L. & Tech. 391, 398–413 (2020).

*Columbia Univ.*, 141 S. Ct. 1220, 1223 & n.3 (2021) (Thomas, J., concurring).[7] But that was the rare exception.

This was the common-sense system throughout the twentieth century.[8] Transmitters usually had little control over what rode their networks[9] and rarely knew the circumstances that might make a statement harmful.[10] Imposing liability for conduct that lacked culpability would unfairly punish beneficial industries and pin emerging networks under the weight of endless lawsuits. But the scale tipped in a different

---

[7] Liability for telephone companies came to function much the same way. *See* Candeub, *Reading Section 230 as Written*, *supra*, at 146 n.26.

[8] It also conformed with the regulation of other common carriers. A railroad, for example, was generally not liable for a passenger's unlawful acts facilitated by the train unless the operator knew its service was being used for an unlawful purpose. *See* Bruce Wyman, *Illegality as an Excuse for Refusal of Public Service*, 23 Harv. L. Rev. 577, 584 (1910). So too with telegraphs and telephones that had only a duty to "refuse to transmit messages which would implicate [the company] in illegality," such as communications these companies knew were libelous, obscene, fraudulent, or otherwise used to further some harmful act proscribed by law. *See id.* at 584–85, 587.

[9] *See* Ryan Gerdes, *Scaling Back 230 Immunity: Why the Communications Decency Act Should Take a Page from the Digital Millennium Copyright Act's Service Provider Immunity Playbook*, 60 Drake L. Rev. 653, 656 (2012).

[10] Take the telegraph operator transmitting the statement "John is a crook." If the operator does not know that John is scrupulously law-abiding, the context necessary to make the statement false and libelous is absent.

way when a transmitter of third-party information knew the content was harmful, a distinction that carried into the changes in communications technology during the back half of the twentieth century.

**2.**  The internet began infiltrating daily life in the early 1990s through large commercial service providers like CompuServe, Prodigy, and AOL.[11] These emerging services "were born serving content of their own,"[12] but, facing competition, they expanded to allow "users to post comments on bulletin boards, open to other members, and to communicate in chat rooms."[13] Those added functions resurrected the old legal question familiar to common carriers: Should online service providers be liable for the actions of third parties on their networks? Understanding how courts answered this question is essential to understanding the legal context in which § 230 was enacted. Because a 1991 district court decision set the boundaries of liability law for the next three decades.

Believed to be the first case in the United States "to decide whether an online service . . . could be held liable for third-party content,"[14] *Cubby, Inc. v. CompuServe, Inc.* involved a defamation claim arising out of an allegedly libelous statement appearing on one of CompuServe's "special interest 'forums.'" 776 F. Supp. 135, 137 (S.D.N.Y. 1991). These fora, "comprised of electronic bulletin boards, interactive online conferences, and topical databases," allowed

---

[11] Lawrence Lessig, The Future of Ideas 147 (2001).

[12] *Id.* at 148.

[13] Jeff Kosseff, The Twenty-Six Words That Created The Internet 37 (2019).

[14] *Id.* at 42.

subscribers to post their own messages and interact with other users. *Id.* Pivoting from the closed curation of the old networks, CompuServe did not review subscriber postings. *Id.* Inevitably, disagreements arose among the users, and a lawsuit followed seeking to hold CompuServe liable for a posting on its system.

The district court sketched two paths for determining CompuServe's liability. Perhaps the company could be considered a "publisher," someone strictly liable for repeating defamatory statements no matter the company's knowledge of what was said and why it might be actionable. *Id.* at 139. Or the company might be a "distributor," like "news vendors, book stores, and libraries," and liable only if the company knew or had reason to know the statement was defamatory. *Id.* The district court decided CompuServe's forum was "in essence an electronic, for-profit library," with the company having "little or no editorial control over [the forum's] contents." *Id.* at 140. And because it was merely a distributor, liability could only attach if CompuServe knew the post was defamatory (which it did not). *Id.* at 140–41.

*CompuServe* both won praise and stoked worry because the opinion turned on the amount and kind of editorial control exercised by the internet forum, a test that could vary in application from service to service. *See, e.g.*, Jonathan M. Moses & Michael W. Miller, *CompuServe Is not Liable for Contents*, Wall St. J. (Oct. 31, 1991). Prodigy, for example, sold subscribers on the rigor of its screening and the promise that families could enjoy online entertainment without offensive messages. That suggested Prodigy could be subject to strict liability because it was "the only major commercial [bulletin board] operator that monitor[ed] all public messages by screening them before they [were] posted." David J. Conner, Note, Cubby v. CompuServe, *Defamation Law on the*

*Electronic Frontier*, 2 Geo. Mason Indep. L. Rev. 227, 240 (1993).

These predictions proved prescient. Three years later, in *Stratton Oakmont, Inc. v. Prodigy Services Company*, Prodigy was sued for hosting allegedly defamatory statements posted on one of its electronic bulletin boards. 1995 WL 323710, at *1 (N.Y. Sup. Ct. May 24, 1995). Following the reasoning of *CompuServe*, the *Stratton Oakmont* court found Prodigy "exercised sufficient editorial control over its computer bulletin boards to render it a publisher with the same responsibilities as a newspaper." *Id.* at *3. That meant Prodigy was liable for any defamatory statements on its service. *Id.* at *3–5. Though it was a non-precedential opinion issued by a state trial court judge, *Stratton Oakmont* received significant attention, much of it negative.[15] If *Stratton Oakmont*'s reasoning stood, online service providers acting to exclude offensive and obscene content would now risk liability for the rest of the material they hosted. *See* Adam Candeub, *Bargaining For Free Speech: Common Carriage, Network Neutrality, and Section 230*, 22 Yale J.L. & Tech. 391, 421 (2020).

---

[15] *See* Kosseff, *supra*, at 55–71; R. Hayes Johnson Jr., *Defamation in Cyberspace: A Court Takes a Wrong Turn on the Information Superhighway in* Stratton Oakmont, Inc. v. Prodigy Services Co., 49 Ark. L. Rev. 589, 594 & n.10 (1996); Douglas B. Luftman, Note, *Defamation Liability for On-Line Services: The Sky Is Not Falling*, 65 Geo. Wash. L. Rev. 1071, 1072 (1997) (describing the "apocalyptic reactions in the legal and technical communities").

**B.**

**1.**  Congress responded vigorously, and a mere nine months after *Stratton Oakmont*, the President signed the Communications Decency Act of 1996 (CDA) into law as part of the Telecommunications Act of 1996, Pub. L. No. 104–104, 110 Stat. 56. A last-minute addition to the Telecommunications Act, the CDA was initially designed to regulate internet pornography and protect children from obscene and harmful material. *See* Robert Cannon, *The Legislative History of Senator Exon's Communications Decency Act: Regulating Barbarians on the Information Superhighway*, 49 Fed. Comm. L.J. 51, 52–58 (1996). But a month after *Stratton Oakmont*, lawmakers introduced the CDA amendment that ultimately became § 230. *See* Internet Freedom and Family Empowerment Act, H.R. 1978, 104th Cong. (1995). Unlike other aspects of the CDA, § 230's "proposal and passage flew under the radar" and "received virtually no opposition or media coverage." Jeff Kosseff, The Twenty-Six Words That Created The Internet 3 (2019).

As enacted, § 230 created two complementary protections. Section 230(c)(1) directs that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." And § 230(c)(2)(A) states that "[n]o provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." The statute expressly preempts any "cause of action" or "liability" "under any State or local law that is inconsistent with" those provisions. § 230(e)(3).

It is conventional wisdom that § 230 was passed to, at least in part, overrule *Stratton Oakmont*,[16] a goal that fit within the purpose of the CDA's statutory scheme. Most of the CDA's provisions sought to protect minors from offensive online material. *See Force v. Facebook, Inc.*, 934 F.3d 53, 78–80 (2d Cir. 2019) (Katzmann, J., concurring in part & dissenting in part). But *Stratton Oakmont*'s reasoning undercut incentives for computer services to limit access to offensive material. After all, it was precisely Prodigy's attempt to moderate its platform to provide a family-friendly environment that led to vast tort liability. *See Stratton Oakmont*, 1995 WL 323710, at *1–5. By overruling *Stratton Oakmont*, Congress encouraged private action to complement the CDA's regulations and bolster efforts to reduce the spread of indecent material on the internet. *See Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997).

**2.** But from the very start, courts held § 230 did much more than overrule *Stratton Oakmont*'s publisher-liability theory. And they almost all followed *Zeran v. America Online, Inc.*, which read § 230(c)(1) to immunize an interactive computer service provider's "exercise of a publisher's

---

[16] *See* Kosseff, *supra*, at 48–82; Candeub, *Bargaining For Free Speech*, *supra*, at 419–21; *Force v. Facebook, Inc.*, 934 F.3d 53, 79–80 (2d Cir. 2019) (Katzmann, J., concurring in part & dissenting in part). Contemporary commentators, *see, e.g.*, Cannon, *supra*, at 61–63, 68, early courts, *see, e.g.*, *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997), and even modern proponents of broad § 230 immunity, *see, e.g.*, Tr. Oral Argument at 126, *Gonzalez v. Google LLC*, 598 U.S. 617 (2023) (No. 21-1333) (Counsel for Google: "[O]ne lawsuit freaked out the Congress . . . ."), all agree.

11

traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." 129 F.3d at 330. This broad immunity was broadened even further when *Zeran* held that § 230(c)(1) barred both publisher *and* distributor liability. *Id.* at 331–34. Though *Zeran* has been criticized as inconsistent with the text, context, and purpose of § 230 (and was decided in an era where those traditional tools of construction were rarely consulted), the opinion was cut-and-paste copied by courts across the country in the first few years after the statute arrived. *See Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 15–18 (2020) (Thomas, J., statement respecting denial of certiorari); *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 746–47 (9th Cir. 2024) (Nelson, J., concurring); Candeub, *Bargaining For Free Speech, supra*, at 423–28.

Today, § 230 rides in to rescue corporations from virtually any claim loosely related to content posted by a third party, no matter the cause of action and whatever the provider's actions. *See, e.g.*, *Gonzalez v. Google LLC*, 2 F.4th 871, 892–98 (9th Cir. 2021), *vacated*, 598 U.S. 617 (2023); *Force*, 934 F.3d at 65–71. The result is a § 230 that immunizes platforms from the consequences of their own conduct and permits platforms to ignore the ordinary obligation that most businesses have to take reasonable steps to prevent their services from causing devastating harm.

### C.

But this conception of § 230 immunity departs from the best ordinary meaning of the text and ignores the context of congressional action. Section 230 was passed to address an old problem arising in a then-unique context, not to "create a lawless no-man's-land" of legal liability. *Fair Hous. Council*

*of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008) (en banc).

As with all cases involving the interpretation of statutes, our job in interpreting § 230's text is to "give effect to the legislature's charge," "stated through the 'ordinary meaning . . . at the time Congress enacted the statute.'" *OI Eur. Grp. B.V.*, 73 F.4th at 165 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Courts must take care to construe a statute's terms in light of "background understandings and the structure and circumstances of the [legislative] utterance." *Herrmann v. Cencom Cable Assocs., Inc.*, 978 F.2d 978, 982 (7th Cir. 1992). A task that necessarily includes consideration of the legal "backdrop against which Congress" acted. *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 487 (2005); *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring) ("[T]extualists, like all interpreters," read "text in context . . . . Context is not found exclusively within the four corners of a statute. Background legal conventions, for instance, are part of the statute's context." (cleaned up)).[17]

**1.** Section 230(c)(1) directs that TikTok not be "treated as the publisher . . . of any information provided by another

---

[17] A principle of interpretation with deep roots in the classical legal tradition. Blackstone understood the interpretation of statutes that sought to change the legal status quo to necessarily include consideration of 1) how the law "stood at the making of the act"; 2) "what the mischief was, for which the [then-existing] law did not provide"; 3) "and what remedy the [legislature] hath provided to cure this mischief." 1 Blackstone, Commentaries *87. All contextual clues aiding the interpretation of the words the legislature enacted. *See OI Eur. Grp. B.V.*, 73 F.4th at 170.

information content provider."[18] Congress enacted § 230 mindful of the recent and widely discussed online service provider tort cases drawing the publisher-distributor distinction, as well as decades of state and federal law apportioning liability for electronic transmissions along the same line. That points to the best reading of § 230(c)(1) as adopting the meaning of "publisher" used by *Stratton Oakmont* and *CompuServe*. *See George v. McDonough*, 596 U.S. 740, 746 (2022) ("Where Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it." (cleaned up)). So when § 230(c)(1) prohibits "treat[ing]" TikTok as the "publisher" of videos posted by third parties, that means TikTok cannot be liable for the mere act of hosting those videos. *See Malwarebytes*, 141 S. Ct. at 14–16 (Thomas, J., statement respecting denial of certiorari); *Doe ex rel. Roe v. Snap, Inc.*, 88 F.4th 1069, 1070–72 (5th Cir. 2023) (Elrod, J., dissenting from denial of rehearing en banc);

---

[18] The reference to "speaker" in § 230(c)(1) does not change the meaning of the text. When § 230 was enacted, courts often referred to traditional publisher liability as treating the disseminator of a statement as the "original speaker" subject to the same strict liability. *See* Jonathan A. Friedman & Francis M. Buono, *Limiting Tort Liability for Online Third-party Content Under Section 230 of the Communications Act*, 52 Fed. Comm. L.J. 647, 650 (2000). Consistent with common law tort theory, I refer to such claims as publisher liability rather than "third" versus "first-party speech." Doing so also avoids the confusing commingling of statutory and constitutional language that can conflate the distinct legal meanings of "speech."

Candeub, *Reading Section 230 as Written*, *supra*, at 146–51. It cannot, in short, be held liable as a publisher.

But § 230(c)(1) does not immunize more. It allows suits to proceed if the allegedly wrongful conduct is not based on the mere hosting of third-party content, but on the acts or omissions of the provider of the interactive computer service. This is where *Zeran* went astray, wrongly reasoning that distributor liability "is merely a subset, or a species, of publisher liability." 129 F.3d at 332. It is true that "[s]ources sometimes use language that arguably blurs the distinction between publishers and distributors." *Malwarebytes*, 141 S. Ct. at 15 (Thomas, J., statement respecting denial of certiorari). But understanding § 230(c)(1)'s use of "publisher" to subsume distributor liability conflicts with the context surrounding § 230's enactment. Both *CompuServe* and *Stratton Oakmont* saw two distinct concepts. *See CompuServe*, 776 F. Supp. at 138–41; *Stratton Oakmont*, 1995 WL 323710, at *1–5. So did the common law of common carriers. It is implausible to conclude Congress decided to silently jettison both past and present to coin a new meaning of "publisher" in § 230(c)(1). *See Malwarebytes*, 141 S. Ct. at 14–16 (Thomas, J., statement respecting denial of certiorari); *Doe v. Am. Online, Inc.*, 783 So. 2d 1010, 1023–25 (Fla. 2001) (Lewis, J., dissenting).

**2.** Properly read, § 230(c)(1) says nothing about a provider's own conduct beyond mere hosting.[19] A conclusion

---

[19] *See Doe v. Facebook, Inc.*, 142 S. Ct. 1087, 1088 (2022) (Thomas, J., statement respecting denial of certiorari) ("It is hard to see why the protection § 230(c)(1) grants publishers against being held strictly liable for third parties' content should protect Facebook from liability for its *own* 'acts

confirmed by § 230(c)(2), which enumerates acts that
platforms can take without worrying about liability.[20] *See*
David L. Shapiro, *Continuity and Change in Statutory
Interpretation*, 67 N.Y.U. L. Rev. 921, 942 (1992) ("[A]ll
legislation occurs against a background of customs and
understandings of the way things are done . . . . [A] speaker
who is issuing an order or prohibition is likely to focus on what
is being changed and to expect the listener to understand that,
so far as this communication is concerned, all else remains the
same.").[21]

_____

and omissions.'" (emphasis in original)); *cf. FTC v.
Accusearch Inc.*, 570 F.3d 1187, 1204 (10th Cir. 2009)
(Tymkovich, J., concurring) ("Section 230 only immunizes
publishers or speakers for the *content* of the information from
other providers that they make public. The CDA says nothing
about immunizing publishers or speakers for their own conduct
. . . ." (emphasis in original) (citation omitted)).

[20] *See* § 230(c)(2) ("No provider or user of an interactive
computer service shall be held liable on account of (A) any
action voluntarily taken in good faith to restrict access to or
availability of material that the provider or user considers to be
obscene, lewd, lascivious, filthy, excessively violent,
harassing, or otherwise objectionable; or (B) any action taken
to enable or make available to information content providers or
others the technical means to restrict access to material
described in [§ 230(c)(2)(A)].").

[21] Invoking § 230(f)(4)(C)'s definition of "access
software provider," TikTok argues for a broader reading of
§ 230(c)(1) to include immunity for any actions taken to
"organize" or "reorganize" content. In TikTok's view, its

**3.** What does all this mean for Anderson's claims? Well, § 230(c)(1)'s preemption of traditional publisher liability precludes Anderson from holding TikTok liable for the Blackout Challenge videos' mere presence on TikTok's platform. A conclusion Anderson's counsel all but concedes. But § 230(c)(1) does not preempt distributor liability, so Anderson's claims seeking to hold TikTok liable for continuing to host the Blackout Challenge videos knowing they were causing the death of children can proceed. So too for her claims seeking to hold TikTok liable for its targeted recommendations of videos it knew were harmful. That is TikTok's own conduct, a subject outside of § 230(c)(1). Whether that conduct is actionable under state law is another question. But § 230 does not preempt liability on those bases.[22]

---

targeted recommendations just organize the hosted content. But I do not read a definitional provision defining a different statutory term to expand the scope of § 230(c)(1)'s "publisher" immunity. Section 230(f)(4)(C), on its own, provides no immunity. It only states that a provider or user of an interactive computer service does not become an "information content provider"—and thereby fall outside the scope of § 230(c)(1)—just by organizing or reorganizing third-party content. One cannot conclude from § 230(f)(4) that because some providers or users of interactive computer services organize information, § 230(c)(1) necessarily immunizes that conduct. Section 230(f)(4) just loops the reader back to § 230(c)(1) to determine the meaning of "treat[] as the publisher . . . of any information provided by another information content provider."

[22] A word on *Green v. America Online*, 318 F.3d 465 (3d Cir. 2003), a two-decade-old decision that decided very

little. *Green* involved a disgruntled former subscriber to AOL's chat room service who filed a pro se complaint that was "not especially clear." *Id.* at 468. By the time his case made it to this Court, Green's main complaint seems to have been that AOL "negligently failed to live up to its contractual obligations" by failing to kick certain third-party users off AOL's platform after they sent Green a virus through AOL and posted defamatory statements about him in a chat room. *See id.*; Brief for Appellant, *Green v. Am. Online*, 318 F.3d 465 (3d Cir. 2003) (No. 01-1120), 2002 WL 32397368, at *1–2, *4, *13–14. We explained that "[t]he only question" presented on appeal was "whether holding AOL liable for its alleged negligent failure to properly police its network for content transmitted by its users" was barred by § 230(c)(1). *Green*, 318 F.3d at 470. In a single, three-sentence paragraph of analysis, we answered that question in the affirmative, holding that Green's claims were barred by § 230(c)(1) because they sought "to hold AOL liable for . . . actions quintessentially related to a publisher's role." *Id.* at 471.

Exactly what "failure to properly police its network" meant is also "not especially clear." But in my view, it is best understood to refer to a provider of an interactive computer service failing to pre-screen third-party content before circulation and failing to actively monitor its service for allegedly harmful content. *See, e.g.*, *id.* at 469 (describing Green's complaint that AOL "did nothing to stop" the initial posting of additional defamatory statements); Brief for Appellee, *Green v. Am. Online*, 318 F.3d 465 (3d Cir. 2003) (No. 01-1120), 2002 WL 32397367, at *8 (explaining that Green's complaint did not allege that he "suffer[ed] any damages at any time after" he notified AOL of the third-party

* * *

"It used to be said that there were three great influences on a child: home, school, and church. Today, there is a fourth great influence . . . ." Newton N. Minow, Speech Before the Nat'l Ass'n of Broads. (May 9, 1961), *reprinted in* Newton N. Minow, *Television and the Public Interest*, 55 Fed. Comm. L.J. 395, 399 (2003). When Commissioner Minow spoke of the perils and promise of television, the internet was still two decades from its earliest form. But his description of a "procession of game shows, . . . formula comedies about totally unbelievable families, blood and thunder, mayhem, violence, sadism, murder, . . . more violence, and cartoons" captures the dreary state of the modern internet. *Id.* at 398. The marketplace of ideas, such as it now is, may reward TikTok's pursuit of profit above all other values. The company may decide to curate the content it serves up to children to emphasize the lowest virtues, the basest tastes. It may decline to use a common good to advance the common good.

But it cannot claim immunity that Congress did not provide. For these reasons, I would affirm the District Court's judgment as it relates to any of Anderson's claims that seek to hold TikTok liable for the Blackout Challenge videos' mere existence on TikTok's platform. But I would reverse the District Court's judgment as it relates to any of Anderson's

_____

information). In other words, all *Green* held was that § 230 precluded publisher liability as that term was understood by *Stratton Oakmont* and *CompuServe*. *Green* said nothing about whether § 230 immunizes providers or users of interactive computer services for failing to take down harmful content once they receive notice of its presence on the platform (distributor liability).

claims that seek to hold TikTok liable for its knowing distribution and targeted recommendation of the Blackout Challenge videos. Accordingly, I concur in the judgment in part and dissent in part.