No. 22-3061

# In the United States Court of Appeals for the Third Circuit

―――――――――――――――

Tawainna Anderson, individually and as administratix of the estate of N.A., a deceased minor,

*Appellant,*

v.

TikTok, Inc.; ByteDance, Inc.,

*Appellees.*

―――――――――――――――

BRIEF OF AMICI CURIAE TECHFREEDOM AND MEDIA LAW RESOURCE CENTER IN SUPPORT OF APPELLEES' PETITION FOR REHEARING EN BANC

―――――――――――――――

On appeal from the United States District Court for the Eastern District of Pennsylvania (No. 2:22-cv-1849)

―――――――――――――――

Corbin K. Barthold
Berin Szóka
Ari Cohn
TechFreedom
1500 K Street NW
Washington, DC 20005
(771) 200-4997
cbarthold@techfreedom.org
*Counsel for Amici Curiae
TechFreedom and Media Law
Resource Center*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 and Third Circuit Rule 26.1, TechFreedom and Media Law Resource Center make the following disclosures:

TechFreedom is a non-profit corporation organized under Section 501(c)(3) of the Internal Revenue Code. TechFreedom has no parent corporation, and it issues no stock.

Media Law Resource Center is a non-profit organization under Section 501(c)(6) of the Internal Revenue Code. MLRC has no parent corporation, and it issues no stock.

/s/ Corbin K. Barthold

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE ............................................................ 1

SUMMARY OF ARGUMENT ............................................................... 1

ARGUMENT ........................................................................................ 3

I.     The Panel Ignored Persuasive Authority from Other Circuits—Especially *Force v. Facebook* (2d Cir.) ........................ 3

II.    The Panel Misunderstood and Misapplied *Moody v. NetChoice* (U.S.) .......................................................................... 6

III.   The Panel Ignored the Lessons of *Gonzalez v. Google* (U.S.) ................................................................................................ 10

CONCLUSION .................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Batzel v. Smith,*
   333 F.3d 1018 (9th Cir. 2003) .......................................................... 8

*Force v. Facebook,*
   934 F.3d 53 (2d Cir. 2019).................................................... 2, 4, 5, 6

*Gonzalez v. Google,*
   143 S. Ct. 1191 (2023) ........................................................ 2, 10, 12

*Google Inc. v. Hood,*
   822 F.3d 212 (5th Cir. 2016) .......................................................... 8

*Moody v. NetChoice,*
   No. 22-277 (U.S., July 1, 2024) .................................................. 2, 8

*Paxton v. NetChoice,*
   49 F.4th 439 (5th Cir. 2022)........................................................ 2, 9

*United States v. Miller,*
   891 F.2d 1265 (7th Cir. 1989) .................................................. 3, 13

*Zeran v. Am. Online,*
   129 F.3d 327 (4th Cir. 1997) .......................................................... 3

## Statutes

47 U.S.C. § 230(b)(1) ........................................................................ 4, 5

# TABLE OF AUTHORITIES
## (Cont.)

**Page(s)**

### Other Authorities

Ryan Calo, *Courts Should Hold Social Media Accountable—But Not By Ignoring Federal Law*, Harv. L. Rev. Blog (Sept. 10, 2024), https://tinyurl.com/fb6f7n4j ............................................................. 6

141 Cong. Rec. H. 8471 (Aug. 4, 1995) (statement of Rep. Zoe Lofgren).................................................................... 8

*Gonzalez v. Google*, No. 21-1333, OA Tr. (U.S. Feb. 21, 2023) ..................................................................... 11, 12

Brief of Google LLC, *Gonzalez v. Google*, No. 21-1333 (U.S. Jan. 12, 2023) .......................................................... 11

Elliot Harmon, *No, Section 230 Does Not Require Platforms to Be "Neutral"*, Electronic Frontier Foundation (April 12, 2018), https://bit.ly/2DJ1zO4 ....................... 7

"Publish," *Merriam-Webster.com Dictionary*, https://tinyurl.com/yc6uk64s............................................................ 3

Brief of United States, *Gonzalez v. Google*, No. 21-1333 (U.S. Dec. 7, 2022) .......................................................... 11

## INTEREST OF AMICI CURIAE*

TechFreedom is a nonprofit, nonpartisan think tank based in Washington, D.C. It has long been at the forefront of the fight to protect Section 230, the bulwark of online free expression. See TechFreedom & MLRC Mot. to File Amicus Brief, No. 22-3061 (3d Cir., Oct. 8, 2024).

Media Law Resource Center, Inc., (MLRC) is a non-profit membership organization for media organizations and attorneys who advocate for media and First Amendment rights. See *Id*. The views expressed here are those of MLRC and do not necessarily reflect the views of any of its individual or organizational members.

## SUMMARY OF ARGUMENT

The panel concluded that algorithmic recommendations aren't protected by Section 230. To reach that erroneous result, the panel had to brush aside the well-reasoned decisions of other circuits, misread or ignore multiple Supreme Court decisions, and trip into a basic fallacy about how Section 230 works.

---

\* No party's counsel authored any part of this brief. No one, apart from amici and their counsel, contributed money intended to fund the brief's preparation or submission.

**I.** The panel is not the first court to confront the question of whether Section 230 protects algorithmic recommendations. It is the first, however, to conclude that the answer is no—thus creating both an inter-circuit and intra-circuit split. Among the many decisions the panel ignored, an especially persuasive one is *Force v. Facebook*, 934 F.3d 53 (2d Cir. 2019). *Force* sheds much light on the panel's error. As the Second Circuit understood, Section 230 protecting algorithmic recommendations is Section 230 working precisely as designed.

**II.** Instead of addressing the precedents that run against it, the panel claimed that the Supreme Court's recent decision in *Moody v. NetChoice*, No. 22-277 (U.S., July 1, 2024)—which never even mentions Section 230—sweeps those precedents away. That is incorrect. What's more, *Moody* overturns *Paxton v. NetChoice*, 49 F.4th 439 (5th Cir. 2022), which contains the same error—assuming no overlap between the First Amendment and Section 230—that pervades the panel's decision.

**III.** The panel failed to grapple with the Supreme Court's inability to reach the merits in *Gonzalez v. Google*, 143 S. Ct. 1191 (2023). The justices wanted to decide whether Section 230 protects algorithmic recommendations. During oral argument, however, it became clear that this is a difficult—probably intractable—question. The logic of the panel's decision runs into all the problems that caused the Supreme Court not to

reach the merits in *Gonzalez*. Yet in a footnote, the panel arbitrarily limits the scope of its decision. "Such a meandering, personal approach is the antithesis of justice under law[.] … 'I know it when I see it' is not a rule of any kind." *United States v. Miller*, 891 F.2d 1265, 1273 (7th Cir. 1989) (Easterbrook, J., concurring).

The full Court should grant en banc review.

## ARGUMENT

### I.    The Panel Ignored Persuasive Authority from Other Circuits—Especially *Force v. Facebook* (2d Cir.)

Section 230(c)(1) says that a website shall not be "treated as the publisher" of most third-party content it hosts and spreads. Under the ordinary meaning of the word, a "publisher" prepares information for distribution and disseminates it to the public. See, e.g., "Publish," *Merriam-Webster.com Dictionary*, https://tinyurl.com/yc6uk64s (accessed Oct. 1, 2024).

Under Section 230, therefore, a website is protected from liability for posting, removing, arranging, and otherwise organizing third-party content. See, e.g., *Zeran v. Am. Online*, 129 F.3d 327, 330 (4th Cir. 1997). In other words, Section 230 protects a website as it fulfills a publisher's traditional role. And one of Section 230's stated purposes is to "promote

the continued development of the Internet"—so the statute plainly envisions the protection of new, technology-driven publishing tools as well. 47 U.S.C. § 230(b)(1).

The plaintiffs here are not the first to contend that websites lose Section 230 protection when they use fancy algorithms to make publishing decisions. Several notable court rulings reject the notion that algorithms are special. See Slip.op. 11-13 n.13.

*Force v. Facebook*, 934 F.3d 53 (2d Cir. 2019), is especially instructive. The plaintiffs there argued that "Facebook's algorithms make … content more 'visible,' 'available,' and 'usable.'" They asserted that "Facebook's algorithms suggest third-party content to users 'based on what Facebook believes will cause the user to use Facebook as much as possible,'" and that "Facebook intends to 'influence' consumers' responses to that content." *Id*. 70. As here, the plaintiffs insisted that algorithms are a distinct form of speech, belonging to the platform and unprotected by Section 230.

The Second Circuit was unpersuaded. Nothing in the text of Section 230, it observed, suggests that a website "is not the 'publisher' of third-party information when it uses tools such as algorithms that are designed to match that information with a consumer's interests." *Id*. 66. In fact, it noted, the use of such tools promotes Congress's express policy

"to promote the continued development of the Internet." *Id.* (quoting 47 U.S.C. § 230(b)(1)).

By "making information more available," the Second Circuit wrote, Facebook was engaging in "an essential part of traditional *publishing*." *Id.* 70. It was doing what websites have done "on the Internet since its beginning"—that is, "arranging and distributing third-party inform-ation" in a manner that "forms 'connections' and 'matches' among speakers, content, and viewers of content." *Id.* 66-67. It "would turn Section 230(c)(1) upside down," the court concluded, to hold that Congress intended to revoke Section 230 protection from websites that, whether through algorithms or otherwise, "become especially adept at performing the functions of publishers." *Id.* 67. The Second Circuit had no authority, in short, to curtail Section 230 on the ground that by deploying algorithms, Facebook had "fulfill[ed] its role as a publisher" too "vigorously." *Id.* 70.

As the Second Circuit recognized, it would be exceedingly difficult, if not impossible, to draw logical lines, rooted in law, around how a website arranges third-party content. What in Section 230 would enable a court to distinguish between content placed in a "for you" box, content that pops up in a newsfeed, content that appears at the top of a homepage, and content that's permitted to exist in some obscure section

of a site? Nothing. It's the wrong question. Ryan Calo, *Courts Should Hold Social Media Accountable—But Not By Ignoring Federal Law*, Harv. L. Rev. Blog (Sept. 10, 2024), https://tinyurl.com/fb6f7n4j ("[I]f … a platform can be held liable just for the way it distributes content, then TikTok or YouTube or anyone could be held liable for alphabetizing content, let alone displaying it in accordance with popularity.").

The question is not *how* the website *serves up* the content; it's *what* makes *the content* problematic. When, under Section 230, is third-party content also a website's first-party content? Only, the Second Circuit explained, when the website "directly and materially contributed to what made the content itself unlawful." 934 F.3d at 68 (cleaned up). This is the "crucial distinction"—*presenting* unlawful content (protected) versus *creating* unlawful content (unprotected). *Id*.

## II.    The Panel Misunderstood and Misapplied *Moody v. NetChoice* (U.S.)

Because they're the platforms' First Amendment-protected expression, the panel reasoned, algorithms are the platforms' "own first-party speech," and thus fall outside Section 230's liability shield for the publication of third-party speech. Slip.op. 8-9 n.10.

Of course, a platform's decision to host a third party's speech at all is also First Amendment-protected expression. By the panel's logic, then, such hosting decisions, too, are a platform's "own first-party speech" unprotected by Section 230.

This is the key problem with the panel's analysis. "Given … that platforms engage in protected first-party speech under the First Amendment when they curate compilations of others' content via their expressive algorithms," the panel declared, "it follows that doing so amounts to first-party speech under [Section] 230, too." Slip.op. 9. No, it does not. Assuming a lack of overlap between First Amendment protection and Section 230 protection is a basic mistake.

The fact that a website is *not liable* for speaking, when it disseminates others' content, does not mean that it is *not speaking*. Websites "are within their First Amendment rights to moderate their online platforms however they like, and they're additionally shielded by Section 230 for many types of liability for their users' speech. It's not one or the other: It's both." Elliot Harmon, *No, Section 230 Does Not Require Platforms to Be "Neutral"*, Electronic Frontier Foundation (April 12, 2018), https://bit.ly/2DJ1zO4. The First Amendment and Section 230 are *mutually reinforcing* mechanisms. In enacting Section 230, Congress sought to *bolster* intermediaries' First Amendment rights. See, e.g.,

*Google Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016) ("First Amendment values … drive" Section 230); *Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003) (Section 230 "sought to further First Amendment … interests on the Internet"); 141 Cong. Rec. H. 8471 (Aug. 4, 1995) (statement of Rep. Zoe Lofgren) (Section 230 "preserve[s] the First Amendment … on the Net").

How, then, did the panel trip into thinking otherwise? By both misreading and misapplying *Moody v. NetChoice*, No. 22-277 (U.S., July 1, 2024)—a ruling that doesn't even mention Section 230.

First, the misreading. *Moody* confirms that social media platforms have a First Amendment right to editorial control over their newsfeeds. The right to editorial control is the right to decide what material to host or block or suppress or promote, including by algorithm. These are all expressive choices. Yet the panel homed in on the *algorithm* piece alone. Because *Moody* declares algorithms a platform's protected expression, the panel claims, a platform does not enjoy Section 230 protection for using an algorithm to recommend third-party content.

But *Moody* confirms that choosing to *host* or *block* third-party content, too, is a platform's protected expression. *Moody*, slip.op. 29. Are those choices "first-party speech" unprotected by Section 230? If so—and the panel's logic *requires that result*—Section 230(c)(1) would be a nullity;

it would protect nothing. That makes no sense. *Moody* does not support the panel's decision.

Next, the misapplication. Having treated *Moody*'s stray lines about algorithms like live hand grenades, the panel moved on to treating *Moody* as a sweeping (yet silent) landmark Section 230 ruling. *Moody* breaks no new ground; it merely reiterates existing First Amendment principles. Yet the panel uses *Moody* to ignore a swath of Section 230 precedent. In a footnote, the panel dismisses eight appellate rulings, including *Force v. Facebook*, that conflict with its ruling. It doesn't contest the reasoning of these opinions; it just declares that they all "pre-dated [*Moody v.*] *NetChoice*." Slip.op. 11-13 n.13.

Not only does *Moody* say nothing about Section 230; it pushes against the panel's misuse of it. *Moody* roundly rejects *Paxton v. NetChoice*, 49 F.4th 439 (5th Cir. 2022). The Fifth Circuit wrote that Section 230 "reflects Congress's factual determination that Platforms are not 'publishers,'" and that they "are not 'speaking' when they host other people's speech." *Id.* 467. The Fifth Circuit conflated not *treating* a platform as a publisher, for purposes of *liability*, with a platform's not *being* a publisher, for purposes of the *First Amendment*. This decision has since been overturned.

The Fifth Circuit concluded that because platforms enjoy Section 230 protection, they lack First Amendment rights. That's wrong. The Supreme Court having now confirmed that platforms have First Amendment rights, the panel concluded that they lack Section 230 protection. Wrong again. Obviously, Congress could not revoke First Amendment rights wherever Section 230 protection exists (or anywhere else), and Section 230 would serve no purpose if it did not apply wherever First Amendment rights exist. In reality, websites that disseminate third-party content *both* exercise First Amendment-protected editorial control *and* enjoy Section 230 protection from publisher liability.

## III. The Panel Ignored the Lessons of *Gonzalez v. Google* (U.S.)

Instead of misusing *Moody*, the panel should have taken its cues from the Supreme Court's (non-)decision in *Gonzalez v. Google*, 143 S. Ct. 1191 (2023).

The issue in *Gonzalez*, as here, was whether Section 230 protects algorithmic recommendations. Weighing in on the side of the petitioners, the United States offered a purportedly simple new rule. Section 230 protects a platform from liability "for hosting … content," the government argued, but not from liability for its "own conduct in designing and

implementing … targeted-recommendation algorithms." Brief of U.S., p. 12, *Gonzalez v. Google*, No. 21-1333 (U.S. Dec. 7, 2022).

Google's response explained why this line is illusory. Some websites provide a nearly unfiltered feed of third-party content. Others hand-pick certain third-party content and give it prominent placement on a homepage. YouTube presents third-party content in part "based on predictions of what users might consider relevant." Brief of Google LLC, p. 41, *Gonzalez v. Google*, No. 21-1333 (U.S. Jan. 12, 2023). And still other websites might have yet more elaborate ways of displaying, organizing, or promoting third-party content. Crucially, though, these examples do not fall into neat buckets; they sit on a continuum. And as Google's brief underscored, the government could not "offer any limiting principle" for parsing these varied methods of organizing third-party content into one category that's protected by Section 230, and another that's not. *Id*. 45.

Google had it right—as became abundantly clear at oral argument. The government's counsel claimed that YouTube can use "algorithms to identify users who are likely to be especially receptive" to a message, and to target the message at those users specifically. *Gonzalez v. Google*, No. 21-1333, OA Tr. 113 (U.S. Feb. 21, 2023). That capacity, he insisted, was what placed YouTube on the far side of the government's newly concocted Section 230 line.

The justices were conspicuously unpersuaded. "Well," said Justice Thomas at one point, "I'm still confused." *Id.* 72. "How do we draw the line," Justice Sotomayor reflected; "that's where my colleagues [still] seem to be suffering." *Id.* 97. Under the government's theory, Justice Kavanaugh opined, "lawsuits will be nonstop." *Id.* 81. Justice Kagan summed things up:

> The problem [with the government's position] is that in trying to separate the content from the choices that are being made, whether it's by YouTube or anyone else, you can't present this content without making choices. So, in every case in which there is content, there's also a choice about presentation or prioritization. And the whole point of suits like this is that those choices [inherently] amplify certain messages.

*Id.* 75-76. As Justice Kagan saw, the government's line was no line at all.

The Court ultimately concluded, in a short per curiam opinion, simply that "plaintiffs' complaint—independent of §230—states little if any claim for relief." *Gonzalez*, 143 S. Ct. at 1192. The justices wanted to decide a Section 230 case, but they didn't. Why? Partly because they could not separate "targeted" recommendations from "untargeted" ones, or "sophisticated" algorithms from "unsophisticated" ones. They left the broad "publisher" protections of Section 230 squarely in place because there is no sound way to narrow them.

Instead of grappling with the problems that vexed the Supreme Court, the panel glossed over them. Indeed, the panel explicitly declined to address whether its new rule governs "allowing third-party content to be posted on a website." Slip.op. 11 n.12. This is not judicial modesty. There is a difference between a court's declining to decide cases not before it, on the one hand, and a court's refusing to acknowledge that its ruling has no coherent boundaries, on the other.

The panel's "unprincipled" line is "not judicial in nature." *Miller*, 891 F.2d at 1273 (Easterbrook, J., concurring). It is arbitrary. It draws on nothing in the text of Section 230 itself. *That* is why the Supreme Court refused to draw such a line in *Gonzalez*. The panel should have followed the high court's lead.

# CONCLUSION

The petition should be granted.

October 8, 2024

Respectfully submitted,

/s/ Corbin K. Barthold
Corbin K. Barthold
Berin Szóka
Ari Cohn
TECHFREEDOM
1500 K Street NW
Washington, DC 20005
(771) 200-4997
cbarthold@techfreedom.org
*Counsel for Amici Curiae*
*TechFreedom and Media Law*
*Resource Center*

## CERTIFICATE OF BAR MEMBERSHIP, COMPLIANCE WITH WORD-COUNT AND TYPEFACE REQUIREMENTS, AND VIRUS CHECK

I certify that I am a member in good standing of the Bar of this Court. I further certify, pursuant to Federal Rules of Appellate Procedure 29(b)(4) and 32(a)(5)-(7), and Local Appellate Rules 29.1(b), 31.1(c) and 32.1(c), that the foregoing brief is proportionately spaced, has a typeface of 14-point Century Schoolbook, and contains 2,599 words; and that the text of the electronic brief is identical to the text of any paper copies. I further certify, pursuant to Local Appellate Rule 31.1(c), that Microsoft Defender Antivirus did not detect a virus.

/s/ Corbin K. Barthold

## CERTIFICATE OF SERVICE

On October 8, 2024, a true and correct copy of the foregoing brief was filed with the Clerk of the United States Court of Appeals for the Third Circuit via the Court's CM/ECF system. All counsel of record in this case are registered CM/ECF users. In accord with Local Rule 31.1, as amended by the April 29, 2013, standing order, I have on this day mailed seven copies of the brief to the Clerk.

/s/ Corbin K. Barthold