# In the United States Court of Appeals for the Third Circuit

TAWAINNA ANDERSON, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF N.A., A DECEASED MINOR,

*Plaintiff-Appellant,*

*v.*

TIKTOK, INC.; BYTEDANCE, INC.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Pennsylvania, No. 2:22-cv-1849 (Diamond, J.)

**BRIEF OF COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE, CHAMBER OF PROGRESS, CONSUMER TECHNOLOGY ASSOCIATION, ENGINE ADVOCACY, INTERACTIVE ADVERTISING BUREAU, INTERNET INFRASTRUCTURE COALITION, SOFTWARE & INFORMATION INDUSTRY ASSOCIATION, AND TECHNET AS AMICI CURIAE IN SUPPORT OF APPELLEES' PETITION FOR REHEARING EN BANC**

Scott A. Keller
Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, amici make the following disclosure: (1) Amici have no parent corporations; (2) no publicly held corporations own 10% or more of Amici's stock. Amici reserve the right to supplement this disclosure statement if needed.

Dated: October 8, 2024            */s/ Scott A. Keller*

                                              Scott A. Keller

# TABLE OF CONTENTS

Corporate Disclosure Statement............................................................ i

Table of Contents................................................................................ ii

Table of Authorities........................................................................... iii

Interest of Amici Curiae .....................................................................1

Introduction and Summary of Argument ...........................................5

Argument.............................................................................................7

    I. Section 230 protects websites from liability for disseminating user-created speech, notwithstanding websites' longstanding First Amendment right to disseminate curated compilations........................7

    II. Section 230 protects websites from all "publisher" liability, including its subset of distributor liability. ...........................................11

    III. The panel's decision would threaten the Internet as we know it, by jeopardizing websites' ability to disseminate user-created speech and the public's ability to communicate online. ...........................................13

Conclusion.........................................................................................15

Certificate of Compliance..................................................................17

Certificate of Service .........................................................................18

**Cases**

*Barrett v. Rosenthal,*
    146 P.3d 510 (Cal. 2006) ................................................................11

*In re Facebook, Inc.,*
    625 S.W.3d 80 (Tex. 2021) .............................................................12

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,*
    521 F.3d 1157 (9th Cir. 2008) ..........................................................8

*Gonzalez v. Google LLC,*
    598 U.S. 617 (2023) ....................................................................5, 13

*Henderson v. Source for Pub. Data, L.P.,*
    53 F.4th 110 (4th Cir. 2022) ..............................................................8

*Moody v. NetChoice, LLC,*
    144 S. Ct. 2383 (2024) .......................................................5, 7, 8, 10

*Packingham v. North Carolina,*
    582 U.S. 98 (2017) ....................................................................13, 14

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.,*
    1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)..........................6, 9

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.,*
    576 U.S. 519 (2015) ..................................................................12, 13

*Zeran v. Am. Online, Inc.,*
    129 F.3d 327 (4th Cir. 1997) ....................................................11, 12

**Statutes**

47 U.S.C. § 230 .................................................................*passim*

**Other Authorities**

Fed. R. App. P. 29 ................................................................................1

NetChoice, By the Numbers: What Content Social Media
Removes and Why (2021), https://perma.cc/KM4A-FUYC......................14

Melissa Pittaoulis, *Hate Speech & Digital Ads: The Impact of
Harmful Content on Brands*, CCIA Research Center (Sept. 5,
2023), https://perma.cc/B4D8-HCU4 ............................................15

Prosser & Keeton on the Law of Torts (5th ed. 1984) ....................................11

*Publish*, Black's Law Dictionary (8th ed. 2004) ....................................11

Restatement (Second) of Torts .....................................................11, 12

Rodney A. Smolla, 1 Law of Defamation (2d ed.) ...........................................12

Amici curiae have an interest in the proper interpretation and application of 47 U.S.C. § 230's protections for all online services.[1] Those protections have been critical to ensuring the free flow of information online.

The Computer & Communications Industry Association (CCIA) is an international, not-for-profit trade association representing a broad cross section of communications, technology, and Internet industry firms that collectively employ more than 1.6 million workers, invest more than $100 billion in research and development, and contribute trillions of dollars in productivity to the global economy. For more than 50 years, CCIA has promoted open markets, open systems, and open networks. CCIA believes that open, competitive markets and original, independent, and free speech foster innovation. As co-Plaintiff in *NetChoice, LLC v. Moody*—in which the Supreme Court recently issued a seminal decision that the panel here attempted to interpret—CCIA has a particular interest in urging this Court to grant the Petition for Rehearing En Banc.

NetChoice is a national trade association of e-commerce and online businesses that share the goal of promoting convenience, choice, and commerce on the Internet. For over a decade, NetChoice has worked to increase

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from amici curiae, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). Counsel for Plaintiff and Defendants consent to the filing of this brief.

consumer access and options via the Internet, while minimizing burdens on small businesses that are making the Internet more accessible and useful.

Chamber of Progress is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate. Chamber of Progress backs public policies that build a fairer, more inclusive country in which the tech industry operates responsibly and fairly, and in which all people benefit from technological leaps. Chamber of Progress seeks to protect internet freedom and free speech, to promote innovation and economic growth, and to empower technology customers and users.

As North America's largest technology trade association, CTA® is the tech sector. Their members are the world's leading innovators—from start-ups to global brands—helping support more than 18 million American jobs. CTA owns and produces CES®—the most influential tech event in the world.

Engine Advocacy (Engine) is a non-profit technology policy, research, and advocacy organization dedicated to bridging the gap between startups and policymakers. Engine works with government officials and a community of thousands of high-technology, growth-oriented startups across the nation to support innovation and entrepreneurship through research, policy analysis, and advocacy. Engine's community of startups includes small- and medium-sized companies that are building alternatives to larger, incumbent social media websites. Engine and its community of entrepreneurs, supporters, and donors seek to protect the opportunities that exist for startups and

their users thanks to the robust protections provided by the First Amendment and Section 230.

The Interactive Advertising Bureau (IAB) is an advertising industry trade association representing over 700 leading companies that are responsible for selling, delivering, and optimizing digital advertising and marketing campaigns. IAB develops industry standards, conducts research, and provides legal support for the online advertising industry. Through its public policy advocacy, IAB works to build a sustainable and consumer-centric media and marketing ecosystem and raise the industry's political visibility and profile as a driving force in the global economy through grassroots advocacy, member fly-ins, research, and public affairs campaigns.

Internet Infrastructure Coalition is a trade association representing interests of businesses that construct and operate essential building blocks of the Internet. Its members include cloud providers, data center operators, domain name registrars, domain name registries, and other foundational Internet enterprises. Its mission is to preserve a free and open Internet as an engine for growth and innovation. It works with its members to advocate for sensible policies, establish and reinforce best practices, help create industry standards, and promote awareness of how the Internet works.

The Software & Information Industry Association (SIIA) is the principal trade association for the software and digital information industries. SIIA's membership includes nearly 400 software companies, search engine providers, data and analytics firms, and digital publishers that serve nearly every

segment of society, including business, education, government, healthcare, and consumers. It is dedicated to creating a healthy environment for the creation, dissemination, and productive use of information.

TechNet is the national, bipartisan network of technology CEOs and senior executives that promotes the growth of the innovation economy by advocating a targeted policy agenda at the federal and 50-state level. TechNet's diverse membership includes dynamic American businesses ranging from startups to the most iconic companies on the planet and represents over 4.5 million employees and countless customers in the fields of information technology, artificial intelligence, e-commerce, the sharing and gig economies, advanced energy, transportation, cybersecurity, venture capital, and finance.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case calls out for en banc review. The panel majority held that when websites display a curated compilation of speech created by others, that somehow transforms the underlying content into the website's own speech. Op. at 9-10.[2] This holding departs from every prior 47 U.S.C. § 230 (§ 230) decision; creates a square circuit split; is impossible to reconcile with this Court's own precedents; and destabilizes established law in ways that threaten profound consequences for countless websites across the Internet—and their users.

The panel's decision does all this without any effort to grapple with § 230's plain text or its underlying purpose. Instead, it fundamentally misreads the Supreme Court's First Amendment ruling in *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024). *Moody* said nothing about § 230. All it did was recognize and apply the settled First Amendment rights of editorial judgment to the latest generation of media and technology. It is wholly implausible to think that the Supreme Court, after consciously declining to override the lower courts' consensus § 230 interpretation in *Gonzalez v. Google LLC*, 598 U.S. 617 (2023) (per curiam), silently rewrote § 230 to reach that very conclusion the next year in *Moody*. *See* PFR at 11-12.

The panel majority's interpretation cannot be squared with § 230's plain text. Section 230 preempts claims that "treat" websites "as the publisher or

---

[2] This Brief will refer to "interactive computer service[s]," 47 U.S.C. § 230(f)(3), as "websites."

speaker of any *information provided* by *another* information content provider,"
*e.g.*, a user. 47 U.S.C. § 230(c)(1) (emphases added). This provision applies if
the speech disseminated by a website was created by "another" person, ra-
ther than the website itself. *Id.*; *see id.* § 230(f)(3) (distinction turns on who
was "responsible, in whole or in part, for the creation or development of in-
formation"). But the panel majority concluded that if plaintiffs purport to
challenge websites' curated dissemination of speech created by others, then
§ 230 somehow offers no protection. This would take the Internet back to the
mid-1990s, before Congress enacted § 230's protections. The panel majority's
approach would make websites liable in the precise circumstance—websites
using editorial discretion while disseminating compilations of user-created
speech—that Congress enacted § 230 to protect. *See* PFR at 13 (discussing
*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct.
May 24, 1995)). *Moody*'s recognition of websites' First Amendment rights
does not impose such a bizarre result.

The partial concurrence correctly rejected the majority's test for § 230
protection. Concurrence at 1-2. But the concurrence, too, erred by concluding
that "§ 230(c)(1) does not preempt distributor liability." *Id.* at 17. Under
§ 230(c)(1), there is no distinction between publisher liability and distributor
liability, as the latter is a subset of claims seeking to "treat[]" the speech dis-
tributors "as the publisher." 47 U.S.C. § 230(c)(1).

In sum, the panel rewrote § 230, broke from a uniform body of precedent,
and created uncertainty for every website that disseminates speech created

by others. This outlier holding would jeopardize not just social media platforms, but search engines, product-review websites, online message boards, and websites facilitating users exchanging information about every topic under the sun. If permitted to stand, the panel's opinion would overhaul the Internet as we know it. The full Court should correct the panel's mistake.

<h2 align="center">ARGUMENT</h2>

## I. Section 230 protects websites from liability for disseminating user-created speech, notwithstanding websites' longstanding First Amendment right to disseminate curated compilations.

For the past three decades, courts across the Nation have uniformly understood what § 230's plain text commands: Websites are protected by § 230(c)(1) when they disseminate speech created by others. Contrary to the panel majority's interpretation, user-created speech does not become the website's own speech when websites disseminate "curate[d] compilations of others' content via their expressive algorithms." Op. at 9. Such curated dissemination is protected by the First Amendment, as *Moody* recognized. 144 S. Ct. at 2393. But nothing in *Moody* transforms user-created speech into information created *by the website itself*.

The plain text of § 230(c)(1) preempts state-law claims that seek to "treat[]" websites "as the publisher or speaker of any *information* provided by *another* information content provider"—*i.e.*, speech created by others besides the website itself. 47 U.S.C. § 230(c)(1) (emphases added). The text thus requires looking at who is responsible for "the creation or development of

7

information." *Id.* § 230(f)(3) (defining "information content provider"). And caselaw establishes a test for determining who creates or develops the underlying content: "if [a website] *contributes materially to the alleged illegality* of the conduct." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,* 521 F.3d 1157, 1168 (9th Cir. 2008) (emphasis added).

Section 230(c)(1) protection therefore turns on whether the allegedly injurious *information* is provided—*i.e.*, "creat[ed] or develop[ed]"—by someone other than the website itself. 47 U.S.C. § 230(f)(3). Thus, websites cannot be held legally responsible for (that is, "treated as the publisher or speaker" of) information in content created by others. *Id.* § 230(c)(1). After all, the common law's conception of "treat[] as the publisher" means to assign fault for the speech's content to the speech disseminator. *See Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 122 (4th Cir. 2022) ("hold them responsible for the content's improper character").

The panel majority failed to conduct any of this analysis mandated by § 230. Instead, it concluded that whenever websites "curate compilations of others' content via their expressive algorithms it follows that doing so amounts to first-party speech under § 230, too." Op. at 9 (citing *Moody*, 144 S. Ct. at 2409). But this flouts Congress's § 230(c)(1) protections in all sorts of ways. Editorial publishing decisions protected by § 230 include the display and curation of user-created speech. *See* PFR at 12-14. Indeed, Congress defined "interactive computer service[s]" that receive § 230's protections as websites that, for example, use "tools" that "pick, choose," "filter, screen,"

"forward," "search, subset, organize," or "reorganize" content. 47 U.S.C.
§ 230(f)(2), (4). These protected actions are precisely the same ones that web-
sites use to "curate compilations of others' content." Op. at 9. Websites' use
of such actions to display curated compilations does not transmogrify this
user-created speech into the website's own "first-party speech" under § 230.
*Id.* As even the panel majority (understatedly) recognized, websites' curated
compilations "capture[] certain third-party speech." *Id.* at 10 n.11.

Under the panel majority's rationale, § 230 would not protect websites
from precisely the kind of liability this statute sought to preempt. *See* PFR at
13. At the Internet's advent, one prominent state-court decision imposed li-
ability on a website because it disseminated allegedly defamatory user-cre-
ated speech, while simultaneously exercising editorial discretion to remove
certain speech it considered objectionable. *Stratton Oakmont*, 1995 WL
323710, at *2-5. The website in *Stratton Oakmont* engaged in the (1) "promul-
gation of 'content guidelines'" about acceptable speech on the service; and
(2) "use of a software screening program which automatically prescreens"
content. *Id.* at *2. In other words, the website in that case exercised "editorial
control" to determine whether and how to disseminate and display content
created by others. *Id. Stratton Oakmont* essentially penalized those editorial
activities by concluding they rendered the website liable as a "publisher" of
speech created by others. If adopted by other courts, that reasoning would
have made it practically impossible for websites to disseminate speech cre-
ated by others while still retaining editorial discretion over their own

websites. Congress therefore acted swiftly, by passing § 230, to "remove disincentives for the development and utilization of blocking and filtering technologies" implemented by websites.  47 U.S.C.  § 230(b)(4).

Nevertheless, the panel has resurrected *Stratton Oakmont*'s rationale by concluding that "decid[ing] on the third-party speech that will be included in or excluded from a compilation" strips a website of § 230 protections. Op. at 10 (cleaned up; quoting *Moody*, 144 S. Ct. at 2402).

*Moody* does not support the panel majority's misinterpretation of § 230. In fact, the *Moody* majority opinion said nothing about § 230. PFR at 10-11. Among other things, *Moody* holds that the First Amendment prohibits States from telling social media websites how they must disseminate their curated compilations of speech "created by others." 144 S. Ct. at 2400. Publishers' "choices" about what speech to "include and exclude, organize and prioritize" have long been protected by the First Amendment. *Id.* at 2393. *Moody* took that well-established precedent, which has always coexisted with § 230's protections, and expressly recognized that it applies to "social media" websites. *Id.* The Supreme Court did *not* say that curation of user-created content renders that underlying content the websites' own speech. To the contrary, *Moody* observed that the "individual messages" in websites' curated compilations "may originate with third parties." *E.g.*, *id.* at 2405.

At bottom, the First Amendment and § 230 are complementary, not mutually exclusive. They are not coterminous, as § 230 can protect more than the First Amendment (such as websites disseminating user-created

defamation)—and vice versa (as the First Amendment applies beyond websites disseminating speech created by others). But websites' First Amendment rights do not somehow negate § 230's statutory protections.

## II. Section 230 protects websites from all "publisher" liability, including its subset of distributor liability.

Section 230(c)(1) protects websites from being "treated as the *publisher* or speaker of" speech created by others. 47 U.S.C. § 230(c)(1) (emphasis added). By using the term "publisher," Congress codified the pre-existing understanding of the scope of "publisher" liability, which included *distributor* liability. Yet the partial concurrence erred in concluding that "§ 230(c)(1) does not preempt distributor liability." Concurrence at 17; *see* PFR at 14-15.

At common law, distributor liability was a subset of publisher liability. To hold a distributor liable for, *e.g.*, defamation, plaintiffs must prove *publication*. *See, e.g.*, Restatement (Second) of Torts § 558(b) ("an unprivileged publication to a third party"). The longstanding interpretation of "publishing" includes public distribution of speech. *See Publish*, Black's Law Dictionary 1268 (8th ed. 2004) ("[t]o distribute copies . . . to the public" and "[t]o communicate (defamatory words) to someone other than the person defamed"); *accord Zeran v. Am. Online, Inc.*, 129 F.3d 327, 332 (4th Cir. 1997); *Barrett v. Rosenthal*, 146 P.3d 510, 517 (Cal. 2006).

"Publisher," in other words, includes all those "who take[] part in the publication"—which includes "editor[s]," "printer[s]," and "*vendor*[s]." Prosser & Keeton on the Law of Torts § 113 (5th ed. 1984) (emphasis added).

Within that broad category, "primary" publishers subject to "publisher liability" include, *e.g.*, "the newspaper or book publisher that prints the statement, or the radio or television station that broadcasts it." Rodney A. Smolla, 1 Law of Defamation § 4:92 (2d ed.). And "distributors" ("secondary *publishers*")—such as bookstores—are subject to distributor liability. *Id.* (emphasis added).

The only relevant difference between a "publisher" and a "distributor" is the level of fault the common law required. For instance, distributor liability requires a higher level of fault: Distributors cannot be held liable unless the distributor knew or had reason to know the speech was defamatory. *See, e.g.*, Restatement (Second) of Torts § 581(1). Once a distributor has knowledge of the allegedly defamatory nature of speech, "it is thrust into the role of a traditional publisher" and "must decide whether to publish, edit, or withdraw the posting"—*i.e.*, "the ['publisher'] role for which § 230 specifically proscribes liability." *Zeran*, 129 F.3d at 332-33. That is why other Circuits and state high courts have followed *Zeran*, and many have expressly held § 230 protects against distributor liability. *See* PFR at 9-10 & n.1 (collecting cases).

Congress has "ratified" this consensus interpretation multiple times when amending § 230. *See, e.g.*, *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536 (2015). "Congress, with knowledge of the prevailing judicial understanding of section 230, has twice *expanded* its scope." *In re Facebook, Inc.*, 625 S.W.3d 80, 92 (Tex. 2021) (discussing

legislative expansions of § 230 protections in 2002 and 2010). Similarly, Congress's 2018 limitations of § 230 protections for certain claims leads to the "conclusion . . . that the . . . amendments were deemed necessary because Congress presupposed" § 230 protects distributor liability. *Inclusive Cmtys.*, 576 U.S. at 537. Thus, in the multiple times that Congress has "amend[ed]" § 230's scope, it has declined to upset the consensus interpretation of § 230's protections for distributor liability. *Id.* This "is convincing support for the conclusion that Congress accepted and ratified the unanimous holdings of the Courts of Appeals." *Id.* at 536. Similarly, the U.S. Supreme Court also recently left this consensus interpretation in place. *See Gonzalez*, 598 U.S. at 622.; *see* PFR at 11-12.

## III. The panel's decision would threaten the Internet as we know it, by jeopardizing websites' ability to disseminate user-created speech and the public's ability to communicate online.

Allowing the panel majority's decision to stand would frustrate Congress's design: fostering the development of countless "forum[s] for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230 (a)(3). To date, courts correctly applying § 230 have ensured that websites can "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017); *see* PFR at 15. The panel's interpretation threatens to end this Internet as we know it.

Many websites disseminate expressive content created by others. These websites span the largest "social media" websites to the smallest blogs, and everything in between. For decades, § 230 has provided those websites with the necessary protections to continue disseminating that content, confident that any legal liability arising from disseminating and enabling speech would attach to whom it belonged: those who "creat[ed] or develop[ed]" the injurious information. 47 U.S.C. § 230(f)(3).

As a result, people have more opportunity to speak than at any point in history—and can reach previously unimaginable audiences. *See Packingham*, 582 U.S. at 107. Moreover, people have been able to interact on websites that exercise editorial judgment to ensure that their users are not besieged with all manner of objectionable and harmful content. *See, e.g.*, NetChoice, By the Numbers: What Content Social Media Removes and Why (2021), https://perma.cc/KM4A-FUYC (noting the scale of objectionable content that some of NetChoice's members remove). In addition to shielding users from objectionable content, these editorial practices also help present users with content those users find relevant, useful, or interesting. *See* PFR at 16-17. So, websites' editorial discretion ensures that people see more content they want, and less content they would rather avoid.

But the panel's decision penalizes those valuable editorial practices. If allowed to stand, the panel's decision would create substantial uncertainty for every website on the Internet that disseminates user-created speech.

According to the panel, the very same editorial decisions that make websites' services useful may be a potential source of liability.

That will lead some websites to either stop disseminating user-created content altogether or stop moderating content—the exact result Congress intended to forestall by enacting § 230. *See* 47 U.S.C. § 230(b)(3)-(4); *see* PFR at 15-16. Either way, this will fundamentally change these websites and how users can speak online. When websites are overrun with hate speech and abuse, they are obviously less-hospitable places for users. Melissa Pittaoulis, *Hate Speech & Digital Ads: The Impact of Harmful Content on Brands*, CCIA Research Center (Sept. 5, 2023), https://perma.cc/B4D8-HCU4. Various websites may decide that comments sections, for example, are more trouble than they are worth and remove them entirely. And yet more websites will remove *more* speech to avoid potential liability. *See* PFR at 16

Whatever the path, the predictable response to the panel's decision leads to the same place: an Internet with much less user-created speech. This Court should grant review and correct the panel's exceptionally important errors.

## CONCLUSION

This Court should grant the Petition for Rehearing En Banc.

Dated: October 8, 2024

/s/ *Scott A. Keller*
Scott A. Keller
    *Counsel of Record*
Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com
steve@lkcfirm.com
jeremy@lkcfirm.com

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

1. I hereby certify that at least one attorney whose name appears on this brief is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2. This brief complies with the word limit of Federal Rules of Appellate Procedure 27(D)(2)(A) and 29(a)(5) because—excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and 3d Cir. L.A.R. 29.1(b)—this document contains 2582 words.

3. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word.

4. I certify that the text of this electronic brief is identical to the text in the paper copies. *See* 3d Cir. L.A.R. 31.1(c).

5. I certify that a virus detection program has been run on the file and that no virus was detected. *See* 3d Cir. L.A.R. 31.1(c).

Dated: October 8, 2024                    */s/ Scott A. Keller*
                                          Scott A. Keller

**CERTIFICATE OF SERVICE**

I hereby certify that on October 8, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who have consented to electronic notification.

*/s/ Scott A. Keller*
Scott A. Keller